IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RECEIVED
2015 JUL 10  P 3:27

DEBRA P. HACKETT, CLK
U.S. DISTRICT COURT
MIDDLE DISTRICT ALA

| | |
|---|---|
| WEST ALABAMA WOMEN'S CENTER and WILLIAM J. PARKER, M.D., on behalf of themselves and their patients,<br><br>Plaintiffs,<br><br>v.<br><br>DONALD E. WILLIAMSON, M.D., in his official capacity as State Health Officer,<br><br>Defendant. | CIVIL ACTION<br><br>Case No. 2:15cv497-MHT<br><br><br><br>COMPLAINT |

Plaintiffs, by and through their undersigned attorneys, bring this Complaint against the above-named Defendant, his employees, agents, and successors in office, and in support thereof allege the following:

**PRELIMINARY STATEMENT**

1.   Plaintiffs West Alabama Women's Center ("WAWC" or "the Clinic"), the sole abortion clinic in Tuscaloosa and one of only two providers of abortions throughout the second trimester in the state, and William J. Parker, M.D., WAWC's physician and Medical Director ("Dr. Parker"), bring this as-applied challenge under the U.S. Constitution and 42 U.S.C. § 1983, on behalf of themselves and their patients, to Ala. Admin. Code r. 420-5-1-.03(6)(b) ("the Regulation"). A copy of the Regulation is attached hereto as Exhibit A.

2.   The Regulation requires that every physician who performs an abortion at a licensed abortion clinic have staff privileges at a local hospital or, in the alternative, that the clinic enter into a written agreement with a local physician who has such privileges to serve as the clinic's outside covering physician. However, the only hospital in Tuscaloosa is unwilling to grant Dr. Parker privileges for reasons unrelated to his competency as an abortion provider. In

addition, no ob-gyn in the Tuscaloosa area is willing to serve as the Clinic's outside covering physician, due to anti-abortion sentiment and/or fear of being publicly associated with an abortion clinic. As a result, after more than two decades of providing safe and legal abortion care in Tuscaloosa, WAWC has been forced to suspend patient services.

3. WAWC's closure has caused and will continue to cause significant and irreparable harm to the health and safety and constitutional rights of women seeking abortion in Alabama. Having exhausted all other options to reopen the Clinic, absent injunctive relief from this Court, WAWC will be forced to close its doors for good. This will cause further harm to the health of Alabama women seeking abortions, and will deprive many women of their constitutional right to abortion. Plaintiffs therefore seek declaratory and injunctive relief from those constitutional deprivations.

4. Almost all of the factual and legal questions raised by this action were already decided by the Court in a related action currently pending in this district (the "*PPSE* litigation") in which the Court has enjoined a statutory (as opposed to regulatory) requirement that all physicians performing abortions in licensed abortion clinics have staff privileges at a local hospital. *See Planned Parenthood Southeast, Inc. v. Bentley*, No. 2:13-cv-00405-MHT-TFM ECF Nos. 49, 238 (hereinafter "*PPSE* docket").

## JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. § 1331 and 28 U.S.C. §§ 1343(a)(3)–(4).

6. Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202 and by Rules 57 and 65 of the Federal Rules of Civil Procedure.

7.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because the Defendant who is sued in his official capacity carries out his official duties at an office located in this district.

## PARTIES

### A.   Plaintiffs

8.      Plaintiff WAWC has provided safe and legal abortions for more than twenty years. In addition to abortions, WAWC also provides a range of high-quality reproductive health services, including contraceptive counseling and care, testing and treatment for sexually transmitted infections, pregnancy testing and options counseling, and referrals for prenatal care and adoption services.

9.      Plaintiff WAWC is currently, and always has been, the sole licensed abortion or reproductive health center in Tuscaloosa. WAWC is also one of only two licensed clinics in Alabama that provides abortions throughout the second trimester. For at least the last two years for which statistics are available, if not longer, WAWC has been the highest-volume abortion provider in the state.

10.     Plaintiff Dr. Parker is an experienced and highly-credentialed board-certified obstetrician/gynecologist ("ob-gyn") and abortion provider, and is the sole physician and Medical Director of WAWC.

### B.   Defendant

11.     Defendant Donald E. Williamson, M.D., is the State Health Officer at the Alabama State Department of Public Health, located at 201 Monroe Street, Montgomery, Alabama. Among other things, he is responsible for supervising and directing all activities of the State Department of Public Health, pursuant to Ala. Code § 22-2-2 *et seq.*, including the licensing, inspecting, and disciplining of abortion or reproductive health care centers, *see* Ala. Code § 22-21-20 *et seq.*; Ala. Admin. Code r. 420-5-1-.01 *et seq.* As such, Defendant

3

Williamson is responsible for enforcing the staff privileges and covering physician requirements of the Regulation at issue in this case, Ala. Admin. Code r. 420-5-1-.03(6)(b). Defendant Williamson is sued in his official capacity.

## REGULATORY AND STATUTORY FRAMEWORK

### A. Challenged Regulation

12. Plaintiff WAWC is licensed as an "abortion or reproductive health center" by the Alabama Department of Public Health ("DPH").

13. DPH has the authority to promulgate rules and regulations concerning the licensing of abortion clinics. *See* Ala. Admin. Code r. 420-5-1-.01. DPH also has the authority to grant a waiver or variance from any such rule, provided that the rule does not restate a statutory requirement or define any terms. *See* Ala. Admin. Code r. 420-1-2-.09.

14. Among these regulations governing the licensure of abortion clinics is the Regulation, *see* ¶ 1, *supra*, the provision at issue in this case. *See* Ala. Admin. Code r. 420-5-1-.03(6)(b).

15. The Regulation mandates, as a condition of licensure, that abortion clinics comply with either of the following requirements: (1) that "every physician that performs an abortion shall have staff privileges at an acute care hospital within the same standard metropolitan statistical area as the abortion or reproductive health center is located, that permit him or her to perform dilation and curettage, laparotomy procedures, hysterectomy, and any other procedures reasonably necessary to treat abortion-related complications," or (2) that a licensed abortion clinic obtain "a valid written contract" for "outside covering physician services" with a physician who "has staff privileges at a hospital within the same standard metropolitan statistical area that

4

permit him or her to perform dilation and curettage, laparotomy procedures, hysterectomy, and any other procedures necessary to treat abortion-related complications." *Id.*

16. Failure to comply with the Regulation can lead to suspension and/or revocation of a clinic's license. *See* Ala. Code § 22-21-25.

**B.      Staff Privileges Statute and Related Proceedings**

17. In April 2013, the Alabama Legislature passed Alabama House Bill 57, Reg. Sess., (2013) ("H.B. 57" or "the staff-privileges statute"), which would have required all physicians providing abortions at a licensed abortion clinic to obtain staff privileges to perform complex gynecological surgical procedures at a hospital within the same metropolitan statistical area as the clinic. *See* Ala. Code § 26-23E-4(c).

18. The staff-privileges statute thus expanded the preexisting regulatory requirement (the Regulation at issue in this lawsuit), eliminating the "outside covering physician" option.

19. On June 11, 2013, three of Alabama's five licensed abortion clinics—Reproductive Health Services ("RHS") in Montgomery and Planned Parenthood Southeast ("PPSE") health centers in Birmingham and Mobile—filed a constitutional challenge to the staff-privileges statute in the Middle District of Alabama. *See PPSE* docket, Compl. (doc. no. 1).

20. Plaintiff WAWC was not a party to the *PPSE* litigation because, at the time of filing and through trial, the Clinic's sole physician had staff privileges at the DCH Health System ("DCH") in Tuscaloosa.

21. On June 28, 2013, the District Court granted the *PPSE* litigation plaintiffs' motion for a temporary restraining order. *See PPSE* docket, June 28, 2013 Op. and Order (doc. no. 49). That order remains in effect today. *See PPSE* docket, Aug. 4, 2014 Op. (doc. no. 238).

22. From May to June 2014, the District Court held an eleven-day bench trial on the constitutionality of the staff privileges statute. At trial, the Court considered evidence and

testimony regarding, among other things, the following issues, all of which are relevant in this case as well:

- the availability of abortion in Alabama;
- the safety of abortions and the medical standard of care for management of complications;
- the obstacles that women in Alabama would face if clinics were forced to close and women were required to travel outside their home cities and/or longer distances to obtain abortions;
- the extreme difficulties clinics face in attempting to find doctors willing to provide abortions or serve as the clinics' outside covering physicians; and
- the inability of abortion providers in Alabama to obtain staff privileges at local hospitals.

23.    On August 4, 2014 the Court issued an opinion declaring the staff-privileges statute unconstitutional as applied to the plaintiffs in that case. *See PPSE* docket, Aug. 4, 2014 Op. (doc. no. 238).

24.    On August 4, the Court also requested further briefing as to the questions of facial relief, permanent injunctive relief, and severability. *See PPSE* docket, Briefs on the Scope of Final Relief (doc. nos. 250, 256, 257). The Court has not issued an order as to the scope of final relief, and the temporary restraining order remains in effect.

25.    To the extent temporary restraining order remains in effect, the staff-privileges statute is unenforceable and WAWC is therefore subject to the Regulation, which allows clinics *either* to obtain staff privileges *or* a written contract with an outside covering physician. However, if the Court grants only as-applied relief in the *PPSE* litigation, WAWC will become subject to the staff-privileges statute and the requirements for licensure will change accordingly.

## PRESENT ACTION

A. **Abortion in Alabama**

26. Dr. Louis Payne (who is now retired) and Ms. Gloria Gray founded WAWC in 1993.

27. As a licensed abortion clinic, WAWC is subject to extensive regulations, including but not limited to those relating to patient care, infection control, personnel, physician qualifications, fire evacuation plans, emergency communications, recordkeeping, and physical plant requirements (such as minimum doorway and room sizes, interior finishes and flooring material, and emergency exists). *See* Ala. Admin. Code r. 420-5-1-.01 *et seq.* DPH conducts extensive annual surveys of WAWC to ensure compliance with the regulations.

28. Today, WAWC is one of only five such licensed clinics in the state. The other clinics are: RHS in Montgomery, PPSE Birmingham, PPSE Mobile, and Alabama Women's Center in Huntsville.

29. WAWC and Alabama Women's Center are the only licensed clinics in Alabama that provide abortions throughout the second trimester. WAWC provides medication abortions through nine weeks of pregnancy and surgical abortions up to twenty-one weeks and six days (21.6) gestation, as measured from the woman's last menstrual period ("LMP"). None of the other licensed clinic in the states provides abortions past 15.0 weeks LMP.

30. On information and belief, WAWC provided more abortions than any other clinic in the state by a large margin for at least the last three years. According to published statistics, in 2013, WAWC performed approximately 39% of the abortions in Alabama (3,503 procedures), more than double the number of procedures performed by the clinic with the second-highest volume (1,451 procedures); and in 2012, WAWC performed approximately 44% of the abortions in Alabama (3,710 procedures), more than 2.5 times the number of procedures performed by the

clinic with the second-highest volume (1,469). Although published statistics are not yet available for 2014, WAWC's own records indicate the Clinic performed 4,723 abortions last year. This is over three times more than any other clinic in Alabama has ever performed in any prior year for which statistics are available.

31. WAWC also provided more second-trimester abortions than any other clinic in the state. In 2012 and 2013, WAWC performed more than 60% of the second-trimester abortions in the state, and performed nearly 80% of abortions between seventeen and 21.6 weeks LMP (the state's legal limit).

32. Approximately one in three women in this country will have an abortion by age 45. Most women having abortions (61%) already have at least one child, and 66% plan to have children when they are older, financially able to provide necessities for them, and/or are in a supportive relationship with a partner so their children will have two parents.

33. Women seek abortions for a variety of reasons, including familial, medical, financial, and personal reasons, including the desire to wait to have a child (or another child) until they are ready; to preserve their life or their health; because they have become pregnant as a result of rape; and/or because they choose not to have biological children.

34. While the vast majority (more than 80%) of the abortions performed at WAWC are performed in the first trimester, women who seek second-trimester abortions usually do so because of difficult circumstances. Many women are forced to obtain an abortion at later gestational ages because of issues related to poverty, intimate partner violence, and overall diminished access to abortion throughout the South. Others decide to have an abortion only after learning the fetus has been diagnosed with a severe, even lethal, anomaly (many of which cannot be diagnosed until later in pregnancy).

35. Most of WAWC's patients are low-income women. More than 82% are living at or below 110% of the federal poverty level. Many struggle to cover the cost of the abortion, as well as other costs related to the procedure (e.g., transportation, child care, lost wages).

**B.     Plaintiffs' Inability to Comply with the Regulation**

36. Dr. Payne retired from the practice of medicine on December 31, 2014. Until that time, WAWC was in compliance with the Regulation because Dr. Payne held staff privileges to perform the requisite surgical procedures at DCH Regional Medical Center and Northport Medical Center (both operated by the DCH Health System) in Tuscaloosa.

37. DCH is the sole hospital system in Tuscaloosa.

38. Before Dr. Payne's retirement, Plaintiff Dr. Parker agreed to move to Tuscaloosa in order to apply for staff privileges and to succeed Dr. Payne as the Medical Director of WAWC and serve as its sole full-time physician. In December 2014, Dr. Parker began the process of applying for staff privileges to perform gynecological surgery at DCH.

39. By the beginning of April 2015, it became clear that, despite Dr. Parker's diligent efforts, he would not be able to obtain staff privileges. This is so not because of any issue related to Dr. Parker's competence as an abortion provider but because abortion is such a safe procedure.

40. DCH will not grant him privileges unless he can personally admit ten patients for hysterectomies and ten patients for laparoscopic procedures to the hospital and submit those cases for review in the next year. Because Dr. Parker has been, and will continue to be a full-time outpatient abortion provider and because abortion is extremely safe, Dr. Parker would not be able to admit anywhere near the twenty cases to the hospital necessary to satisfy DCH's requirements.

41. In fact, in the eight years he has provided abortions, none of Dr. Parker's abortion patients has ever experienced a complication that resulted in a hysterectomy, let alone 10 patients in a single year.

42. Thus, Plaintiffs cannot obtain staff privileges that will satisfy the Regulation.

43. Ms. Gray is not aware of any other physician in Tuscaloosa, or anywhere else in Alabama, who is willing and able to provide abortions at WAWC and who could meet DCH's criteria for staff privileges.

44. Nor can Plaintiff WAWC comply with the Regulation's covering physician requirement.

45. Ms. Gray has contacted, or tried to contact, every other known ob-gyn in the Tuscaloosa area with privileges at DCH who might be willing to serve as an outside covering physician. These physicians have either rejected Ms. Gray's request because of opposition to abortion or fear of personal, professional, and/or economic consequences of being associated with an abortion clinic, or have refused to speak to her outright.

46. Because compliance with the Regulation was impossible, on May 6, 2015, Plaintiff WAWC applied to DPH for a waiver from the Regulation, pursuant to Ala. Admin. Code r. 420-1-2-.09.

47. Defendant Williamson may grant a waiver from a licensing regulation "when such waiver or variance is based upon a compelling public health need . . . or the occurrence of an event or circumstance that makes strict compliance with a rule highly impractical or impossible." Ala. Admin. Code r. 420-1-2-.09(b).

48. In support of its application, WAWC submitted a statement from Plaintiff Dr. Parker (and his *curriculum vitae*) concerning abortion safety and his inability to obtain staff

10

privileges, as well as copies of WAWC's safety policies and protocols. On May 12, WAWC supplemented its application with a statement from Mr. Dalton Johnson, the owner and administrator of Alabama Women's Center in Huntsville. Mr. Johnson's statement provided data demonstrating that WAWC's closure is preventing some women from obtaining abortions, forcing others to obtain abortions later in pregnancy, and stretching the Huntsville clinic to its maximum capacity.

49. On May 22, Defendant Williamson denied the request for a waiver without any reference to the evidence that WAWC's closure has caused and continues to cause ongoing harm to Alabama women.

### C. Safety of Abortion and Treatment of Abortion Complications

50. The Regulation is medically unnecessary because WAWC's policies and protocols ensure their patients would receive the same level and quality of care in the event of a complication as they would if the Clinic had an outside covering physician.

51. Legal abortion is one of the safest and most common procedures in contemporary medical practice.

52. A recent peer-reviewed study of first trimester abortions found that only 0.89% of abortion procedures performed by physicians resulted in any complication whatsoever; only .05% patients experienced complications that resulted in hospital admissions. Plaintiffs' hospitalization rates, including those for second-trimester abortions, are even lower.

53. Although abortion remains very safe throughout pregnancy, the risk of complications, as well as the cost of the procedure, increases as gestational age advances.

54. Of the very few complications that do occur, almost all are safely and appropriately managed in the clinic setting, either at the time of the procedure or in a follow-up

visit. The physician and clinical staff remain at the Clinic until every patient has been certified as fit for discharge.

55.     In the extremely rare event of a complication that requires hospital-based treatment, WAWC's policies and protocols ensure that a woman will receive high-quality care.

56.     Upon discharge, all of WAWC's patients are provided with a phone number for a 24-hour hotline (staffed by a registered nurse and Plaintiff Dr. Parker) that they can call regarding any complications, questions, and concerns that arise after they have left the clinic. In most cases, the patients' questions, concerns or complications can be addressed over the phone, or through a return visit to the clinic; many patients just need reassurance that their symptoms are normal and will subside. If a return visit is necessary, the patient is given an appointment on the next day that the Clinic is open.

57.     If Dr. Parker determines that a patient who contacts the after-hours hotline should be treated or evaluated by a physician sooner, he will refer the patient to a local emergency room. If Dr. Parker knows where the woman intends to go, he will contact the treating emergency room physician prior to the patient's arrival to explain the patient's clinic treatment, complaint, and the reason for her referral to the emergency room. If the patient does not provide Dr. Parker with this information, he will instruct her to bring his phone number with her wherever she goes to give to the emergency room physician.

58.     Many WAWC patients come from outside the Tuscaloosa area. Consistent with the standard of care, if any of these patients were to experience a complication after returning home, they would be referred to a local hospital in their area rather than a hospital near the clinic, making entirely irrelevant whether Dr. Parker has staff privileges or an arrangement with a covering physician at a local hospital.

59. In the exceedingly rare event that a patient needs to be transferred directly from the clinic to the hospital, Dr. Parker and WAWC staff would stabilize the patient and contact emergency medical services. To ensure continuity of care, Plaintiff Dr. Parker would communicate directly with the emergency room physician treating the patient. The emergency room physician would then involve on-call physicians at the hospital as is necessary and appropriate.

60. These policies and protocols are consistent with or exceed the standard of care for outpatient medical procedures.

61. There is an increasing divide between inpatient and outpatient medicine in contemporary practice, with inpatient care handled more and more often by physicians who regularly or even exclusively provide care in hospital settings.

62. It is outside the standard of care to require every physician that performs exclusively outpatient procedures (i.e., abortion) to obtain staff privileges at a local hospital, let alone staff privileges to perform complex surgical procedures, as is required by the Regulation.

63. In Alabama, physicians who perform outpatient procedures other than abortion in an office-based setting, even procedures that pose more risk than abortion, are not required to obtain staff privileges at a local hospital, let alone staff privileges to perform complex surgical procedures, as required by the Regulation.

64. On information and belief, the physicians at three of the five Alabama clinics (RHS, PPSE Birmingham, and PPSE Mobile) do not have staff privileges anywhere in Alabama. Instead, these clinics remain open by virtue of the temporary restraining order and declaration in the *PPSE* litigation. These clinics currently satisfy the Regulation because they have a prior written agreement with an outside covering physician who has staff privileges.

65. In Alabama, physicians who perform outpatient procedures other than abortion in an office-based setting, no matter how great the risk, are not required to obtain a prior written agreement with an outside covering physician.

66. There is nothing in the law that requires a licensed abortion clinic to involve, or even notify, its outside covering physician in a patient's treatment in the event of a complication that requires hospital-based care.

67. There is nothing in the law that requires an outside covering physician to give priority to a clinic's patients over his or her own patients.

68. Unless the outside covering physician is the patient's personal ob-gyn, that physician will have no prior relationship with the patient and will rely entirely on information provided by the clinic and/or the providing physician.

69. Nothing in the Regulation requires the outside covering physician to have any information about the procedure, or the clinic's policies and protocols.

70. Emergency room physicians and on-call ob-gyns are trained to treat any gynecological complications that may occur after an abortion procedure.

71. If a complication is not of a gynecological nature, neither the physician who provides the abortion nor the outside covering physician would be the appropriate physician to manage the patient's care in the hospital. In that case, the emergency room physicians and/or the appropriate on-call specialist should treat her.

72. Because WAWC's policies and protocols ensure communication (whenever possible) with the physician that assumes the patients' care in the event of a complication, WAWC's patients receive the same level and quality of care as do the patients of a clinic with a prior written agreement with an outside covering physician.

73. Requiring Dr. Parker to have hospital admitting privileges or requiring WAWC to contract with an outside covering physician does not increase patient safety and is medically unnecessary.

### D. Irreparable Injury Caused by the Regulation

74. Enforcement of the Regulation has inflicted and will continue to inflict significant irreparable harm to Plaintiffs' patients.

75. Enforcement of the Regulation will lead to the permanent closure of WAWC. Because qualified, experienced personnel are so integral to the operation of an abortion clinic, WAWC has retained its staff in the hopes that it will be able to reopen. As a result, Ms. Gray has been paying the Clinic's operating expenses, including staff salaries, while the Clinic has been closed.

76. Ms. Gray has been financially maintaining the Clinic with money that would otherwise have gone to her retirement. Due to continuing financial strain, the loss of staff, and because additional payments become due at the beginning of August, absent an injunction by August 4, Ms. Gray fears she will have no option but to close the Clinic permanently.

77. Permanent closure of WAWC will cause Ms. Gray to lose her livelihood and the business she has maintained for more than twenty years.

78. Permanent closure of WAWC will prevent Dr. Parker from pursuing his chosen profession and practicing medicine as an abortion provider in Tuscaloosa.

79. If WAWC closes permanently, there will be only four licensed abortion clinics left in Alabama. There will be no licensed abortion clinics left in Tuscaloosa.

80. The forced closure of WAWC will impact the ability of thousands of women each year, many of whom are in dire circumstances, to obtain safe, legal abortion services in Alabama.

81. Women who would have obtained an abortion at WAWC will be forced to travel to the next nearest clinic. For women seeking abortions in the first trimester, this will likely be in Birmingham, which is almost sixty miles from Tuscaloosa. For women seeking abortions after 15.0 weeks LMP, their only option will be to travel to Alabama Women's Center in Huntsville, which is more than 150 miles from Tuscaloosa.

82. For many women, the increased travel will make it extremely difficult, and in many cases impossible, to obtain an abortion. It will cause delay, forcing some women to seek abortions later in pregnancy when the procedure is more risky and more expensive, and will prevent others from obtaining an abortion at all. Other women who are unable to surmount the travel burdens will resort to unsafe self-abortion methods, thereby jeopardizing their health.

83. There is already evidence that these harms are occurring. For example, in the first six months of 2015, the Montgomery clinic has seen more than a 100% increase in the number of patients who have sought care at the clinic but who are past the clinic's fifteen-week gestational cutoff, and has experienced a 50% increase in telephone calls from such women, as compared with the same period in 2014. These women must be referred to Huntsville, which is nearly 200 miles from Montgomery.

84. Since WAWC closed, the Alabama Women's Center in Huntsville has experienced a significant increase in the number of women calling from western Alabama. Many of these women have expressly stated that they were unable to travel to Huntsville.

85. Some callers who have stated that they cannot travel the long distance to Huntsville have asked Alabama Women's Center staff about the best way for a woman to take matters into her own hands to induce an abortion if she is unable to travel.

86. Since WAWC's closure, many women who have been able to reach the Huntsville clinic have experienced unwanted delay in obtaining an abortion due to the difficulty of traveling a long distance to reach the clinic.

87. Upon information and belief, the number of women who have obtained abortions in Alabama in the months since WAWC closed is significantly smaller than the number of women who obtained abortions in Alabama during the same period in 2014 when WAWC was open.

88. Even if all of the women who would have sought abortion services at WAWC were able to make the trip to one of the other providers in the state (which many cannot), the other providers would not be able to accommodate this substantial influx of patients. Both RHS in Montgomery and Alabama Women's Center in Huntsville are operating very close to, if not at, their maximum capacity.

89. Upon information and belief, PPSE's health centers in Birmingham and Mobile do not have the capacity to treat the thousands of women who seek abortion services at WAWC each year.

90. Enforcement of the Regulation will therefore cause Plaintiffs' patients to suffer irreparable harm by shutting down the highest-volume abortion provider in the state without medical justification, and severely limiting the availability of safe abortion care in the state, particularly in the second trimester of pregnancy, thereby jeopardizing women's health and forcing women to continue their pregnancies to term against their will.

91. Plaintiffs' patients will also suffer irreparable harm from the violation of their constitutional rights if the Regulation is not enjoined.

## CLAIMS FOR RELIEF

### COUNT I

### (Due Process – Patients' Right to Privacy)

92. The allegations of paragraphs 1 through 91 are incorporated as though fully set forth herein.

93. The Regulation violates the Plaintiff's' patients' right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution. As applied to Plaintiffs, it is an unreasonable health regulation and imposes an undue burden on women's right to choose abortion.

### COUNT 2

### (Due Process – Right to Pursue Profession)

94. The allegations of paragraphs 1 through 91 are incorporated as though fully set forth herein.

95. The Regulation violates rights of Plaintiffs to due process under the Fourteenth Amendment to the U.S. Constitution. It makes Plaintiffs' ability to maintain their businesses and pursue their chosen professions contingent entirely on the willingness of third parties to be publicly associated with an abortion clinic.

WHEREFORE, Plaintiffs respectfully request that the Court:

1. declare Ala. Admin. Code r. 420-5-1-.03 unconstitutional under the Fourteenth Amendment to the United States Constitution as applied to Plaintiffs,

2. enjoin Defendant, his employees, agents, and successors in office from enforcing Ala. Admin. Code r. 420-5-1-.03 without bond;

3. award Plaintiffs costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

4. grant Plaintiffs such other, further, and different relief as the Court may deem just and proper.

Date: July 10, 2015

Respectfully submitted,

*/s/ Randall C. Marshall*

Randall C. Marshall
ASB-3023-A56M
ACLU FOUNDATION OF ALABAMA, INC.
P.O. Box 6179
Montgomery, AL 36106-0179
rmarshall@aclualabama.org
(334) 265-2754

Alexa Kolbi-Molinas*
New York State Bar No. 4477519
Andrew Beck*
New York State Bar No. 4740114
Jennifer Lee*
New York State Bar No. 4876272
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
akolbi-molinas@aclu.org
abeck@aclu.org
jlee@aclu.org
(212) 549-2633

*Attorneys for Plaintiffs*

**Pro hac vice motions to be filed*

## CERTIFICATE OF SERVICE

I, <u>Randall Marshall</u>, do hereby certify that a true and correct copy of the foregoing will be perfected upon the following counsel of record via e-mail on this 10th day of July, 2015: and hand delivery

P Brian Hale
brian.hale@adph.state.al.us
Alabama Department of Public Health
P.O. Box 303017
Montgomery, AL 36130

Dated:

Randall C. Marshall
ASB-3023-A56M
ACLU Foundation of Alabama, Inc.
P.O. Box 6179
Montgomery, AL 36106-0179
rmarshall@aclualabama.org
(334) 265-2754