**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| WEST ALABAMA WOMEN'S CENTER and WILLIAM J. PARKER, MD, on behalf of themselves and their patients,<br><br>              Plaintiffs,<br><br>v.<br><br>DONALD E. WILLIAMSON, MD, in his official capacity as State Health Officer,<br><br>              Defendant. | CIVIL ACTION<br><br>Case No. 2:15-CV-497-MHT |

**REPLY MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER**

## TABLE OF CONTENTS

**INTRODUCTION** ..........................................................................................................................1

**I.   PLAINTIFFS AND THEIR PATIENTS WILL SUFFER IRREPARABLE HARM IF INJUNCTIVE RELIEF DOES NOT ISSUE** ...................................................................1

**II.  PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THE MERITS** ...........................................................................................................................7

    A.   *Defendant's administrative exhaustion argument is meritless* ........................................7

    B.   *Defendant's attack on Plaintiffs' privacy claim is meritless* ..........................................8

**III. PLAINTIFFS SATISFY THE REMAINING REQUIREMENTS FOR A TEMPORARY RESTRAINING ORDER** ................................................................................12

    A.   *The balance of equities and the public interest favor the entry of a temporary restraining order* ...................................................................................................12

    B.   *Plaintiffs did not delay and the circumstances plainly warrant emergency relief* ..........14

**CONCLUSION** ...........................................................................................................................16

**INTRODUCTION**

This is an as-applied challenge—brought by the highest-volume abortion clinic in Alabama and one of only two clinics in the state that provide abortions throughout the second trimester—to a Regulation, the enforcement of which has forced Plaintiff WAWC to suspend patient services.  Rather than respond to the overwhelming evidence showing that enforcement of the Regulation against Plaintiffs is having and will continue to have a devastating effect on Plaintiffs' patients and women throughout Alabama, Defendant's brief is almost entirely devoted to past events and to defending the facial reasonableness of the Regulation.  But this is not a facial challenge and Plaintiffs are not attacking ADPH for its original decision to promulgate the Regulation.  As set forth below, Defendant's historical and theoretical defense of the Regulation is utterly insufficient to overcome Plaintiffs' concrete and context-specific arguments proving their entitlement to temporary injunctive relief.  Having failed to refute the evidence showing that enforcement of the Regulation is having and will continue to have profoundly negative, and in some instances life-altering, effects on Plaintiffs' patients and Alabama women, and having failed to offer any justification for continuing to enforce the Regulation against Plaintiffs despite this negative impact, Defendant's arguments against the grant of injunctive relief in this case necessarily fail.  This Court should therefore grant Plaintiffs' request for a temporary restraining order.

**ARGUMENT**

I.   **PLAINTIFFS AND THEIR PATIENTS WILL SUFFER IRREPARABLE HARM IF INJUNCTIVE RELIEF DOES NOT ISSUE.**

The prevention of irreparable harm is "the *sine qua non* of injunctive relief." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Amer. v. City of Jacksonville,* 896 F.2d 1283, 1285 (11th Cir. 1990) (quoting *Frejlach v. Butler,* 573 F.2d 1026, 1027 (8th Cir. 1978)).  The record in this

1

case amply demonstrates that, absent injunctive relief from this Court, Plaintiffs' patients will suffer concrete, significant, and irreparable harms. *See, e.g.*, Pls.' Br. at 21–24, 50–52. Indeed, in *Planned Parenthood Southeast, Inc. v. Bentley*, this Court granted the plaintiffs' request for a temporary restraining order ("TRO") on a near-identical record. 951 F. Supp. 2d 1280, 1288–90 (M.D. Ala. 2013) [hereinafter "*PPSE I*"]. For example, as in *PPSE I*, Plaintiffs here "have submitted evidence showing that, for many Alabama women, the increase in the burden of travel [resulting from enforcement of the challenged Regulation] will be so great that they will not obtain an abortion at all." *Id.* at 1289; *see* Declaration of Stanley K. Henshaw, PhD ("Henshaw Decl.") ¶¶ 3–8, 17–22, attached to Pls.' Br. as Exhibit 5. Furthermore, as in *PPSE I*, Plaintiffs' evidence here shows that "women who carry unwanted pregnancies to term are at increased risk of death and childbirth complications." 951 F. Supp. 2d at 1289; *see* Declaration of Dr. William J. Parker ("Parker Decl.") ¶¶ 35–36, 53–54, attached to Pls.' Br. as Exhibit 4. And, just as in *PPSE I*, Plaintiffs' evidence here demonstrates that many women who are forced to "travel farther due to the effects of [the Regulation]" will "wait until later in their pregnancy term to undergo the procedure" and that "[t]his delay also carries an heightened risk of medical complication." 951 F. Supp. 2d at 1289; *see* Henshaw Decl. ¶¶ 3, 14–15, 17–18, 25; Parker Decl. ¶¶ 35–36, 53–54. If anything, the most significant difference between the records in these two cases is that in *PPSE I* these concrete injuries were "imminent," 951 F. Supp. 2d at 1288–89; in this case, they are actual and ongoing.

Defendant's attempts to refute this showing fall well short of the mark. As an initial matter, Defendant does not—because he cannot—dispute that the threatened violation of Plaintiffs' patients' constitutional right to privacy constitutes irreparable harm as a matter of law. *See* Pls.' Br. at 51–52. Nor does Defendant seriously dispute the factual record in this case,

conceding that it "*suggests* that women are having difficulty getting an abortion because of the Clinic being closed." Def.'s Br. at 20. Instead, Defendant argues—without a shred of authority—that this evidence is insufficient because Plaintiffs have not "*specifically show[n]*" that any of their patients have been unable to obtain an abortion at another Alabama clinic. *Id*. This argument is both legally and factually incorrect.

First, in order to obtain temporary prospective injunctive relief, Plaintiffs need only show a "substantial *threat* of irreparable harm if the injunction is not granted." *S.E.C. v. Asset Recovery and Management Trust, S.A.*, 340 F. Supp. 2d 1305, 1310 (M.D. Ala. 2004) (emphasis added). Plaintiffs have more than done so here, as it is indisputable that if this Court does not temporarily enjoin enforcement of the Regulation as to WAWC, the Clinic will remain closed and Tuscaloosa women will be forced to travel the very distances—if not farther—that *this Court has already found* (1) will prevent a significant number of women from obtaining a safe abortion; (2) will lead some to resort to unsafe methods of self-abortion rather than be forced to continue their pregnancies against their will; and (3) will delay still other women in their ability to obtain an abortion (subjecting them to unnecessary health risks), and causing significant harms in terms of time, and financial cost. *See Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1355 (M.D. Ala. 2014) [hereinafter "*PPSE III*"].

Second, contrary to Defendant's claims, the record here demonstrates that the suspension of care at WAWC is having an extraordinary impact on Alabama women's ability to get an abortion. Since WAWC suspended services, the number of abortions in the state has declined dramatically, women have been forced to delay their abortions, and the number of women who were able to obtain an abortion after sixteen weeks of pregnancy has dropped by fifty percent

3

compared to the same period last year. *See* Pls.' Br. at 31–41.[1] Moreover, the record is replete with evidence of specific women who, due to WAWC's closure, have been forced to delay having a safe and legal abortion, have threatened to resort to methods of self-abortion, or have been prevented from obtaining a safe and legal abortion outright. *See, e.g.*, Declaration of June Ayers ("Ayers Decl.") ¶¶ 5–8, attached to Pls.' Br. as Exhibit 3; Declaration of Gloria Gray ("Gray Decl.") ¶¶ 37–41, attached to Pls.' Br. as Exhibit 1; Declaration of Dalton Johnson ("Johnson Decl.") ¶¶ 6–11, attached to Pls.' Br. as Exhibit 2. For example, Mr. Johnson, the owner and administrator of the Alabama Women's Center in Huntsville, testified that

> one patient from Tuscaloosa recently told me she would have obtained a first-trimester abortion there had West Alabama Women's Center been open. But with the local clinic closed, she made an appointment in Montgomery. By the time she was able to travel to the clinic there for pre-procedure counseling, she was 14 weeks pregnant, and that clinic's physician was not available to perform the abortion until the following week, at which point she would have been past the clinic's gestational limit. So her only option was to travel to yet another clinic (our clinic in Huntsville)—but it took her an additional two weeks to make arrangements with someone willing to drive her the 150-mile (one way) distance from Tuscaloosa to Huntsville. Ultimately, she was able to get an abortion, but the cost of the procedure was nearly twice as expensive as the first-trimester surgical abortion she would have had in Tuscaloosa, and that is not including transportation costs.

Johnson Decl. ¶ 10. Mr. Johnson also testified that, since WAWC has been closed, he receives calls at least twice per month from women seeking instructions on how to perform a self-abortion because they are unable to travel to a clinic. *Id.* ¶ 9; *see also* Gray Decl. ¶ 41. In addition, as Ms. Gray recounted:

> In some heartbreaking cases, women have shown up at [WAWC] itself and we have no choice but to turn them away, even when we know they

---

[1] Notably, although Defendant Williamson is already in possession of the underlying data, he does not attempt to dispute these facts. *See* Ala. Admin. Code r. 420-5-1-.03(6)(g) (requiring clinics to report each abortion performed to ADPH on a monthly basis).

>have literally nowhere else to go. For example, a father recently brought his 15 year old daughter, whose pregnancy was extremely close to Alabama's legal limit (22.0 weeks LMP) for abortion, to the Clinic. By the time they could get an appointment at the Huntsville clinic, the young girl would be past the legal limit. It was simply devastating to know that this girl's life would be forever changed, just because of this needless regulation.

Gray Decl. ¶ 39.[2]

Finally, Plaintiffs have shown that injunctive relief is necessary "to preserve the court's power to render a meaningful decision after a trial on the merits." *Alabama v. U.S. Army Corps of Engineers*, 424 F.3d 1117, 1128 (11th Cir. 2005) (quoting 11A Charles Alan Wright, Arthur Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2947 (3d ed. 1998)). Notwithstanding Defendant's numerous attempts to suggest otherwise, Def.'s Br. at 1, 22–23, injunctive relief *would* preserve the status quo in this case: it would prevent Ms. Gray from having to lay off her staff and permanently close WAWC, leaving Tuscaloosa without a licensed abortion clinic for the first time in more than two decades. *See, e.g.*, Gray Decl. ¶¶ 1, 4. But even if Defendant were correct, the law of this Circuit is clear that "the purpose of a preliminary injunction is *always* to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits," not simply to preserve the status quo. *Canal Auth. of State*

---

[2] Defendant's remaining arguments—that ADPH is not to blame for the reduction in second-trimester abortion services or the decreased capacity of Alabama's remaining abortion clinics—similarly lack any merit. Def.'s Br. at 20. By enforcing the Regulation against Plaintiffs, Defendant has indisputably forced the highest-volume provider of abortion services in Alabama, and also the largest provider of second-trimester abortion services in the state, to suspend abortion services altogether. *Cf. PPSE III*, 33 F. Supp. 3d at 1358 ("*Casey*'s treatment of the spousal-notification requirement shows that the interaction of the state regulation *and existing social conditions* can create an obstacle for women. And if that obstacle is substantial, it can render the regulation unconstitutional.") (citing *Vosburg v. Putney*, 50 N.W. 403 (1891)) (emphasis added). Conversely, enjoining enforcement of the Regulation would enable Plaintiffs to resume providing these essential services, expanding access throughout the state and lessening the burden on the other clinics.

5

*of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (internal citations omitted) (emphasis added). As the former Fifth Circuit has explained, "[i]t must not be thought, however, that there is any particular magic in the phrase 'status quo.' . . . If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury . . . *The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo.*" *Id.* (emphasis added).

Here, having exhausted all other non-litigation options for keeping the Clinic open, absent injunctive relief from this Court, Ms. Gray will be forced to lay off her staff and *permanently* close a clinic that has provided critical health care services to tens of thousands of women for over two decades. *See* Gray Decl. ¶¶ 4, 9–10. Once the clinic is rendered non-operational (with its staff laid off and its license ultimately surrendered), the likelihood that it would be able to reopen if the Court were to render a final decision on the merits in Plaintiffs' favor becomes severely diminished, if not eliminated outright. *Cf. PPSE III*, 33 F. Supp. 3d at 1348 ("[T]he court finds that the number of abortion doctors nationally and throughout the South is declining; the decision to perform abortions carries detrimental professional consequences in Alabama; violence against and harassment of abortion providers, beyond run-of-the-mill political protest, persist in the State; prior attempts to recruit local doctors have failed dramatically; and there are significant regulatory barriers to entry for a new doctor to begin providing abortions at any scale."). [3] Therefore, Plaintiffs have shown irreparable harm sufficient to justify temporary injunctive relief.

---

[3] In asserting that temporary injunctive relief is inappropriate because "[t]he Clinic Owner/Administrator's alleged depletion of funds is not sufficient to warrant . . . a temporary restraining order," Def.'s Br. at 19, Defendant once again mischaracterizes both the facts and the law. As both this Court and numerous other courts have recognized, for Ms. Gray, the loss of her business and sole source of income plainly constitutes irreparable harm for which there is no

6

## II.    PLAINTIFFS ARE SUBSTANTIALLY LIKELY TO PREVAIL ON THE MERITS.

As their opening brief makes clear, Plaintiffs are substantially likely to prevail on the merits of their claim that enforcement of the Regulation against Plaintiffs violates their patients' constitutional privacy rights. Nothing in Defendant's submission comes close to suggesting otherwise.

### A.    *Defendant's administrative exhaustion argument is meritless.*

Defendant devotes much of its discussion of Plaintiffs' likelihood of success on the merits to a baseless argument on administrative exhaustion. According to Defendant, as a precondition to filing this lawsuit, Plaintiffs were not only required to apply for a waiver of the Regulation, but upon the Department's rejection of that application were also compelled to petition the agency to undertake formal rulemaking proceedings to overhaul its regulatory scheme for "all abortion or reproductive health centers" and repeal the Regulation altogether. Def.'s Br. at 11. Only at the conclusion of that months-long regulatory process, Defendant says, could Plaintiffs have filed this federal lawsuit.[4] This is absurd.

---

adequate remedy at law. *See, e.g.*, *PPSE I*, 951 F. Supp. 2d at 1289 (finding irreparable harm where statute would force clinic owner to "close her business altogether"); *ABC Charters, Inc. v. Bronson*, 591 F. Supp. 2d 1272, 1307 (S.D. Fla. 2008) (finding irreparable harm where plaintiffs would "be forced to close their businesses," thus depriving plaintiffs of their sole source of income and means of retirement); *Mid–Fla Coin Exchange v. Griffin,* 529 F. Supp. 1006, 1030 (M.D. Fla. 1981) (finding irreparable harm where plaintiffs' "businesses face virtual extinction if they are forced to comply with the legislation"). In any event, as shown above, the harm to WAWC's patients indisputably constitutes irreparable harm.

[4] Ironically, Defendant argues that Plaintiffs were required to petition the Department to undertake a months-long rulemaking process before filing this lawsuit, while at the same time strenuously arguing that the time Plaintiffs' spent attempting to come into compliance with the rule and gathering the necessary evidence about the effect of WAWC's closure somehow robs them of their ability to seek injunctive relief. *See* pp. 14-15, *infra*.

First, the doctrine of administrative exhaustion has no application in a lawsuit brought under § 1983, and Defendant's reliance upon it is therefore misplaced.[5]  *See, e.g.*, *Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1226-27 (11th Cir. 2006).  Moreover, Defendant's position fundamentally misunderstands the administrative exhaustion doctrine.  As the Eleventh Circuit has made clear, "[i]f the complainant properly presented his or her claim to the agency in the first place, [and] the agency was given every opportunity to investigate and resolve the dispute," that is "all that is intended by the exhaustion requirement."  *Wade v. Secretary of Army*, 796 F.2d 1369, 1378 (11th Cir. 1986).  Plaintiffs unquestionably satisfied that standard here.  Indeed, "the possibility that a law might be amended or repealed does not prevent a party with standing from challenging the law's validity in court."  *Hillery v. Rushen*, 720 F.2d 1132, 1138 n.5 (9th Cir. 1983).  Defendant's exhaustion argument simply lacks any merit.

> B.  *Defendant's attack on Plaintiffs' privacy claim is meritless.*

The remainder of Defendant's argument concerning Plaintiffs' likelihood of success on the merits boils down to the following contention: On its face, the Regulation's covering physician requirement is reasonable, and therefore Plaintiffs are not substantially likely to prevail on the merits of their as-applied challenge.  This argument altogether fails to grapple both with the governing law as articulated extensively by this Court in the *PPSE* litigation, and with the ample record evidence showing that, as applied to Plaintiffs, the burdens imposed by the Regulation far exceed its benefits.

---

[5] As the Eleventh Circuit has recognized, while the doctrine of administrative exhaustion does not apply under § 1983, litigants may be required to seek administrative relief in order to present a ripe claim.  *Beaulieu*, 454 F.3d at 1226-27.  Plaintiffs unquestionably satisfied that requirement here by filing a request for a waiver of the Regulation's requirements precisely in accordance with the administrative procedures provided by the Department.  *See* Ala. Admin. Code r. 420-1-2-.09(d) ("A current or prospective licensee, permittee, or registrant directly affected by a provision of a rule may request a waiver or variance from said rule.").

Plaintiffs' opening brief and the considerable evidence filed in support of it establish in no uncertain terms that in the specific context of this as-applied challenge, the obstacles are far "more significant than is warranted by the State's justifications for the regulation." *Planned Parenthood Southeast, Inc. v. Strange*, 9 F. Supp. 3d 1272, 1287 (M.D. Ala. 2014) [hereinafter "*PPSE II*"]; *see also* Pls.' Br. at 25–49. In particular, the evidence is clear that the obstacles imposed by the closure of the state's highest-volume abortion provider and one of just two Alabama clinics providing abortions through the second trimester are tantamount to a public health crisis—there has been a precipitous drop in the number of women obtaining abortions, particularly second-trimester abortions, since the Tuscaloosa clinic's closure; women are experiencing unwanted and harmful delay in accessing medical care; the remaining clinics are stretched to their maximum capacity; and desperate women who are unable to access abortion services are inquiring about self-abortion. *See* Pls.' Br. at 31–41; *see also* pp. 1-6, *supra*. And in view of the specific evidence concerning Plaintiffs' safety record and their detailed protocols for maintaining continuity of care in the very rare event of a complication, the evidence is equally clear that for the minimal number of women for whom the outside covering physician requirement may be relevant, the Regulation confers, at best, a theoretical benefit. *See* Pls.' Br. at 41–48. Balancing the severe obstacles against the at-best-theoretical benefits, it is plain that Plaintiffs are substantially likely to prevail in proving that, as applied here, the Regulation imposes an undue burden. *See PPSE II*, 9 F. Supp. 3d at 1287.

It is no answer—or it is at best a woefully incomplete answer—for Defendant to argue that in 2003, and then again in 2006, the Department could reasonably have believed that the covering physician requirement was a good idea that fell within the range of reasonable medical

9

disagreement.[6] *See* Def.'s Br. at 15. As this Court has held, in the undue burden analysis, the constitutionality of a health regulation is not evaluated in a vacuum. A regulation, even if it is "legitimate," will not "justify any and all obstacles." *PPSE II*, 9 F. Supp. 3d at 1287. "Rather, the more severe the obstacle a regulation creates, the more robust the government's justification must be, both in terms of how much benefit the regulation provides towards achieving the State's interests and in terms of how realistic it is the regulation will actually achieve that benefit."[7] *Id.*

As set forth above, the obstacles imposed by the closure of WAWC are extreme, and Defendant has not produced a shred of evidence to the contrary. *See* pp. 1-6, *supra*; *see also* Pls.' Br. at 31–41. In the face of this evidence, Defendant's submissions do not come close to providing a "robust" justification for continuing to enforce the Regulation as to Plaintiffs. *See PPSE II*, 9 F. Supp. 3d at 1287. In quoting at length from the deposition testimony of Gloria Gray and citing the deposition testimony of June Ayers from the prior *PPSE* litigation, Defendant appears to argue that the primary benefit of, and justification for, continued enforcement of the covering physician requirement is the state's apparent interest in "patients

---

[6] Defendant makes a passing reference to *Gonzales v. Carhart*, but his reliance upon that decision is misplaced. Def.'s Br. at 15. In *Gonzales*, the Court discussed the significance of medical uncertainty in the context of a *facial* challenge to a ban on a specific type of abortion procedures, but went out of its way to authorize *as-applied* challenges. 550 U.S. 124, 166-67 (2007). Plaintiffs here bring only an as-applied challenge to the Regulation. Moreover, *Gonzales* addressed the relevance of medical uncertainty only in the context of evaluating "[c]onsiderations of marginal safety" where a law regulated one abortion procedure but left other available procedures unaffected. *Id.* at 166. That discussion has little application where, as here, enforcement of the Regulation outright eliminates access to an abortion for many affected women. *See* Pls.' Br. at 31-41.

[7] *Accord Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 914 (9th Cir. 2014) (under the undue burden test, the court must "weigh the extent of the burden against the strength of the state's justification in the context of each individual statute or regulation"); *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 738 F.3d 786, 798 (7th Cir. 2013); *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, No. 13-CV-465-WMC, 2015 WL 1285829, at *10 (W.D. Wis. Mar. 20, 2015) (the court must "weigh legitimate health benefits derived from an abortion regulation against the burdens it places on women seeking access to abortion services").

10

having an advocate in the emergency room," Def.'s Br. at 18 (citing Deposition of June Ayers, September, 25, 2013, at 66-72), who is "'respectful,'" Def.'s Br. at 17 (quoting Deposition of Gloria Gray, October 21, 2013, at 29).[8]

But as Plaintiffs' evidence makes clear, under WAWC's policies and protocols for complication management, in the exceedingly rare event of a hospital transfer, WAWC's patients *do* have an advocate. Dr. Parker's testimony makes clear that in any such case, clinic staff would "alert [the hospital] to the pending transfer and provide the emergency department with necessary details about the case, and prepare a copy of the patient's medical records and all other pertinent data to go with the patient to the hospital," and that Dr. Parker himself would "speak directly with the emergency room physician at the hospital and any other appropriate hospital physician, such as the on-call ob-gyn or other specialist, to provide a summary of the patient's clinical situation and to ensure continuity of care." Parker Decl. ¶ 44. If Defendant believes that the Regulation affords any marginal benefit over Plaintiffs' detailed protocols in this regard, his brief articulates no basis to support such a belief. Nor does Defendant begin to explain (or provide evidence of) "how much benefit the regulation provides towards achieving the State's interests," or how the Court could possibly conclude that the marginal benefit of the Regulation (whatever it may be) is sufficiently "robust" to justify the extreme obstacles that its enforcement has imposed, and will continue to impose.[9] *PPSE II*, 9 F. Supp. 3d at 1287.

---

[8] Plaintiffs note that it is troubling for Defendant to defend the enforcement of a regulation that has shut down the highest-volume clinic in the state—a clinic with an unimpeachable safety record—on the basis that in the extremely rare circumstance that a patient may need hospital care, she might encounter a physician opposed to abortion who might be disrespectful. *Cf. Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect.").

[9] Defendant likewise provides unelaborated citations to the depositions of Dalton Johnson and Dr. P1 from the prior *PPSE* litigation. Def.'s Br. at 18. Mr. Johnson's deposition testimony

11

In sum, Plaintiffs have amply demonstrated that they are substantially likely to prevail on the merits of their privacy claim, and nothing in Defendant's submission diminishes that showing.

### III. PLAINTIFFS SATISFY THE REMAINING REQUIREMENTS FOR A TEMPORARY RESTRAINING ORDER.

A. *The balance of equities and the public interest favor the entry of a temporary restraining order.*

When deciding whether to grant injunctive relief, "courts must balance the competing claims of injury and consider the effect of granting or withholding of the requested relief." *Winter v. N.R.D.C.*, 555 U.S. 7, 24 (2008). As set forth above and in Plaintiffs' opening brief, the evidence demonstrates that every day the Regulation is enforced against Plaintiffs, women in Alabama suffer "concrete, serious harms," *PPSE I*, 951 F. Supp. 2d at 1290. *See* pp. 1-6, *supra*; Pls.' Br. at 21–24. On the other side of the scale, Defendant argues that the Regulation furthers two relevant state interests—ensuring that legal abortions are performed safely and regulating the medical profession. *See* Def.'s Br. at 20–21. However, merely asserting these interests is insufficient to demonstrate "the harm that will *actually* flow [to Defendant]" if the injunction is issued. *K.G. ex rel. Garrido v. Dudek*, 839 F. Supp. 2d 1254, 1279 (S.D. Fla. 2011). First, as even Defendant admits in the denial of Plaintiffs' waiver application, emergency complications

---

shows nothing more than that his physician with privileges has occasionally provided hospital-based care for clinic patients in the extremely rare event of a complication. *See* Def.'s Br. at Ex. 12. That is, the testimony shows only that a physician has utilized staff privileges, but not that it has any impact on patient health when physicians have done so. *Id.*; *see also PPSE II*, 9 F. Supp. 3d at 1287 (where obstacles are great, government justification must show "how much benefit the regulation provides towards achieving the State's interests and in terms of how realistic it is the regulation will actually achieve that benefit"). And Dr. P1's testimony has nothing to do with the treatment or management of complications at all. *See* Def.'s Br. at Ex. 11. The deposition shows only that Planned Parenthood relied upon its covering physician on a single occasion when it became clear *before the procedure was performed* that the patient would require greater sedation than the clinic was able to provide. *Id.*

12

requiring hospital-based treatment are exceedingly rare.  *See* Gray Decl., Ex. E (Defendant's letter denying Plaintiffs' application for a waiver, acknowledging that "it may be an infrequent event that a patient experiences a complication during an abortion procedure requiring an immediate visit to a hospital emergency department or admission to a hospital for treatment of a complication."); *see also* Pls.' Br. at 17–19; Parker Decl. ¶¶ 32–36; Gray Decl. ¶ 12.  Second, Defendant does not dispute that in the unlikely event such a complication does arise the Regulation does not actually require a clinic to rely on its outside covering physician.  *See* Pls.' Br. at 43; *see also Planned Parenthood of Wis., Inc. v. Van Hollen*, 738 F.3d 786, 798 (7th Cir. 2013); *PPSE III*, 33 F. Supp. 3d at 1370 n.23.  Third, as set forth in detail in Plaintiffs' opening brief, Plaintiffs' protocols ensure patient safety to the same extent as does a contract with a covering physician—and Defendant has not adduced an iota of evidence to the contrary.  *See* Pls.' Br. at 41–48.  Given that Defendant can identify only "speculative harms and . . . rather abstract injury," *PPSE I*, 951 F. Supp. 2d at 1290, and Plaintiffs have provided substantial evidence that WAWC's closure harms Plaintiffs' patients on a daily basis, the balance of equities clearly favors the issuance of a temporary restraining order.

Defendant also argues that enforcing the Regulation as to Plaintiffs serves the public interest, because the Regulation's purpose is to protect women's health and safety, which is "necessarily in the public's interest."  *See* Def.'s Br. at 21.  However, for much the same reasons that the balance of equities weighs in Plaintiffs' favor, the public interest is best served by *granting* injunctive relief here, not denying it.  There is ample and uncontradicted evidence that enforcement of the Regulation actively undermines the health and safety of Plaintiffs' patients.  *See* pp. 1-6, *supra*; Pls.' Br. at 21-24.  Thus, far from undermining women's health and safety, injunctive relief would further the Regulation's purpose of protecting women's health.  *See*

13

*Garrido*, 839 F. Supp. 2d at 1279 (finding that an injunction requiring the state to provide Medicaid funding for the plaintiff's necessary medical services would serve the public interest because it would "further[] the stated purpose of the Medicaid program"). Moreover, the public interest is never served by enforcing an unconstitutional law. *See Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010) ("[T]he public, when the state is a party asserting harm, has no interest in enforcing an unconstitutional law.").

Accordingly, the balance of the equities and the public interest favor a temporary restraining order in this case.

B.  *Plaintiffs did not delay and the circumstances plainly warrant emergency relief.*

Finally, Defendant argues that Plaintiffs are not entitled to emergency relief because they waited seven weeks between May 22, 2015, the date Ms. Gray received ADPH's denial of her waiver application, *see* Gray Decl. ¶ 30, and July 10, the date Plaintiffs' filed the instant case and motion, *see* Def.'s Br. at 23–24. However, this minimal delay was "caused by good faith efforts to investigate the facts" and thus does not weigh against Plaintiffs' request for temporary injunctive relief. *Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 333 (S.D.N.Y. 2011). Because the circumstances justifying a temporary restraining order in this case continue to be exigent, *see* pp. 1-6, *supra*, Plaintiffs are entitled to injunctive relief.[10]

Indeed, while Defendant is quick to point out that WAWC was forced to suspend services in January, he makes no mention of what Plaintiffs did in the intervening months. The vast majority of this time was spent attempting to come into compliance with the Regulation: dutifully attempting to find a way for Dr. Parker, an eminently qualified physician with

---

[10] To the extent Defendant argues that in seeking temporary injunctive relief prior to August 4, Plaintiffs failed to "provide the Court a reasonable amount of time to reach a decision *on the merits*," Def.'s Br. at 1 (emphasis added), Defendant clearly misunderstands the nature and purpose of a temporary restraining order.

14

privileges at other hospitals, to obtain privileges in Tuscaloosa; repeatedly attempting to track down and speak with any ob-gyn in the area who might be willing to serve as a back-up doctor; and applying for the waiver (which Defendant argues Plaintiff was required to do). *See* Pls.' Br. at 12–17.

With no remaining option after the waiver was denied, and recognizing that raising a constitutional claim would require this Court to "perform a careful, fact-specific analysis of how the restrictions would impede women's ability to have an abortion, in light of the circumstances of their lives," *PPSE II*, 9 F. Supp. 3d at 1285, Plaintiffs then spent the period between the denial of the waiver application and the filing of this action diligently investigating the harm of WAWC's suspension of services on Alabama women, and gathering the necessary evidence and data so that this Court could consider the "character and magnitude of the asserted injury," *id.* at 1284 (internal citation omitted). "[A]s soon as plaintiff[s] had what [they] felt was solid proof, this suit was filed." *Hunting World Inc. v. Reboans Inc.*, No. 92–1519 BAC, 1992 WL 361741, at *4 (N.D. Cal. Sept. 10, 1992) (granting request for preliminary injunctive relief). Contrary to what Defendant has argued, "[u]nder such circumstances, waiting to file for preliminary relief until a credible case for irreparable harm can be made is prudent rather than dilatory." *Arc of California v. Douglas*, 757 F.3d 975, 991 (9th Cir. 2014); *see also Marks Org., Inc. v. Joles*, 784 F. Supp. 2d 322, 333 (S.D.N.Y. 2011) (finding that delay was "caused by good faith efforts to investigate the facts" and thus did not weigh against Plaintiffs' request for temporary injunctive relief). More importantly, it is beyond dispute that Plaintiffs' patients will continue to suffer irreparable harm absent injunctive relief from this Court. *See* pp. 1-6, *supra*; *see also* Pls.' Br. at 21–24, 50–52. Therefore, emergency relief is necessary and proper in this case.

## CONCLUSION

For the reasons set forth above, and in Plaintiffs' opening brief, this Court should grant Plaintiffs' request for a temporary restraining order.

Date: July 27, 2015                                          Respectfully submitted,

                                                                     /s/ Alexa Kolbi-Molinas
Alexa Kolbi-Molinas*
New York State Bar No. 4477519
Andrew Beck*
New York State Bar No. 4740114
Jennifer Lee*
New York State Bar No. 4876272
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
akolbi-molinas@aclu.org
abeck@aclu.org
jlee@aclu.org
(212) 549-2633

Randall C. Marshall
ASB-3023-A56M
ACLU FOUNDATION OF ALABAMA, INC.
P.O. Box 6179
Montgomery, AL 36106-0179
rmarshall@aclualabama.org
(334) 420-1741

*Attorneys for Plaintiffs*

*\*admitted pro hac vice*

## **CERTIFICATE OF SERVICE**

      I, <u>Alexa Kolbi-Molinas</u>, do hereby certify that a true and correct copy of the foregoing will be filed with the Clerk of Court using the CM/ECF system, which will serve a copy of the same upon the following counsel of record, on this 27th day of July, 2015:

P Brian Hale
Bethany L. Bolger
Carol R. Gerard
Alabama Department of Public Health
P.O. Box 303017
Montgomery, AL 36130

                                    <u>/s/Alexa Kolbi-Molinas</u>

                                      Alexa Kolbi-Molinas
                                      AMERICAN CIVIL LIBERTIES UNION FOUNDATION
                                      125 Broad Street, 18th Floor
                                      New York, NY 10004
                                      (212) 549-2633
                                      akolbi-molinas@aclu.org