IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| WEST ALABAMA WOMEN'S<br>CENTER and WILLIAM J.<br>PARKER, M.D., on behalf of<br>themselves and their<br>patients,<br><br>    Plaintiffs,<br><br>    v.<br><br>DONALD E. WILLIAMSON,<br>M.D., in his official<br>capacity as State Health<br>Officer,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CIVIL ACTION NO.<br>2:15cv497-MHT<br>(WO) |

OPINION

This lawsuit is an 'as-applied' challenge by a
licensed abortion clinic in the State of Alabama and
its new, sole doctor against a regulation, Alabama
Administrative Code § 420-5-1-.03(6)(b), requiring
that, in order to perform abortions at the clinic,
either the doctor must have 'admitting privileges' at a
local hospital or the clinic must contract with a
'covering physician' who has such privileges.  The

plaintiffs, West Alabama Women's Center and Dr. William J. Parker, on behalf of themselves and their patients, claim that this regulation is unconstitutional under the Due Process Clause of the Fourteenth Amendment, as enforced through 42 U.S.C. § 1983 and as applied to them, because it violates their patients' rights to liberty and privacy and their right to pursue their business and profession. The defendant is Dr. Donald E. Williamson, in his official capacity as the State Health Officer. Jurisdiction is proper under 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights).

Previously, based on a limited record, the court granted the plaintiffs' motion for a temporary restraining order against the regulation as applied to them. This opinion explains why.

## I.   LEGAL STANDARD

To demonstrate that a temporary restraining order is warranted, the plaintiffs must show: (1) that there

is a substantial likelihood of success on the merits of their suit; (2) that they will suffer irreparable harm absent injunctive relief; (3) that the harm to the plaintiffs absent an injunction would outweigh the harm to the defendant from an injunction; and (4) that an injunction is in the public interest.  <u>Ingram v. Ault</u>, 50 F.3d 898, 900 (11th Cir. 1995).

## II. BACKGROUND

This case focuses on a regulation promulgated by the Alabama State Board of Health: Alabama Administrative Code § 420-5-1-.03(6)(b).  Before diving into the question at hand, some history is helpful to understand the legal context of this challenge.

The regulation took effect in 2007.[1]  It requires either that a doctor who performs abortions have admitting privileges at a local hospital or that the

_____

1. As the defendant notes, a regulation imposing similar requirements was first enacted in 2003.  It was then amended in 2006, and these amendments took effect in 2007.

clinic where an abortion is performed to contract with a local covering physician with such admitting privileges. <u>See</u> Ala. Admin. Code § 420-5-1-.03(6)(b).

In 2013, Alabama enacted a statute that would have superseded this regulation. The new statute, 1975 Ala. Code § 26-23E-4(c), required that every physician performing abortions have admitting privileges at a local hospital. In effect, it would have eliminated the alternative covering-physician arrangement.

Five abortion clinics were operating in the State at the time, only two of which were staffed by physicians who had local admitting privileges. The other three, to that point, had complied with the regulation by contracting with a covering physician.

Before the statute went into effect, the three clinics relying on covering physicians brought a lawsuit in this court to enjoin enforcement of the statute's requirement that all physicians providing abortions have admitting privileges. <u>See</u> <u>Planned Parenthood Se., Inc. v. Bentley</u> (<u>Strange I</u>), 951 F.

Supp. 2d 1280 (M.D. Ala. 2013) (Thompson, J.) (granting plaintiffs' motion for temporary restraining order); Planned Parenthood Se., Inc. v. Strange (Strange II), 9 F. Supp. 3d 1272, 1289 n.31 (M.D. Ala. 2014) (Thompson, J.) (granting in part and denying in part the parties' motions for summary judgment); Parenthood Se., Inc. v. Strange (Strange III), 33 F. Supp. 3d 1330, 1337 (M.D. Ala. 2014) (Thompson, J.) (finding that 1975 Ala. Code § 26-23E-4(c) creates an undue burden at least as to the plaintiff clinics); Planned Parenthood Se., Inc. v. Strange (Strange IV), 33 F. Supp. 3d 1381 (M.D. Ala. 2014) (supplementing liability opinion with evidentiary findings). Importantly, the plaintiff clinics did not challenge the State's regulation because they did not need to--they remained able to comply with the regulation by contracting with a covering physician.

This court found the new statute unconstitutional, at least as applied to the three clinics that brought the suit. Strange III, 33 F. Supp. 3d at 1378. The court's decision as to the scope of relief remains

pending.  By agreement of the parties until relief is decided, a temporary restraining order prohibiting any enforcement of the statute in the State remains in effect.

Because the statute requiring that all physicians have admitting privileges has been enjoined, the two alternative routes for compliance in the regulation remain: admitting privileges for the doctor or a covering-physician contract for the clinic.  And though the regulation has been amended in light of the statute and in the wake of the <u>Strange</u> litigation, it still allows for compliance by either route.[2]

_____

2.   More specifically, the regulation now states that the statutory requirement that all physicians obtain staff privileges is "stayed until such time that the restraining order is lifted or there has been a final disposition allowing for enforcement of this requirement in <u>Planned Parenthood Southeast, et al. v. Strange, et al.</u>, Civil Action No. 2:13-cv-504-MHT," and that, "until that time," clinics may comply with the regulation by contracting with a covering physician.

Although the revised language of the regulation is a bit abstruse, it appears that both sides in this litigation agree that the current regulation retains the same two alternative routes for compliance: staff (continued...)

Until December 2014, the West Alabama Women's Center in Tuscaloosa had no trouble complying with the regulation. Its doctor, Louis Payne, had admitting privileges at the local hospital. The situation, however, has changed. Dr. Payne retired in December 2014, and, although the Center has found a replacement doctor, he does not have staff privileges at the local hospital. Nor has the Center been able to find a covering physician, that is, one who has local admitting privileges and who willing to contract with it. Because the Center cannot meet either requirement of the regulation, it has been closed since January 2015. The Center now brings this suit asking the court to declare the regulation unconstitutional as applied to it so that the clinic may reopen.

For over 20 years before its recent closure, the Women's Center provided reproductive health services to women in Alabama, including abortions, birth control,

---

privileges for the doctor or a covering-physician contract for the clinic.

treatment for sexually transmitted infections, pregnancy counseling, and referral for adoption. As relevant to this case, Dr. Payne performed all the abortions at the clinic. Early-term abortions (which is how the court will refer to all abortions prior to 16 weeks postfertilization) make up the vast majority of the procedures performed at the Center. In 2012 and 2013, about 80 % of the abortion procedures at the Center were performed prior to 10 weeks postfertilization, and almost 96 % of the abortion procedures were before 16 weeks postfertilization. During that same period, the remaining 4 % of procedures performed at the Center were mid-second-trimester abortions (which is how the court will refer to abortions between 16 weeks and 20 weeks postfertilization). Subject to a health-exception, Alabama's legal limit for obtaining an abortion is 20 weeks postfertilization. 1975 Ala. Code § 26-23B-5(a).

By 2013, around 40 % of the abortions in Alabama took place at the Women's Center, far more than at any

8

other clinic.  In 2012, the Center performed two times more abortion procedures than any other clinic; in 2013, the latest year for which the State has statistics, that gap increased to 2.5.  The Center was the only clinic open five days a week, including on Saturdays, and was the only clinic in Tuscaloosa, Alabama's fifth largest city.  Additionally, it was one of only two clinics in the State that performed abortions throughout the first 20 weeks postfertilization, and it provided around 75 % of the State's mid-second-trimester abortions.

In these 20 years, the Center's license has never been placed on probation, suspended, or revoked for failure to meet any safety regulation.  During the past five years, less than one-tenth of one percent of the Center's patients were transferred to a hospital for observation or a complication.  The Center has never been closed for failing to treat its patients properly.

On the other hand, attacks on the Center have forced it to suspend operations on several occasions.

In 1997, "a person opposed to abortion climbed onto the roof of [the Center] and dropped a lit flare into the air-conditioning unit. The flare lit the entire inside of the clinic on fire, causing over $ 400,000 of damage. The perpetrator of the arson was never identified." <u>Strange III</u>, 33 F. Supp. 3d at 1333. About a decade later, "a man intentionally drove through the front of the [Center], eventually fleeing and engaging police in a chase." <u>Id</u>. Also, the Center has received bomb threats and had gunshots fired through its windows. In addition to these violent acts towards the Center, Dr. Payne and Gloria Gray, the clinic administrator, have encountered protestors at their home. A few months ago, protestors handed out flyers near Gray's home with her name, photograph, and home address, a tactic which has led to violence against abortion providers in the past. <u>See</u> <u>id</u>. at 1333 (noting that an Alabama doctor who provided abortions was murdered after he was identified in an anti-abortion poster at a Montgomery rally that

contained his name, photo, and contact information).
This history mirrors the larger history of "severe
violence against abortion providers in Alabama and the
surrounding regions," including threats, shootings, and
bombings that left at least one doctor and one police
officer dead. Id.

Dr. Payne retired on December 31, 2014, leaving the
Women's Center without a doctor with local admitting
privileges. Since that time, the Center has been
closed. However, it found a replacement, Dr. William
Parker, an Alabama native, to move to Tuscaloosa to
practice at the Center. Dr. Parker is a
board-certified OB/GYN with subspecialty training in
family planning, contraception, and abortion, and with
over 20 years of experience in women's health. He is
currently on the faculty of Northwestern School of
Medicine, and he holds admitting privileges at the
hospital there. He has performed abortions in a number
of States, including Alabama and Mississippi, and

currently provides abortions at the Montgomery clinic when the primary physician is unavailable there.[3]

After agreeing to join the Women's Center, Dr. Parker attempted to meet the legal requirements to provide abortions in Alabama. First, he looked into getting local admitting privileges at the only hospital in the Tuscaloosa area, which required that he perform a number of hysterectomies and laparotomies at that hospital. However, the reality is that, because Dr. Parker is a full-time abortion provider and because complications from abortions are so rare, he would never be able to do the required amount of procedures. Indeed, out of the estimated 10,000 abortions Dr. Parker has performed in the last three years on women up to 20 weeks postfertilization, only two of his patients were transferred to the hospital, and one of the two went for observation only. Dr. Parker has in

_____

3. Even though he does not have staff privileges at any local hospital in Alabama, Dr. Parker is authorized to perform abortions at the Montgomery clinic because that clinic has a contract with a covering physician.

fact never had a patient who needed a hysterectomy from an abortion complication.

Realizing this obstacle, Dr. Parker met with the hospital board in charge of reviewing his application for admitting privileges to propose an alternative. Instead of performing these procedures on his own patients (who would not need them because of the low complication rate from abortions), Dr. Parker proposed a proctoring arrangement where he could work with other OB/GYNs associated with the University of Alabama and perform the required number of procedures, under their guidance, on their patients.  The board stated in a letter that this was an "outstanding idea."  Decl. of William J. Parker, Ex. B (doc. no. 4-12) at 2.  The group of local OB/GYNs affiliated with the University signaled its agreement to be the proctors in this arrangement, writing to the board that Dr. Parker's suggestion was "wonderfully innovative" and that it was "the rest of the medical staff['s] (specifically gynecology staff's) obligation to support this

13

process." Id., Ex. C (doc. no. 4-13) at 2.[4]  The Women's Center even reopened for a brief period, believing that it had an agreement.

This seeming agreement quickly fell apart. The OB/GYNs who originally had signaled they would proctor backed out, and Dr. Parker could not find any replacement. In any case, the board, which Dr. Parker had heard was going to approve his proctoring proposal, did not. Instead, it stated that he must satisfy the proctoring requirement with his own patients, an impossible task for a full-time abortion provider and given the low number of complications from abortion.

When Dr. Parker's attempt to acquire admitting privileges began to break down, the Center sought out a covering physician instead. As could be expected, none of the OB/GYNs from the University group agreed to contract with the Center as a covering physician.  The

---

4.  While a low-quality photocopy makes this exhibit difficult to read, the plaintiffs cite this letter's text in their briefing and the defendant does not dispute the accuracy of this language.

Center then turned to the other OB/GYNs in Tuscaloosa. Those efforts likewise failed. One practice refused point blank to provide covering physicians; the only other practice in the area is headed by a physician with well-known anti-abortion views. All the local solo practitioners also refused to serve as the clinic's covering physician. One of the solo practitioners specifically refused to sign a covering physician agreement because of concerns about reputational harm.

The Women's Center then pursued its last resort and applied to the Department of Public Health for a waiver of the regulation requiring its doctor to have admitting privileges at the local hospital or the clinic to contract a covering physician. In the application for waiver, the Center explained Dr. Parker's safety record and noted that it had policies and procedures in place if complications were to arise at the clinic or after the patient had been discharged. These policies include a 24-hour hotline and a protocol

15

for the Center to communicate with any treating physicians at emergency rooms.   The Department denied the waiver request, and the Center remains closed today.

Absent the temporary restraining order now in effect, financial constraints would have, as of August 4, 2015, forced the Center to fire its staff whom it had continued paying since being closed, and the Center would likely have shut down permanently.

## III. DISCUSSION

The Alabama State Board of Health has the authority to promulgate rules and regulations concerning the licensing of abortion clinics in the State.   Ala. Admin. Code § 420-5-1-.01.   The Board's administrative arm is the Department of Public Health, and the head of Department is the State Health Officer, the defendant.

The regulation at issue here, Ala. Admin. Code. § 420-5-1-.03(6)(b), provides that under current state law, one of two requirements related to abortion

follow-up care must be met before any facility within the State may perform an abortion: (1) the physician who performs the abortion "shall have staff privileges at an acute care hospital within the same standard metropolitan statistical area as the abortion or reproductive health center is located, that permit him or her to perform dilation and curettage, laparotomy procedures, hysterectomy, and any other procedures reasonably necessary to treat abortion-related complications"; or, in the alternative, (2) the abortion clinic shall obtain "outside covering physician services ... through a valid written contract." Ala. Admin. Code. § 420-5-1-.03(6)(b).[5] To be qualified as a clinic's covering physician, a doctor must have admitting privileges as described above, and the contract must require that the doctor be "available to treat and manage all complications that may reasonably arise as a result of an abortion." Id.

---

5. See supra, note 1.

These two alternative requirements are described within the regulation as part of the abortion provider's responsibility to "ensure that all patients receive adequate follow-up care," that is, care relating to any complication that may arise following the procedure. Id. The failure to comply with these regulations can lead to suspension or revocation of a clinic's license, 1975 Ala. Code § 22-21-25, and the operation of any unlicensed clinic can lead to criminal penalties. 1975 Ala. Code § 22-21-33(a).

The plaintiffs make two separate claims for relief. First, they argue that the regulation violates their patients' due-process rights to liberty and privacy guaranteed by the Fourteenth Amendment and imposes an undue burden on a woman's right to choose to have an abortion. Second, they argue that the regulation violates their own due-process rights under the Fourteenth Amendment to pursue their chosen business and profession. They ask the court to declare Ala. Admin. Code § 420-5-1-.03(6)(b) unconstitutional as

<u>applied</u> to them only; in other words, they ask the court to enjoin the enforcement of the regulation against them, but they do not challenge the regulation facially or as it applies to other clinics in Alabama.

The court now turns to the question at hand: whether the plaintiffs have shown that a temporary restraining order was warranted to suspend enforcement of the regulation against them and to allow the Center to reopen.

## A. Substantial Likelihood of Success on the Merits

### 1. Administrative Exhaustion

The State Health Officer first argues that a temporary restraining order should not have been granted because the plaintiffs failed to exhaust administrative remedies. Specifically, he contends that the plaintiffs should have petitioned for an amendment or repeal of the challenged regulation under the Alabama Administrative Code in addition to applying for a waiver. The court disagrees.

Most simply, "there is no requirement that a plaintiff exhaust his administrative remedies before filing a suit under § 1983." Beaulieu v. City of Alabaster, 454 F.3d 1219, 1226 (11th Cir. 2006) (citing Patsy v. Bd. of Regents of State of Fla., 457 U.S. 496, 508 (1982)). As such, any administrative exhaustion requirement is inapplicable here.[6] Indeed, requiring

---

6. Beaulieu went on to note that a claim still must meet "constitutional ripeness requirements." 454 F.3d at 1227. "To determine whether a claim is ripe [a court] must evaluate: (1) the fitness of the issues for judicial decision; and (2) the hardship to the parties of withholding court consideration. In applying the fitness and hardship prongs [the court] must consider the following factors: (1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." Id. (internal citations and quotations marks omitted).

This case is ripe. As discussed below, without judicial intervention, the Women's Center will close and the right of many Alabama women to choose to have an abortion will be curtailed severely and, in some cases, denied. Moreover, further administrative action through the petition process would be both inapt, as any petition would cover far more than the plaintiffs are requesting, and futile, as the State Health Officer has already declared the covering-physician requirement (continued...)

all plaintiffs to go through a petition process in state government when they allege constitutional violations under § 1983 against the State undermines the congressional intent to establish federal-court review under § 1983.  See Patsy, 457 U.S. at 503-504.[7]

In any case, the plaintiffs' application for a waiver certainly fulfilled the general purposes of exhaustion by bringing the issue to the state agency's attention before pursuing litigation in federal court.

---

"essential" in his denial of the plaintiffs' waiver application. State Department of Public Health Response to Plaintiffs' Request for Waiver (doc. no. 4-6) at 3. Last, the factual record has been developed through adequate briefing, which includes the application for and denial of a waiver.

7. The State Health Officer cites Woodford v. Ngo, 548 U.S. 81 (2006), in support of his exhaustion argument. Woodford concerns the Prison Litigation Reform Act (PLRA), 42 U.S.C. § 1997e et seq., which carves out an exception to the general rule that § 1983 cases do not require administrative exhaustion. However, the court can find no authority indicating that the PLRA exception has swallowed the rule, nor has the State Health Officer cited any cases that take this statutory rule from the PLRA and apply it to all § 1983 cases.  Indeed, Beaulieu affirmed that there is no general exhaustion requirement for § 1983 cases ten years after the PLRA passed.

See Chandler v. Crosby, 379 F.3d 1278, 1287 (11th Cir. 2004) (finding that "the purpose of administrative exhaustion ... is to put the administrative authority on notice of all issues in contention and to allow the authority an opportunity to investigate those issues.") (internal quotation marks omitted).

Furthermore, the State Health Officer's contention that the plaintiffs also should have petitioned to change the rule misunderstands their claims.  A person who pursues the petitioning process seeks to change a regulation as a whole.  See Ala. Admin. Code § 420-1-2-.04 ("Any person may petition the Board to adopt, amend or repeal a rule.").  The State Health Officer acknowledges as much, noting that consideration of a petition would allow for one regulation "that [would] apply with equal force to all ... licensed abortion or reproductive health centers." Def. Opp. to Pl. Mot. for Temporary Restraining Or. (doc. no. 17) at 13.  But this is simply not what the plaintiffs seek to do.  The plaintiffs here bring an as-applied challenge;

that is, they argue only that the regulation should not be applied to the Center and Dr. Parker.  They make no claim as to the regulation as it operates in the State generally, and it would be illogical indeed if they were required to seek a change they may not even endorse in order to exhaust their claims.

Finally, even if the exhaustion requirement did apply here, it would not have defeated the plaintiffs' motion for a temporary restraining order.  It is implausible to require that any plaintiff seeking a temporary restraining order against an immediate and irreparable harm must go through a lengthy, potentially fruitless rulemaking process.  As background, if a person petitions for a rule change, the Health Officer has a maximum of 90 days (60 days plus a potential 30-day extension) to either deny the rule or initiate the rulemaking process.  Id. § 420-1-2-.06.  If the Board does not immediately deny the petition, it is unclear from state regulations how long it would have to change the regulation or even if it would have to change the

23

regulation at all.   Thus, the State's argument comes down to this: any party suffering immediate and irreparable harm to their federal constitutional rights because of a state regulation must engage in a lengthy rulemaking process before seeking redress in federal courts.   That would defeat the very purpose of a temporary restraining order.   See <u>Fletcher v. Menard</u> <u>Corr. Ctr.</u>, 623 F.3d 1171, 1173 (7th Cir. 2010) ("[T]here is no duty to exhaust, in a situation of imminent danger, if there are no administrative remedies for warding off such a danger").

In short, there is no exhaustion requirement here. Even if there were, the plaintiffs have fully exhausted their claims.   In any event, exhaustion would not have defeated the plaintiffs' motion for a temporary restraining order.


## 2.  Undue-Burden Test

The plaintiffs have put forth two theories for relief: that the regulation imposes an undue burden and

that it violates the plaintiffs' right to pursue their chosen business and profession.   The court need consider only one at this time.   The court is persuaded that the plaintiffs have a substantial likelihood of success on their argument that the Alabama regulation requiring either local staff privileges or a covering physician, as applied to the West Alabama Women's Center, would impose an undue burden on a woman's right to choose to have an abortion in violation of the Fourteenth Amendment's Due Process Clause.

"An undue burden is an unconstitutional burden," and a "finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." Planned Parenthood of Se. Pennsylvania v. Casey, 505 U.S. 833, 877 (1992) (plurality opinion).   This court has held that, "to determine whether an actual or intended obstacle is substantial[,] the court must determine whether, examining the regulation in its

real-world context, the obstacle is more significant than is warranted by the State's justifications for the regulation." Strange III, 33 F. Supp. 3d 1330, 1337 (M.D. Ala. 2014) (Thompson, J.) (internal citations omitted); see also Planned Parenthood of Wisconsin, Inc. v. Van Hollen, 738 F.3d 786, 798 (7th Cir. 2013) ("The feebler the medical grounds, the likelier the burden, even if slight, to be 'undue' in the sense of disproportionate or gratuitous."); Planned Parenthood Arizona, Inc. v. Humble, 753 F.3d 905, 914 (9th Cir. 2014) (holding that "the undue burden test is context-specific, and that both the severity of a burden and the strength of the state's justification can vary depending on the circumstances"); but see Whole Woman's Health v. Cole, 790 F.3d 563, at n.33 (5th Cir.) (rejecting this context-specific test), modified, 790 F.3d 598 (5th Cir.), stayed by 135 S. Ct. 2923 (2015).

Turning to the undue-burden test, the court will address the obstacles and justifications for the

regulation, Alabama Administrative Code § 420-5-1-.03(6)(b), as applied to plaintiffs, and then evaluate whether the obstacles are more severe than warranted by the State's justifications.

### a. Obstacles

The plaintiffs argue that the regulation has forced the Women's Center to close and will cause it to remain closed, resulting in the continuing denial of the right to obtain an abortion for many women and presenting serious difficulties in obtaining an abortion for others.

The court must take a two-step inquiry to address this argument: first, whether the regulation will force the Center to remain closed; and second, if the Center remains closed, and no other clinic takes its place, determining the effect on Alabama women who seek abortions. See Strange III, 33 F. Supp. 3d at 1342.

### i. The Effect on the Center

The question in this section is whether the Center will ever be able to reopen. This question boils down to whether a doctor with local staff privileges will ever be willing to associate with the Center, either by providing abortions there or serving as a covering physician.

As a threshold, based on the record before the court, Dr. Parker will not be able to obtain staff privileges by performing the required number of procedures on his patients at the local hospital. To obtain staff privileges that would enable him to provide abortions at the Center, Dr. Parker first would have to perform 10 hysterectomies and 10 laparotomies at Tuscaloosa's only hospital. This requirement is impossible for a doctor whose entire practice is providing abortions, because of the extreme rarity of these complication-related procedures for abortion patients. To put this requirement in perspective, Dr. Parker has never had a patient who suffered a

complication from abortion requiring a hysterectomy. Only two of his last 10,000 patients who were up to 20 weeks pregnant have been hospitalized and one of them simply went in for observation. Although Dr. Parker attempted to set up a proctoring agreement in which he would help other doctors to perform these procedures on their patients, the hospital eventually rejected that arrangement. Moreover, the court has no cause to believe that the hospital--again, the only one in Tuscaloosa, and thus the only one that would be able to grant staff privileges that meet the regulation's locality requirement--would consider the entreaty of any other doctor differently.

The only way, then, for the Center to remain open would be to associate a doctor, with local admitting privileges, to perform abortions or to contract as a covering physician. As discussed above, Dr. Parker's past attempts to work with local OB/GYNs shows that this is highly unlikely. When he tried to set up a proctoring arrangement, which another OB/GYN group and

the hospital originally received enthusiastically, this plan fell apart after the group and the hospital suddenly reversed course. Reaching out for a covering physician in Tuscaloosa was equally unavailing. Dr. Parker and the Center contacted every OB/GYN practice and solo practitioner in Tuscaloosa, except one with known strong anti-abortion views, and all refused. One solo practitioner specifically stated she would not be a covering physician for fear of reputational harm.

This fits within the general pattern the court observed in Strange. Abortion providers in Alabama have faced severe harassment and stigma for being associated with abortion in any way; similar ramifications have been felt even by covering physicians, who handle only complication-related care and do not perform abortions themselves. Strange III, 33 F. Supp. 3d at 1349. In Huntsville, when a doctor with an OB/GYN practice agreed to perform abortions as part of her practice, anti-abortion protestors started confronting her patients, leading her to close down her

30

obstetrics practice entirely.[8]   _Id_.   Another doctor lost patients from her private practice en masse after her role as Huntsville clinic's covering physician was revealed publicly; the negative publicity also forced her to remove her children from their school.   _Id_. at 1350.   Finally, a doctor who originally agreed to be a covering physician in Montgomery backed out after she realized her anonymity might be compromised.   _Id_.   This threat of economic ruin, combined with the palpable threat of violence discussed above, keeps even those doctors in Alabama who do not have a moral or ethical opposition to abortion from providing abortions. Indeed, it even prevents these doctors from serving as covering physicians.

Nor is it likely that another doctor will fill the current void in Tuscaloosa.   There is a "severe scarcity of abortion doctors ... nationwide and

---

8.   To protect the anonymity of any doctor not specifically named in the parties' filings, the court generally refers to them by feminine pronouns, regardless of their gender.

particularly in the South," with no residency program offering training in performing abortion in Louisiana, Alabama, or Mississippi. Id. at 1348. As discussed in Strange, it is most unlikely that doctors with local admitting privileges in Alabama will decide to start performing abortions or that doctors who move from out-of-state could obtain local admitting privileges. Id. Indeed, if a doctor like Dr. Parker (who has impressive credentials, a personal connection to the State, and a willingness to risk the danger of being an abortion provider) cannot either obtain admitting privileges or find a covering physician, it is unlikely that any doctor can.

Finally, as discussed above, the Department of Health has called the covering-physician requirement "essential," indicating it will not reverse its decision to refuse a waiver.

For these reasons, the court finds that if the regulation remains in effect as applied to the Women's Center and Dr. Parker, the Center will remain closed,

likely permanently eliminating access to abortion services in Tuscaloosa.

### ii. The Effect on Women

By closing down operations at the Center, the regulation seems to impose severe and, in some cases insurmountable, obstacles on women who seek abortions in this State in several ways.

First, Tuscaloosa is the fifth-largest city in the State; until recently, women who lived in the city were able to obtain abortions without having to travel outside the city. Now, any woman in Tuscaloosa seeking an early-term abortion must travel nearly 60 miles to the closest provider, in Birmingham, or over 100 miles to the next closest provider in Montgomery. The court has previously discussed the serious impact of the "first 50 miles" of travel on women seeking abortions, and that "when a clinic closes, the largest effects are actually felt by women who, prior to the closure, needed to travel only short distances, less than 50

miles."   Strange III, 33 F. Supp. 3d at 1358-60.   This circumstance imposes the same burden.

Moreover, obtaining an abortion after 16 weeks now has become especially onerous for a woman who lives in Tuscaloosa, or who lives closer to Tuscaloosa than to Huntsville.   Huntsville is near the northern border of the State--100 miles from Birmingham, 150 miles from Tuscaloosa, and 200 miles from Montgomery.   This is far by any measure, even for women already prepared to travel some distance.   And these distances are compounded by the fact that the Center is the only provider in the State that performs abortions through the mid-second trimester on Saturdays.   As the plaintiffs point out, Saturdays have been the Center's busiest days because it is often the only day that patients can get off work or find someone to accompany them to the clinic.

For many women, the plaintiffs argue, these obstacles are insurmountable.   The plaintiffs present evidence that over the past several months, the Center

has received numerous calls from women seeking help because they are unable to travel the distance; the administrator of the Huntsville clinic stated the same. Indeed, the statistical evidence bears out the severity of this impact. While the clinics that remain open have treated hundreds more patients this year as compared to years past, the data suggest that these clinics have not come close to filling fully the gap left by the Center closure--and thus, hundreds fewer women have been able to obtain an abortion this year.

Yet even for women who are able to obtain an abortion elsewhere, the "array of harms" imposed by the Center's closure remain significant. <u>Strange III</u>, 33 F. Supp. 3d at 1356-57. This is particularly true for women in poverty, as most of the Center's patients are. In 2014, 82 % of the Center's patients were living at or below 110 % of the federal poverty level. As this court previously explained, for women in poverty,

> "going to another city to procure an abortion is particularly expensive and difficult. Poor women are less likely to own their own cars and are instead

35

dependent on public transportation, asking friends and relatives for rides, or borrowing cars; they are less likely to have internet access; many already have children, but are unlikely to have regular sources of child care; and they are more likely to work on an hourly basis with an inflexible schedule and without any paid time off or to receive public benefits which require regular attendance at meetings or classes. A woman who does not own her own car may need to buy two inter-city bus tickets (one for the woman procuring the abortion, and one for a companion) in order to travel to another city. Without regular internet access, it is more difficult to locate an abortion clinic in another city or find an affordable hotel room. The additional time to travel for the city requires her to find and pay for child care or to miss one or several days of work. Furthermore, at each juncture, a woman may have to tell relatives, romantic partners, or work supervisors why she is leaving town: to procure an abortion. And, in light of the pervasive anti-abortion sentiment among many in Alabama, such disclosures may present risks to women's employment and safety. Finally, ... many low-income women have never left the cities in which they live. The idea of going to a city where they know no one and have never visited, in order to undergo a procedure that can be frightening in itself, can present a significant

> psychological hurdle. This
> psychological hurdle is as serious as
> a burden as the additional costs
> represented by travel."

Strange III, 33 F. Supp. 3d at 1357 (internal citations

omitted). As a result, regulations such as the one at

issue here, which purportedly enhance women's health,

cause delays which increase the risk of complications

if the woman is able to eventually obtain the

procedure.

Further, based on the limited record, women seeking

mid-second-trimester abortions are among those for whom

the burdens of travel and other related hurdles are

most severe. The plaintiffs present evidence that

low-income women are more likely to have later

abortions because difficulties in securing financial

and logistical arrangements cause unwanted delay. A

declaration from the administrator of the Huntsville

clinic--the State's only remaining provider of

abortions through the mid-second trimester--confirms

that his patients have reported delays in obtaining the

procedure due to travel that has become necessary as a

result of the Center's closure.  Similarly, clinic administrator Gray recounts an example in which one young woman arrived with her father at the Women's Center, but was turned away because it was closed.  Her pregnancy was already extremely close to the legal limit, and, by the time she would have been able to obtain an abortion in Huntsville, it would have been too late.  This shows that for patients in their mid-second trimester, delays may lead to an outright denial of the right to choose, given Alabama's restrictions on the provision of abortion later in pregnancy.

Second, the closure of the Center predictably has stretched the capacity of the clinics that remain open. As explained above, until it closed, the Women's Center provided the most abortions in Alabama by a substantial margin, performing more than 40 % of the abortions in the State.  It is one of only two providers that performed abortions throughout the second trimester,

and it performed about 75 % of the mid-second-trimester abortions in the State.

At least some of the clinics that remain open are now operating at or very near maximum capacity. And as discussed above, it is statistically implausible that the increase in the number of procedures provided by the remaining clinics has covered fully the needs of women who might have sought care at the Center. This fact makes it extremely likely that women in Alabama will be or already have been unable to obtain the abortions they seek due to capacity constraints.

For example, since the Center has closed, the Huntsville clinic has seen more than a 57 % increase in the number of women obtaining abortions there as compared with last year, and triple the number of women obtaining abortions after 16 weeks. Because mid-second-trimester abortion procedures are more time-consuming, this additional influx of patients seeking mid-second-trimester abortions has reduced the clinic's capacity to provide early-term abortions. The

39

Huntsville clinic administrator has stated that due to the increased number of patients seeking both first-trimester and second-trimester abortions at his clinic, he fears that his clinic soon will be forced to institute a waiting list to prioritize those women with the most urgent needs, further delaying all women's access to care.

This capacity constraint is the result of a longer history in the State of clinic closures, and the inability of new clinics to open to meet the demand. Whereas in 2001 there were 12 clinics providing abortions in Alabama, that number had dwindled to five by the end of 2014; with the Center's closure, there are now only four in operation. This steady decline can be understood in the context of the climate of hostility in the State towards the procedure and its providers, as discussed above. See also Strange III, 33 F. Supp. 3d at 1334. It is also clearly correlated to state regulations, such as this one, which make it impossible for new doctors to begin practicing here due

<u>to that climate</u>.   As this lawsuit makes abundantly clear, doctors who are not already practicing in Alabama are unable to comply with the regulation at issue--and thus will be unable to practice here at all, without court intervention--not because they are unqualified, but because they cannot find sufficient support among peers in the local medical community who are not influenced by this climate of hostility.   The effect, of course, is that the capacity of abortion providers in this state--already constricted--is not likely to expand again.

Finally, because travel-related obstacles and a statewide capacity constraint caused by the Center's closure appear to have made it more difficult to obtain an abortion in Alabama, there is now likely to be a greater risk that women who "desperately seek to exercise their ability to decide whether to have a child" will attempt to obtain an abortion without medical supervision, "with corresponding dangers to life and health."   <u>Strange III</u>, 33 F.Supp.3d at 1363;

41

Strange II, 9 F. Supp. 3d 1272, 1289 n.31 (M.D. Ala. 2014); see also Planned Parenthood of Wisconsin, Inc. v. Van Hollen, --- F. Supp. 3d. ----, 2015 WL 1285829, at *42 n.31 (W.D. Wis. 2015) (Conley, J.) (crediting evidence that "epidimologic data indicate an inverse relationship between the availability of legal abortion and resorting to illegal abortion associated with remarkable increased risks of death or morbidity, which includes septic abortion, uterine infection, pelvic abscess, loss of uterus and/or ovaries and infertility.") (internal citations omitted).

The plaintiffs submit evidence that the remaining providers already are witnessing the manifestation of that risk. One woman showed up to the Center after it had closed and threatened to take measures into her own hands because she was unable to travel the distance to another clinic. Similarly, the Huntsville clinic has received at least two calls per month from women who, after explaining that they plan to attempt to terminate the pregnancy on their own because they cannot travel

42

to Huntsville, have sought advice as to what pills they can take to self-induce abortion.

In sum, based on the evidence now before the court, the regulation's effect on women seeking abortions at the Center is profound. Patients who live in Tuscaloosa now need to travel outside of the city to procure an abortion, causing delays that increase the risk of the procedure if they are able to obtain it elsewhere, and causing women to suffer other harms, including financial difficulties, psychological stress, and being prevented from obtaining an abortion at all. For all Alabama women, the closure of the largest abortion provider in the State, one of two providers in the State that administers abortions after 16 weeks, has reduced the number of abortions that can be provided here. Finally, and as chillingly recounted above, closing the Center has increased the risk that women will take their abortion into their own hands.

## b. Justifications

Having established the weight of the obstacles, the court will now turn to the other side of the scales--determining the strength of the State's justifications for the regulation. "In order to evaluate the weight of the state interest involved in a particular case ... the court must look to case-specific factors. These factors include the extent of the anticipated benefit, the likelihood of the anticipated benefit, the means a regulation employs, and the political history and context of the regulation." Strange III, 33 F. Supp. 3d at 1365.

As discussed above, a clinic can comply with the regulation by either employing a doctor with local admitting privileges or contracting with a covering physician. Both prongs are meant to ensure that women who obtain abortions receive adequate complication-related care; they do so by authorizing two alternative models for continuity of care.

44

"Continuity of care is the goal of ensuring that a patient receives high-quality care not only during a certain procedure but also after it, including treatment of complications and any necessary follow-up care." Strange III, 33 F. Supp. 3d at 1363. In Strange, the court heard evidence on three approaches to providing continuity of care in the abortion context.[9] See id. at 1363-66. Because the differences among these three models reflect the positions of the parties here as well, the court reviews them below.

The first model, which the court will call the 'consulting-physician' model, ensures that the clinic physician remains readily available to consult with other physicians who provide complication-related care, and that lines of communication remain open and

_____

9. The parties in Strange presented evidence on these approaches to continuity of care as they relate to complications from early-term abortions. Because neither party here has argued that models for adequate continuity of care would be any different for complications that could arise from a mid-second-trimester abortion, the court will adopt this framework for the purposes of considering this motion as well.

accessible between the abortion clinic and its patients following any procedure. Under this model, patients have 24-hour telephone access to an on-call clinic staff member who can remotely assess the patient's needs at any time and make referrals as necessary. Strange III, 33 F. Supp. 3d at 1364. Some calls to the clinic's number may require the clinic staff member to reassure the patient that her symptoms are normal; to give instructions for in-home treatment, such as to take extra-strength Tylenol; or to schedule the woman for a follow-up visit at the clinic. Other calls may require the clinic staff member to notify the clinic's doctor, who will then assess next steps. If the doctor determines that the woman should be immediately assessed or treated for a complication, she will be directed to the nearest emergency room; and emergency-room doctors are trained to provide care for all abortion complications. In the rare circumstance that a complication arises during the abortion procedure itself, the patient will be transferred

46

directly to the nearest hospital.  In either case, the clinic physician will communicate directly with the hospital physicians.  _Id_. at 1364-65.  This is the model that best reflects the Center's emergency-care protocol.

The second approach to continuity of care is the covering-physician model.  A clinic that follows this approach maintains an agreement with a physician who has admitting privileges at a local hospital.  _Id_. at 1365.  In the event of a complication that requires treatment at a hospital, the covering physician will meet the patient at the hospital to admit the patient, or will assume care after the patient has been assessed and treated by an emergency-room doctor.

The third approach to complication care is what the court has termed the 'country-doctor' model.  Adhering to this model requires the doctor who performs the abortion to provide care for almost any complications that arise, though a specialist may get involved with certain treatments.  _Id_.  As such, the clinic physician

herself must have staff privileges at a local hospital near the abortion clinic.[10]

The covering-physician model and the country-doctor model reflect the two approaches to continuity of care

---

10.   In Strange, the court found that "the country-doctor approach, while carrying an intuitive appeal, does not reflect the practice of 21st century medicine, as it relates to simple, low-risk surgeries and medical treatment." Strange III, 33 F. Supp. 3d at 1371.   The court concluded that, while "there is a range of disagreement within the medical community regarding the appropriate model of complication care for minor surgeries and medication-based procedures like early-term abortion," the country-doctor model "falls outside that range of disagreement." Id. at 1364.

Because the Strange plaintiffs did not provide mid-second-trimester abortions at their clinics, the court did not hear evidence in that case regarding those procedures, the types of complications that can arise from them, and what impact that may have on assessing standards for complication-related care.   As such, the court refrains, at this point, from drawing any conclusions as to the range of reasonable medical opinion regarding procedures that would ensure adequate continuity of care for clinics that provide mid-second-trimester abortions.

However, the court also notes that this general question is not presented by this case.   The question here is context-specific: whether the Center's emergency-care protocol is sufficient to provide high-quality continuity of care when Dr. Parker is administering abortions in its clinic.

authorized by the two alternative prongs of the regulation's requirements. However, because under the current state of the law a clinic can comply with the regulation by contracting with a covering physician, the court assumes that the State's interest is satisfied by the covering-physician approach to continuity of care. Therefore, it will compare the Center's protocol to that baseline model.

The plaintiffs argue that at least as to abortions provided by Dr. Parker, the Center's emergency-care protocol is sufficient to ensure adequate continuity of care and that requiring the Center to contract with a covering physician would not benefit patient health in any meaningful way. The plaintiffs support their claim in two ways: first, they contend that, while abortions are safe generally, Dr. Parker has an extraordinary safety record; second, they contend that the Center's emergency-care protocol is as effective at ensuring high-quality continuity of care as the covering-physician model.

49

To assess whether the covering-physician requirement could meaningfully further the State's interest in continuity of care, the court will first put its use in context. As the court has explained previously, complications from early-term abortions, which are the vast majority of the procedures performed at the Center, are "vanishingly rare." Strange III, 33 F. Supp. 3d at 1364. The plaintiffs present data from a recent study showing that only 0.89 % of first-trimester abortions cause any complication of any kind and that only 0.05 % of first-trimester abortions cause a complication that requires hospital-based care. These statistics suggest, as the court found in Strange, that "clinics do not make frequent use of their covering physicians because the procedures they perform are extremely safe and because, where possible, the clinics themselves provide complication care." Strange III, 33 F. Supp. 3d at 1370 n.23.

Of course, the Women's Center and Dr. Parker also provide some second-trimester abortions, and

complication rates for these procedures are not captured by the statistics cited above. But Dr. Parker's complication rate over the past three years-- which includes procedures performed up to 20 weeks postfertilization, Alabama's legal limit--is even lower than that general first-trimester complication rate. Dr. Parker estimates that the number of his patients who have been transferred to the hospital over the past three years is two out of 10,000, or 0.02 %. This evidence suggests that the chances are similarly low here that the Center would make use of its covering physician at all.

Moreover, when a complication requires hospital admission, the regulation itself does not guarantee that a clinic patient would ever be seen by the covering physician, even if the Center were to contract with one. First, the regulation itself does not actually require a clinic to make use of the covering physician in the case of any complication: to comply with the regulation, a clinic need only maintain a

contract promising the covering physician's availability. Second, if a patient who experiences complications lives outside the Tuscaloosa area--as do at least some of the Center's patients--the fact that the Center might have a contract with a covering physician who could admit her to the Tuscaloosa hospital is unlikely to affect her complication-related care in any way, as she will (and should) seek emergency care closer to home.

This background context suggests that there is likely only a tiny number of women who would ever come into contact with the Center's covering physician, if it had one. Yet the plaintiffs argue that, even for this tiny fraction of women, the covering-physician requirement does not confer any health benefit that enhances the quality or continuity of care, due to the robustness of the Center's emergency-care protocol. The court will examine the plaintiffs' contention for two sets of patients who might seek complication-related care during or after obtaining an

abortion: patients who are transferred directly from the clinic to a hospital where the covering physician has privileges, and patients who seek complication-related care after being discharged.

First, in the extremely rare event that any patient needs to be transferred to the hospital during an abortion procedure, the Center's emergency-care protocol requires Dr. Parker and clinic staff to alert 911 and the hospital to the pending transfer; to provide the hospital's emergency department with necessary information about the patient's case; and to send a copy of the patient's medical records to the hospital along with the patient. When the patient arrives at the hospital, she will be assessed and triaged by emergency-room staff and she may then be seen by the hospital's OB/GYN or another specialist. The Center would communicate directly with the hospital and Dr. Parker would be available for consultation with the hospital's physicians at any time during the patient's course of treatment.

If the Center had a covering physician, that doctor would be contacted at the soonest possible point in time in this process; would be relayed necessary information about the patient; and, if she could, would meet the patient at the hospital to assume care. Because this doctor would have a contractual relationship with the clinic, she might have some working relationship with Dr. Parker that could facilitate their communication--though as explained above, the rarity of complications means that the two doctors would not be in regular communication. However, there is no guarantee that the covering physician will reach the hospital to admit the patient before the patient is assessed or treated by the emergency-room physicians; that the covering physician will be any more knowledgeable about the patient or her condition than would be the hospital physicians; or that the covering physician will be any more qualified to treat the patient than would be the hospital physicians. Moreover, because Dr. Parker and staff

**54**

from the Center communicate directly with the hospital
and provide consultation as necessary, the patient
continues to have an advocate for her care even after
she has been transferred.

Second, the Center's policies also ensure that
patients will receive adequate continuity of care after
they have been discharged.  As a preliminary matter,
the Center will not perform abortions at all unless Dr.
Parker will be available for at least 72 hours
following the procedure.  After obtaining an abortion
at the Center and being discharged for recovery,
patients are provided 24-hour telephone access to the
Center's medical staff.  If a woman suspects a
complication, she can call the hotline number to speak
to a registered nurse employed by the Center or, as
necessary, to Dr. Parker.  If Dr. Parker determines
that the woman should be assessed immediately at a
hospital, he will direct her to the nearest one.  If he
knows where she intends to go, he will call ahead to
the hospital to provide any pertinent information about

the patient; if he does not, he will provide his
contact information to the patient and emphasize that
she should ask the hospital to contact him.

If the Center had a covering physician, and if the
covering physician had staff privileges at the hospital
nearest to the patient, then the Center might notify
the covering physician so that she could admit the
patient to the hospital herself.   However, the
regulation does not require the Center to do so.
Moreover, as in the previous scenario, there is no
guarantee that the covering physician will arrive at
the hospital before the patient or before she is
treated by the emergency-room doctor; will be any more
knowledgeable about the patient than the hospital
staff; or will be any more qualified to treat her.

While the State Health Officer points to a
concern--first articulated by clinic administrator Gray
during a deposition taken in <u>Strange</u>--that a covering
physician, at the very least, would be respectful of
the patient's choice to have an abortion (perhaps in

56

contrast to other hospital physicians), the court will not allow hypothetical personal biases to influence whether some women can be denied the constitutional right to choose. Cf. Palmore v. Sidoti, 466 U.S. 429, 433 (1984) ("Private biases may be outside the reach of the law, but the law cannot, directly or indirectly, give them effect."). And without any evidence before it to the contrary, the court assumes that any doctor charged with the care of a patient will treat that patient to the best of her ability, notwithstanding any personal biases she may hold about the patient's choice to obtain an abortion.

Finally, the State Health Officer contends that the regulation is sufficiently justified, by two past incidents that occurred at other clinics in the State, to be enforced against the plaintiffs, given that support for the covering-physician requirement is within the range of reasonable medical opinion and that States have discretion to regulate medical procedures when there is medical and scientific uncertainty as to

the safety benefits and risks of those procedures.  But the fact that a regulation "conceivably might, in some cases, lead to better health" does not, in itself, justify the regulation.  Strange III, 33 F. Supp. 3d at 1340-41 (citing Doe v. Bolton, 410 U.S. 179 (1973)); see also Strange II, 9 F. Supp. 3d at 1287 ("Not every legitimate state interest will justify any and all obstacles....").  Rather, the justifications for a regulation must be weighed against the obstacles it imposes on women who seek abortion, and a regulation that could eliminate access to abortion for some women entirely must be supported by a weighty justification indeed.

Moreover, the case that the State Health Officer relies on for support of this argument, Gonzalez v. Carhart, 550 U.S. 124 (2007), is inapposite here. Gonzalez was a facial challenge to a ban on a certain type of abortion procedure; in that case, the Supreme Court held that the ban was "not invalid on its face where there is uncertainty over whether the barred

procedure is ever necessary to preserve a woman's health, given the availability of other abortion procedures that are considered to be safe alternatives." Id., 550 U.S. at 166-167. In other words, the Court found that the justification for the law (the State's interest in the life of the fetus) outweighed the weak obstacle created by the law (a prohibition on an abortion procedure that provided what the Court characterized as an uncertain benefit to women's health and for which there was an alternative).

The scales in this case are reversed. Here, the evidence suggests that the regulation's justification of protecting women's health as applied to this clinic is weak, given the Center and Dr. Parker's strong safety records, while the obstacles for the Center and Alabama women exercising their constitutional right to choose to have an abortion loom large. See Van Hollen, 2015 WL 1285829 at *10 ("As this court explained in its preliminary injunction opinion, unlike cases where courts have considered a regulation adopted to respect

the potential life of the unborn or to further the integrity and ethics of the medical community, see, e.g., Gonzales, 550 U.S. at 157, there is no other legitimate state interest or interests at play [in this case,] which would counter-balance any arguable uncertainty in the medical community as to the medical rationale underlying this regulation. .... Accordingly, the court must balance health interests against health interests....").

Furthermore, the fact that the plaintiffs challenge the application of the regulation to only the Center makes any evidence as to certain events that have occurred at other reproductive health centers in the State in the past less compelling, for this clinic has an impeccable safety record.

In sum, walking through each of these scenarios makes clear that the State Health Officer's justifications for the regulation are slight insofar as the regulation applies to the West Alabama Women's Center. The covering-physician requirement, the

State's baseline for continuity of care, seems to provide little to no realistic benefit here.  Very few of the Center's patients, if any, would come into contact with a covering physician, if the Center had one; for those patients that might, the Clinic's emergency-care protocol makes any relative benefit to continuity of care gained from a covering physician marginal at best.

### c. Substantial Obstacle?

Now the court turns to the heart of the substantial-obstacle test: Have the plaintiffs shown that the obstacles imposed by the regulation are substantially likely to be more severe than warranted by the defendant's justifications for the regulation? Strange III, 33 F. Supp. 3d at 1377.  If so, the burden is undue, and is therefore unconstitutional.  And on the record now before the court, the answer is "Yes."

The plaintiffs have presented evidence that the obstacles imposed on the Center and its patients by the

regulation loom large.  The Center itself is unable to operate, even though it has a highly qualified doctor on staff.  Women who would otherwise obtain an abortion at the Center now need to travel much further, imposing financial and psychological hardships and delaying and probably preventing their access to care.  Capacity has been reduced at clinics statewide, especially for women seeking mid-second-trimester abortions (an especially vulnerable group), causing further delays and harms for women in the State.  Finally, these obstacles create a significant risk that some women who cannot otherwise obtain an abortion at the clinic will attempt to self-induce, with corresponding risks to their health and safety.

On the other side, on the record currently before the court, the justifications for the regulation as it would be applied to the Center seem to be weak.  The Center's emergency-care protocol ensures that its patients have 24-hour access to medical care; that pertinent patient information will be shared with

doctors who provide complication-related treatment; and that Dr. Parker will be available for consultation with those doctors and, when possible, will directly communicate with them.   The continuity of care provided by the Center according to this procedure would not be meaningfully different from that ensured by the covering-physician requirement.   Cf. Van Hollen, 2015 WL 1285829 at *1 ("While ... sometimes it is necessary to reduce access to insure safety, this is decidedly not one of those instances.").   Any impact on patient health would be speculative, and any benefit would be, at best, marginal.   Yet even that marginal benefit would be reversed by the increased dangers to health resulting from self-induced abortion.

As the court has previously explained, "the more severe an obstacle a regulation creates, the more robust the government's justification must be, both in terms of how much benefit the regulation provides towards achieving the State's interest and in terms of how realistic it is the justification will actually

achieve that benefit." <u>Strange II</u>, 9 F. Supp.3d at 1287.  Here, because the obstacles to women caused by the regulation are so severe, the defendant must come forward with justifications that are sufficiently robust to justify such obstacles.  So far, the State Health Officer has not.  The court therefore agrees, for now, that the plaintiffs have demonstrated that the regulation imposes a substantial obstacle to a woman's right to choose abortion.  As such, the plaintiffs have shown a substantial likelihood of success on the merits of this claim.


## B. Irreparable Harm

There are ongoing and imminent irreparable harms to the plaintiffs and their patients.  As detailed above, it appears from the record that the enforcement of the regulation as-applied to the Center is an ongoing infringement on the constitutionally protected privacy interests of Alabama women.  <u>See Strange I</u>, 951 F. Supp. 2d at 1289.  "[C]ourts presume that violations to

the fundamental right to privacy are irreparable." Id. (citing Deerfield Med. Ctr. v. City of Deerfield Beach, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981)[11]). Moreover, if a temporary restraining order is not issued, the Center will be forced to close, very likely permanently. Although the Center has been able to keep paid staff since January while trying to come into compliance with the regulation, it will no longer have the funds to operate if immediate relief is not given. This would make the ongoing violation of many Alabama women's fundamental rights permanent and would force the clinic administrator to lose her entire business. Both of these are irreparable harms.[12]  Id.

---

11.  The Eleventh Circuit has adopted as precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981, and all Former Fifth Circuit Unit B and non-unit decisions rendered after October 1, 1981.  See Stein v. Reynolds Secur., Inc., 667 F.2d 33, 34 (11th Cir. 1982); Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

12. The former Fifth Circuit used a "sliding scale" standard when evaluating whether to issue a temporary restraining order or preliminary injunction.  See Siff v. State Democratic Executive Comm., 500 F.2d 1307, (continued...)

The State Health Officer responds that the plaintiffs have not shown why a temporary restraining order is needed to address the plaintiffs' alleged harms because the harm is not proven; because the lack of other abortion providers is not due to the

---

1309 (5th Cir. 1974) (explaining that "a sliding scale must be applied in considering the probability of plaintiffs' winning on the merits and plaintiffs' irreparable injury in the absence of interlocutory relief."); State of Tex. v. Seatrain Int'l, S. A., 518 F.2d 175, 180 (5th Cir. 1975) ("[N]one of the four prerequisites has a fixed quantitative value. Rather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus."); Florida Med. Ass'n, Inc. v. U. S. Dep't of Health, Ed. & Welfare, 601 F.2d 199, 203 n.2 (5th Cir. 1979) ("[A] sliding scale can be employed, balancing the hardships associated with the issuance or denial of a preliminary injunction with the degree of likelihood of success on the merits."). Because this precedent is binding in the Eleventh Circuit, see supra, n.11, it must be followed "absent an intervening Supreme Court decision or en banc circuit decision." See Monroe Cnty., Florida v. U.S. Dep't of Labor, 690 F.2d 1359, 1363 (11th Cir. 1982). The Eleventh Circuit has not directly referred to the sliding-scale standard when evaluating whether a temporary restraining order or preliminary injunction is warranted.

In any case, whether or not the former Fifth Circuit rule controls, the result is not different here because the plaintiffs have met their burden as to each prong.

regulation; and because there is no recent development that justifies immediate relief. All of these arguments lack merit.

First, as discussed in detail above, the clinic's permanent closure will both decrease the access to abortion for many Alabama women and deny it altogether for others. These are not speculative harms.

Second, the argument that the court cannot consider the lack of capacity at other clinics to provide early-term or mid-second-trimester abortions when assessing irreparable harm likewise lacks merit. The court cannot divorce the regulation at issue from its "real-world context." Strange III, 33 F. Supp. 3d 1330. Although the State Health Officer maintains it is the other clinics' "choice" not to open for longer hours or provide mid-second-trimester abortions, that assumes there are doctors willing and able to perform abortions that live in Alabama and simply are not being asked. That assumption is misplaced. The history of violence and the continued extreme hostility towards

67

abortion providers has created a shortfall of clinics and doctors in Alabama.  Id. at 1333-36.  In lieu of local doctors, three of the four other clinics around the State have doctors from out-of-state come to provide abortions.  Id. at 1343-47.  These doctors will not move to Alabama--in part because of the extreme stigma--and therefore likely cannot increase the capacity at the other clinics to match the 40 % drop from the Center's closing.  And as to mid-second-trimester abortions, all of the other clinics are already near capacity, and mid-second-trimester abortion procedures take longer to complete than early-term abortions.  In sum, when examining the real-world context, the Health Officer's "choice" is a false one.

Finally, the Health Officer contends there is not a "threatened--or even recent--development justifying entry of a temporary restraining order."  Def. Opp. to Pl. Mot. for Temporary Restraining Order (doc. no. 17) at 25.  This dovetails with his argument, which will be

addressed below, that the plaintiffs are not entitled
to a temporary restraining order, because the legal
status quo has not changed.  Put differently, the State
Health Officer argues that, because the clinic has been
closed since January and because the plaintiffs did not
bring this motion until July, there must not be a
pressing irreparable harm for which a temporary
restraining order is needed.

The permanent closure of the Center is an imminent
irreparable harm requiring a temporary restraining
order.  After six months of retaining paid staff, the
Center will have to shut down entirely if not granted
immediate injunctive relief.  Given the difficulty of
opening a reproductive-health clinic that provides
abortions, finding a doctor and qualified staff, and
complying with the regulations in Alabama, there is a
definite possibility the Center would never reopen and
no other clinic will replace it.  If the Center
permanently closed during the pendency of this case,
then any as-applied relief the court may give would be

meaningless. This would cut against the purpose of pre-trial injunctive relief "to preserve the court's power to render a meaningful decision after a trial on the merits." <u>Alabama v. U.S. Army Corps of Engineers</u>, 424 F.3d 1117, 1128 (11th Cir. 2005) (internal quotation marks omitted).

Furthermore, while the Health Officer's contends that the fact that the Center's has been closed since January means there is no pressing recent development to necessitate immediate relief, this argument rings hollow. It is unclear when he believed the plaintiffs could have filed a temporary restraining order. Certainly, it was not when the regulation was passed (the Center would not have had standing because its doctor had admitting privileges); nor was it before the Center had to close temporarily in January (the claim could have faced a ripeness question if the plaintiffs did not first pursue getting admitting privileges or seeking a covering physician in the community); nor before plaintiffs sought a waiver under state law (the

claim would again have faced ripeness issues and the Health Officer would have also raised the same exhaustion issue discussed above). Perhaps, the plaintiffs could have filed between May and July, but the window they used to file--seven weeks--can be justified by "good faith efforts to investigate the facts and the law." Marks Org., Inc. v. Joles, 784 F. Supp. 2d 322, 333 (S.D.N.Y. 2011) (Wood, J.). The plaintiffs' actions demonstrate the "equitable, diligent, good-faith, vigilant conduct required of a litigant seeking equitable relief," Arthur v. Allen, 574 F. Supp. 2d 1252, 1256 (S.D. Ala. 2008) (Steele, J.); see also id. (denying a § 1983 suit on the eve of execution after the defendant had multiple years to file a particular claim), and they should not be barred from relief from irreparable harm because of good-faith steps to reopen the Center short of litigation. See Canal Auth. of State of Fla. v. Callaway, 489 F.2d 567, 576 (5th Cir. 1974) ("The purpose of a preliminary injunction is always to prevent irreparable injury so

as to preserve the court's ability to render a
meaningful decision on the merits.   It often happens
that this purpose is furthered by preservation of the
status quo, but not always.   If the currently existing
status quo itself is causing one of the parties
irreparable injury, it is necessary to alter the
situation so as to prevent the injury.").

### C. Balance of the Hardships

The State Health Officer claims that a temporary
restraining order would harm him because the
plaintiffs' delay in filing the temporary restraining
order did not give him a fair chance to respond and
because patient health at the Tuscaloosa clinic would
suffer.

As to the first harm, the plaintiffs did not
unnecessarily delay nor was the Health Officer harmed
by any such delay.   The plaintiffs "delay" in filing
the lawsuit after the January closure can be attributed
to their efforts to comply with the regulation until

72

they filed in mid-May and then, likely, to the
fact-gathering necessary for the lawsuit until they
filed in early July. In the context of the temporary
restraining order, the Health Officer also received a
similar amount of time to respond as the State did in
<u>Strange</u>.

As to the second harm, the record suggests that the
State Health Officer's concern about safety is
overstated given the comparable procedures the Center
uses to communicate with emergency rooms during any
complication. At minimum, "the parties heartily
dispute" whether this regulation improves women's
health at the Tuscaloosa clinic at all. <u>Strange I</u>, 951
F. Supp. 2d at 1290. "The second harm is minor,
particularly given the temporary nature of the order,"
<u>id</u>., as well as the limited as-applied scope of the
requested relief.

On the other hand, the record indicates that the
Center will shut down permanently if as-applied relief
is not granted, eliminating the ability to get an

abortion in Tuscaloosa and drastically reducing capacity throughout the State. Thus, while the plaintiffs show concrete, serious harms, the defendant faces only speculative harm from the temporary break in its enforcement of the regulation as-applied to the Tuscaloosa clinic. The balance of the hardships weighs heavily in the plaintiffs' favor.

### D. Public Interest

A temporary restraining order may be imposed because it is in the public interest to preserve the court's ability to make a meaningful ruling on the merits. As discussed above, doing so often requires preserving the status quo. See, e.g., Strange I, 951 F. Supp. 2d at 1290 ("The court finds that it is in the public interest to preserve the status quo and give the court an opportunity to evaluate fully the lawfulness of HB 57 without subjecting the plaintiffs, their patients, or the public at large to any of its potential harms.").

Here, the State Health Officer contends that the regulation is the status quo, because the regulation (and the requirements it imposes on the Center) have been in effect there for a number of years.  The tacit argument is that, because the legal status quo has not changed, the plaintiffs' request for a temporary restraining order should be assessed differently and more carefully than a challenge to a law that has just passed through a legislature but has not yet taken effect.  <u>Compare</u> <u>id</u>. (where plaintiffs moved for temporary restraining order to stop a new law from taking effect).

But this conception of the status quo views the regulation in a vacuum.  The true 'status quo' is a regulation with which the Center can comply based on circumstances within the Center's control--and not based on the fear of stigma or violence.  For example, by maintaining a good safety record and a strong reputation in the medical community, the Center should, theoretically, be able to employ a doctor with

75

admitting privileges or to contract with a covering physician.

But this is exactly what has changed.  The Center can no longer comply with the regulation even though, given the evidence now before the court, the Center itself maintains a spotless safety record, and the Center's policies to protect the health of its patients are robust.  Indeed, the sudden reversal of other local OB/GYNs who were at first enthusiastic to help Dr. Parker obtain admitting privileges cannot be explained on any grounds except by looking to the fact that the Center provides access to a procedure that is controversial within this State: abortion.  But this is also a procedure that women have a fundamental right to access, should they so choose.

Put differently, a narrow conception of the 'status quo' as it plays out in many cases does not fit here. Matters as sensitive to our State's political landscape as abortion regulations must be viewed within that broader landscape--that is, by examining how they

**76**

operate in the real world.  Therefore, in maintaining the status quo, the court must look to a state of affairs in which the Center's ability to comply with the regulation is based on its own merits.  Given the climate in this State today, there is no way the Center can do so with the regulation now in effect.  As a result, the court must grant plaintiffs a reprieve from the regulation.

With this in mind, the relief the court granted on the temporary-restraining order will be doubly limited. First, as with all temporary-restraining orders, it is limited in time.  Second, it is limited in scope.  The plaintiffs will be able to maintain this reprieve only if, in the meantime and while this temporary injunction remains in effect, they continue with their good-faith attempts to comply with the regulation (by continuing to seek out physicians whose association with the clinic would bring the Center into compliance).  To be sure, the evidence reflects that their goal will be difficult, if not impossible, to achieve.

Nevertheless, at this juncture, the court will give the Health Officer the benefit of the doubt that, despite the severely hostile environment the plaintiffs confront, they will still be able to comply with the regulation.

\* \* \*

In a typical case regarding a regulation by the State that imposes no harm and may even help people, the court has no role to play.  It respects the judgments of state officials.  Even in the case of regulating a fundamental right like abortion, the court would not interfere with the State Board of Health's judgment about a regulation that imposes only a minimal obstacle on women and could, theoretically, safeguard women's health.

Here, the court does not have that typical case: because of the circumstances in which it must operate, this regulation imposes a harm on women.  It imposes such a harm because circumstances here have transformed

a facially neutral regulation into one that actually prevents women from exercising their fundamental right to obtain an abortion.  These circumstances have resulted in a climate in which any physician associated with abortion in this State is stigmatized, harassed, and even threatened with violence.  The same has occurred even to covering physicians, who would simply be caring for women who have already received an abortion and now may need urgent medical help.  The court's obligation to protect the right cannot sway in light of these tactics.

At oral argument for a recent death-penalty case, Justice Alito posed the question: "[I]s it appropriate for the judiciary to countenance what amounts to a guerilla war against the death penalty which consists of efforts to make it impossible for the States to obtain drugs that could be used to carry out capital punishment with little, if any, pain?"  Transcript of Oral Argument at 14:20-25, Glossip v. Gross, 135 S. Ct. 2726 (2015) (No. 14-7955).  Because the Supreme Court

took as a basic premise that the death penalty was constitutional, the implication was "No": the Court would not allow the State's interest to be subverted in that way.[13]  As such, when circumstances have shifted the balance between the State's interest and the individual's fundamental rights, the scales were adjusted to address the imbalance.

Here, the same question could be asked: Is it appropriate for the judiciary to countenance efforts by those opposed to abortion to create circumstances, through a confluence of violence and hostility to abortions in the community, in which abortion clinics find it impossible to comply with otherwise neutral regulations because they cannot find local doctors willing to perform abortions or to associate with those who do?  The implication here, too, could be "No": this court should not stand by to allow a woman's

_____

13. In drawing this parallel, the court does not in any way suggest that opponents to the death penalty are in fact waging a "guerrilla war."

fundamental right to obtain an abortion to be subverted in that way.

Thus, it could be argued that, because circumstances--for which those who wish to provide abortions are not responsible--have greatly thwarted the ability of women to obtain an abortion, the State, in fashioning a regulation governing abortion, should address the imbalance. And one way to correct the imbalance would be to place on the State an obligation to create a regulation that realistically serves the State's interests while, at the same time, realistically serving women's interests in the exercise of their constitutionally given right to obtain an abortion. Whether the state should, in fact, bear this obligation here, the court does not reach at this time.

DONE, this the 13th day of August, 2015.

      /s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE