**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**

| | |
|---|---|
| WEST ALABAMA WOMEN'S CENTER, DR. WILLIAM J. PARKER, ALABAMA WOMEN'S CENTER, and DR. YASHICA ROBINSON WHITE, on behalf of themselves and their patients, | |
| Plaintiffs, | |
| v. | CIVIL ACTION |
| DR. THOMAS M. MILLER, in his official capacity as State Health Officer, LUTHER STRANGE, in his official capacity as Alabama Attorney General, LYN HEAD in her official capacity as District Attorney for Tuscaloosa County, ROBERT L. BROUSSARD in his official capacity as District Attorney for Madison County, DR. H. JOSEPH FALGOUT, in his official capacity as Chairman of the Alabama Board of Medical Examiners, and DR. JAMES E. WEST, in his official capacity as Chairman of the Medical Licensure Commission of Alabama, | Case No. 2:15-cv-497-MHT  **FIRST SUPPLEMENTAL COMPLAINT** |
| Defendants. | |

Plaintiffs, by and through their undersigned attorneys, bring this First Supplemental

Complaint against the above-named Defendants, their employees, agents, and successors in

office, and in support thereof allege the following:

**PRELIMINARY STATEMENT**

1.     Plaintiffs West Alabama Women's Center ("WAWC"), the sole abortion clinic in

Tuscaloosa, and William J. Parker, M.D., WAWC's Medical Director, brought this case under

the U.S. Constitution and 42 U.S.C. § 1983, on behalf of themselves and their patients, to

challenge an Alabama Department of Public Health ("ADPH") regulation that had forced the

clinic to cease providing abortion services.  At the time the case was filed, the regulation required that every physician who performs an abortion at a licensed abortion clinic have staff privileges at a local hospital ("staff privileges requirement") or, in the alternative, that the clinic enter into a written agreement with a local physician who has such privileges to serve as the clinic's outside covering physician ("covering physician requirement")—a requirement WAWC could not comply with due to circumstances beyond its control that had nothing to do with its ability to provide safe abortion care.

2.      Based on evidence of the significant harms WAWC's temporary closure had imposed on women seeking abortion services, and the likelihood that the forced closure of the clinic was unconstitutional, the Court issued a temporary restraining order blocking enforcement of the regulation on August 4, 2015, allowing the clinic to reopen.  Following the entry of the Court's TRO, ADPH granted WAWC a one-year waiver from the challenged regulation and stated that it would undertake rulemaking to modify the regulation in an effort to bring it into compliance with constitutional requirements.  On August 31, 2015, the Court entered a stipulated order staying litigation in this case and providing that the "plaintiffs shall have up to 30 days from the effective date of the final rule, in which to review the rule and move this court to dismiss this action, lift the stay, amend the complaint, or seek other appropriate relief."  Stay Order ¶ 5 (doc. no. 31).

3.      ADPH amended its regulation, which became effective on June 2, 2016.  The amended regulation sets forth a series of requirements that an abortion clinic must satisfy if it is unable to comply with the staff privileges or covering physician requirements.  One of the new requirements poses a medically unjustifiable threat to patient confidentiality by mandating that every abortion patient receive a copy of her medical records prior to leaving the facility (the

"medical records requirement").[1]  Enforcement of this requirement, which is not imposed on any other providers of outpatient medical care in Alabama, would jeopardize the privacy of WAWC's patients—including patients who are victims of domestic abuse—by forcing patients to receive a paper trail of their reproductive health care.

4.      Additionally, while this case was stayed, the Alabama legislature enacted two new abortion restrictions that would significantly and irreparably harm the health, safety, and constitutional rights of women seeking abortion services in Alabama if enforced.  The first restriction, Alabama Senate Bill 205, Reg. Sess. 2016 ("SB 205" or the "clinic closure requirement"), prohibits ADPH from issuing or renewing a health center license to an abortion clinic or reproductive health center that is located within 2,000 feet of a K-8 public school.[2]  If enforced, SB 205 would not only force WAWC to close, but would also shutter Plaintiff Alabama Women's Center ("AWC"), the only abortion clinic in Huntsville.  The second restriction, Alabama Senate Bill 363, Reg. Sess. 2016 ("SB 363" or the "D&E ban") bans the safest and most common method of second-trimester abortion, and the only method provided in outpatient facilities, dilation and evacuation (or "D&E").[3]  Both bills have been signed by the Governor and are set to take effect on August 1, 2016.

5.      If allowed to take effect, these new statutes would nullify the relief ordered by this Court in this case by forcing WAWC—as well as AWC—to close and/or by virtually eliminating access to second-trimester abortion services in Alabama.  Indeed, the statutes would not only inflict the precise harms that this Court's prior orders in this case were directed at preventing, but would significantly amplify those harms by shutting the Huntsville clinic as well

---

[1]  A copy of the amended regulation is attached hereto as Exhibit A.
[2]  A copy of SB 205 is attached hereto as Exhibit B.
[3]  A copy of SB 363 is attached hereto as Exhibit C.

as the Tuscaloosa clinic—providers of well over half of the abortions in Alabama and the only clinics that provide abortion services throughout the second trimester.

6.   To prevent the irreparable harm that the medical records requirement would impose on their patients, Plaintiffs WAWC and Dr. Parker seek declaratory and injunctive relief under the U.S. Constitution and 42 U.S.C. § 1983 against that requirement.  In addition, Plaintiffs WAWC and Dr. Parker, along with Plaintiffs AWC and Dr. Robinson White, seek declaratory and injunctive relief under the U.S. Constitution and 42 U.S.C. § 1983 against SB 205 and SB 363.

## JURISDICTION AND VENUE

7.   This Court has subject matter jurisdiction over Plaintiffs' federal claims under 28 U.S.C. § 1331 and 28 U.S.C. §§ 1343(a)(3)–(4).

8.   Plaintiffs' action for declaratory and injunctive relief is authorized by 28 U.S.C. §§ 2201 and 2202 and by Rules 57 and 65 of the Federal Rules of Civil Procedure.

9.   Venue is proper pursuant to 28 U.S.C. § 1391(b)(1) because the majority of Defendants, who are sued in their official capacities, carry out their official duties at offices located in this district.

## PARTIES

A.   **Plaintiffs**

10.   Plaintiff WAWC has provided safe and legal abortions for more than twenty years.  In addition to abortions, WAWC also provides a range of high-quality reproductive health services, including contraceptive counseling and care, testing and treatment for sexually transmitted infections, pregnancy testing and options counseling, and referrals for prenatal care and adoption services.

4

11.     Plaintiff WAWC is currently, and always has been, the sole licensed abortion or reproductive health center in Tuscaloosa.  WAWC is also one of only two licensed clinics in Alabama that provides abortions throughout the second trimester.  Apart from an eight-month period in 2015 when WAWC was temporarily closed, WAWC has for years been the highest-volume abortion provider in the state.  WAWC is located within 2,000 feet of at least one public K-8 school and would therefore be shuttered by SB 205.

12.     Plaintiff Dr. Parker is an experienced and highly-credentialed board-certified obstetrician/gynecologist ("ob-gyn") and abortion provider, and is the Medical Director of WAWC.  The abortion services Dr. Parker provides at WAWC include D&E procedures banned by SB 363.

13.     Plaintiff Alabama Women's Center ("AWC") has provided safe and legal abortions for fifteen years.  In addition to abortions, AWC also provides a range of high-quality reproductive health services, including contraceptive counseling and care, testing and treatment for sexually transmitted infections, pregnancy testing and options counseling, and referrals for prenatal care and adoption services.  AWC is located within 2,000 feet of at least one public K-8 school and would therefore be shuttered by SB 205.

14.     Plaintiff AWC is the sole licensed abortion or reproductive health center in Huntsville.  Together with WAWC, AWC is one of only two licensed clinics in Alabama that provides abortions throughout the second trimester.

15.     Plaintiff Yashica Robinson White, M.D. is an experienced and highly-credentialed board-certified ob-gyn and abortion provider, and is the Medical Director of AWC.  The abortion services Dr. Robinson White provides at AWC include D&E procedures banned by SB 363.

**B.**     **Defendants**

16.     Defendant Thomas M. Miller, M.D., is the State Health Officer at the Alabama State Department of Public Health, located at 201 Monroe Street, Montgomery, Alabama. Among other things, he is responsible for supervising and directing all activities of ADPH, pursuant to Ala. Code § 22-2-2 *et seq.*, including the licensing, inspecting, and disciplining of abortion or reproductive health care centers, *see* Ala. Code § 22-21-20 *et seq.*; Ala. Admin. Code r. 420-5-1-.01 *et seq.*  As such, Defendant Miller is responsible for enforcing ADPH's medical records requirement and SB 205's requirement that ADPH not issue or renew licenses to abortion clinics located within 2,000 feet of a K-8 public school.  In addition, Defendant Miller is responsible for ensuring that patient care at abortion clinics is "rendered in accordance with all applicable . . . state . . . laws," Ala. Admin. Code r. 420-5-1-.03(1), including SB 363's D&E ban.  Defendant Miller is sued in his official capacity.

17.     Defendant Luther Strange is the Attorney General of Alabama, located at 501 Washington Avenue, Montgomery, Alabama.  The Attorney General may—at "any time he or she deems proper"—"superintend and direct the prosecution of any criminal case in any of the courts of this state," Ala. Code § 36-15-14, and may also "direct any district attorney to aid and assist in the investigation or prosecution of any case in which the state is interested," Ala. Code § 36-15-15.  Additionally, the Attorney General "shall give the district attorneys of the several circuits any opinion, instruction or advice necessary or proper to aid them in the proper discharge of their duties."  *Id.*  As such, Defendant Strange is responsible for criminal enforcement of SB 363.  Defendant Strange is sued in his official capacity.

18.     Defendant Lyn Head is the District Attorney for Tuscaloosa County, located at 714 Greensboro Avenue, Tuscaloosa, Alabama.  District attorneys have the power to "draw up all indictments and to prosecute all indictable offenses" within their territory.  Ala. Code § 12-

17-184(2).  As such, Defendant Head is responsible for criminal enforcement of SB 363.

Defendant Head is sued in her official capacity.

20.     Defendant Robert L. Broussard is the District Attorney for Madison County,
located at 100 North Side Square, Huntsville, Alabama.  District attorneys have the power to
"draw up all indictments and to prosecute all indictable offenses" within their territory.  Ala.
Code § 12-17-184(2).  As such, Defendant Broussard is responsible for criminal enforcement of
SB 363.  Defendant Broussard is sued in his official capacity.

20.     Defendant H. Joseph Falgout, M.D., is Chairman of the Alabama Board of
Medical Examiners, located at 848 Washington Avenue, Montgomery, Alabama. The Board of
Medical Examiners is responsible for licensing and disciplining physicians in Alabama.  *See* Ala.
Code § 34-24-53; Ala. Admin. Code r. 540-X-l-.07.  As such, Defendant Falgout is responsible
for enforcing SB 363 with respect to physician licensing.  Defendant Falgout is sued in his
official capacity.

21.     Defendant James E. West, M.D., is Chairman of the Medical Licensure
Commission of Alabama, located at 848 Washington Avenue, Montgomery, Alabama.  The
Medical Licensure Commission is empowered to "issue, revoke, suspend and reinstate all
licenses" authorizing physicians to practice, and is responsible for licensing and disciplining
physicians in Alabama.  Ala. Admin. Code r. 545-X-l-.06.  As such, Defendant West is
responsible for enforcing SB 363 with respect to physician licenses.  Defendant West is sued in
his official capacity.

## PRIOR PROCEEDINGS

A.     *Planned Parenthood Southeast* Litigation

22.     This Court has twice considered the constitutionality of state laws and regulations
that would burden abortion access in Alabama by forcing abortion clinics to close.

23.     In April 2013, the Alabama Legislature passed Alabama House Bill 57, Reg. Sess. (2013) ("HB 57" or "the staff-privileges statute"), which, *inter alia*, required all physicians providing abortions at a licensed abortion clinic to obtain staff privileges at a hospital within the same metropolitan statistical area as the clinic.  *See* Ala. Code § 26-23E-4(c).

24.     On June 11, 2013, three of Alabama's five licensed abortion clinics filed a constitutional challenge to the staff-privileges statute.  *See Planned Parenthood Se., Inc. v. Bentley*, No. 2:13-cv-00405-MHT (hereinafter "*PPSE* docket"), Compl. (doc. no. 1).

25.     On June 28, 2013, the District Court granted the *PPSE* litigation plaintiffs' motion for a temporary restraining order.  *See PPSE* docket, TRO Op. & Order (doc. no. 49).

26.     From May to June 2014, the District Court held an eleven-day bench trial on the constitutionality of the staff privileges statute.  At trial, the Court considered evidence and testimony regarding, among other things, the availability of abortion in Alabama and the obstacles that women in Alabama would face if clinics were forced to close and women were required to travel outside their home cities and/or longer distances to obtain abortions.

27.     On August 4, 2014, the Court issued an opinion declaring the staff-privileges statute unconstitutional as applied to the plaintiffs in that case.  *See PPSE* docket Op., Aug. 4, 2014 (doc. no. 238).  The Court issued an opinion and final judgment declaring the staff-privileges statute facially unconstitutional on March 25, 2016.  *See PPSE* docket, Final Op. (doc. no. 275).

**B.**     **Prior Proceedings in This Action**

28.     Plaintiffs WAWC and AWC were not parties to the *PPSE* litigation because, at the time of filing in 2013 and through trial in 2014, each clinic employed one or more physicians with local hospital staff privileges.

29.     WAWC's long-time physician, Dr. Payne, retired on December 31, 2014.

8

30.     At that time, the ADPH regulation at issue in this action required that every physician who performs an abortion at a licensed abortion clinic have staff privileges at a local hospital or, in the alternative, that the clinic enter into a written agreement with a local physician who has such privileges to serve as the clinic's outside covering physician.

31.     The regulation applied only to clinics that provide abortion care and not to health care facilities that provide other services of comparable or greater risk.

32.     Before Dr. Payne's retirement, Plaintiff Dr. Parker agreed to move to Tuscaloosa in order to apply for staff privileges and to succeed Dr. Payne as the Medical Director of WAWC and serve as its full-time physician.

33.     Despite exhaustive efforts, and for reasons completely unrelated to his qualifications as an abortion provider, Dr. Parker was unable to obtain local hospital staff privileges, and WAWC was unable to secure the services of an outside covering physician.

34.     WAWC and Dr. Parker filed this action on July 10, 2015, seeking declaratory and injunctive relief against the covering physician requirement, which had forced WAWC to discontinue abortion services and was inflicting irreparable harm on women in need of such services.  *See* Compl. (doc. no. 2).

35.     This Court entered a temporary restraining order temporarily blocking enforcement of the challenged regulation against the Tuscaloosa clinic on August 4, 2015.  TRO Order (doc. no. 20).

36.     In its opinion issued August 13, 2015 (doc. no. 23-1), the Court reasoned that the justifications for applying the regulation to WAWC were weak and detailed the harms that the closure of WAWC imposed on women seeking abortion services in Alabama.  Those harms included:

- the reduced availability of abortion providers, which imposed travel obstacles that for some women were insurmountable and for others resulted in delay and other serious harms;
- the particularly severe obstacles imposed on women in need of an abortion after 16 weeks, who had no option but to travel to Huntsville for such services;
- the reduced capacity of the remaining clinics in the state; and
- the heightened risk that women would resort to medically unsupervised self-abortion as a result of the decreased access to licensed abortion providers.

37.     On August 26, 2015, the parties filed a stipulation seeking to stay this litigation to give ADPH the opportunity to modify the regulation to bring it into compliance with constitutional requirements.  Proposed Stipulated Order (doc. no. 27).  Pursuant to the stipulation, the Court entered an order staying the case. *See* Stay Order (doc. no. 31).

38.     As detailed in the Court's order, ADPH granted WAWC a waiver from Ala. Admin. Code, Rule 420-5-1-.03(6)(b) until August 24, 2016.  *Id.* ¶ 1.

39.     The Court's order provided that "[t]he plaintiffs shall have up to 30 days from the effective date of the final rule, in which to review the rule and move this court to dismiss this action, lift the stay, amend the complaint, or seek other appropriate relief."  *Id.* ¶ 5.

## THE CHALLENGED REGULATION

40.     On October 27, 2015, ADPH proposed a new regulation to replace the requirement this Court had enjoined.

41.     The proposed regulation provided an alternative means to comply with the staff privileges and/or covering physician requirement.  Pursuant to this alternative, a clinic that was unable to satisfy the staff privileges and/or covering physician requirement could continue to provide abortion services if it complied with a series of detailed requirements concerning, *inter alia*, staff training, complication management, medical provider availability, and follow-up care. Plaintiffs did not object to this proposal.

10

42.     On December 16, 2015, the State Committee of Public Health rejected the proposed regulation.

43.     On February 18, 2016, ADPH issued a second proposed regulation (the "Amended Regulation").  The regulation provided a detailed alternative to the staff privileges and/or covering physician requirement that was substantially similar to the prior proposed regulation, with one significant addition.[4]  Under the Amended Regulation, a clinic that is unable to comply with the staff privileges and/or covering physician requirement would also be required to ensure that every "patient shall receive a copy of her medical record that pertains to the current abortion procedure prior to leaving the facility."  Ala. Admin. Code r. 420-5-1-.03(6)(c)(5) (effective June 2, 2016).

44.     During the comments period, ADPH received multiple comments opposing the medical records requirement on the basis that it would pose an unacceptable threat to patient confidentiality and singled out abortion providers for a requirement not imposed on any other healthcare providers.  ADPH did not seek to modify the Amended Regulation.

45.     On April 14, 2016, the State Committee of Public Health approved the Amended Regulation.

46.     The Amended Regulation became effective on June 2, 2016, although WAWC's waiver from its requirements remains valid through August 24, 2016.

## THE CHALLENGED STATUTES

47.     While this case was stayed, and prior to the effective date of the Amended Regulation, Alabama enacted two new statutory abortion restrictions that would decimate

---

[4]  The amended regulation also requires clinics provide each patient with a consent form explaining that the clinic does not have a back-up doctor, a requirement Plaintiffs do not challenge.

abortion access in the state if enforced, nullifying the relief issued by this Court earlier in this case.

48.     Both bills state that they "shall become effective on the first day of the third month following its passage and approval by the Governor, or its otherwise becoming law."  SB 205, § 2; SB 363, § 11.  Governor Bentley signed the bills into law on May 12, 2016, and accordingly they both take effect on August 1, 2016.

**A.     <u>SB 205</u>**

49.     SB 205, the clinic closure requirement, would shutter the two clinics that provide well over half of the abortions in Alabama, and the only providers of abortion services throughout the second trimester.

50.     Under SB 205, "[t]he Alabama Department of Public Health may not issue or renew a health center license to an abortion clinic or reproductive health center that performs abortions and is located within 2,000 feet of a K-8 public school."  SB 205, § 1(b).

51.     The Tuscaloosa and Huntsville clinics are each located within 2,000 feet of at least one K-8 public school and would be forced to close as a result of SB 205.

52.     Abortion or reproductive health centers must renew their licenses on an annual basis in order to continue to provide healthcare services.  Plaintiffs' licenses are valid through December 31, 2016, and are due to be renewed in December in order to continue operating in 2017.  Thus, absent relief from this Court, the Act's ban on the renewal of abortion or reproductive health center licenses for facilities located within 2,000 feet of a K-8 public school will force Plaintiffs' clinics to close on December 31, 2016.

**B.     <u>SB 363</u>**

53.     SB 363 criminalizes the performance of what the statute calls a "dismemberment abortion."  Although "dismemberment abortion" is not a medical term, the definition in the

statute makes clear that it prohibits a procedure referred to in the medical profession as dilation and evacuation, or "D&E."  D&E is the safest and most commonly used method of abortion in the second trimester, and the only method used in outpatient facilities for abortions throughout the second trimester.

54.     SB 363 defines "dismemberment abortion" as follows:

> With the purpose of causing the death of an unborn child, purposely to dismember a living unborn child and extract him or her one piece at a time from the uterus through use of clamps, grasping forceps, tongs, scissors, or similar instruments that, through the convergence of two rigid levers, slice, crush, or grasp, or any combination of the foregoing, a portion of the unborn child's body to cut or rip it off. This definition does not include an abortion which uses suction to dismember the body of the developing unborn child by sucking fetal parts into a collection container. This definition includes an abortion in which a dismemberment abortion is used to cause the death of an unborn child and suction is subsequently used to extract fetal parts after the death of the unborn child.

SB 363, § 2(3).

55.     An exception to the ban is permitted only when the procedure is "necessary to prevent serious health risk" to the pregnant woman, which the law defines as "a condition that so complicates her medical condition that it necessitates the abortion of her pregnancy to avert her death or to avert serious risk of substantial and irreversible physical impairment of a major bodily function, not including psychological or emotional conditions."  SB 363, §§ 2(6), 3(a).

56.     A physician found guilty of violating the ban is subject to two years' imprisonment, or $10,000 in fines, or both.  SB 363, § 7.

57.     SB 363 creates a cause of action for injunctive relief against an individual who performs an abortion in violation of the ban.  Such a cause of action may be maintained by the woman who obtains an abortion in violation of the ban; her spouse; her parent or guardian, irrespective of the woman's age; her current or former licensed healthcare provider; or a prosecuting attorney with appropriate jurisdiction.  *Id.* § 4.

13

58.     In addition, SB 363 creates a cause of action for damages for physical and psychological injuries, plus statutory damages in the amount of three times the cost of the procedure against a person who violates the ban, which can be maintained by the woman who obtained the abortion, her husband, or her parents if she is a minor.  *Id.* § 5.

59.     Under SB 363, a plaintiff who obtains a favorable judgment in an action for injunctive relief or damages is entitled to an award of attorneys' fees against the defendant.  *Id.* § 6(a).  A physician who successfully defends against a claim may obtain attorneys' fees only if "the court finds that the plaintiff's suit was frivolous and brought in bad faith."  *Id.* § 6(b).

## FACTUAL ALLEGATIONS

### A.     Abortion in Alabama

60.     There are five licensed abortion clinics in the state of Alabama—Plaintiff WAWC in Tuscaloosa; Plaintiff AWC in Huntsville; Reproductive Health Services ("RHS") in Montgomery; and two Planned Parenthood Southeast ("PPSE") health centers located in Birmingham and Mobile.

61.     WAWC and AWC are the only licensed clinics in Alabama that provide abortions throughout the second trimester.  Both clinics provide medication abortions through ten weeks of pregnancy as measured from the woman's last menstrual period ("LMP") and surgical abortions up to twenty-one weeks and six days (21.6) LMP.  None of the other licensed clinics in the state provides abortions past approximately 15.0 weeks LMP.

62.     On information and belief, between 2012 and 2014, WAWC provided more abortions than any other clinic in the state by a large margin.  According to published statistics, in 2014, WAWC performed more than 58% of the abortions in Alabama (4,725 procedures).  In 2013, WAWC performed approximately 39% of the abortions in Alabama (3,503 procedures); and in 2012, WAWC performed approximately 44% of the abortions in Alabama (3,710

14

procedures).  Although published statistics are not yet available for 2015, WAWC's own records indicate the clinic performed about 1,200 abortions during the months when the clinic was open last year.

63.     On information and belief, between 2012 and 2013, AWC provided the second-highest number of abortions in Alabama.  According to published statistics, in 2013, AWC performed more than 17% of the abortions in Alabama (1,469 procedures).  In 2012, AWC performed nearly 16% of the abortions in Alabama (1,451 procedures).  In 2014, AWC was closed for approximately one-third of the year, and performed nearly 14% of the abortions in Alabama (1,108 procedures).  Although published statistics are not yet available for 2015, AWC's own records indicate the clinic performed 2,017 abortions last year.

64.     WAWC performed 153 second-trimester abortions (at and after 14.0 weeks LMP) during the months it was open in 2015; 553 such abortions in 2014; and 593 such abortions in 2013.  The vast majority of second-trimester abortions at WAWC are performed as a one-day procedure.

65.     AWC performed 328 second-trimester abortions in 2015; 84 such abortions during the months it was open in 2014; and 124 such abortions in 2013. All second-trimester abortions at AWC are performed as a one-day procedure.

66.     At both WAWC and AWC, the vast majority of patients are low-income women. Many struggle to cover the cost of the abortion, as well as other costs related to the procedure (*e.g.*, transportation, child care, lost wages).  Many do not have access to a reliable means of transportation.

**B.     The Medical Records Requirement and its Impact**

67.     The medical records requirement, which applies only to WAWC because Dr. Robinson White has local hospital staff privileges, imposes a medically unnecessary requirement

that forces each one of WAWC's abortion patients to receive a copy of her medical records before leaving the clinic. If enforced, the requirement would jeopardize the privacy and confidentiality of WAWC's patients by making it more difficult to keep their medical history, including the decision to have an abortion, private.

68.     Health care providers are the principal stewards of patients' medical records. It is well outside standard practice for a health care provider to provide copies of a patient's medical record to the patient in the absence of a request to do so.

69.     Like the preexisting staff privileges and/or covering physician requirement, the medical records requirement is unique to abortion patients: patients who have any other outpatient procedure in Alabama, regardless of how complex, are not required to receive copies of these sensitive documents following medical treatment.

70.     A patient's medical records from WAWC contain her most personal and sensitive information. In addition to details of the abortion procedure itself, this information includes but is not limited to: the patient's name, date of birth, social security number, contact information, race, relationship status, and the name of the person, if any, who referred her, such as a friend or physician; the patient's medical and surgical history, including her HIV status, history of sexually transmitted infections, mental health history, and her pregnancy history, including number of children, miscarriages, and prior abortions; notes from the patient's pre-abortion counseling session about her reasons for seeking the abortion; and the name and signature of the person who will drive her home from the clinic.

71.     As is generally the case with medical care, a patient's medical records are not complete and finalized at the time of a patient's discharge from WAWC, but will be reviewed and finalized within a few days after the procedure. They also lack test and laboratory results

16

that have not yet been completed.  For instance, a pathology report, which is required by Alabama law, confirms that a pregnancy was intrauterine and not ectopic, and that all of the products of conception were removed during the procedure.  This report takes 7-10 days to process and will not be reflected in a patient's medical record until that time.

72.   WAWC takes special precautions to ensure the security and confidentiality of patient records.  The staff does not refer to patients by name in the reception area, they use paper medical records that can be duplicated only upon request, and they store them securely.

73.   It is extremely rare (on average, fewer than one patient a year) for a patient to request a copy of her entire medical record for her personal use.

74.   Indeed, because complications from abortion are so rare and can easily be handled by an emergency room ("ER") physician or ob-gyn, it is extremely rare for even a hospital or any other healthcare professional to request a patient's medical record.  However, when WAWC does receive such a request, it provides a copy immediately.

75.   If WAWC were required to provide all patients with a copy of their medical records upon discharge, the patient would have to wait until she has left the recovery room and her record has been reviewed and photocopied.  The medical records requirement would thus require more staff time and resources and lengthen patient appointment times.

76.   Legal abortion is one of the safest and most common procedures in contemporary medical practice.

77.   A recent peer-reviewed study of first-trimester abortions found that only 0.89% of abortion procedures performed by physicians resulted in any complication whatsoever; only .05% patients experienced complications that resulted in hospital admissions.  WAWC's hospitalization rates, including those for second-trimester abortions, are even lower.

78.     Of the very few complications that do occur, almost all are safely and appropriately managed in the clinic setting, either at the time of the procedure or in a follow-up visit.  The physician and clinical staff remain at the clinic until every patient has been certified as fit for discharge.

79.     Upon discharge, all of WAWC's patients are provided with a phone number for a 24-hour hotline (staffed by a registered nurse and Plaintiff Dr. Parker) that they can call regarding any complications, questions, and concerns that arise after they have left the clinic.  In most cases, the patients' questions, concerns, or complications can be addressed over the phone or through a return visit to the clinic; many patients just need reassurance that their symptoms are normal and will subside.  If a return visit is necessary, the patient is given an appointment on the next day that the clinic is open.

80.     If Dr. Parker determines that a patient who contacts the after-hours hotline should be treated or evaluated by a physician sooner, he will refer the patient to a local emergency room.

81.     The medical records requirement is medically unnecessary.  Emergency room physicians and on-call ob-gyns are trained to assess and treat gynecological complications that may occur after an abortion procedure without referring to a patient's medical records.

82.     It is extremely rare—indeed, practically unheard of—for any patient to present at an ER with a copy of her medical record.  ER physicians are trained to examine the patient to independently assess the patient's symptoms and condition and to determine what course of treatment is required to treat her.  Even if an abortion patient presented with her medical records, the ER physician would nonetheless do a complete examination and evaluation and would not assume that her symptoms are necessarily related to her abortion.

83.     In Alabama, physicians who perform outpatient procedures other than abortion in an office-based setting, including procedures that pose more risk than abortion, are not required to give their patients a copy of their entire medical record upon discharge unless the patient requests it.  This is true whether or not the physician has hospital staff privileges or a covering physician.  Similarly, abortion providers who have staff privileges or a relationship with an outside covering physician pursuant to Ala. Admin. Code r 420-5-1-.03(6)(b) do not have to give their patients a copy of their medical records upon discharge unless requested.  This is true even though a patient who experiences a very rare complication may receive hospital-based care from a physician who was neither the original abortion provider nor the clinic's covering physician.

84.     The medical records requirement jeopardizes the privacy of WAWC's patients by increasing the likelihood that highly sensitive information, including the patient's decision to have an abortion, will be exposed to third parties.

85.     It is not uncommon for WAWC's patients to be reluctant to take any paperwork home with them because they worry about creating a paper trail related to their abortion that could be discovered by someone else.

86.      For example, protesters outside of clinics in Alabama, including WAWC, have been known to rummage through the garbage outside the clinic looking for information that might identify patients.

87.     Many abortion patients lack access to the resources necessary to store or maintain medical records in a secure fashion, or to securely dispose of unwanted medical records, such as with a shredder.

88.     By contrast, WAWC hires an outside company to shred records box by box under the clinic director's direct supervision, after which the company provides a certificate of destruction.

89.     The medical records requirement will particularly endanger vulnerable groups of women, including those who are victims of domestic violence.

90.     Abusers frequently subject victims to relentless monitoring and scrutiny, including searching through belongings.  Forcing a woman who has just had an abortion to receive a copy of her medical record reflecting her entire sexual and medical history and the care she received at WAWC makes it substantially more likely that an abusive partner (or relative) will learn that information.  For victims of abuse, this could jeopardize their wellbeing, safety, or even their lives.

C.     **The Clinic Closure Requirement and its Impact**

91.     If enforced, SB 205 would close the only abortion clinics in Tuscaloosa and Huntsville, each of which is located within 2,000 feet of one or more K-8 public schools.

92.     Neither clinic would be able to relocate or reopen if SB 205 were permitted to close them down.

93.     Dalton Johnson, the owner and administrator of AWC, originally opened the Huntsville clinic at a different location—at 612 Madison Street SE—in 2001.  However, in 2013, Alabama enacted HB 57, which, among other things, mandated that abortion clinics meet enhanced ambulatory health care occupancy and fire safety code standards.

94.     It was logistically and financially unfeasible to bring the Madison Street facility into compliance with the new law, and Mr. Johnson was forced to purchase a new building and relocate in order for abortion services to remain available in Huntsville.  To purchase the building, Mr. Johnson had to cash in his retirement savings and take on a significant amount of

debt.  Mr. Johnson remains in debt as a result of the expenditures he made to comply with HB

57.  He could not afford to initiate the process of attempting to acquire a new facility again.

95.    Gloria Gray opened WAWC at its current location with Dr. Payne in 1993.

When HB 57 imposed new facility and fire safety requirements on abortion clinics in 2013, it

cost over $100,000 to bring the clinic into compliance with the new law.

96.    Ms. Gray had the building appraised in 2015 after these renovations. Despite the

significant investment and updates, the appraisal found that the building was worth only slightly

more than what they paid for it more than twenty years before.

97.    If SB 205 forced WAWC to close, Ms. Gray would have to close the clinic

permanently.  She is near retirement age and could not afford to purchase a new property and

renovate it to meet the specific requirements that apply only to abortion clinics or build a new

property to the proper specifications from the ground-up, without depleting her retirement

savings or otherwise going into debt.

98.    Even if Mr. Johnson or Ms. Gray could afford to purchase or build different

facilities (which they cannot), they would not do so because the likelihood that Alabama would

enact a new restriction forcing such a facility to close, or undergo additional, expensive

renovations, makes the prospect untenable.

99.    In the absence of protesters, there would be nothing about WAWC or AWC to

distinguish either clinic from any other outpatient medical provider to an outside observer.

100.    The leader of an antiabortion group in Huntsville that protests in front of AWC,

Rev. James Henderson, made public statements indicating that his antiabortion group drafted the

clinic closure requirement and advocated for its passage.

21

101.     The protesters at AWC make specific efforts to target the nearby school in addition to the clinic.  For example, AWC does not begin to see patients until 8:00 a.m., but the school opens at 7:15 a.m.  Protesters show up well before the clinic opens, timing their arrival to the opening of the school, not the clinic.

102.     Upon information and belief, Mr. Johnson proposed to a liaison from the Huntsville Police Department that the clinic delay opening until 9:00 a.m. to minimize any contact between protesters and arriving students, but the protesters rejected that proposal.

103.     Enforcement of SB 205 would not impact antiabortion protest activities within 2,000 feet of K-8 public schools, because antiabortion protesters do not confine their protests to abortion clinics, but also target the private offices of physicians who provide abortions.

104.     For example, before AWC purchased the Sparkman Drive facility, Dr. Robinson White leased that building for her private ob-gyn office.  Dr. Robinson White's lease started in August 2013.  Two months later, antiabortion protesters applied for, and received, a permit to protest outside of the Sparkman Drive ob-gyn office on a daily basis starting on October 19, 2013, even though the office was not an abortion clinic.

105.     The protests continued from October 2013 to the present day, during which time the facility transitioned from being a private ob-gyn office to an abortion clinic.

106.     Similarly, when AWC moved from its Madison Street facility to the Sparkman Drive facility, Dr. Robinson White moved her ob-gyn practice to the Madison Street facility. Antiabortion protest activity at the Madison Street facility did not cease, despite the fact that the facility no longer housed an abortion clinic.

107.     The Madison Street facility where these antiabortion protests currently take place is located within 2,000 feet of a K-8 public school (as well as a private K-12 school and a private

22

daycare center).  Closing down the abortion clinic at that location did not cause antiabortion protest activity within 2,000 feet of the school to cease.

108.   If SB 205 were permitted to take effect, Mr. Johnson would be unable to operate an abortion clinic at the Sparkman Drive facility, but he would continue to own the building. Under those circumstances, Dr. Robinson White would utilize the Sparkman Drive facility as an ob-gyn office as she did before AWC relocated to that space.

109.   Under Alabama law, physicians in offices that are not licensed as abortion clinics may perform no more than 10 abortions per month, and no more than 100 per year.  Ala. Admin. Code r. 420-5-1-.01(2)(e).  Under that regulation, Dr. Robinson White would provide a limited number of abortions at the Sparkman Drive facility and the Madison Street facility.

110.   Upon information and belief, antiabortion protests would continue to target this office-based abortion practice, just as protesters continued to target the Madison Street facility long after it transitioned from being an abortion clinic to a private ob-gyn office.

**D.   The D&E Ban and its Impact**

111.   SB 363 bans dilation and evacuation, or D&E, abortions, the safest and most common abortion method used during the second trimester, accounting for more than 95% of all second-trimester abortions nationally.

112.   Virtually all abortions in Alabama performed at and after approximately 15.0 weeks LMP are performed at Plaintiffs AWC and WAWC.

113.   In the first trimester of pregnancy, abortions are performed using medical or surgical means.  Medication abortions, which under recent FDA guidelines are provided up to 10.0 weeks LMP, involve the ingestion of two medications one to two days apart.  Surgical abortions in the first trimester are usually performed using a suction device to aspirate (or empty) the uterus.

114.    Starting at approximately 15.0 weeks LMP, Plaintiffs use a combination of suction and forceps or other instruments to remove the fetus, placenta, and uterine tissues (products of conception) from the uterus, followed by additional suction to ensure the uterus is completely empty.  Usually, separation or disarticulation of the fetus occurs as the physician uses instruments to bring fetal tissue through the opening of the cervix.

115.    The use of instruments, alone or in conjunction with suction, to empty the uterus in this manner is known as a D&E.

116.    Other than the D&E method, the only other medically-proven abortion method available during the second-trimester is known as "induction of labor" or an "induction abortion."  Induction of labor accounts for only about 5% of second-trimester procedures. Induction abortions must be performed in a hospital or hospital-like facility (which has the capacity to admit and monitor a patient overnight).  Induction abortions can last for two or even three days, are extremely expensive, and entail more pain, discomfort, and recovery time for the patient—similar to that of a woman giving birth—than the D&E procedure.

117.    Alabama hospitals perform abortions only in extremely rare circumstances and do not make such services available to most women.

118.    Therefore, Alabama women have essentially no other option but to obtain abortions in an outpatient facility, and starting early in the second trimester, D&E is the *only* method of outpatient abortion available.

119.    SB 363 does not appear to prohibit procedures where fetal demise occurs prior to the use of instruments to remove the contents of the uterus.  Beginning at 18.0-20.0 weeks LMP, some physicians induce fetal demise prior to starting an abortion procedure, usually using an

injection of a medication called digoxin, but this increases the length, complexity and risk of the abortion.

120.    Published data show that use of digoxin to induce demise increases risks of nausea, vomiting, infection, and extramural delivery, while providing no clear medical benefit to the patient. In addition, digoxin is contraindicated for some patients.

121.    According to the American Congress of Obstetricians and Gynecologists, "[n]o evidence currently supports the use of induced fetal demise to increase the safety of second trimester medical or surgical abortion." Am. Coll. Obstetricians and Gynecologists, Second Trimester Practice Bulletin (No. 135, June 2013).

122.    Digoxin can take several hours, if not longer, to cause demise. As a result, the use of digoxin typically turns a one-day abortion procedure into a two-day procedure

123.    Even then, digoxin is not always effective in causing demise. There are no published studies evaluating the safety of a second injection of digoxin, if the first is unsuccessful.

124.    There are virtually no published studies addressing the safety of digoxin prior to 18.0 weeks LMP.

125.    Physicians, including Plaintiffs, do not use digoxin at any stage in pregnancy at Alabama abortion clinics. Indeed many physicians, including Plaintiff Dr. Robinson White, are not trained to use it.

126.    Therefore, SB 363 imposes a criminal ban, and significant civil penalties, on Plaintiffs' second-trimester abortion practice.

**E.      Irreparable Harm**

127.    Each of the challenged laws would inflict severe and irreparable injury on Plaintiffs' patients if enforced.

25

128.    If enforced, the medical records requirement would jeopardize the privacy and confidentiality of WAWC's patients by making it significantly more difficult to keep their medical history, including the decision to have an abortion, private.

129.    For some of WAWC's patients, including those who are victims of domestic violence, being forced to receive copies of their medical records before leaving the clinic would not only jeopardize their privacy, but would put their wellbeing and safety at risk by making it more likely that others—including an abusive partner or relative—will learn of the abortion and harm the woman.

130.    Enforcement of SB 205 would result in the permanent closure of the only abortion clinics in Tuscaloosa and Huntsville, and enforcement of SB 363 criminalizes Plaintiffs' second-trimester abortion practice.  If either or both laws were enforced, it would prevent a significant number of affected women—many of whom are in dire circumstances—from being able to obtain safe, legal abortion services in Alabama.  Enforcement of either law would lead other women to resort to medically unsupervised self-abortion due to reduced access to abortion services.

131.    If WAWC were forced to close, women who would have obtained abortion services at the clinic would be forced to travel to another city to obtain abortion services.  The closest provider of abortion services up to 15 weeks is in Birmingham, which is almost sixty miles from Tuscaloosa.  Women in need of abortion services at and after approximately 15 weeks would have no option but to leave the state to obtain an abortion.  The closest out-of-state provider of abortion services throughout the second trimester is in Atlanta, Georgia, which is more than 230 miles from Tuscaloosa.

132.    If AWC were forced to close, apart from the very small number of abortions Dr. Robinson White would be able to perform in an office-based practice, women who would have obtained abortion services at the clinic would be forced to travel to another city to obtain abortion services.  The closest provider of abortion services before 15 weeks is in Birmingham, which is more than 100 miles from Huntsville.  Women in need of abortion services at and after approximately 15 weeks would have no option but to leave the state to obtain an abortion.  The closest out-of-state provider of abortion services throughout the second trimester is in Atlanta, Georgia, which is approximately 180 miles from Huntsville.

133.    If SB 363 were enforced, women in need of abortion services at and after approximately 15 weeks LMP would have no option but to leave the state to obtain an abortion. The closest out-of-state provider of abortion services throughout the second trimester is in Atlanta, Georgia, which is more than 230 miles from Tuscaloosa, and approximately 180 miles from Huntsville.

134.    For many women, the increased travel would make it extremely difficult, and in many cases impossible, to obtain an abortion.  It will cause delay, forcing some women to seek abortions later in pregnancy when the procedure is more risky and more expensive, and will prevent others from obtaining an abortion at all.  Other women who are unable to surmount the travel burdens will resort to unsafe self-abortion methods, thereby jeopardizing their health.

135.    When WAWC was forced to discontinue abortion services between January and August 2015, these very harms materialized.  The forced closure of not just WAWC, but AWC as well, and/or the elimination of access to most second-trimester abortions, would magnify the harms that women experienced when WAWC ceased providing abortion services in 2015.

136.    For example, in the first six months of 2015 when WAWC was closed, the

Montgomery clinic saw more than a 100% increase in the number of patients who sought care at

the clinic but who were past the clinic's fifteen-week gestational cutoff, and experienced a 50%

increase in telephone calls from such women, as compared with the same period in 2014.  At that

time, the Montgomery clinic referred those women to AWC in Huntsville, but if SB 205 were to

take effect, such women would have no option but to leave the state to obtain abortion services.

137.    When WAWC was temporarily closed, AWC experienced a significant increase

in the number of women calling from western Alabama.  Many of these women expressly stated

that they were unable to travel to Huntsville.  Some of those callers asked AWC staff about the

best way for a woman to take matters into her own hands to induce an abortion if she is unable to

travel.

138.    When WAWC was temporarily closed, many women who sought care at AWC

had experienced unwanted delay in obtaining an abortion due to the difficulty of traveling a long

distance to reach the clinic.  This problem would be exacerbated if SB 205 forced both WAWC

and AWC to close, and/or if SB 363 forced clinics to cease performing D&Es.

139.    Upon information and belief, the number of women who obtained abortions in

Alabama during the period in 2015 when WAWC was closed is significantly smaller than the

number of women who obtained abortions in Alabama during the same period in 2014 when

WAWC was open.

140.    Upon information and belief, even if women were able to overcome the

substantial travel obstacles imposed by the closure of WAWC and AWC, the three remaining

clinics in the state would not have the capacity to accommodate thousands of additional abortion

patients each year, to say nothing of the unavailability of abortion services after approximately 15 weeks at the remaining clinics.

141.   Enforcement of the challenged statutes would therefore cause Plaintiffs' patients to suffer irreparable harm by shutting down the clinics providing well over half the abortions in the state, severely limiting the availability of safe abortion care in the state, and eliminating access to abortion after the earliest weeks of the second trimester.  This will jeopardize women's health and force women to continue their pregnancies to term against their will.

142.   Plaintiffs' patients will also suffer irreparable harm from the violation of their constitutional rights if the challenged requirements are not enjoined.

143.   Plaintiffs' patients have no adequate remedy at law.

## CLAIMS FOR RELIEF

### COUNT I

**(Medical Records Requirement – Due Process – Patients' Right to Privacy)**

144.   The allegations of paragraphs 1 through 143 are incorporated as though fully set forth herein.

145.   By jeopardizing the privacy of abortion patients' confidential information, including information about their decision to have an abortion, the medical records requirement violates Plaintiff WAWC's patients' right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

### COUNT II

**(Medical Records Requirement – Plaintiffs' Right to Equal Protection)**

146.   The allegations of paragraphs 1 through 143 are incorporated as though fully set forth herein.

29

147.    By singling out abortion clinics for a medically unnecessary requirement not imposed on any other outpatient healthcare providers, the medical records requirement violates Plaintiff WAWC's right to equal protection as guaranteed by the equal protection clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT III

### (Clinic Closure Requirement – Due Process – Patients' Right to Privacy)

148.    The allegations of paragraphs 1 through 143 are incorporated as though fully set forth herein.

149.    The clinic closure requirement violates Plaintiffs' patients' right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution. It has the unlawful purpose and effect of imposing an undue burden on women's right to choose abortion.

## COUNT IV

### (D&E Ban – Due Process – Patients' Right to Privacy)

150.    The allegations of paragraphs 1 through 143 are incorporated as though fully set forth herein.

151.    By banning the safest and most common method of second-trimester abortion, the D&E ban violates Plaintiffs' patients' right to liberty and privacy as guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution.

## COUNT V

### (D&E Ban – Due Process – Patients' Right to Bodily Integrity)

152.    The allegations of paragraphs 1 through 143 are incorporated as though fully set forth herein.

153.    The D&E ban violates Plaintiffs' patients' right to bodily integrity guaranteed by the due process clause of the Fourteenth Amendment to the U.S. Constitution by forcing women to undergo an unnecessary procedure that their physician does not believe is in their medical interests in order to effectuate their right to obtain an abortion.

WHEREFORE, Plaintiffs respectfully request that the Court:

1. declare Ala. Admin. Code r. 420-5-1-.03(6)(c)(5), SB 205, and SB 363 unconstitutional;

2. enjoin Defendants, their employees, agents, and successors in office from enforcing Ala. Admin. Code r. 420-5-1-.03(6)(c)(5), SB 205, and SB 363 without bond;

3. award Plaintiffs costs and attorneys' fees pursuant to 42 U.S.C. § 1988; and

4. grant Plaintiffs such other, further, and different relief as the Court may deem just and proper.

Date: July 6, 2016                    Respectfully submitted,

                                      s/ Andrew Beck
                                      Andrew Beck*
                                      New York State Bar No. 4740114
                                      Alexa Kolbi-Molinas*
                                      New York State Bar No. 4477519
                                      Jennifer Lee*
                                      New York State Bar No. 4876272
                                      AMERICAN CIVIL LIBERTIES UNION
                                      FOUNDATION
                                      125 Broad Street, 18th Floor
                                      New York, NY 10004
                                      abeck@aclu.org
                                      akolbi-molinas@aclu.org
                                      jlee@aclu.org
                                      (212) 549-2633

Randall C. Marshall
ASB-3023-A56M
ACLU FOUNDATION OF ALABAMA, INC.
P.O. Box 6179
Montgomery, AL 36106-0179
rmarshall@aclualabama.org
(334) 265-2754

*Attorneys for Plaintiffs*

*\* Admitted pro hac vice*

<u>**CERTIFICATE OF SERVICE**</u>

I, <u>Andrew Beck</u>, do hereby certify that a true and correct copy of the foregoing will be filed with the Clerk of Court using the CM/ECF system, which will serve a copy of the same upon the following counsel of record, on this 6th day of July, 2016:

P. Brian Hale
Bethany L. Bolger
Carol R. Gerard
Alabama Department of Public Health
P.O. Box 303017
Montgomery, AL 36130

I further certify that a true and correct copy of the foregoing will be served upon the following by hand delivery this same day:

Luther Strange
Attorney General of Alabama
501 Washington Avenue
Montgomery, Alabama 36104

Lyn Head
District Attorney for Tuscaloosa County
714 Greensboro Avenue
Tuscaloosa, Alabama  35401

Robert L. Broussard
District Attorney for Madison County
100 North Side Square
Huntsville, Alabama 35801

H. Joseph Falgout, M.D.
Alabama Board of Medical Examiners
848 Washington Avenue
Montgomery, Alabama 36104

James E. West, M.D.
Medical Licensure Commission of Alabama
848 Washington Avenue
Montgomery, Alabama 36104

<u>s/ Andrew Beck</u>
Andrew Beck
New York State Bar No. 4740114
AMERICAN  CIVIL  LIBERTIES  UNION FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
abeck@aclu.org
(212) 549-2633