# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## NORTHERN DIVISION

| | | |
|---|---|---|
| **WEST ALABAMA WOMEN'S CENTER, et al.,** | ) | |
| *Plaintiffs*, | ) ) | |
| **v.** | ) ) | **Civil Action No. 2:15-cv-497-MHT** |
| **DR. THOMAS M. MILLER, et al.,** | ) ) | |
| *Defendants*. | ) ) | |

### Brief in Opposition to Plaintiff's Motion for Preliminary Injunction
### By Defendants Luther Strange, Lyn Head, and Robert Broussard

Luther Strange
  *Attorney General*
Andrew Brasher
  *Solicitor General*
James W. Davis
  *Deputy Attorney General*
Brett Talley
  *Deputy Solicitor General*
William G. Parker, Jr.
  *Assistant Attorney General*

State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: 334.242.7300
Facsimile: 334.353.8440
abrasher@ago.state.al.us
jimdavis@ago.state.al.us
btalley@ago.state.al.us
wparker@ago.state.al.us

*Counsel for Attorney General Strange, District Attorney Head, and District Attorney Broussard*

August 30, 2016

# TABLE OF CONTENTS

Index of Exhibits ................................................................................. iii

Table of Authorities ............................................................................. v

Introduction ......................................................................................... 1

Statement of Facts ............................................................................... 2

I.  The Legislature bans killing a fetus by tearing it apart limb by limb ............ 2

    A.  The Dismemberment Abortion ban is similar to the federal partial-birth abortion ban ...................................................... 3

    B.  The Dismemberment Abortion Ban affects a small number of abortions .................................................................................. 5

    C.  There are safe and effective ways to induce fetal demise .................... 7

II.  The Legislature prohibits the licensing of an abortion clinic within 2,000 feet of a school ............................................................................ 9

Standard of Review ............................................................................. 11

Argument ............................................................................................ 12

I.  Plaintiffs are not likely to prevail on the merits of their challenge to Act 2016-397, which does not bar all "D&E" abortions ............................... 12

    A.  Act 2016-397 Advances Legitimate State Interests ........................... 12

    B.  Act 2016-397 does not place an undue burden on abortion ............... 17

        1.  The Dismemberment Abortion Ban affects few abortions ....... 18

        2.  The Supreme Court's case law on abortion permits states to prohibit a particular procedure so long as there are safe alternatives .............................................................. 20

        3.  Act 2016-397 permits several safe methods of D&E as alternatives to living dismemberment ..................................... 22

i

4.   The intent requirement and health exception further strengthen the constitutionality of Act 2016-397 ....................31

II.   The Plaintiffs are not likely to prevail on their challenge to the school proximity law.................................................................................33

A.   The school proximity law advances important state interests ...........35

B.   The school proximity law does not meaningfully limit a woman's   access to abortion...............................................38

Conclusion ...............................................................................................41

Certificate of Service ..............................................................................43

## INDEX OF EXHIBITS

Exhibit 1     Declaration of Joseph R. Biggio Jr.

Exhibit 2     Warren M. Hern & Billie Corrigan, *What about us? Staff reactions to D&E*, Advances in Planned Parenthood (1980).

Exhibit 3     Gillian Dean et al., *Safety of digoxin for fetal demise before second-trimester abortion by dilation and evacuation*, 85 CONTRACEPTION 144 (2012).

Exhibit 4     Cassing Hammond, *Recent advances in second-trimester abortion: an evidence-based review*, AM. J. OBSTETRICS & GYNECOLOGY 347 (2009)

Exhibit 5     Deborah Nucatola et al., *A randomized pilot study on the effectiveness and side-effect profiles of two doses of digoxin as fetocide when administered intraamniotically or intrafetally prior to second-trimester surgical abortion*, 81 CONTRACEPTION 67 (2010)

Exhibit 6     Justin Diedrich et al., *Induction of fetal demise before abortion*, 81 CONTRACEPTION 462 (2010), Society of Family Planning Clinical Guidelines

Exhibit 7     Anna K. Sfakianaki et al., *Potassium Chloride-Induced Fetal Demise*, 33 J. ULTRASOUND MED. 337 (2014).

Exhibit 8     Patricia A. Lohr, *Surgical Abortion in the Second Trimester*, 16 REPROD. HEALTH MATTERS 151 (2008)

Exhibit 9     L. Pasquini et al., *Intracardiac injection of potassium chloride as method for feticide: experience from a single UK tertiary centre*, 115 BJOG 528 (2008).

Exhibit 10    Michael Molaei et al., *Effectiveness and safety of digoxin to induce fetal demise prior to second-trimester abortion*, 77 CONTRACEPTION 223 (2008)

Exhibit 11    Lynn Borgatta et al., *Relationship of intraamniotic digoxin to fetal demise*, 81 CONTRACEPTION 328 (2010)

Exhibit 12   Warren M. Hern, *Laminaria, induced fetal demise and misoprostol in late abortion*, 75 INT'L J. GYNECOLOGY & OBSTETRICS 279 (2001)

Exhibit 13   Kristina Tocce, *et al.*, *Umbilical cord transection to induce fetal demise prior to second-trimester D&E abortion*, 88 CONTRACEPTION 712 (2013)

Exhibit 14   Declaration of Catherine Molchan Donald

Exhibit 15   George Flesh, *Perspective on Human Life: Why I No Longer Do Abortions*, L.A. TIMES (Sept. 12, 1991)

Exhibit 16   Anna Claire Vollers, *Anti-abortion protesters picket near Huntsville elementary school on first day back to school* (Aug. 5, 2015)

Exhibit 17   Megan Brantley, *Parent: Abortion protesters' signs causing safety concern in pickup line at Huntsville's Academy for Academics and Arts* (Oct. 15, 2015)

Exhibit 18   Associated Press, *Parents dislike abortion protests near Huntsville Academy of the Arts* (Nov. 20, 2015)

Exhibit 19   Shawn Smith affidavit

Exhibit 20   Dalton Johnson deposition excerpts

Exhibit 21   Gloria Gray deposition excerpts

## TABLE OF AUTHORITIES

**Cases**

*BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*,
425 F.3d 964 (11th Cir. 2005) ................................................................11

*City of Renton v. Playtime Theatres, Inc.*,
475 U.S. 41 (1986) ..................................................................... 35, 38

*Ctr. For Bio-Ethical Reform, Inc. v. L.A. Cty. Sheriff Dep't*,
533 F.3d 780 (9th Cir. 2008) ................................................................37

*Dariano v. Morgan Hill Unified Sch. Dist.*,
767 F.3d 764 (9th Cir. 2014) ................................................................36

*Davidson v. City of Clinton*,
826 F.2d 1430 (5th Cir. 1987) ....................................................... 35, 36

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
661 F.2d 328 (5th Cir. Unit B 1981) ....................................................40

*Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A.*,
320 F.3d 1205 (11th Cir. 2003) ...........................................................12

*Glass v. Louisiana*,
471 U.S. 1080 (1985) ...........................................................................15

*Gonzales v. Carhart*,
550 U.S. 124 (2007) .................................................................. passim

*Grayned v. City of Rockford*,
408 U.S. 104 (1972) ..............................................................................35

*Hope Clinic v. Ryan*,
195 F.3d 857 (7th Cir. 1999) ..................................................................1

*Larkin v. Grendel's Den, Inc.*,
459 U.S. 116 (1982) ................................................................. 2, 35, 38

*McDonald's Corp. v. Robertson*,
147 F.3d 1301 (11th Cir. 1998) ............................................................11

*Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*,
  896 F.2d 1283 (11th Cir. 1990) ............................................................12

*Planned Parenthood of Cent. Mo. v. Danforth*,
  428 U.S. 52 (1976) ...............................................................................20

*Planned Parenthood of Se. Pa. v. Casey*,
  505 U.S. 833 (1992) ..................................................................... 13, 17

*Planned Parenthood Se., Inc. v. Strange*,
  33 F. Supp. 3d 1330 (M.D. Ala. 2014).......................................... 10, 13

*Planned Parenthood Se., Inc. v. Strange*,
  9 F. Supp. 3d 1272 (M.D. Ala. 2014)................................................13

*Stenberg v. Carhart*,
  530 U.S. 914 (2000) ....................................................... 4, 15, 16

*Village of Euclid v. Ambler Realty Co.*,
  272 U.S. 365 (1926) ...............................................................................37

*W. Side Women's Servs., Inc. v. City of Cleveland*,
  573 F. Supp. 504 (N.D. Ohio 1983) .................................................40

*Whole Woman's Health v. Hellerstedt*,
  136 S. Ct. 2292 (2016) ................................................... 33, 34, 39

**Statutes**

18 U.S.C. § 922 .......................................................................................35

Act 2016-397................................................................... 3, 18, 19, 32

ALA. CODE § 22-9A-13 ...........................................................................19

**Other Authorities**

Anna Claire Vollers, *Anti-abortion protesters picket near Huntsville
  elementary school on first day back to school,* AL.COM (August 5, 2015) .........11

Anna K. Sfakianaki et al., *Potassium Chloride-Induced Fetal Demise*, 33 J.
  ULTRASOUND MED. 337 (2014)...........................................................23

Associated Press, *Parents dislike abortion protests near Huntsville Academy
  of the Arts*, AL.COM (November 20, 2015) .........................................11

Cassing Hammond, *Recent advances in second-trimester abortion: an evidence-based review*, AM. J. OBSTETRICS & GYNECOLOGY 347 (2009) ...... 8, 22

Deborah Nucatola et al., *A randomized pilot study on the effectiveness and side-effect profiles of two doses of digoxin as fetocide when administered intraamniotically or intrafetally prior to second-trimester surgical abortion*, 81 CONTRACEPTION 67 (2010).................................................... passim

George Flesh, *Perspective on Human Life: Why I No Longer Do Abortions*, L.A. TIMES (Sept. 12, 1991) .......................................................... 5, 16

Gillian Dean et al., *Safety of digoxin for fetal demise before second-trimester abortion by dilation and evacuation*, 85 CONTRACEPTION 144 (2012)... 22, 24, 25

Justin Diedrich et al., *Induction of fetal demise before abortion*, 81 CONTRACEPTION 462 (2010) (Society of Family Planning Clinical Guidelines)....................................................................... 23, 25, 26, 27

Kristina Tocce, et al., *Umbilical cord transection to induce fetal demise prior to second-trimester D&E abortion*, 88 CONTRACEPTION 712 (2013).. 28, 29

L. Pasquini et al., *Intracardiac injection of potassium chloride as method for feticide: experience from a single UK tertiary centre*, 115 BJOG 528 (2008).................................................................................24

Lynn Borgatta et al., *Relationship of intraamniotic digoxin to fetal demise*, 81 CONTRACEPTION 328 (2010).................................................... 24, 26

Megan Brantley, *Parent: Abortion protesters' signs causing safety concern in pickup line at Huntsville's Academy for Academics and Arts*, WHNT NEWS 19 (Oct. 15, 2015) ...................................................................11

Michael Molaei et al., *Effectiveness and safety of digoxin to induce fetal demise prior to second-trimester abortion*, 77 CONTRACEPTION 223 (2008) 24, 25

Patricia A. Lohr, *Surgical Abortion in the Second Trimester*, 16 REPROD. HEALTH MATTERS 151 (2008) ............................................... 23, 26, 27

*State Policies on Later Abortions*, GUTTMACHER INST............................................6

Warren M. Hern & Billie Corrigan, *What about us? Staff reactions to D&E*, 15 ADVANCES IN PLANNED PARENTHOOD 3 (1980) ......................................... 5, 16

Warren M. Hern, *Laminaria, induced fetal demise and misoprostol in late abortion*, 75 INT'L J. GYNECOLOGY & OBSTETRICS 279 (2001)...........................27

**Constitutional Provisions**

U.S. CONST. amend. VIII .........................................................................................15

**INTRODUCTION**

Plaintiffs seek a preliminary injunction against enforcement of two Alabama statutes.  Although both statutes pertain to abortion, the governmental interests they support are very different.

The first statute Plaintiffs challenge (Act 2016-397) prohibits dismemberment abortion—a form of abortion where a living fetus is killed by tearing it limb from limb.  Federal law constitutionally prohibits partial-birth abortion.  *Gonzales v. Carhart*, 550 U.S. 124, 133 (2007).  And there is "no meaningful difference" between death-by-dismemberment abortion in the womb and partial-birth abortion outside it.  *Hope Clinic v. Ryan*, 195 F.3d 857, 879 (7th Cir. 1999) (Posner, J., dissenting).  "No reason of policy or morality that would allow the one would forbid the other."  *Id.*  These procedures are, in the words of Justice Ginsburg, "equally gruesome."  *Gonzales*, 550 U.S. at 182 (Ginsburg, J., dissenting).

Although the statute prohibits death-by-dismemberment, it does *not* do what Plaintiffs assert it does.  Act 2016-397 is not a ban on dilation and evacuation (D&E) abortion.  D&E abortion remains legal as long as the fetus' life is ended before its body is torn apart.  This method of performing an abortion is already in regular use.  In 2014, Alabama doctors used injections to end fetal life 22 times

1

before performing an abortion.  By contrast, Alabama doctors performed only 12 D&E abortions in 2014.

The second statute that Plaintiffs challenge (Act 2016-388) prohibits the operation of an abortion clinic within 2,000 feet of a K-8 public school.  "[T]here can be little doubt about the power of a state to regulate the environment in the vicinity of schools . . . by exercise of reasonable zoning laws."  *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 121 (1982).  On procedure days, 5 to 150 pro-life protesters and 10 to 25 counter-protesters organize on the sidewalks outside abortion clinics.  The opposing groups use amplified sound and megaphones. Although these particular groups are peaceful, abortion clinics have attracted violence before.  The Legislature reasonably determined that these activities should not occur across the street from a school.

## STATEMENT OF FACTS

### I.     The Legislature bans killing a fetus by tearing it apart limb by limb.

In 2016, the Alabama Legislature enacted the Alabama Unborn Child Protection from Dismemberment Abortion Act with overwhelming bipartisan majorities in both Houses, 30-2 in the Senate and 74-26 in the House.  The Act bans a particularly gruesome type of abortion in which a physician literally rips the fetus apart limb from limb while the fetus's heart is still beating.  Specifically, the Act prohibits a "dismemberment abortion," which it defines as "dismember[ing] a

living unborn child and extract[ing] him or her one piece at a time from the uterus through use of clamps, grasping forceps, tongs, scissors, or similar instruments . . . ." Act 2016-397 § 2(3) (Doc. 50-3). Importantly, the Act does not prohibit an abortion that "uses *suction* to dismember the body of the developing unborn child by sucking fetal parts into a collection container." *Id.* (emphasis added). Only the dismemberment of a living fetus by way of "slic[ing], crush[ing], or grasp[ing]" is illegal. *Id.* The Act also includes an exception that allows the procedure if necessary to preserve a woman's life or health. *Id.* at § 2(6).

### A. The Dismemberment Abortion ban is similar to the federal partial-birth abortion ban.

The dismemberment abortion ban does not prevent a woman from receiving an abortion; rather, it prohibits one type of abortion, leaving alternative methods available. In the second trimester of pregnancy, one method of abortion practiced in the United States is referred to as "dilation and evacuation" (D&E). *Gonzales*, 550 U.S. at 135. During a D&E, the abortionist first dilates the cervix using drugs or instruments. *Id.* Sometimes guided by ultrasound, the doctor will then use surgical instruments such as forceps to grab the fetus and remove it from the uterus. *Id.*

The removal of the fetus during a D&E can be accomplished in several ways. Two are relevant here.

3

First, the person performing the abortion may extract the entire fetus intact apart from the head, which lodges in the cervix. *Id.* at 138. With the living fetus almost completely outside of the womb, the abortionist then "forces scissors into the base of the skull," "spreads the scissors to enlarge the opening," and places a suction catheter into that opening to vacuum out the child's brains. *Id.* at 138. The dead fetus is then removed. *Id.* This D&E technique, known variously as "intact D&E," "dilation and extraction" (D&X), or "partial-birth abortion," was banned by the U.S. Congress in the Partial-Birth Abortion Ban Act of 2003 and that ban was upheld by the U.S. Supreme Court in *Gonzales v. Carhart*.

In a second form of D&E, "the abortionist . . . use[s] instruments to grasp a portion (such as a foot or hand) of a developed *and living* fetus and drag the grasped portion out of the uterus into the vagina." *Stenberg v. Carhart*, 530 U.S. 914, 958 (2000) (Kennedy, J., dissenting) (emphasis added). He then "uses the traction created by the opening between the uterus and vagina to dismember the fetus, tearing the grasped portion away from the remainder of the body." *Id.* As a result, "[t]he fetus, in many cases, dies just as a human adult or child would: It bleeds to death as it is torn limb from limb." *Id.* at 958–59. Indeed, with its heart still beating, "[t]he fetus can be alive at the beginning of the dismemberment process and can survive for a time while its limbs are being torn off." *Id.* at 959. Afterwards, "the abortionist is left with 'a tray full of pieces.'" *Id.*

4

As with partial-birth abortion, many physicians and policymakers have raised grave moral concerns with the process of terminating a fetus by dismembering it piece by piece.  Two doctors who have performed abortions described the then-novel procedure as "an act of destruction."[1]  "Some part of our cultural and perhaps even biological heritage recoils at a destructive operation on a form that is similar to our own, even though we know that the act has a positive effect for a living person. . . . The sensations of dismemberment flow through the forceps like an electric current."  Similarly, a former abortionist concluded that "tearing a developed fetus apart, limb by limb, . . .  is an act of depravity that society should not permit," for "[w]e cannot afford such devaluation of human life, nor the desensitization of medical personnel that it requires."[2]

### B.     The Dismemberment Abortion Ban affects a small number of abortions.

The dismemberment abortion ban at issue in this case criminalizes some of the second type of D&E abortions discussed above.  But the dismemberment abortion ban affects a very small number of abortions.  This is so for two reasons.

---

[1] *See* Warren M. Hern & Billie Corrigan, *What about us? Staff reactions to D&E*, 15 ADVANCES IN PLANNED PARENTHOOD 3, 3 (1980), attached as Exhibit 2.

[2] George Flesh, *Perspective on Human Life: Why I No Longer Do Abortions*, L.A. TIMES at 2 (Sept. 12, 1991), *available at* http://articles.latimes.com/1991-09-12/local/me-2729_1_human-life (last visited Aug. 29, 2016), attached as Exhibit 15.

5

First, as Plaintiffs' doctor Yashica Robinson White attests, D&E is not used until the second trimester, but almost all abortions are performed in the first trimester. Doc. 54-4 at ¶ 20. The latest abortion figures for Alabama are from 2014. In 2014, approximately 86% of abortions in Alabama (6967 of 8080 total) were performed in the first trimester. Ala. Ctr. for Health Statistics, *Induced Terminations of Pregnancy Occurring in Alabama, 2014* (Dec. 9, 2015), attached as Exhibit 14-C.[3] These abortions are accomplished by suction curettage or vacuum aspiration, in which the physician vacuums out the embryonic tissue, or by medication abortion, which uses medication to terminate fetal life and expel the fetal contents from the woman. Doc. 54-4 at ¶ 19 (Robinson White declaration); Doc. 54-5 at ¶ 10 (Davis declaration). The dismemberment abortion ban does not affect any of these abortions.

Second, the D&E procedure is rarely performed in Alabama. Only 12 of the 8080 abortions in Alabama in 2014 were reported as D&E abortions— approximately one tenth of one percent. Ex. 14-C. The State's statistics show that an equivalent number of abortions were performed by induction in 2014 (7), even though Plaintiffs claim that this is a "minority variation." *Id.*; Doc. 54 at 44.

---

[3] The Department of Public Health reports gestational age based on weeks postfertilization in these statistics. *See* Ex. 14-C (2014 statistics). There is a two-week difference between postfertilization age and weeks after the woman's last menstrual cycle. *See State Policies on Later Abortions*, Guttmacher Inst. (last updated Aug. 1, 2016), https://www.guttmacher.org/state-policy/explore/state-policies-later-abortions. For example, "20 weeks postfertilization is equivalent to 22 weeks LMP." *Id.* This number is based on abortions performed within 10 weeks postfertilization or 12 weeks LMP.

These figures are consistent with statistics from the last few years; there were 28 D&Es in 2013 and 14 in 2012.  Ala. Ctr. for Health Statistics, *Induced Terminations of Pregnancy Occurring in Alabama, 2013*, attached as Exhibit 14-B; Ala. Ctr. for Health Statistics, *Induced Terminations of Pregnancy Occurring in Alabama, 2012*, attached as Exhibit 14-A.  For its part, Plaintiff West Alabama Women's Center reported 11 of the 12 D&E procedures that were conducted in 2014.  Ala. Ctr. for Health Statistics, *Induced Terminations of Pregnancy by Facility and Termination Procedure, Alabama, 2014*, attached as Exhibit 14-F. The vast majority of second trimester abortions performed were accomplished in ways that are unaffected by the dismemberment abortion ban.

### C.    There are safe and effective ways to induce fetal demise.

For the one tenth of one percent of abortions that are affected by the ban, there are alternatives available to induce fetal demise in that small number of abortions before ripping the fetus apart limb by limb.  As described in more detail below, infra 22-31, an abortionist may end fetal life by suction, an injection, or by severing the umbilical cord.  These methods of inducing fetal demise would not be difficult for a physician who performs abortions to learn.  The State's expert, Dr. Joseph Biggio Jr., is currently the Director of the Division of Maternal Fetal Medicine at the University of Alabama at Birmingham as well as the Executive Director of Women's and Infant Services at University Hospital in Birmingham.

7

Declaration of Joseph R. Biggio Jr., M.D., attached as Exhibit 1, at ¶ 1.  Dr. Biggio

concluded that the additional training for learning to perform both the injection-

based procedures "would not be extensive" because of "the similarity of these

procedures to the performance of an amniocentesis, a procedure which obstetrics

and gynecology residents are trained to perform . . . ."  *Id.* at ¶ 11.  Similarly, the

training required to perform an umbilical cord transection would not be

"considerable."  *Id.* at ¶ 12.  After killing the fetus, the abortionist may then

remove it through a standard D&E.  These procedures are safe and effective and do

not involve tearing apart a fetus while its heart is still beating.  In fact, the literature

suggests that these methods of D&E are preferred by most women over a living

dismemberment abortion.[4]

Moreover, these methods of inducing fetal demise are already commonly

practiced.  As even Plaintiffs' experts recognize, some abortion doctors already

"induce demise prior to starting certain second-trimester procedures, usually using

an intra-fetal or intra-amniotic injection of digoxin."  Doc. 54-6 at ¶ 18 (Parker

declaration); *see also* Doc. 54-5 at ¶ 20 (Davis declaration) ("minority of

physicians").  In 2014, Alabama doctors induced fetal demise with an injection in

22 abortions.  Ex. 14-C (2014 statistics).

---

[4] *See, e.g.*, Cassing Hammond, *Recent advances in second-trimester abortion: an evidence-based review*, AM. J. OBSTETRICS & GYNECOLOGY 347, 352 (2009), attached as Exhibit 4.

**II.      The Legislature prohibits the licensing of an abortion clinic within 2,000 feet of a school.**

In legislation unrelated to the dismemberment abortion ban, the Alabama Legislature in 2016 removed the authority of the Department of Public Health to grant a license to an abortion clinic that operates within 2,000 feet of a K-8 public school.  *See* Doc. 50-2.  The Act provides simply that "the Alabama Department of Public Health may not issue or renew a health center license to an abortion clinic or reproductive health center that performs abortions and is located within 2,000 feet of a K-8 public school."  Doc. 50-2 at 3.

This Court is well aware of protests and other similar activity that takes place on the sidewalks outside of abortion clinics on procedure days.  Dalton Johnson, the administrator of Plaintiff Alabama Women's Clinic, has previously testified that the pro-life protesters at his clinic are "the worst ones in the state." Dep. Dalton Johnson, 72:13 (Oct. 21, 2013), excerpts attached as Exhibit 20.  "We have anywhere between five to, on their big rallies, 150 people out there."  *Id.* at 72:14–15.  At the same time, these protesters are themselves being protested by supporters of the clinic with "about 25 in their group" and "on an average day, they'll have about ten out there."  *Id.* at 74:9–10.  These competing groups use loud music, bullhorns, signs, and other devices to advance their messages.

Gloria Gray, the administrator of Plaintiff West Alabama Women's Center, has also previously testified that there are protests in the public streets around the

9

Tuscaloosa clinic.  *See* Dep. Gloria Gray, 64:14–17, 65:6-9 (Oct. 21, 2013), excerpts attached as Exhibit 21.  In her previous testimony, she also described shouting and verbal confrontations between pro-life protesters and clinic staff.  *See id.* at 65:10–11.

Although these protesters and counter-protesters are peaceful, the Court is also aware of the violence that has been targeted at clinics.  *See Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1333–34 (M.D. Ala. 2014).  Bombs were set off in front of a Birmingham abortion clinic. *Id*. at 1333.  Someone set the Tuscaloosa abortion clinic on fire. *Id*. Another person drove his car through the Tuscaloosa clinic and led police on a high-speed car chase. *Id*.

The Huntsville abortion clinic is located within 2,000 feet of two K-8 schools.  It is directly across the street from the Academy for Academics and Arts and down the street from Highlands Elementary School.  Affidavit of Shawn Smith, ¶ 4–5, attached as Exhibit 19.  When parents drop off their children at the Academy, they sometimes park at the abortion clinic and walk their children across the street.  *Id.* at 7.  Similarly, children who attend Highlands walk on the sidewalks in front of the clinic to reach the school.  *Id.*  Parents have complained to

10

the Huntsville City Council and others about the protesters and counterprotesters near the school.[5]

The Tuscaloosa abortion clinic appears to be located within 2000 feet of Tuscaloosa Magnet Middle School.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the 'burden of persuasion'" as to each of the four prerequisites. *McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1306 (11th Cir. 1998). A party seeking a preliminary injunction must show "(1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction is issued; (3) the threatened injury to the moving party outweighs whatever damage the proposed injunction might cause the non-moving party; and (4) if issued, the injunction would not be adverse to the public interest." *BellSouth Telecomms., Inc. v. MCIMetro Access Transmission Servs., LLC*, 425 F.3d 964, 968 (11th Cir. 2005) (citing *Four Seasons Hotels & Resorts,*

---

[5] Anna Claire Vollers, *Anti-abortion protesters picket near Huntsville elementary school on first day back to school*, AL.COM (Aug. 5, 2015), http://www.al.com/news/huntsville/index.ssf/2015/08/anti-abortion_protesters_picke.html (last visited Aug. 30, 2016), attached as Exhibit 16; Megan Brantley, *Parent: Abortion protesters' signs causing safety concern in pickup line at Huntsville's Academy for Academics and Arts*, WHNT NEWS 19 (Oct. 15, 2015), http://whnt.com/2015/10/15/parent-abortion-protesters-signs-causing-safety-concern-in-pickup-line-at-huntsvilles-academy-for-academics-and-arts/ (last visited Aug. 30, 2016), attached as Exhibit 17; Associated Press, *Parents dislike abortion protests near Huntsville Academy of the Arts*, AL.COM (Nov. 20, 2015), http://www.al.com/news/index.ssf/2015/11/parents_dislike_abortion_prote.html (last visited Aug. 30, 2016), attached as Exhibit 18.

*B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003)). The movant's alleged "irreparable injury" "must be 'neither remote nor speculative, but actual and imminent.'" *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).

**ARGUMENT**

**I.     Plaintiffs are not likely to prevail on the merits of their challenge to Act 2016-397, which does not bar all "D&E" abortions.**

Plaintiffs label Act 2016-397 a "D&E *Ban*," Doc. 54 at 48 (emphasis added); it is not.  The challenged law does not prohibit all D&E abortions, but rather only those particular methods of D&E that dismember a fetus while it is still alive.  Several alternative safe and well-established D&E methods—methods that are actually preferred by most women—terminate fetal life prior to removing any part of the fetus from the womb, and all of these alternatives remain available under the Act.  Because the Act permits several safe and effective alternative procedures and the Act advances legitimate state interests by requiring the use of these more humane alternatives, Plaintiffs are not likely to prevail on the merits of their challenge to this Act.

**A.     Act 2016-397 Advances Legitimate State Interests.**

Act 2016-397 advances the legitimate state interests in valuing unborn life and promoting the value of life in both the medical profession and society at large,

12

by prohibiting an inhumane practice, and permits methods of abortion that are both safe and less barbaric than dismemberment.

The State has a legitimate interest "from the outset of the pregnancy" in both protecting the life and health of the mother and promoting respect for "the life of the fetus that may become a child." *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 846 (1992); *see also Gonzales*, 550 U.S. at 157 ("The government may use its voice and regulatory authority to show its profound respect for the life within the woman."); *Planned Parenthood Se., Inc. v. Strange*, 9 F. Supp. 3d 1272, 1292–93 (M.D. Ala. 2014) ("The Supreme Court has identified three legitimate governmental interests which may justify regulation of abortion: the life of the fetus, the health of the woman, and the regulation of the medical profession."). Unfortunately, as the U.S. Supreme Court lamented, that latter interest "has been given too little acknowledgment" by courts. *Casey*, 505 U.S. at 871. Courts must "fully honor[] the State's ability to pursue" this interest. *Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330, 1332 (M.D. Ala. 2014). When that interest is properly acknowledged, it becomes clear that "the State may use its regulatory power to bar certain procedures and substitute others, all in furtherance of its legitimate interests in regulating the medical profession in order to promote respect for life, including life of the unborn." *Gonzales*, 550 U.S. at 158.

Thus, for example, the U.S. Supreme Court in *Gonzales v. Carhart* upheld the federal Partial-Birth Abortion Ban, which like Act 2016-397 prohibited one type of D&E, even though medical opinion differed over whether that ban "create[d] significant health risks for women," because it furthered the government's interests in promoting respect for the unborn and promoting an ethical society. *Gonzales*, 550 U.S. at 161. Congress justified the restriction of that procedure by stating that "[i]mplicitly approving such a brutal and inhumane procedure by choosing not to prohibit it will further coarsen society to the humanity of not only newborns, but all vulnerable and innocent human life, making it increasingly difficult to protect such life." *Gonzales*, 550 U.S. at 157 (citation omitted). Moreover, Congress concluded that the inhumanity of this type of D&E also undermines the medical profession, by "confus[ing] the medical, legal, and ethical duties of physicians to preserve and promote life." *Id.* The Supreme Court found these justifications compelling, upholding the act on the basis of the government's legitimate interest in "express[ing] respect for the dignity of human life" and "protecting the integrity and ethics of the medical profession." *Id.*

The same profound concerns that justified Congress's prohibition on partial-birth abortion also justify the Legislature's prohibition on dismemberment abortion for three reasons.

First, prohibition of the particularly cruel and inhumane dismemberment abortion advances respect for human life.   As many Justices have noted, dismemberment abortion is just as "brutal" and "equally gruesome" as partial-birth abortion, as it involves "tearing a fetus apart and ripping off its limbs," and any distinction between the two procedures "is simply irrational."   *Gonzales*, 550 U.S. at 182 (Ginsburg, J., dissenting); *see also id.* at 160 (majority opinion) (recognizing that dismemberment "is in some respects as brutal, if not more, than" partial-birth abortion); *Stenberg*, 530 U.S. at 946–47 (Stevens, J., dissenting) (describing dismemberment as "equally gruesome" as partial-birth abortion).   It is a legitimate state interest to ensure that, even if a life may be extinguished, society should not permit barbarism.   *See, e.g.*, U.S. CONST. amend. VIII (prohibiting "cruel and unusual punishments," including cruel forms of execution); *Glass v. Louisiana*, 471 U.S. 1080, 1084 (1985) (explaining that the "inhuman and barbarous" practice of "drawing and quartering," which causes death by dismemberment, is "obvious[ly] unconstitutional[]).

Second, Act 2016-397 promotes the integrity and ethics of the medical profession by ensuring that at least some respect is paid to the fetus being terminated.   Many of those in the medical profession recognize that dismemberment "is a qualitatively different procedure" than other types of abortions, causing those participating in it to "report[] serious emotional reactions

that produced physiological symptoms, sleep disturbances, effects on interpersonal relationships, and moral anguish."[6]   One doctor wrote that this procedure caused loss of sleep, depression, anxiety attacks, nausea, palpitations, and dizziness, as well as a loss of pride in being a physician.   Ex. 15, Flesh, *supra* note 2. Procedures such as this "might cause the medical profession or society as a whole to become insensitive, even disdainful, to life, including life in the human fetus." *Stenberg*, 530 U.S. at 961 (Kennedy, J., dissenting); *see also* Ex. 15, Flesh, *supra* note 2 (dismemberment abortion requires "desensitization of medical personnel"). The State has an interest in avoiding these harmful consequences to those in the medical field and preventing desensitization to ethical issues.  *Gonzales*, 550 U.S. at 157; *see also Stenberg*, 530 U.S. at 961 (Kennedy, J., dissenting).

Finally, in abortion and other contexts, the State has an interest in promoting a respect for life, compassion, and humanity in society at large.   Even in euthanizing a dog, a veterinarian cannot rip it apart, limb by limb, while its heart is still beating.  The State should be free to extend that same basic level of respect to an unborn child by prohibiting a procedure "laden with the power to devalue human life."  *Gonzales*, 550 U.S. at 158.

Thus, because this Act furthers the State's legitimate interests in promoting respect for life and the integrity of the medical profession by prohibiting a

---

[6] *See* Ex. 2, Hern & Corrigan, *supra* note 1, at 3.

particularly brutal abortion procedure, and because this Act permits safe alternatives to the dismemberment procedure, it does not impose an undue burden on women seeking a second trimester abortion.

**B.    Act 2016-397 does not place an undue burden on abortion.**

While Act 2016-397 certainly prohibits the dismemberment of a living fetus, a particular form of abortion, "not every law which makes a right more difficult to exercise is, *ipso facto*, an infringement of that right." *Casey*, 505 U.S. at 873. The burden placed on abortion by Act 2016-397 is not "undue" both because it advances the legitimate state interests in promoting respect for life and the integrity of the medical profession and because it permits women seeking abortion to obtain safe, alternative forms of the D&E procedure.

Act 2016-397 is only relevant to the very few D&E procedures performed in Alabama. And it does not prohibit abortion providers from performing D&Es; it merely requires that a provider must first ensure fetal demise so that a living unborn child is not dismembered in the procedure. The U.S. Supreme Court has not held that there is a constitutional right to a particular abortion procedure, but rather that States may ban a particular procedure, if it permits safe alternatives. Here, Act 2016-397 prohibits D&E abortions to be performed on a living fetus, but permits them so long as fetal demise is induced first. There are at least three safe and effective means of inducing fetal demise—potassium chloride injection,

17

digoxin injection, and umbilical cord transection—before a D&E.  And if these methods fail and delaying the D&E would seriously endanger a woman's health, the Act's health exception would permit an otherwise prohibited D&E to be performed.

### 1.     The Dismemberment Abortion Ban affects few abortions.

It is worth noting at the outset that Act 2016-397 only applies to a small percent of abortions.  The Act is only relevant when a D&E abortion procedure is performed.  And the D&E abortion procedure is not performed until a few weeks into the second trimester and rarely performed at all in Alabama.  Additionally, the Act only prohibits dismemberment abortion D&Es when they are performed on a living fetus—when the dismemberment itself causes the fetus's death.

The Act does not affect all second-trimester abortions.  It does not apply to the vacuum-aspiration abortions that are commonly performed in the beginning of the second trimester.  Abortions, like the vacuum-aspiration procedure, "which use[] suction to dismember the body of the developing unborn child" and thereby cause fetal death are explicitly excluded from the Act's prohibition.  Act 2016-397 § 2(3) (Doc. 50-3).  The Plaintiffs' physicians state that they do not begin to perform D&E abortions before approximately 15 weeks LMP.  Doc. 54-4 at ¶ 22 (Robinson White declaration); Doc. 54-6 at ¶ 12 (Parker declaration).  Thus, the

Act is not relevant to the Plaintiffs' (or most abortionists') practice until a few weeks into the second trimester.

D&Es are rarely performed in Alabama. The Department of Public Health's statistics show that D&E accounts for a vanishingly small number of abortions on an annual basis—12 in 2014, compared with the hundreds of abortions in the second trimester. Ex. 14-C (2014 statistics). Plaintiffs apparently agree with the accuracy of the Department's statistics, because they cite them throughout their declarations and briefs. *See* Doc. 54 at 39–40; Doc. 54-1 at ¶ 12 (second Gray declaration); Doc. 54-2 at ¶ 9 (Johnson declaration). And state law requires institutions, like the Plaintiffs, in which abortions are performed to file reports including the method of abortion with the Office of Vital Statistics. ALA. CODE § 22-9A-13(b). But these figures present a stark contrast to the unsubstantiated assertions of Plaintiffs that D&E is a common form of a second trimester abortion that is in regular use in Alabama.

Moreover, even when the Act is relevant, it does not prohibit a physician from performing a D&E procedure; it only requires that the procedure be performed *after* the fetus has been killed by other means. Act 2016-397 prohibits only those D&E abortions in which a still living fetus is dismembered. The Act defines the prohibited dismemberment abortion, in part, as one in which a person "purposely . . . dismember[s] a living unborn child . . . ." Act 2016-397 § 2(3)

19

(Doc. 50-3).  When a D&E is performed on the body of a fetus whose life has been terminated by other means, the Act simply does not apply.  Thus, an abortion provider could first induce fetal demise by other means and then dismember the fetus's dead body without violating the Act.

> **2.**     **The Supreme Court's case law on abortion permits states to prohibit a particular procedure so long as there are safe alternatives.**

The dismemberment ban, like the partial-birth abortion ban, is permitted by the Supreme Court's case law on abortion.  States may prohibit particular abortion procedures so long as they permit alternative procedures that are safe for the mother—even when there is medical uncertainty regarding the relative safety of those procedures.  Here, because these alternative forms of D&E are safe for the mother and effective at inducing fetal demise, the prohibition of the dismemberment abortion procedure is not an undue burden.

State legislatures have "wide discretion to pass legislation in areas where there is medical and scientific uncertainty." *Gonzales*, 550 U.S. at 163.  In order for this Court to find the law unconstitutional, the safety risks of the alternative procedures must be *significantly* greater than the prohibited one, *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 76 (1976); where the safety considerations are "marginal," they are within the competence of the legislature to regulate, *Gonzales*, 550 U.S. at 166.  Here, several D&E procedures are available

that do not violate Act 2016-397 and are as safe as the living dismemberment of a fetus that Plaintiffs currently practice.   Plaintiffs have failed to demonstrate that these alternative procedures are less safe, much less significantly so.   And when "other abortion procedures that are considered to be safe alternatives" are available, as they are here, the law is "not invalid on its face."   *Id.* at 166–67. These alternative means of inducing fetal demise are safe and sufficient for the Act's constitutionality.

Nor does the Supreme Court's case law on abortion counsel otherwise. Plaintiffs argue that "it is unconstitutional to ban the most common second-trimester abortion method," Doc. 54 at 48 (citations omitted), and that D&E is such a method, *id.* at 50.   To support this assertion, Plaintiffs characterize the Supreme Court's decision in *Gonzales* as upholding the federal Partial-Birth Abortion Ban only "because the safest and most common abortion method—standard D&E— remained available throughout the second trimester."   *Id.* at 52.

*Gonzales* did not constitutionally enshrine the D&E procedure—let alone the particular type of D&E prohibited by this Act.   Rather the Court found that the federal ban did not create an undue burden because it permitted "*a* commonly used and generally accepted method," D&E, as an alternative.   *Gonzales*, 550 U.S. at 165 (emphasis added).   Further, to support the constitutionality of that ban, the Court also relied on the fact that "an injection that kills the fetus," exactly like two

21

of the methods proposed here, "is an alternative under the [a]ct that allows the doctor to perform the [prohibited partial-birth abortion] procedure." *Gonzales*, 550 U.S. at 164.   These two factors made that ban constitutional—even without a health exception like that present in Act 2016-397.

In short, *Danforth*, *Stenberg*, and *Gonzales* stand for the proposition that a ban on a particular abortion procedure is permitted when there are safe and common alternatives.   Here, all D&E procedures are *not* banned—only those that involve the dismemberment of a living fetus.   And the alternatives discussed below are undoubtedly safe, and at least one, digoxin, is already in "widespread use."[7]

### 3. Act 2016-397 permits several safe methods of D&E as alternatives to living dismemberment.

Act 2016-397's prohibition on D&Es only when they are performed on a *living* fetus is an important limitation.   In fact, the literature suggests that women *prefer* that fetal demise be induced before D&E.   When given the option, most women receiving a second trimester abortion preferred that fetal demise be induced before the operation.[8]   There are at least three proven alternative methods of D&E

---

[7] Gillian Dean et al., *Safety of digoxin for fetal demise before second-trimester abortion by dilation and evacuation*, 85 CONTRACEPTION 144, 144 (2012), attached as Exhibit 3.

[8] Ex. 4, Hammond, *supra* note 4, at 352 (". . . 91% of patients preferred preoperative administration of a feticidal agent for emotional reasons."); Deborah Nucatola et al., *A randomized pilot study on the effectiveness and side-effect profiles of two doses of digoxin as fetocide when administered intraamniotically or intrafetally prior to second-trimester surgical abortion*, 81 CONTRACEPTION 67, 71 (2010), attached as Exhibit 5 ("A majority of subjects (73%) reported that, if given the choice, they preferred to receive digoxin before the D&E procedure.").

that induce fetal demise before the child is ripped apart or evacuated during the procedure. Each of these methods is safe for the mother and complies with the Act.

*Injection Methods.* There are two types of injections that can be used to induce fetal demise: potassium chloride and digoxin.

First, fetal demise can be induced by an injection of potassium chloride directly into the fetus[9] before the D&E is performed. This method was introduced as early as 1988 and has grown in use ever since (including being the "preferred method of induced fetal demise" at Yale New Haven Hospital).[10] An injection of potassium chloride is safe for the woman and has a greater than 99% success rate in causing the death of the fetus.[11] Ex. 1 at ¶ 7 (Biggio declaration). Multiple studies show that an injection of potassium chloride into the fetus has been associated with no maternal complications.[12] In one study, the authors examined all cases where fetal demise was induced by an injection of potassium chloride

---

[9] Justin Diedrich et al., *Induction of fetal demise before abortion*, 81 CONTRACEPTION 462, 465 (2010) (Society of Family Planning Clinical Guidelines), attached as Exhibit 6.

[10] Anna K. Sfakianaki et al., *Potassium Chloride-Induced Fetal Demise*, 33 J. ULTRASOUND MED. 337, 338 (2014), attached as Exhibit 7.

[11] *Id.* at 337.

[12] Ex. 7 at 338; *see also* Patricia A. Lohr, *Surgical Abortion in the Second Trimester*, 16 REPROD. HEALTH MATTERS 151, 156 (2008), attached as Exhibit 8 ("Administration of [potassium chloride] is safe."); Ex. 6, Diedrich, *supra* note 9, at 467 ("During an international collaborative experience with selective terminations, there were no failed inductions of fetal demise by intrafetal or intrafunic injection of [potassium chloride] in 402 cases, which included gestational durations from 9 weeks until after 24 weeks.").

before an abortion procedure was performed in five years at one center.[13]   They

found that in all cases, the entire injection procedure took five minutes or less and

no case required a second "needle insertion" or resulted in maternal

complications.[14]   Further, the authors noted that "[a]lthough . . . certainly

possible[,] inadvertent maternal injection or maternal absorption of potassium

chloride during feticide . . . would be extremely rare if correct fetal placement of

the needle is confirmed prior to the procedure."[15]   *See also* Ex. 1 at ¶ 9 (Biggio

declaration) ("The dose of potassium chloride required to induce demise would not

be expected to have maternal effects, unless inadvertently injected into the

maternal circulation.").

Second, fetal demise can be induced by an injection of digoxin. Such

injections of digoxin "are widely used regimens"[16] and effective at inducing fetal

demise.  This procedure has been used since the 1980s "without any reported

---

[13] L. Pasquini et al., *Intracardiac injection of potassium chloride as method for feticide: experience from a single UK tertiary centre*, 115 BJOG 528, 528–29 (2008), attached as Exhibit 9.

[14] *Id.* at 529.

[15] *Id.* at 530.

[16] Michael Molaei et al., *Effectiveness and safety of digoxin to induce fetal demise prior to second-trimester abortion*, 77 CONTRACEPTION 223, 223 (2008), attached as Exhibit 10; *see also* Ex. 3, Dean, *supra* note 7, at 144 (describing digoxin to induce fetal demise as in "widespread use"); Lynn Borgatta et al., *Relationship of intraamniotic digoxin to fetal demise*, 81 CONTRACEPTION 328, 329 (2010), attached as Exhibit 11 ("Digoxin is widely used to induce fetal demise prior to second-trimester abortion . . . ."); Ex. 5, Nucatola, *supra* note 8, at 73 ("Digoxin, administered either intraamniotically or intrafetally, is commonly used by abortion providers to facilitate second-trimester D&E.").

major feticide-related complications" and only "mild" common reactions such as nausea and vomiting.[17]   And a pilot study on digoxin injections found that "more women reported a decrease in pain and nausea immediately following digoxin injection and on the following day compared to prior to the injection."[18]   Unlike potassium chloride, which can only be injected directly into the fetus, digoxin can be injected either into the fetus or into the amniotic fluid, and consequently, "less skill is required" for this injection.[19]   An intraamniotic injection is easier to administer than an intrafetal injection, and may be equally effective.[20]

Although there is medical uncertainty regarding the benefits and risks of these procedures, studies have indicated that a digoxin injection is both safe and effective—and may even be safer than dismemberment D&Es.   On the one hand, studies have concluded that a digoxin injection before a D&E procedure may increase the likelihood that a woman may experience a higher rate of infection and spontaneous abortion without a proven benefit to the woman.[21]   The risks of both digoxin and potassium chloride injections "include small risks of bleeding,

---

[17] Ex. 6, Diedrich, *supra* note 9, at 463.

[18] Ex. 5, Nucatola, *supra* note 8, at 73.

[19] Ex. 6, Diedrich, *supra* note 9, at 465.

[20] *Compare* Ex. 10, Molaei, *supra* note 16, at 225 ("Intra-amniotic digoxin . . . was much less effective in producing fetal demise than intrafetal injection at the doses studied here.") *with* Ex. 5, Nucatola, *supra* note 8, at 71 (finding that the difference in effectiveness between intrafetal and intraamniotic injections "was not significant").

[21] Ex. 3, Dean, *supra* note 7, at 148.

infection, and inadvertent penetration of the bowel or bladder with the needle" and "are similar to those of amniocentesis, a procedure utilized in the assessment and management of many pregnancies."  Ex. 1 at ¶ 9 (Biggio declaration).  On the other hand, studies have concluded that a digoxin injection is safe and effective.[22] Large studies have shown "no failures of causing demise" and "no injection-related complications," and other studies confirm "no adverse events suggesting digoxin toxicity."[23]  The data also shows that digoxin injections create "no difference in procedure time" or "physician-reported case difficulty."[24]  Further, "[t]he dose of digoxin required to cause fetal demise is sufficient to result in maternal serum digoxin level that are similar to those that would be aimed for in a woman placed on digoxin for medical indications."   Ex. 1 at ¶ 9 (Biggio declaration).  Administration of digoxin is considered safe,[25] and no causal relationship between digoxin and any dangers to health have been established.  Moreover, some abortion providers prefer to induce fetal demise before performing a D&E because it might

---

[22] Ex. 5, Nucatola, *supra* note 8, at 71 (finding that digoxin was 87% effective at inducing fetal death and that this effectiveness did not vary significantly based upon whether the injection was intrafetal or intraamniotic); Ex. 11, Borgatta, *supra* note 16, at 330 ("We found that 1.5 mg of digoxin by intraamniotic injection is effective at causing fetal demise by 24 h, but that demise is not immediate.").

[23] Ex. 6, Diedrich, *supra* note 9, at 465–66.

[24] *Id.* at 467; *see also* Ex. 8, Lohr, *supra* note 12, at 156.

[25] Ex. 8, Lohr, *supra* note 12, at 156.

have the benefit of reducing complications by softening the fetal tissue.[26]  In one study, the author concluded that "the pre-operative induction of fetal demise by intrafetal injection performed 24-28 h prior to the abortion" "enhances safety."[27]

Plaintiffs make two arguments about these procedures, neither of which survives the barest scrutiny.

First, Plaintiffs' affidavits complain that their physicians are unwilling or not competent enough to perform either injection.  Doc. 54 at 23.  But Plaintiffs' lack of willingness or ability cannot be a sufficient reason to invalidate the law.  The Supreme Court had held that physicians—including abortion providers—"are not entitled to ignore regulations that direct them to use reasonable alternative procedures."  *Gonzales*, 550 U.S. at 163.  Moreover, Plaintiffs' physicians can learn these procedures.  The Director of the Division of Maternal Fetal Medicine at the University of Alabama at Birmingham, Dr. Joseph R. Biggio Jr., who "ha[s] been involved in resident education for the entirety of [his] professional career," testifies that although the Plaintiffs' physicians would need additional training to perform these methods, such training would not be "extensive."  Ex. 1 at ¶ 11.

---

[26] Ex. 6, Diedrich, *supra* note 9, at 467; *see also* Ex. 8, Lohr, *supra* note 12, at 156; Ex. 5, Nucatola, *supra* note 8, at 67 ("Many clinicians believe that inducing fetal death prior to D&E results in softer macerated fetal tissues that may ease evacuation of the fetus and potentially decrease procedure time and risk of complications.") (citation omitted).

[27] Warren M. Hern, *Laminaria, induced fetal demise and misoprostol in late abortion*, 75 INT'L J. GYNECOLOGY & OBSTETRICS 279, 284 (2001), attached as Exhibit 12.

27

Second, Plaintiffs claim that these alternatives are unavailable in Alabama and thus cannot support the constitutionality of the Act. Doc. 54 at 51. This is not so. In fact, in 2014, the most recent for which statistics are available, the alternatives proposed by the statute were used in more abortion procedures than the method Act 2016-397 seeks to prevent. "[I]ntra-fetal injection[s were] used in an attempt to induce fetal demise" before 22 abortions in Alabama in 2014. Ex. 14-C (2014 statistics). At the same time, only 12 were performed with the D&E procedure. *Id.* Thus, these means of inducing fetal demise, which comply with the statute, are not only available within the State, they are commonly used.

*Umbilical cord transection.* A final method of inducing fetal demise is umbilical cord transection. Umbilical cord transection (UCT) is a "feasible, efficacious and safe way to induce fetal demise."[28] UCT can be performed immediately before a D&E.[29] After dilating the woman's cervix (the first step in a D&E, Doc. 54-5 at ¶ 12 (Davis declaration)), the abortion provider draws the umbilical cord into the cervical os and then transects it.[30] Ex. 1 at ¶ 8 (Biggio declaration). Generally, this induces fetal hemorrhage followed by demise in

---

[28] Kristina Tocce, et al., *Umbilical cord transection to induce fetal demise prior to second-trimester D&E abortion*, 88 CONTRACEPTION 712, 715 (2013), attached as Exhibit 13.

[29] *Id.* at 713.

[30] *Id.* at 713.

under five minutes. *Id.* Moreover, "a board certified OB/GYN should be able to perform [UCT] without considerable additional training." *Id.* at ¶ 12.

UCT is both safe for the mother and effective. One study found that UCT was effective at inducing fetal demise in all of the cases examined and both major and minor complications when UCT was performed before a D&E were "comparable" to the rates of complications "in other large D&E case series."[31] UCT is so effective and safe that, in at least one facility, *all* abortions at or over 16 weeks gestation are done using UCT after the passage of the federal Partial-Birth Abortion Act.[32]

Plaintiffs have no response to UCT, simply ignoring it in their briefs. Although the Plaintiffs do not address the use of UCT in their memorandum, the Plaintiffs' expert Dr. Anne Davis, does. She identifies three purported problems with UCT.

First, Dr. Davis says that UCT "has no known medical benefit." Doc. 54-5 at ¶ 32–36. But that objection is irrelevant to the constitutionality of the Act. This Act is not based on the State's interest in protecting the woman's health, but rather in promoting respect for life and the integrity of the medical profession by

---

[31] *Id.* at 714–15.

[32] *Id.* at 713.

directing physicians to use a safe and less gruesome form of D&E.  UCT is such an alternative.

Second, Dr. Davis asserts that UCT is not technically possible before every D&E.  Doc. 54-5 at ¶ 32–36.  But no procedure is possible with all patients, including D&E itself, and that fact is remedied by the other alternatives proposed here if UCT is problematic for a given individual.

Third, Dr. Davis asserts that UCT can increase the risks of the D&E procedure by (1) prolonging the procedure and (2) increasing the risk of uterine perforation.  Doc. 54-5 at ¶ 32–36.  But that completely unsupported assertion is contrary to the evidence and common sense.  Dr. Davis cites *no* studies or other medical literature in support of her claim that UCT increases the risks of uterine perforation.   And, UCT does not significantly lengthen the abortion procedure because it can be performed in as little as five minutes at the start of the D&E. Because UCT "is performed at the same time as the abortion procedure, it would not be expected to increase the risk beyond that inherently associated with the D&E procedure itself."   Ex. 1  at  ¶ 10  (Biggio  declaration).   Reports of complications after UCT "appear to have occurred when there was an interval of 24 hours" between UCT and the D&E procedure.  *Id.*

 Ultimately, legitimate abortion regulations cannot be struck down merely because "some part of the medical community were disinclined to follow the

proscription." *Gonzales*, 550 U.S. at 166.  If the people decide that abortion should not be performed in a grotesque and ethically-compromising manner, "[t]he medical profession . . . may find different and less shocking methods to abort the fetus in the second trimester, thereby accommodating legislative demand" and advancing the "State's interest in respect for life."  *Id.* at 160.  If Plaintiffs' incalcitrant physicians are truly unwilling to keep up with the latest medical advances, then the "burden" on abortion is created by Plaintiffs, not the State. Because Act 2016-397 prohibits one particular, brutal method of abortion and permits ample, safe alternative procedures, it is constitutional under the Supreme Court's case law.

### 4.  The intent requirement and health exception further strengthen the constitutionality of Act 2016-397.

The Plaintiffs additionally argue that if the initial attempt to induce fetal demise were to be unsuccessful (*i.e.*, the fetus is still alive at the time of the D&E), they must either violate the Act by performing a dismemberment D&E on a living fetus or risk the mother's health by attempting a second injection and waiting to perform the procedure.  Doc. 54 at 51.  For instance, the Plaintiffs argue that this delay could increase the risk of infection or extramural delivery to the mother because she would be "already dilated and [her] uterus may have already started to contract . . . ."  Doc. 54 at 23.  The Act, however, does not requires such a delay.

The Act's health exception would permit a D&E to be performed on a living child if necessary to avoid serious risks to the woman's physical health.  The health exception provides that the living dismemberment ban does not apply when "[i]n reasonable medical judgment, the child's mother has a condition that so complicates her medical condition that it necessitates the abortion of her pregnancy . . . to avert serious risk of substantial and irreversible physical impairment of a major bodily function . . . ."  Act 2016-397 § 2(6) (Doc. 50-3).  Thus, the Act does not force Plaintiffs' physicians to choose between violating it and seriously risking a woman's health by delay.  Because of this health exception, if an initial attempt to induce fetal demise prior to the scheduled procedure were to fail and that procedure could not be delayed for a second attempt without "serious risk" to the mother's physical health, *id.*, the physician would be permitted to perform a D&E on a living fetus.

And to the extent that the Plaintiffs claim that they may accidentally violate the dismemberment ban while intending to perform a permitted abortion procedure, this is not the case.  The statute only prohibits dismemberment abortions that are performed "purposefully."  *Id.* at § 2(3); *see also id.* at § 2(5) (defining "act[ing] purposely with respect to a material element").  Thus, if a physician does not intend to perform a dismemberment abortion on a living fetus, he or she will not violate the Act. *See Gonzales*, 550 U.S. at 149–50, 155 (noting

the critical nature of an "Act's intent requirements, which preclude liability from attaching to an accidental" violation after a permitted procedure begins).

*          *          *

In sum, women prefer the procedures permitted by Act 2016-397 over those prohibited. The people of Alabama prefer those procedures to advance the legitimate state interests in promoting respect for fetal life and fostering an ethical medical profession and society. Act 2016-397 does not ban D&E abortions, but rather only a particular method of performing D&E, leaving other safe alternatives available. All the Legislature asks is that unborn children be terminated humanely. For these reasons, Plaintiffs have not shown a substantial likelihood of success on the merits of their challenge to Act 2016-397, and their motion to preliminary enjoin enforcement of that Act is due to be denied.

## II. The Plaintiffs are not likely to prevail on their challenge to the school proximity law.

The Plaintiffs are also not likely to prevail on their lawsuit against the school proximity law. The Supreme Court's most recent application of the undue burden test came in *Whole Woman's Health v. Hellerstedt*, 136 S. Ct. 2292 (2016). There, the Court evaluated whether an admitting privileges requirement and/or ambulatory surgical center requirement posed an undue burden on the right to an abortion. The Court explained that the *Casey* standard requires a court to "weigh[] the asserted benefits [of a law] against the burdens." *Id.* at 2310.

The Court found the laws at issue there unconstitutional for effectively two reasons.  First, the Court emphasized that the two laws at issue did not actually serve the State's asserted governmental interests.  *See id*. at 2312 ("[W]ithout dispute other common prerequisites to obtaining admitting privileges that have nothing to do with ability to perform medical procedures."); *id.* at 2315 ("[M]any surgical-center requirements are inappropriate as applied to surgical abortions."). Second, when evaluating the law's burdens, the Court held that the law would drastically reduce the availability of abortion providers and abortion clinics *because the very nature of an abortion practice made it impossible for abortion doctors to attain admitting privileges or charge enough for abortions to meet ambulatory surgical center building standards*.  *Id.* at 2312 ("[D]octors would be unable to maintain admitting privileges or obtain those privileges for the future, because the fact that abortions are so safe meant that providers were unlikely to have any patients to admit."); *id.* at 2318 ("[T]he costs that a currently licensed abortion facility would have to incur to meet the surgical-center requirements were considerable, ranging from $1 million per facility (for facilities with adequate space) to $3 million per facility (where additional land must be purchased)" such that "more surgical centers will not soon fill the gap when licensed facilities are forced to close.").

34

The *Hellerstedt* balancing test applies differently here.  As explained in more detail below, the school proximity law advances important state interests and, properly understood, does not meaningfully limit a woman's access to abortion. On balance, the State's interest outweighs any burden the law may impose on access to abortion.

## A.  The school proximity law advances important state interests.

The school proximity law is hardly the first instance of a government action that limits the types of businesses that can operate within a specified distance of a school.  The U.S. Supreme Court has observed that "there can be little doubt about the power of a state to regulate the environment in the vicinity of schools . . . by exercise of reasonable zoning laws."  *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 121 (1982).  The government has invoked its power to impose blanket bans on numerous property uses and activities near schools, including the sale of alcohol, e.*g. Davidson v. City of Clinton*, 826 F.2d 1430, 1434 (5th Cir. 1987), the operation of adult movie theaters, *e.g. City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), possession of firearms, 18 U.S.C. § 922(q)(2)(A)(2012), and even "willfully making, on grounds adjacent to a school, noises which are disturbing to the good order of the school sessions," *Larkin*, 459 U.S. at 121 (citing *Grayned v. City of Rockford*, 408 U.S. 104 (1972)).

Like these other laws, the school proximity law "erects a reasonable zone of protection around a center of educational growth and enrichment." *Davidson*, 826 F.2d at 1434.  It advances two important state interests.

First, the school proximity law minimizes disturbance in the educational environment.  Plaintiffs recognize that abortion clinics attract pro-life protesters.  But they ignore the fact that abortion clinics also come with counter-protesters and clinic staff who *confront* the protesters.  For example, on procedure days, 5 to 150 pro-life protesters and 10 to 25 counter-protesters organize on the sidewalks outside of the Huntsville abortion clinic to protest *each other.*  Ex. 20 at 72:13–18, 74:9–12 (Johnson deposition).  Similarly, clinic staff and the pro-life protesters at the Tuscaloosa clinic engage in shouting matches and other kinds of confrontation. *See* Ex. 21 at 82:11–84:4 (Gray deposition).  This kind of obvert confrontational activity can obviously disrupt the learning environment in a K-8 school across the street.

Plaintiffs erroneously argue that enforcing the school proximity law would give pro-life protesters an effective veto over abortion, but that argument misses the point.  The school proximity law is not about the clinic; it is about the school. "In the school context," courts have recognized that "the crucial distinction is the nature of the speech, not the source of it."  *Dariano v. Morgan Hill Unified Sch. Dist.*, 767 F.3d 764, 778 (9th Cir. 2014).  The school proximity law does not

36

outlaw the clinic because of the protesters' views or the community's sentiment.  It simply locates the clinic to a place—2,000 feet away—where it is minimally disruptive to the school environment.

To be clear, these protesters, counter-protesters, and clinic staff may have the first amendment right to shout at each other on the public sidewalks. But that does not make the activity any less disruptive to the educational environmental. "A nuisance may be merely a right thing in the wrong place, like a pig in the parlor instead of the barnyard."  *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926).

Second, the school proximity law supports a parent's right to control their children's exposure to the subject of abortion, a complicated issue that is often intertwined with deeply held religious beliefs.  One parent of a six-year-old who attends a school near the Huntsville abortion clinic reported that her child peppered her with questions about abortion and "I couldn't fully explain and it was uncomfortable."  Ex. 16, Vollers, *supra* note 5.  In a similar case about abortion protests outside of a school, the Ninth Circuit recognized that children pose a "special circumstance" because "[c]hildren may well be particularly susceptible to distraction or emotion in the face of controversial speech, and may not always be expected to react responsibly."  *Ctr. For Bio-Ethical Reform, Inc. v. L.A. Cty. Sheriff Dep't*, 533 F.3d 780, 790 (9th Cir. 2008).  To that end, the school proximity

law is focused on K-8 schools and does not apply to high schools or colleges where the students are more mature.   It supports the interest of parents in controlling their children's exposure to the complicated and morally fraught issue of abortion.

Ultimately, the government's interest here is similar to the government's interest in the Supreme Court's leading case on zoning and the First Amendment— *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986).  There, the Court upheld as constitutional a city ordinance that prohibited adult movie theaters from operating within 1,000 feet of any school.   There, as here, the government's interest was addressing "the undesirable secondary effects" of a business.  *Id.* at 49.   And there, as here, the government left open many areas to the kind of business that was proscribed around schools.   "Plainly schools . . . have a valid interest in being insulated from certain kinds of commercial establishments." *Larkin*, 459 U.S. at 121.   The Legislature reasonably determined that abortion clinics are one such establishment.   The government has a strong interest in the school proximity law.

**B.     The school proximity law does not meaningfully limit a woman's access to abortion.**

Weighed against the government's strong interest in the school proximity law, the school proximity law imposes, at most, a minimal burden on the right to an abortion.   As explained above, the Court's reasoning in *Hellerstedt* turned on the intrinsic inability of an existing or future abortion clinic to meet the admitting

38

privileges and ambulatory surgical center requirements.  *See supra* 34.   For example, the Court reasoned that abortion doctors, in general, "would be unable to maintain admitting privileges or obtain those privileges for the future, because the fact that abortions are so safe meant that providers were unlikely to have any patients to admit."  *Hellerstedt*, 136 S. Ct. at 2312.  The Court did not evaluate the law's effect on specific doctors or existing clinics, except to illustrate the effect of the laws on the provision of abortion generally.

The school proximity law proposes nothing like the widespread and permanent effects that were at issue in *Hellerstedt*.  This law does not drastically curtail the locations in which clinics can operate.  It does not pose a regulatory hurdle that abortion clinics, as a general matter, cannot surmount.  The Plaintiffs are not arguing that it would pose an undue burden for the State to prohibit *new* abortion clinics from opening within 2,000 feet of a K-8 school.  Nor are they arguing that the school proximity law is so broad that it unconstitutionally eliminates all locations in Huntsville or Tuscaloosa where an abortion clinic could be located.  The laws in *Hellerstedt* "vastly increase[d] the obstacles confronting women seeking abortions in Texas without providing any benefit to [the government's interest] capable of withstanding any meaningful scrutiny."  *Id.* at 2319.  That is simply not the case with the school proximity law at issue here.

Plaintiffs' failure to argue, much less prove, that the school proximity law meaningfully limits the locations in which abortion clinics can operate makes this case very different from the law that the old Fifth Circuit addressed in *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328 (5th Cir. Unit B 1981). There, the City refused to allow an abortion clinic to locate in any area zoned for business, which effectively prohibited abortion anywhere within the city limits. *Id.* at 336; *see also W. Side Women's Servs., Inc. v. City of Cleveland*, 573 F. Supp. 504 (N.D. Ohio 1983) ("total ban"). And, even if the City eventually allowed a clinic to operate, it would be "restricted to the most unattractive, inaccessible and inconvenient areas of a city." *Deerfield Med. Ctr.*, 661 F.2d at 336. The law here has no such alleged effect. The school proximity law is a narrow proscription on operating an abortion clinic within 2,000 feet of a K-8 school, which leaves plenty of areas available for clinics to operate in Tuscaloosa and Huntsville.

Because the school proximity law does not meaningfully limit the locations in which clinics can operate, the Plaintiffs' undue burden argument turns on the idiosyncrasies of their specific financial position. Because of their own unique financial situations, Plaintiffs argue that they cannot afford to move their existing clinics. *See* Doc. 54-1 ¶ 34 (second Gray declaration) ("I simply cannot afford to start all over."); Doc. 54-2 ¶ 25 (Johnson declaration) ("There is no way I could afford to do the same thing all over again."). This argument would make sense as a

regulatory takings claim focused on *the clinics* as businesses, but it makes no sense as the basis of *a woman's* substantive due process claim.[33]   A woman's substantive due process right to an abortion does not translate into a right for Dalton Johnson and Gloria Gray to operate their specific clinics in perpetuity.  The school proximity law only marginally affects a woman's right to an abortion because it forecloses abortion clinics from locating in a vanishingly small percentage of the State.  On balance, the government's interest outweighs the burden on the ability of a woman right to an abortion.

CONCLUSION

The Court should **DENY** the motion for a preliminary injunction.

---

[33] The difference between a regulatory takings claim and a substantive due process claim is a meaningful one.  The remedy for an unconstitutional taking is to enjoin the law unless the government provides just compensation to the business owner.

41

Respectfully submitted,

Luther Strange
  *Attorney General*

s/Andrew L. Brasher
Andrew Brasher
  *Solicitor General*
James W. Davis
  *Deputy Attorney General*
Brett Talley
  *Deputy Solicitor General*
William G. Parker, Jr.
  *Assistant Attorney General*

State of Alabama
Office of the Attorney General
501 Washington Avenue
Montgomery, Alabama 36130-0152
Telephone: 334.242.7300
Facsimile: 334.353.8440
abrasher@ago.state.al.us
jimdavis@ago.state.al.us
btalley@ago.state.al.us
wparker@ago.state.al.us

*Counsel for Attorney General Strange,*
*District Attorney Head, and District*
*Attorney Broussard*

42

## CERTIFICATE OF SERVICE

I certify that on August 30, 2016, I filed the foregoing document electronically via the Court's CM/ECF system, which will send a copy to all counsel of record.

| | |
|---|---|
| Andrew D. Beck | Phillip Brian Hale |
| Alexa Kolbi-Molinas | Carol Robin Gerard |
| Jennifer K. Lee | Bethany Lynn Bolger |
| American Civil Liberties Union | State of Alabama |
| 125 Broad St.; 18th Floor | Department of Public Health |
| New York, NY 10004 | P.O. Box 303017 |
| Telephone: (212) 549-2633 | Montgomery, AL 36130-3017 |
| Fax: (212) 549-2650 | Telephone: (334) 206-5209 |
| abeck@aclu.org | Fax: (334) 206-5874 |
| akolbi-molinas@aclu.org | brian.hale@adph.state.al.us |
| jlee@aclu.org | carol.gerard@adph.state.al.us |
| | Bethany.Bolger@adph.state.al.us |

| | |
|---|---|
| Randall C. Marshall | Wayne P. Turner |
| ACLU of Alabama Foundation, Inc. | 1505 Madison Avenue |
| P.O. Box 6179 | Montgomery, AL 36107 |
| Montgomery, AL 36106-0179 | Telephone: (334) 202-6555 |
| Telephone: (334) 420-1741 | waynetlaw@aol.com |
| rmarshall@aclualabama.org | |

James R. Seale
Hill Hill Carter Franco Cole & Black
P.O. Box 116
Montgomery, AL 36101-0116
Telephone: (334) 834-7600
Fax: (334) 263-5969
jrs@hillhillcarter.com

<u>s/Andrew L. Brasher</u>
Of Counsel
