IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| WEST ALABAMA WOMEN'S CENTER, et al., on behalf of themselves and their patients, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) ) | CIVIL ACTION NO. 2:15cv497-MHT (WO) |
| DR. THOMAS M. MILLER, in his official capacity as State Health Officer, et al., | ) ) ) ) ) | |
| Defendants. | ) | |

OPINION

Providers of abortion and other reproductive-health services in Alabama challenge two 2016 state statutes that regulate abortions and abortion clinics. The first statute, which the court will call the "school-proximity law," provides that the Alabama Department of Public Health may not issue or renew licenses to abortion clinics located within 2,000 feet of a K-8 public school.

1975 Ala. Code § 22-21-35.  The second statute, which the court will call the "fetal-demise law," effectively criminalizes the most common method of second-trimester abortion--the dilation and evacuation, or D&E, procedure--unless the physician induces fetal demise before performing the procedure.  1975 Ala. Code § 26-23G-1 et seq.

The plaintiffs are West Alabama Women's Center (an abortion clinic in Tuscaloosa, Alabama) and its medical director and Alabama Women's Center (an abortion clinic in Huntsville, Alabama) and its medical director.  The plaintiffs sue on behalf of themselves and their patients.  The defendants are the State Health Officer, the State Attorney General, and the district attorneys for Tuscaloosa and Madison Counties.  All defendants are sued in their official capacities.

The plaintiffs claim that the school—proximity and fetal—demise laws are unconstitutional restrictions on abortion access in the State of Alabama that violate the Due Process Clause of the Fourteenth Amendment.

Jurisdiction is proper under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights).

This litigation is now before the court on the plaintiffs' motion for a preliminary injunction. For reasons that follow, and based on the evidence presented at a hearing on October 4-6, 2016, the motion for a preliminary injunction will be granted as to both laws.

## I.   HISTORICAL BACKGOUND

Abortion clinics and their physicians have been subject to a number of regulations in Alabama. In just the last five years, Alabama has passed a host of legislation to regulate how and where abortion care can be provided. The court, however, now mentions only some of those laws.

In 2011, the State prohibited abortions at 20 or more weeks after fertilization, unless a woman's condition necessitates an abortion to avert her death or "serious risk of substantial and irreversible physical impairment of a major bodily function." 1975 Ala. Code § 26-23B-5.

**3**

In 2013, the State enacted a law requiring all abortion clinics to meet the same building safety codes applicable to ambulatory surgical centers. 1975 Ala. Code § 26-23E-9. Under that requirement, abortion clinics must meet the standards of the "NFPA 101 Life Safety Code 2000 edition," id., which include requirements for egress, fire protection, sprinkler systems, alarms, emergency lighting, smoke barriers, and special hazard protection. To comply with that law, abortion clinics in Alabama conducted renovations such as installing a fireproof closet, fire alarm system, and outside lighting. Tr. Vol. I (doc. no. 110) at 162:3-7.

In 2013, the State also required all physicians who perform abortions in the State to hold staff privileges at a hospital within the same statistical metropolitan area as the clinic. 1975 Ala. Code § 26-23E-4(c). The court held the staff-privileges requirement to be unconstitutional. Planned Parenthood Se., Inc. v. Strange, 33 F. Supp. 3d 1330 (M.D. Ala. 2014) (Thompson, J.); see also Planned Parenthood Se., Inc. v.

**4**

**Strange**, --- F. Supp. 3d ----, No. 2:13-cv-405-MHT, 2016 WL 1167725 (M.D. Ala. Mar. 25, 2016) (Thompson, J.).

Prior to 2014, Alabama law also required physicians to wait at least 24 hours after providing informed consent explanations to patients before conducting the abortion procedure.  That year, the legislature extended the informed-consent waiting period from 24 hours to 48 hours.  1975 Ala. Code § 26-23A-4.

Two years later, Alabama enacted the two statutes now challenged in this litigation.

The number of clinics in Alabama has decreased significantly in the last 15 years: as of 2001, 12 clinics provided abortions in the State.  Today, only five clinics continue to operate.  The vast majority of abortions performed in Alabama occur in these five clinics.[1]

_____

1.  In addition to abortion clinics, a very small number of abortions take place in Alabama hospitals and physician offices.  In 2014, 8,080 abortions were performed in Alabama; of those, 23 abortions were performed in hospitals and six abortions were provided at physician offices.  Second Johnson Decl. Ex. D (doc.

The plaintiffs operate two of the clinics: the Alabama Women's Center, located in Huntsville, and the West Alabama Women's Center, in Tuscaloosa.[2]  Together, these two clinics provided 72 % of all abortions in Alabama in 2014.  Second Johnson Decl. Ex. D (doc. no. 54-2) at 35.

The Alabama Women's Center, which opened in 2001, is the only abortion clinic in Huntsville, in the far northern part of the State.  The Huntsville metropolitan area, with a population of 417,593,[3] is Alabama's second largest urban area.  In addition to abortion services, the Huntsville clinic provides contraceptive counseling and care, testing and treatment for sexually transmitted

_____

no. 54-2) at 35.  Unless otherwise noted, the court is addressing only those abortions performed outside the hospital setting.

2.  The three other clinics operating in Alabama are Reproductive Health Services in Montgomery and Planned Parenthood clinics in Birmingham and Mobile.

3.  Statistics are derived from 2010 census data. See 2010 Census Population and Housing Tables, http://www.census.gov/population/www/cen2010/cph-t/cph-t-5.html.

infections, pap smears, pregnancy testing, and referrals for prenatal care and adoption.  In 2014, approximately 14 % of the abortions in Alabama took place at the Huntsville clinic.  Second Johnson Decl. Ex. D (doc. no. 54-2) at 35.

The West Alabama Women's Center began operations in 1993 and is the only abortion clinic in Tuscaloosa and all of west Alabama.  The Tuscaloosa metropolitan area is Alabama's fifth largest urban area.  The Tuscaloosa clinic provides reproductive health services to women, including abortions, birth control, treatment for sexually transmitted infections, pregnancy counseling, and referrals for prenatal care and adoption.  In 2014, approximately 58 % of the abortions in Alabama took place at the Tuscaloosa clinic, far more than at any other clinic.  Second Johnson Decl. Ex. D (doc. no. 54-2) at 35.

The Tuscaloosa and Huntsville clinics are the only ones in Alabama that perform abortions at or after 15

7

weeks of pregnancy.[4]   Prior to 15 weeks, most abortions are performed either through the use of medication or the dilation and curettage method, the latter of which uses suction to empty the contents of the uterus.   Starting at 15 weeks, it ordinarily is not possible to complete an abortion using suction alone, so patients must go to clinics that offer the D&E procedure.   The D&E procedure is a surgical abortion method where a physician uses suction and instruments to remove the fetus and other contents of the uterus.   In 2014, the Huntsville and Tuscaloosa clinics provided about 560 abortions starting at 15 weeks, all of which were D&E abortions.   Donald Decl. Ex. F, Induced Terminations of Pregnancy 2014 Report (doc. no. 81-14) at 19.   That said, the vast majority of abortions performed by the Huntsville and

_____

[4].   Throughout the remainder of this opinion, the week of pregnancy refers to gestational age as measured from the last menstrual cycle, rather than post- fertilization age, which is different by two weeks. The court has adjusted the numbers accordingly when citing statistics based on post-fertilization age.

Tuscaloosa clinics occur prior to 15 weeks and therefore do not involve D&E.


## II.  LITIGATION BACKGROUND

In July 2015, after the retirement of its long-time, sole physician who had hospital staff privileges, the Tuscaloosa clinic, along with its new medical director, initiated this litigation to challenge an Alabama Department of Public Health regulation that required all physicians who perform an abortion procedure to have staff privileges at a local hospital or to have an outside covering physician with such privileges.  Ala. Admin. Code r. 420-5-1-.03(6)(b).  This court temporarily restrained enforcement of the regulation against the Tuscaloosa clinic.  W. Ala. Women's Ctr. v. Williamson, 120 F. Supp. 3d 1296 (M.D. Ala. 2015) (Thompson, J.). The department then granted a temporary waiver to the Tuscaloosa clinic, and, with the agreement of the parties, the court stayed the proceeding to allow the department time to modify the regulation.

In May 2016, while the stay was pending, the department amended the regulation to provide that an abortion clinic could operate without a physician with staff privileges or a covering physician as long as the clinic provided to all women undergoing an abortion before they left the clinic, a copy of their medical records.  See Ala. Admin. Code r. 420-5-1-.03(6)(c)(4). That same month the school-proximity law and the fetal-demise law were signed into law.

After obtaining leave of the court, the Tuscaloosa clinic and its medical director further amended their complaint to challenge the amended regulation and the two new laws, which impacted both the Tuscaloosa and Huntsville clinics.  W. Ala. Women's Ctr. v. Miller, --- F.R.D. ----, No. 2:15-cv-497-MHT, 2016 WL 3621273 (M.D. Ala. July 5, 2016) (Thompson, J.).  The Huntsville clinic and its medical director were added as plaintiffs, and the State Attorney General and two district attorneys were added as defendants.

10

On July 13, 2016, the parties agreed to an order temporarily restraining enforcement of the two laws until three weeks after the end of a hearing on the plaintiffs' preliminary-injunction motion.  The parties later agreed to settle the challenge to the amended regulation, and the court entered a judgment dismissing that claim.

From October 4 through October 6, 2016, the court held a preliminary-injunction hearing, during which the court heard evidence and oral argument.  The order temporarily restraining enforcement of the school-proximity and fetal-demise laws expires today, October 27, 2016.

### III.  LEGAL STANDARDS

To show that a preliminary injunction is appropriate, a plaintiff must show that "(1) there is a substantial likelihood that he ultimately will prevail on the merits of the claim; (2) he will suffer irreparable injury unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed

injunction may cause the opposing party; and (4) the public interest will not be harmed if the injunction should issue." Cate v. Oldham, 707 F.2d 1176, 1185 (11th Cir. 1983). The plaintiff bears the burden of persuasion as to each of the four required showings. McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998).

To satisfy the first prong of preliminary-injunction requirements, likelihood of success on the merits, the plaintiffs in this case must show that the statute is likely to violate the "substantive due process rights of the women who seek abortions from the plaintiff clinics." Planned Parenthood Se., Inc. v. Strange, 9 F. Supp. 3d 1272, 1279 (M.D. Ala. 2014) (Thompson, J.). The governing standard for finding a violation of substantive due process rights in this context is the "undue burden" standard developed in Planned Parenthood of Southeastern Pennsylvania v. Casey, 505 U.S. 833, 876-79 (1992) (plurality opinion) and Whole Woman's Health v. Hellerstedt, 136 S. Ct. 2292, 2309-11 (2016). In Casey, a plurality of the Court concluded that, if a government

regulation has "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus," the regulation is an undue burden on a woman's right to have an abortion and is unconstitutional.  505 U.S. at 877.  Casey recognized that a woman's right of privacy extends to freedom "from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."  Id. at 896 (majority opinion) (quoting Eisenstadt v. Baird, 405 U.S. 438, 453 (1972)).

The Supreme Court recently reiterated the undue burden standard, that "a statute which, while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends."  Whole Woman's Health, 136 S. Ct. at 2309 (quoting Casey, 505 U.S. at 877 (plurality opinion)).  The undue-burden analysis requires a court to "consider the burdens a law imposes on abortion access together with the benefits those laws confer."  Whole

13

Woman's Health, 136 S. Ct. at 2309.   The court must "weigh[] the asserted benefits against the burdens."   Id. at 2310.   As this court has stated: "[T]he heart of this test is the relationship between the severity of the obstacle and the weight of the justification the State must offer to warrant that obstacle. . . . [T]he more severe the obstacle a regulation creates, the more robust the government's justification must be, both in terms of how much benefit the regulation provides towards achieving the State's interests and in terms of how realistic it is the regulation will actually achieve that benefit."   Planned Parenthood Se., Inc. v. Strange, 9 F. Supp. 3d 1272, 1287 (M.D. Ala. 2014) (Thompson, J.); see also Planned Parenthood of Wis. v. Van Hollen, 738 F.3d 786, 798 (7th Cir. 2013) (Posner, J.) ("The feebler the [state interest], the likelier the burden, even if slight, to be 'undue' in the sense of disproportionate or gratuitous.").

## IV. SCHOOL-PROXIMITY LAW

The school-proximity law provides that the Alabama Department of Public Health "may not issue or renew a health center license to an abortion clinic or reproductive health center that performs abortions and is located within 2,000 feet of a K-8 public school." 1975 Ala. Code § 22-21-35(b). The parties agree that both the Tuscaloosa and Huntsville clinics are located within 2,000 feet of at least one K-8 public school. Order on Pretrial Hearing (doc. no. 93), Stip. 3(b) at 13. Each clinic is licensed by the department, and their existing licenses will expire December 31, 2016. Accordingly, if the school-proximity law were to take effect, the parties agree the department would not renew either clinic's license to continue operations at its existing location.

No legislative findings accompany the school-proximity law, so the court does not have an explanation from the legislature of the purpose for the law. The plaintiffs have submitted newspaper articles,

15

to which the State has not objected, that report that
Reverend James Henderson, a leader of anti-abortion
protestors outside the Huntsville clinic, drafted the
bill that ultimately became the school-proximity law,
with the purpose of shutting down the Huntsville clinic.
Newspaper Article, Second Johnson Decl. Ex. H (doc. no.
54-2) at 56.  Another article reported that Governor
Robert Bentley's staff offered Henderson assistance in
seeking sponsors for the bill.  Id. Ex. I at 61.

With regard to these interests, the State
school-proximity law furthers two interests: minimizing
disturbance in the educational environment and supporting
a parent's right to control their children's exposure to
the subject of abortion.

With regard to these interests, the State
acknowledges two things.  First, the State's interests
are threatened by demonstrations outside the clinics, but
not by the clinics themselves.  Tr. of Final Pre-Trial
Status Conf. (doc. no. 99) at 35:1-11.  Thus, the
school-proximity law attempts to serve the State's

16

interests through an expressed <u>means</u> (the 2000-foot prohibition on clinics) to an unexpressed <u>end</u> (the relocation of the demonstrations away from public K-8 schools). Second, demonstrators have no effect on the educational environment <u>inside</u> any school; the state interest concerns only disruption <u>outside</u> and around schools. <u>Id</u>. at 37:9-21.

In the absence of legislative findings, the court must now, based on the "judicial record," make findings as to the State's two asserted interests. <u>See</u> <u>Whole Woman's Health</u>, 136 S. Ct. at 2310 ("[T]he relevant statute here does not set forth any legislative findings. Rather, one is left to infer that the legislature sought to further a constitutionally acceptable objective.... For a district court to give significant weight to evidence in the judicial record in these circumstances is consistent with this Court's case law.").

### A. Likelihood of Success

The court is persuaded that the plaintiffs are likely to succeed in their argument that the school-proximity law would impose a substantial obstacle on a woman's right to obtain a pre-viability abortion, in violation of her substantive due-process rights. As discussed below, the judicial record reflects that the State's asserted interests are only minimally, if at all, furthered by the law, while the burden imposed on a woman's right to obtain an abortion is substantial.

### 1. State's Interests

First of all, the State's interests are furthered by neither the law's means (the 2000-foot prohibition on clinics) nor its end (the relocation of the demonstrations). In Tuscaloosa, a middle school sits just within 2,000 feet of the clinic, but a vast wooded area separates the school and the clinic. Map, Second Gray Decl. Ex. E (doc. no. 54-1) at 77 (showing Tuscaloosa clinic at 1,986 feet away from middle school); Pl. Ex.

27 (satellite view showing wooded area separating clinic and school); Tr. Vol. II (doc. no. 111) at 106:4-9.  Up to five protestors (but usually fewer than that) stand outside the clinic on weekdays, but they are neither visible nor audible to children entering, exiting, or inside the school.  Second Gray Decl. (doc. no. 54-1) at ¶ 35; Tr. Vol. II (doc. no. 111) at 104:15-20, 108:24-25 - 109:1-5.  Indeed, on the record currently before the court, there is absolutely no evidence that the children (or their parents) at the Tuscaloosa school are even aware that an abortion clinic is located nearby.[5] Thus, because the record does not reflect that any K-8 public school children within 2,000 feet of the Tuscaloosa clinic are even aware of the clinic or the demonstrations at the clinic, the school-proximity law does not serve either of the State's asserted purposes of minimizing disruption or supporting a parent's right

_____

5.  Counsel for the State agreed that nothing in the record indicates the legislature intentionally included the Tuscaloosa clinic within the scope of the school-proximity law.  Tr. Vol. III (doc. no. 112) at 15:9-11.

to control their children's exposure to the subject of
abortion.



The Tuscaloosa clinic (A) and its protestors (B) are separated
from the nearest school (C) by a large wooded area.
Pl. Ex. 27 (excerpt).


The State does not dispute that, while the law covers
the Tuscaloosa clinic, it was targeted to the "perceived
problem" at the Huntsville clinic.   Tr. Vol. III (doc.
no. 112) at 14:12-16.   Indeed, the State relies on

newspaper articles that describe parental complaints about demonstrations outside the Huntsville clinic.

In Huntsville, from 2 to 15 protestors stand outside the clinic on weekdays. Tr. Vol. I (doc. no. 110) at 168:5-12 (medical director of Huntsville clinic estimates 2 to 5 protestors on a regular basis and up to 10 protestors on weekdays); Second Johnson Decl. (doc. no. 54-2) ¶ 31 (owner of Huntsville clinic estimates 5 to 15 protestors). Occasionally larger crowds of protestors congregate on weekends, when school is not in session. Tr. Vol. I (doc. no. 110) at 169:5-10; Johnson Dep., Def. Ex. 20 (doc. no. 81-20) at 3:13-18 (describing large rallies with up to 150 protestors). Demonstrators may yell at patients as they enter or exit the clinic. Tr. Vol. I (doc. no. 110) at 216:9-11.

Two public schools that include some or all of grades K-8--Highlands Elementary School and the Academy for Academics and Arts--are located within 2,000 feet of the Huntsville clinic. The entrances to Highlands and the clinic are on different streets, and they are

21

approximately three blocks apart.  <u>Id</u>. at 176:18-19,
177:5-6.  It is not necessary to drive past the clinic
to access the school.  <u>Id</u>. at 176:20-23.  The record
contains absolutely no evidence of concerns expressed by
the school's students or their parents about the
Huntsville clinic or the demonstrations near it.  As to
Highlands, the State's two interests (minimizing
disruption and supporting a parent's right to control
their children's exposure to the subject of abortion)
would not in any way be furthered by the closing or
relocation of the Huntsville clinic.



The Huntsville clinic (A) and the two schools, the Academy for
Academics and Arts (B) and Highlands Elementary School (C).
Pl. Ex. 31 (excerpt).

The Academy for Academics and Arts sits diagonally

across a five-lane street from, and to the east of, the

Huntsville clinic.  Published newspaper articles report

that some parents have complained about the presence of

protestors near the clinic.[6]  But the record reflects no disturbance to the educational environment: no evidence suggests that protests are visible or audible from inside the school; no evidence suggests the classroom setting has been in any way disturbed by the protests; and no evidence suggests that children are hindered or disturbed while entering or exiting the school.  In fact, although demonstrators sometimes stand across the street from the abortion clinic and close to an Academy driveway, that driveway is not used by parents who are dropping children off; it is used by parents to access an attached parking lot if they need to enter the school for business or opt to personally walk their child into the school.  Tr. Vol. II (doc. no. 111) at 26:21-25 – 27:1-3.  The entrance used by parents during drop-off and pick-up is accessed

_____

6.  As evidence, the State relies on newspaper articles which describe complaints from a few Academy parents about anti-abortion protestors outside the Huntsville clinic, including dislike that the protestors appeared to target the parents and concern about traffic safety and delay.  Newspaper Articles, Def. Ex. 16 (doc. no. 81-16), Def. Ex. 17 (doc. no. 81-17), & Def. Ex. 18 (doc. no. 81-18).

from another street on the opposite side of the school, while the driveway used by buses bringing children to and from the school is on the same street as the clinic, but further up the road.  Id. at 27:21-25 – 28:1-8; Tr. Vol. I (doc. no. 110) at 174:16-23; Pl. Ex. 33 (depicting traffic flow at the Academy).  As to the Academy, the State's interest in minimizing disruption would be feebly, if at all, advanced by the closing or relocation of the Huntsville clinic.



Traffic pattern at Huntsville's Academy for Academics and Arts. Pl. Ex. 33.

25

Also with regard to the Academy, the State's interest in supporting a parent's right to control their children's exposure to the subject of abortion would be very weakly furthered by the closing or relocation of the Huntsville clinic.  The record reflects only that one mother was forced to respond to questions from her son, an Academy student, about the subject of abortion after he witnessed the protests.  Newspaper Article, Def. Ex. 16 (doc. no. 81-16).  Moreover, because the school-proximity law does not define all the locations where an abortion clinic may not operate, reality dictates that it is highly likely, if not inevitable, that regardless of whether an abortion clinic is located within or without 2,000 feet of a K-8 public school in Huntsville, K-8 public school students are, at one time or another in their travels throughout the city, going to witness demonstrations at that clinic regardless of a parent's best efforts to prevent it.

In addition, the State's statutory means (the closing or relocation of the Huntsville clinic) will not lead to

the State's intended end (the relocation of demonstrations away from the Academy). The evidence reflects, and the court so finds, that protests will continue at the Huntsville clinic's current location even if the school-proximity law were to take effect. Anti-abortion protestors have demonstrated not just outside the Huntsville clinic, but also outside the private practice of the clinic's medical director, Dr. Yashica Robinson White, as well as a hospital where she holds admitting privileges. Robinson White Decl. (doc. no. 54-4) ¶¶ 8-10; Tr. Vol. I (doc. no. 110) at 179:2-16; 180:14-20. Because Robinson White previously used the Huntsville clinic's current site for her private obstetrics and gynecology practice, and routinely two and as many as ten protestors demonstrated outside the facility on weekdays, protests occurred at the site even before it became an abortion clinic. Robinson White Decl. (doc. no. 54-4) ¶ 10; Tr. Vol. I (doc. no. 110) at 166:22-25 – 167:1-5. And, because Robinson White has credibly testified that, if the law were to go into

27

effect, she would again use the facility for her private practice, the law will not stop protests at the site. Tr. Vol. I (doc. no. 110) at 181:22-25 - 182:1-12; Robinson White Decl. (doc. no. 54-4) ¶ 16.  Moreover, because, as the court will explain later, the clinic is likely to close if the law were to go into effect, Robinson White has made clear she will be performing abortions at the facility,[7] all but guaranteeing continued protests at the site.  Id.

Based on the current judicial record, the court finds that the school-proximity law is likely to provide little to no benefit to the State's asserted interests in minimizing disruption and supporting a parent's right to control their children's exposure to the subject of abortion.  Because the court has found little to nothing in the record evidence that shows that the new school-proximity law advances the State's interests, the

---

7.  Robinson White would continue to perform up to 100 abortions per year at the location of the Huntsville clinic, the maximum number permitted under Alabama law without an abortion clinic license.  Robinson White Decl. (doc. no. 54-4) ¶ 16.

court accords it little to no weight in the balancing test.

## 2. Burdens Imposed on Women

In addition to examining the State's asserted interests, the court must also "consider the burdens [the] law imposes on abortion access."   <u>Whole Woman's Health</u>, 136 S. Ct. at 2309.

The parties do not dispute that, if the school-proximity law goes into effect, the State Health Department could not renew the licenses of the Huntsville and Tuscaloosa abortion clinics at their existing locations after December 31, 2016.  At that time, the clinics would need to relocate or shut down.  The court finds, based on the credible record, that it would not be feasible for the Tuscaloosa clinic and the Huntsville clinic to relocate and that the two clinics would have to shut down if the law were to take effect.  Tr. Vol. I (doc. no. 110) at 164:19-25 — 165:1-18; Second Gray Decl.

(doc. no. 54-1) ¶ 34; Second Johnson Decl. (doc. no. 54-2) ¶ 3.

The current evidence credibly shows that, because each clinic incurred significant expenses as a result of the surgical-center requirement imposed on abortion providers by the State in 2013, it would not be financially feasible to relocate now.  Because the Huntsville clinic could not bring its old building into compliance with the surgical-center standards, it was forced to relocate, requiring $ 530,000 to purchase a new facility (the place where Robinson White had leased space for her private practice) and more than $ 100,000 for building renovations.  Tr. Vol. I (doc. no. 110) at 160:23-24, 162:1-4.  To cover those expenses, Dalton Johnson, the clinic owner, and Robinson White incurred significant personal financial debt.  Second Johnson Decl. (doc. no. 54-2) ¶ 16 ("In order to purchase the facility, I cashed in all of my retirement savings; borrowed from my life insurance policy; refinanced the mortgage on the Madison Street building and pulled all

the equity out of it; took out a $ 100,000 line of credit;
and spent money I had inherited from my father, who had
recently passed away.  In addition, Dr. Robinson White
and I each maxed out every one of our credit cards.");
Tr. Vol. I (doc. no. 110) at 162:11-18 (Robinson White
explaining that the clinic owner removed "all of the
equity" from his mortgage on the prior clinic facility;
and that she and the clinic owner "emptied" their savings
accounts, "took all of the cash value" out of their
insurance policies, obtained a line of credit through a
bank, and "maxed out" all of their credit cards).  Johnson
remains hundreds of thousands of dollars in debt from
these expenses.  Second Johnson Decl. (doc. no. 54-2) at
¶ 17 (describing outstanding debt on $ 100,000 line of
credit; $ 90,000 owed to life insurance policy; and
hundreds of thousands of dollars remaining on mortgages
for both prior and current clinic facilities).  The
testimony of Robinson White, which the court found highly
credible, establishes that she and Johnson have committed

significant personal financial sacrifices to continue to operate the Huntsville clinic.

The Tuscaloosa clinic spent $ 130,000 to renovate its existing facility to comply with the surgical-center requirements. Second Gray Decl. (doc. no. 54-1) ¶ 32. Purchasing a new facility now would require the Tuscaloosa clinic's owner to use retirement funds or go into debt, which she would not be able to pay off at this stage of her career. Id. ¶ 34.

The Tuscaloosa and Huntsville clinics also could not rely on leasing a new facility. Anti-abortion protestors in Alabama have also targeted the landlords that lease space to facilities used to provide abortions. After demonstrations targeted the former landlord of the Tuscaloosa clinic, the landlord did not renew the clinic's lease. Id. ¶ 31. Similarly, during an earlier search for a Huntsville facility, Johnson hired real estate agents and engaged in an extensive six-month search, but "each and every time [h]e would meet with the owner or real estate agent of a building [h]e wanted to

lease, the moment [h]e informed prospective lessors that we intended to operate an abortion clinic in the space, they would not lease to [him]." Johnson Decl. (doc. no. 54-2) ¶¶ 12, 14.   Robinson White explained that, during the Huntsville clinic's recent relocation, the stigma surrounding abortion made it difficult to find a banker and closing attorney to work with them.   Tr. Vol. I. (doc. no. 110) at 165:2-11.   These difficulties are consistent with the court's previous finding that abortion providers in Alabama face a "climate of extreme hostility to the practice of abortion."   <u>Planned Parenthood Se.</u>, 33 F. Supp. 3d at 1334.   Against this backdrop, the plaintiffs have credibly demonstrated that it would not be practicable for them to relocate.

The State contends that the burdens analysis should not include the closure of the Huntsville and Tuscaloosa clinics because whether the clinics close depends on "the idiosyncrasies of [the clinics'] specific financial position." Def. Br. (doc. no. 81) at 9.   In other words, the State seems to argue that the court should not

33

consider the actual financial circumstances of the clinics. This contention misapprehends the undue-burden case law. As this court previously explained, the undue-burden analysis requires an examination of the "real-world context" of the challenged statute and its actual effects--and not just those circumstances that were directly attributable to the statute. Planned Parenthood Se., 9 F. Supp. 3d at 1285-86. In Casey, the Supreme Court's evaluation of the burdens imposed by a spousal-notification requirement considered that many women live in abusive relationships, meaning that requiring notification to an abusive spouse imposed a potentially insurmountable barrier to obtaining an abortion. See 505 U.S. at 888-898 (majority opinion). It did not matter that the notification requirement could not be said to cause women to live in abusive relationships or contribute to the existence of such relationships; it was nonetheless dispositive that the notification requirement had the actual effect of

imposing a substantial obstacle on women's access to abortion.

Similarly, courts have routinely recognized that imposing substantial costs on abortion providers to comply with a statute places burdens on women's access to abortion--regardless of the financial circumstances of the clinics. In Whole Woman's Health, the Supreme Court noted that the costs of $ 1 to $ 3 million required to achieve compliance with Texas's surgical-center requirement were "considerable." 136 S. Ct. at 2318. Evidence of those costs, the Court reasoned, "supports the conclusion that more surgical centers will not soon fill the gap when licensed facilities are forced to close." Id.; see also Casey, 505 U.S. at 901 (plurality opinion) (finding that recordkeeping requirements, which "[a]t most ... increase the cost of some abortions by a slight amount" do not impose an undue burden, but acknowledging that "at some point increased cost could become a substantial obstacle"); Tucson Woman's Clinic v. Eden, 379 F.3d 531, 542 (9th Cir. 2004) (concluding

that application of new licensing and regulatory scheme
to abortion facilities, which would have required
abortion providers to expend "[t]ens of thousands of
dollars," contributed to undue burden finding).

The likely closure of two of Alabama's five abortion
clinics would leave only three abortion clinics operating
in the State--one each in Birmingham, Montgomery and
Mobile--while the rest of the State, including the highly
populated metropolitan areas of Huntsville and
Tuscaloosa, would have no licensed abortion providers at
all.   The resulting burdens on women would be
substantial.[8]

First, women would lose the right to obtain an
abortion in Alabama when they reached 15 weeks of
pregnancy altogether, because the Tuscaloosa and

_____

    8.  The State has not disputed any of the plaintiffs'
evidence about the resulting burdens on women should the
Huntsville and Tuscaloosa clinics be forced to close.

Huntsville clinics are the only providers of abortions beginning at 15 weeks of pregnancy.[9]

_____

9.  Admittedly, to obtain an abortion at that point, women in Huntsville and Tuscaloosa could travel approximately 400 miles round-trip out of state to the nearest provider in Atlanta.  Second Henshaw Decl. (doc. no. 54-3) ¶ 20.  For women relying on public transportation, that would require a round trip no less than 12 hours of duration.  Katz Decl. (doc. no. 54-11) ¶ 21.  Citing a study from a similar scenario in Texas, Dr. Stanley Henshaw concluded that the effect in Alabama would be comparable to a 70 % reduction in the number of Alabama women who obtained abortions starting at approximately 15 weeks of pregnancy.  Second Henshaw Decl. (doc. no. 54-3) ¶ 20.  In 2014, 560 abortion procedures were performed beginning at 15 weeks.  See Donald Decl. Ex. F, Induced Terminations of Pregnancy Occurring in Alabama, 2014 (doc. no. 81-14).  Moreover, although some women in Alabama could continue to access abortions beginning at 15 weeks by traveling out of state, courts have refused to allow out-of-jurisdiction access to cure within-jurisdiction restrictions.  See Planned Parenthood Se., 33 F. Supp. 3d at 1360-61; see also Planned Parenthood of Wis., Inc. v. Schimel, 806 F.3d 908, 918 (7th Cir. 2015) (Posner, J.) (rejecting argument that the availability of late second-trimester abortions in Chicago could justify the closure of Wisconsin's only abortion clinic that conducted such abortions, because "the proposition that the harm to a constitutional right can be measured by the extent to which it can be exercised in another jurisdiction is a profoundly mistaken assumption." (internal quotation marks, citations, and alterations omitted)).  Nonetheless, the court does not need to resolve the legal issue of whether to consider out-of-state clinics because, even if this court were to consider those clinics, it would reach the same conclusion.

Second, while abortions before 15 weeks would remain available in Alabama, women who would currently rely on the Huntsville or Tuscaloosa clinics would need to travel significantly greater distances. This burden would become particularly devastating for low-income women who represent half of all abortion recipients and a significant majority of women seeking abortions in Alabama. Second Henshaw Decl. (doc. no. 54-3) ¶ 9; Katz Decl. (doc. no. 54-11) ¶ 15. If the Huntsville clinic closed, a woman in Huntsville would need to travel at least 200 miles round-trip to Birmingham for the next-closest abortion provider. Without a clinic in Tuscaloosa, a woman there would need to travel at least 110 miles round-trip to Birmingham. Multiple studies have concluded that longer travel distances to access an abortion provider correlate with lower abortion rates. Second Henshaw Decl. (doc. no. 54-3) ¶¶ 4-8, 19. The court has previously discussed the serious impact of the "first 50 miles" of travel on women seeking abortions, and that "when a clinic closes, the largest effects are

actually felt by women who, prior to the closure, needed to travel only short distances, less than 50 miles." Planned Parenthood Se., 33 F. Supp. 3d at 1358-60.  The Supreme Court has also recognized that increased driving distances, when taken together with other burdens, increases the burdens on women seeking an abortion. Whole Woman's Health, 136 S. Ct. at 2313 (citing evidence that, after regulation took effect, the number of women living more than 150 and 200 miles from an abortion provider skyrocketed).  Here, without the school-proximity law, women in Huntsville and Tuscaloosa could obtain an abortion with a short trip within the city.  If the law were to take effect, women in those cities would be required to arrange lengthy out-of-town trips, including obtaining access to transportation, time off from work, childcare, and lodging.  But not all women have the means to do so, which would either prevent such women from obtaining an abortion altogether or delay their ability to obtain one.  Second Henshaw Decl. (doc. no. 54-3) ¶¶ 14, 24 (noting that half of women who

experience unwanted delay in obtaining abortions attributed the delay to arrangements such as raising funds, transportation, locating an abortion provider, and organizing childcare).

Beyond the increased difficulties women would face in accessing an abortion clinic, the three remaining abortion clinics in Alabama would lack sufficient capacity to meet the new demand.  As a result, not all women who would want to obtain an abortion could do so.  The Huntsville and Tuscaloosa clinics have performed the majority of abortions in Alabama in recent years: combined, they performed 72 % of all abortions in Alabama in 2014, 60 % of all abortions in 2013, and 55 % of all abortions in 2012.  Second Johnson Decl. Ex. D (doc. no. 54-2) at 35-37.  The three remaining clinics could not shoulder the plaintiff clinics' substantial caseload. Together, the Huntsville and Tuscaloosa clinics performed 5,833 abortions in 2014, compared to 2,218 abortions provided by the three remaining clinics.  Id. at 35.

The total maximum capacity for Alabama's three remaining clinics is 4,500--but that number depends on a significant expansion in staffing and services which seems unrealistic in light of the climate surrounding abortion in Alabama. For example, the Montgomery clinic performed less than 900 abortions in 2014; stretched its resources to perform 1,200 abortions because of the temporary closure of the Tuscaloosa clinic in 2015; and estimates that it could perform a maximum of 1,800 abortions per year at the outermost limit--an estimate dependent on recruiting additional physicians and support staff that it has previously struggled to hire because of the stigma surrounding abortion. Ayers Decl. (doc. no. 54-7) ¶¶ 6-8. The Mobile and Birmingham clinics, which provided a combined total of 1,342 abortions in 2014, estimate that, with an expansion of capacity to provide abortions four days per month, they could perform 2,700 abortions per year--but they too are currently struggling to expand capacity because of staffing troubles. Fox Decl. (doc. no. 54-8) ¶ 5; Donald Decl.

Ex. F, Induced Terminations of Pregnancy 2014 Report (doc. no. 81-14) at 19. In addition, none of the remaining clinics have plans to expand their services to provide abortions at or after 15 weeks.

Beyond the statistical reality that the remaining abortion clinics could not meet the demands of women in Alabama if the school-proximity law were to take effect, evidence in the record suggests that the dramatically expanded services that would need to be provided by the remaining clinics would be accompanied by costly side effects. To assume otherwise flies in the face of "common sense," which "suggests that, more often than not, a physical facility that satisfies a certain physical demand will not be able to meet five times that demand without expanding or otherwise incurring significant costs." Whole Woman's Health, 136 S. Ct. at 2317.

Also, capacity constraints, especially when combined with the increased travel times required for women to obtain an abortion, would introduce delays in women's abilities to obtain an appointment and ultimately an

abortion.  Later-term abortions, if delayed past the 14th week of the pregnancy, carry greater medical risks and also increase the cost of the procedure; if the delay extends to the 20th week of pregnancy, it would become illegal for a woman to obtain an abortion in Alabama, with certain exceptions for the life and health of the mother.  <u>Planned Parenthood Se.</u>, 33 F. Supp. 3d at 1356.

     For women in abusive relationships, delays could make the difference between obtaining or not obtaining an abortion at all: where a battered woman attempts to conceal her pregnancy from her abuser through a medication abortion, she must do so in the first ten weeks of pregnancy or risk having her abuser learn of her abortion.  Walker Decl. (doc. no. 54-9) ¶¶ 15-16. Furthermore, the abortions that the remaining clinics could provide likely would not equal in quality the care provided prior to the law taking effect:  In the crowded clinics that would surely result, women are "less likely to get the kind of individualized attention, serious conversation, and emotional support that doctors at less

taxed facilities may have offered." <u>Whole Woman's</u> <u>Health</u>, 136 S. Ct. at 2318.  These factors, too, would impose a burden on women seeking an abortion.

Each of these factors--the unavailability of abortions beginning at 15 weeks, the increased travel times, and the reduced capacity and increased wait times at Alabama's three remaining clinics--establishes that women will face significantly increased, and even insurmountable, barriers to obtaining an abortion.

Where these types of barriers exist, it is likely that some women will pursue risky alternatives.  <u>Cf</u>. <u>Whole Woman's Health</u>, 136 S. Ct. at 2321 (Ginsburg, J., concurring) ("When a State severely limits access to safe and legal procedures, women in desperate circumstances may resort to unlicensed rogue practitioners, <u>faute de</u> <u>mieux</u>,[10] at great risk to their health and safety."); <u>Planned Parenthood Se.</u>, 33 F. Supp. 3d at 1362-63 (describing greater risk that women would attempt to

---

10.  This phrase, French in etymology, means "for lack of an alternative."  <u>Faute de mieux</u>, Oxford English Dictionary (2d ed. 1989).

obtain an abortion illegally where travel-related obstacles and capacity constraints are imposed). The Tuscaloosa clinic has had firsthand experience with attempts to self-abort, including when the clinic was temporarily closed in 2015. During that time, women would nonetheless show up to the clinic seeking an abortion--including one woman who threatened to stab herself in the stomach. Second Gray Decl. (doc. no. 54-1) ¶ 47. During the same time period, the Huntsville clinic experienced an increased number of calls from far away women, some of whom said "outright that they would try to self-induce an abortion because they could not reach a provider." Second Johnson Decl. (doc. no. 54-2) ¶ 49. Recently, Tuscaloosa's medical director has treated multiple women who attempted to self-abort, such as a woman who consumed turpentine after consulting the Internet and learning about its use as a folk remedy.[11]

---

11. Incidentally, women in the South have resorted to turpentine before. One study from 1936 reported that rural black women in Georgia consumed turpentine for self-induced abortions. Turpentine relies on ingredients

**45**

Tr. Vol. II (doc. no. 111) 69:1-9.  So too can Alabama expect an increased level of self-abortions if the school-proximity law were to take effect.[12]

In summary, because the Tuscaloosa and Huntsville clinics provide more than 70 % of abortions in Alabama and are the only providers of abortions beginning at 15 weeks of pregnancy, and because the two clinics would have to cease operations if the school-proximity law went into effect, the availability of abortions in Alabama would be significantly reduced, and abortions beginning at 15 weeks would become almost wholly unavailable. Thus, Alabama women attempting to obtain a pre-viability abortion would likely experience substantial, and even

---

similar to those reportedly used by southern slaves seeking to self-abort.  Jessie M. Rodrique, The Black Community and the Birth Control Movement, in Women and Health in America 293, 295 (Judith Walzer Leavitt ed., 1999).

12. Even if the clinics did not permanently close, the temporary closure of both clinics effective January 1, 2017 would still impose the significant burdens described above on women seeking abortions in Alabama until each clinic could secure a new facility.

insurmountable, burdens if the school-proximity law were to take effect.

### 3. Balancing

Because, as stated above, the undue-burden analysis involves a balancing test, the weight given to the State's interests impacts the weight of the burdens necessary to conclude that a statute unconstitutionally restricts abortion access.  In other words, "the more severe the obstacle a regulation creates, the more robust the government's justification must be, both in terms of how much benefit the regulation provides towards achieving the State's interests and in terms of how realistic it is the regulation will actually achieve that benefit."  Planned Parenthood Se., 9 F. Supp. 3d at 1287.

Here, because, as the current judicial record reflects, the State's interests are so attenuated and thus should be given little to no weight, and because, as the current judicial record further reflects, the school-proximity law would place substantial, and even

insurmountable, burdens on Alabama women seeking pre-viability abortions, the court preliminarily concludes that the law does not "confer[] benefits sufficient to justify the burdens upon access that [it] imposes." Whole Woman's Health, 136 S. Ct. at 2299.[13] The court thus preliminarily holds that the school-proximity law "constitutes an undue burden on abortion access" and is unconstitutional. Id. [14]

## 4. The State's Other Arguments

In its attempt to justify its regulatory approach, the State argues that governments routinely regulate the

_____

13. While the court finds that the State's justifications for the school-proximity law are weak, the court must emphasize that its conclusion does not turn solely on that finding. In the alternative, the court further finds that the justifications are by no means sufficiently strong to justify the obstacles that the requirement would impose on women seeking an abortion.

14. The issue has arisen as to whether the school-proximity law is both as-applied and facially unconstitutional. The court need not resolve this issue at this time. It is sufficient that, for now, the court simply preliminarily enjoins the law's enforcement against the Tuscaloosa and Huntsville clinics.

types of businesses that may operate near schools, relying principally on First Amendment challenges to zoning decisions. See, e.g., Def. Br. (doc. no. 81) at 44 ("'[T]here can be little doubt about the power of a state to regulate the environment in the vicinity of schools ... by exercise of reasonable zoning laws.'" (quoting Larkin v. Grendel's Den, Inc., 459 U.S. 116, 121 (1982)). That argument misapprehends the nature of the undue-burden analysis. As the Supreme Court reaffirmed in Whole Woman's Health, the undue-burden analysis requires the court to consider, based on the judicial record, "the burdens a law imposes on abortion access together with the benefits those laws confer." 136 S. Ct. at 2309. That analysis must have bite: It would be erroneous to "equate the judicial review applicable to the regulation of a constitutionally protected liberty with the less strict review applicable where, for example, economic legislation is at issue." Id. In zoning cases, by contrast, the government's authority is "undoubtedly broad," and "the standard of review is

determined by the nature of the right assertedly threatened or violated rather than by the power being exercised or the specific limitation imposed." <u>Schad v. Borough of Mount Ephraim</u>, 452 U.S. 61, 68 (1981).  Thus, in government regulation of liquor establishments in the vicinity of schools, "judicial deference is the watchword." <u>Davidson v. City of Clinton, Miss.</u>, 826 F.2d 1430, 1433 (5th Cir. 1987) (approving restriction on sale of alcohol within 500 feet of a school, as applied to a nightclub).  Where constitutionally protected interests are threatened, by contrast, the State's cited examples for government regulation of the areas around schools do not withstand scrutiny.  <u>See, e.g.,</u> <u>Larkin</u>, 459 U.S. at 117 (invalidating, on Establishment Clause ground, statute that delegated authority to schools and churches to veto liquor licenses within 500 feet of their premises).

Similarly, the State's reliance on the First Amendment 'secondary effects' doctrine of <u>City of Renton v. Playtime Theatres, Inc.</u>, 475 U.S. 41 (1986), is

mistaken.   In that case, the Supreme Court upheld a city ordinance prohibiting adult movie theatres from operating within 1,000 feet of a school because the ordinance advanced the State's interests in eliminating the "undesirable secondary effects" of the theatres, such as crime, hurting retail trade, and depressing property values.   475 U.S. at 48-49.   The State asserts that it too has an interest in regulating "the undesirable secondary effects" of abortion clinics, implicitly because of demonstrations and the impact on children who witness them.   Def. Br. (doc. no. 81) at 47.   But the secondary-effects doctrine justifies State actions that would otherwise constitute an impermissible content-based infringement of First Amendment rights; that is, it is an argument specific to a First Amendment claim, but such a claim is not currently before the court. Further, the Supreme Court has squarely rejected the doctrine's applicability to speech viewed as disturbing or offensive, specifically concluding that "[l]isteners' reactions to speech are not the type of 'secondary

effects' we referred to in Renton." Boos v. Barry, 485
U.S. 312, 321 (1988); accord Reno v. Am. Civil Liberties
Union, 521 U.S. 844, 867-68 (1997) (rejecting application
of Renton's secondary-effects doctrine to statute
intended to protect children from offensive speech).
Thus, even under Renton, the State could not force
abortion clinics to relocate based on parents' reactions
to protestor speech.

Moreover, if the State seeks to regulate the areas
around schools, other approaches could effectively
advance its asserted interests. For example, the State
could have enacted a "time, place, and manner"
restriction on demonstrations outside facilities "where
abortions are offered or performed." McCullen v.
Coakley, 134 S. Ct. 2518, 2530-32 (2014) (approving such
a buffer zone because it advanced public safety
objectives in light of evidence of crowding, obstruction,
and violence). It is undoubtedly the province of the
legislature, and not this court, to prescribe the most
appropriate regulatory approach. Nevertheless, the

availability of alternative means more likely to achieve the State's asserted interests confirms the court's conclusion that little weight should be placed on an approach that does not substantially further the State's interests and, in addition, imposes a substantial obstacle on a woman's right to obtain an abortion.

The court's preliminary holding that the school-proximity law is unconstitutional still obtains.

## B. Irreparable Harm

The court now turns to whether the plaintiffs have established irreparable harm. Effective January 1, 2017, if the school-proximity law were to go into effect, the Tuscaloosa and Huntsville clinics would have to lay off staff and close their businesses. Second Gray Decl. (doc. no. 54-1) ¶ 5; Johnson Decl. (doc. no. 54-2) ¶ 3. Indeed, the Tuscaloosa clinic would stop providing abortions and begin to wind down operations in November 2016. Second Gray Decl. (doc. no. 54-1) ¶¶ 5, 37-38. Business closure clearly qualifies as irreparable harm.

ABC Charters, Inc. v. Bronson, 591 F. Supp. 2d 1272, 1307 (S.D. Fla. 2008) (Gold, J.) (finding irreparable harm where evidence showed that plaintiffs would have to close their businesses as a result of the law).[15]

Moreover, Alabama women seeking pre-viability abortions would suffer immediate and irreparable harm as described above. Without injunctive relief, they could no longer obtain an abortion beginning at 15 weeks anywhere in Alabama. Before 15 weeks, women in Alabama's second largest metropolitan area would need to travel at least 200 miles round-trip to obtain an abortion in Alabama, while women in Alabama's fifth largest metropolitan area would need to travel at least 110 miles to do so; and the resulting burdens on Alabama's three

---

15. The ABC Charters court concluded that irreparable harm would result from the closure even though it would occur in part because of the particular financial circumstances of the business: it was a "small family-run company" and was the "primary source of income on which [the proprietor and his wife] had planned to be able to retire." 591 F. Supp. 2d at 1307. The court concluded that the proprietor could not afford the increased costs from the regulation and would, in actuality, close.

remaining clinics would introduce significant delays to obtaining an abortion, translating into reduced quality of care, increased risk of medical complications, and for some women, no access to an abortion until, for reasons of health or law, it is too late. See Harris v. Bd. of Supervisors, L.A. Cty., 366 F.3d 754, 766 (9th Cir. 2004) (concluding that medical complications due to delayed treatment will cause irreparable harm in absence of an injunction). Even if, against all record evidence, one of the clinics should reopen or a new clinic opens to fill the gap, the likelihood of at least a temporary gap of "unknown duration" in which abortions would be unavailable supports a finding of irreparable harm. Planned Parenthood of Wis., 738 F.3d at 795.

Finally, by interfering in women's right to an abortion, the school-proximity law threatens their constitutionally protected privacy rights. "[T]he right of privacy must be carefully guarded for once an infringement has occurred it cannot be undone by monetary relief." Deerfield Med. Ctr. v. City of Deerfield Beach,

661 F.2d 328, 338 (5th Cir. Unit B 1981).[16]  And, where
an ongoing threat to the right of privacy exists,
irreparable harm is presumed.  Ne. Fla. Chapter of
Associated Gen. Contractors v. City of Jackson, 896 F.2d
1283, 1285 (11th Cir. 1990).  Thus, in Deerfield Medical
Center, a denial of a license to open an abortion facility
in a manner that was likely to be unconstitutional
mandated a finding of irreparable injury.  661 F.2d at
338.

For all these reasons, the plaintiffs have met their
burden of showing that a preliminary injunction is
necessary to avoid irreparable injury.

_____

16.  Deerfield Medical Center is binding precedent
in the Eleventh Circuit.  See Doe v. Busbee, 684 F.2d
1375, 1379 n. 2 (11th Cir. 1982) (as Deerfield Medical
Center was decided by a Unit B panel of the former Fifth
Circuit, the Eleventh Circuit "'regards the decision as
binding precedent ...'") (quoting Stein v. Reynolds
Securities, Inc., 667 F.2d 33, 34 (11th Cir. 1982)).

## C. Balance of the Hardships

The court turns next to whether the threatened harm to the plaintiffs outweighs whatever damage or harm a proposed injunction may cause the State.

The State has not asserted it will suffer any hardships if the school-proximity law were preliminarily enjoined. Nevertheless and presumably, the hardship it would suffer is that a law passed by legislators will not go into effect. This harm is minor given the temporary nature of a preliminary injunction. Planned Parenthood Se., Inc. v. Bentley, 951 F. Supp. 2d 1280, 1290 (M.D. Ala. 2013) (Thompson, J.). Further, because the State has not currently demonstrated that its interests are meaningfully threatened or that the law will substantially further those interests, a delay in implementation will not impose a serious hardship to the State.

In contrast, as stated, if the law were to go into effect, the plaintiffs would have to stop providing abortions before January 1, 2017, and, based on the

57

current record, would close their doors.  Women seeking

an abortion will face substantial new obstacles following

the closure, including the denial of abortions beginning

at 15 weeks and accompanying health risks associated with

reduced and delayed access to abortion care.  Because the

plaintiffs have shown concrete and serious harms, while

the State faces only speculative harms and has not

demonstrated the law will help it achieve its asserted

State interests, the balance of hardships weighs heavily

in the plaintiffs' favor.


### D. Public Interest

Finally, the court addresses whether a preliminary

injunction is in the public interest.  Without question,

it is in the public interest to preserve the status quo

and give the court an opportunity to evaluate fully the

lawfulness of the school-proximity law without subjecting

the plaintiffs, their patients, or the public at large

to any of its potential harms.  Further, the public has

no interest in the enforcement of a statute likely to be

unconstitutional.  <u>Odebrecht Const., Inc. v. Sec'y, Fla.
Dep't of Transp.</u>, 715 F.3d 1268, 1290 (11th Cir. 2013).
Finally, as stated, the State has not demonstrated that
the school-proximity law meaningfully furthers interests
in avoiding disturbance in educational environments or
protecting children from the subject of abortion.  In
fact, it is ironic that the State would assert that one
of the purposes behind the school-proximity law is to
minimize disruption in the educational environment, for
the current record reflects that the effect of the law
has been the opposite, the encouragement of disruption.
The law has essentially rewarded the protesters with the
intended goal of their disruption: the harassing, and
even closing, of the clinics.  The message of the law is
arguably that the greater the disruption, the greater the
likelihood that the State will react with laws to curb
that disruption by placing additional restrictions on the
clinics. [17]

_____

     17.  Nevertheless, even if the demonstrations in
Huntsville could be viewed as justifying the passage of

## V. THE FETAL-DEMISE LAW

The court now turns to whether it should preliminarily enjoin enforcement of the fetal-demise law.

The Alabama Unborn Child Protection from Dismemberment Abortion Act, which the court calls the fetal-demise law, imposes a criminal penalty on physicians who purposely perform 'dismemberment abortions,' defined as "dismember[ing] a living unborn child and extract[ing] him or her one piece at a time from the uterus through use of clamps, grasping forceps, tongs, scissors, or similar instruments." 1975 Ala. Code § 26-23G-2(3). A health exception applies if the physician in reasonable medical judgment decides that "the child's mother has a condition that so complicates her medical condition that it necessitates the abortion

_____

the school-proximity law, its 2000-foot restriction is grossly overreaching. As the overwhelming evidence demonstrates, there is no evidentiary basis for the Tuscaloosa clinic to cease operation at its current location because it falls within 2,000 feet of a middle school or for the Huntsville clinic to cease operation at its current location because it falls within 2,000 feet of Highlands Elementary School.

of her pregnancy to avert her death or to avert serious risk of substantial and irreversible physical impairment of a major bodily function, not including psychological or emotional conditions." 1975 Ala. Code. § 26-23G-2(6). A physician found to be in violation of this law may face a civil suit or a criminal penalty, consisting of a fine up to $ 10,000, imprisonment for up to two years, or both.  While not mentioned explicitly in the language of the law, the parties agree that it would ban the standard D&E method, if used without first inducing fetal demise.[18]

Standard D&E is a surgical abortion method in which a woman's cervix is dilated only enough to allow passage of surgical instruments, after which the physician uses forceps to grasp the fetus and remove it, and uses suction

---

18. The law does not use or define the term 'fetal demise' or explain how fetal demise should be determined. The parties appear to agree that the fetus would no longer be considered "living" under the law when asystole, or the termination of a heartbeat, occurs, and they used the term 'fetal demise' to denote that occurrence.  The court likewise uses the term to mean termination of the fetal heartbeat.

to remove remaining contents of the uterus.[19] It is important to open the cervix gently, and then only a small amount, for safety reasons and to preserve it for future pregnancies. Tr. Vol. I (doc. no. 110) at 16:5-12. Because the opening of the cervix is too small for the entire fetus to pass, separation of fetal tissues occurs during the process of removing the fetus. Id. at 17:6-14. Due to this separation of tissues, standard D&E falls under the category of 'dismemberment abortions,' as defined in the fetal-demise law. Physicians start using the standard D&E procedure around 15 weeks of pregnancy, before which they can remove the fetus using only suction. The procedure takes between 10 to 15 minutes. Id. at 17:15-16.

---

19. The court uses the term 'standard D&E' in order to distinguish it from 'intact D&E,' sometimes called 'D&X,' which involves dilating the cervix enough to remove the whole fetus intact. 'Intact D&E' is banned under the Federal Partial-Birth Abortion Ban Act of 2003, unless fetal demise is induced before the procedure. See Gonzales v. Carhart, 550 U.S. 124 (2007) (upholding the federal partial-birth abortion ban). Furthermore, the court refers to standard D&E as the procedure that does not include induced fetal demise.

Standard D&E is considered an extremely safe abortion method, with a less than 1 % chance of major complications. Id. at 17:17-18. Due to its low risk of complications, relative simplicity, and short duration, it is the most common method of second-trimester abortions in Alabama; in fact, it is the only method that the Tuscaloosa and the Huntsville clinics use to perform abortions at or after 15 weeks of pregnancy. Parker Decl. (doc. no. 54-6) ¶ 14; Robinson White Decl. (doc. no. 54-4) ¶¶ 20, 22-25. D&E is the only second-trimester abortion method that can be used in an outpatient setting.[20] Tr. Vol. I (doc. no. 110) at 189:8-11.

---

20. The only other abortion method for second-trimester abortion is the induction method, where a physician uses medication to induce labor and deliver a non-viable fetus over the course of hours or even days. Tr. Vol. I (doc. no. 110) at 12:20-13:30. Induction procedures are more expensive, difficult, and stressful for the patient. Furthermore, state regulations do not allow outpatient clinics to initiate an abortion procedure that may entail more than 12 hours of clinical involvement, meaning that it must be performed in a hospital. Tr. Vol. II (doc. no. 111) at 43:8-24. As a result, induction is essentially unavailable to women seeking second-trimester abortions in Alabama, and the State has not suggested otherwise. See supra note 1.

Nationally, about 95 % of second-trimester abortions are performed through standard D&E.  Davis Decl.  (doc. no. 54-5) ¶ 7.  In Alabama, the Tuscaloosa and Huntsville clinics are the only ones providing abortions starting at 15 weeks of pregnancy.

### A. Likelihood of Success on the Merits

The court must first determine whether there is a likelihood that the plaintiffs will succeed on their challenge to the fetal-demise law.  The Casey undue-burden standard, described previously, governs. Put succinctly, "[a] statute which, while furthering [a] valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." Whole Woman's Health, 136 S. Ct. at 2309 (quoting Casey, 505 U.S. at 877 (plurality opinion)).  Thus, abortion regulations that "have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on

the right." <u>Id</u>. (quoting <u>Casey</u>, 505 U.S. at 878 (plurality opinion)).  For the reasons discussed below, the court holds that the plaintiffs are likely to succeed on the merits of their challenge to the fetal-demise law.

## 1. State's Interests

Because no legislative findings accompany the fetal-demise law, the court does not have an explanation from the legislature of the purpose for the law. Nevertheless, the State argues that the law advances these interests: advancing respect for human life; promoting integrity and ethics of the medical profession; and promoting respect for life, compassion, and humanity in society at large.[21]  The court assumes the legitimacy of these interests. <u>Whole Woman's Health</u>, 136 S. Ct. at 2310 (assuming that the State had legitimate state

---

21.  It is worth noting that the State does not argue that the ban on dismemberment abortion is designed to avoid fetal pain.  Fetal pain is not a biological possibility until 29 weeks, well beyond the range of standard D&E procedures and beyond the legal limit of abortion in the state of Alabama; the State does not dispute this.  Tr. Vol. I (doc. no. 110) at 138:1-6.

interests where the statute did not contain any legislative findings).

## 2. Burdens Imposed on Women

The plaintiffs assert that the fetal-demise law would force Alabama women seeking pre-viability abortions to go through medically unnecessary procedures and subject them to heightened health risks. Furthermore, they state that, if the law were to go into effect they would stop performing D&E abortions altogether due to ethical concerns, thereby rendering abortions essentially unavailable in the State of Alabama starting at 15 weeks. The State responds that fetal demise can be safely achieved before standard D&E with one of these three procedures: umbilical-cord transection, digoxin injection, and potassium-chloride injection. As discussed earlier, the fetal-demise law criminalizes standard D&E unless fetal demise occurs before the procedure; accordingly, the court's determination whether the law imposes substantial obstacles to abortion

access turns on the feasibility of the proposed fetal-demise methods.

As with the State's asserted interests, there are no legislative findings that these procedures are safe and effective. In any event, this court must now, based on the "judicial record," make its own findings in that regard. See Whole Woman's Health, 136 S. Ct. at 2310 ("[T]he relevant statute here does not set forth any legislative findings. Rather, one is left to infer that the legislature sought to further a constitutionally acceptable objective.... For a district court to give significant weight to evidence in the judicial record in these circumstances is consistent with this Court's case law."). The court concludes that, on the current record, the proposed fetal-demise methods are not feasible for use in the Tuscaloosa and Huntsville clinics.


a. Umbilical-Cord Transection

To perform umbilical cord transection incident to standard D&E, the physician must first dilate the woman's

cervix enough to allow the passage of instruments to transect the cord.  Once the cervix is dilated, the physician uses the ultrasound machine to visualize the umbilical cord.  As both parties' experts testified, the physician then punctures the amniotic membrane, inserts an instrument into the uterus, and tries to find the cord with a surgical instrument and cut it.  The physician must then wait for the fetus to achieve asystole, or cessation of heart activity.  Tr. Vol. I (doc. no. 110) at 77:13-21; Tr. Vol. II (doc. no. 111) at 123:8-124:18. Once asystole has occurred, the physician can perform standard D&E, removing fetal tissues and other contents of pregnancy.

The court finds that, for the following reasons, the umbilical cord transection procedure is not a feasible method of causing fetal demise before standard D&E.

(i) Multiple factors make cord transection technically difficult before a standard D&E procedure: (1) lack of visualization; (2) continuous shrinking of the uterus; and (3) the size of the umbilical cord.

First, before the amniotic membrane is punctured, the physician is readily able to visualize the fetus and the umbilical cord due to the contrast on the ultrasound between the amniotic fluid and the uterine and fetal tissue.  However, when the membrane surrounding the amniotic sac is punctured at the beginning of the procedure, the amniotic fluid drains from the uterus. Once the fluid has drained, it is much more difficult to visualize the location of the umbilical cord. Tr. Vol. I (doc. no. 110) at 77:16-78:17. Second, as the fluid drains, the uterus contracts, pushing the contents of the uterus against each other.  In other words, the physician must identify, reach, and transect the cord with a surgical instrument without any visualization aid or space between different types of tissues.  Id. at 77:16-78:17.  Third, depending on the gestational age, the cord may be very thin; at 15 weeks, it is the width of a piece of yarn.[22]  Furthermore, as the fluid drains

---

    22.  Two thirds of patients in Alabama undergo standard D&E during 15 to 18 weeks of pregnancy.  Donald

out of the uterus, the cord may become flaccid, making it harder to find.  Id. at 77:16-78:17.

(ii) Cord transection is not a feasible method for women seeking second-trimester abortion also because it carries significant health risks to the patient, including blood loss, infection, and injury to the uterus.  See Gonzales, 550 U.S. at 161 (reiterating the Court's jurisprudence that abortion regulations that pose "significant health risks" are unconstitutional).  Every time a physician introduces an instrument into the uterus, there is a risk of infection or uterine perforation; this risk increases with every pass of the instrument.  Tr. Vol. I (doc. no. 110) at 80:1-16.  As performing cord transection involves searching blindly for the umbilical cord, the risk of complications would be greater than when performing standard D&E alone.  But far more concerning is the risk of serious blood loss. One of the plaintiffs' experts testified that she and her

_____

Decl. Exs. A-C, Induced Terminations of Pregnancy Occurring in Ala. (doc.  no.  81-14).

colleagues tried using umbilical-cord transections in a hospital to induce fetal demise before performing intact D&E, but stopped because of concerns about patient safety. In their experience, it took as long as 13 minutes after cutting the cord for the heartbeat to stop; and, while waiting for the fetal heart to stop, the patients were having contractions, undergoing placental separation, and losing blood, which caused the physicians great concern. Tr. Vol. I (doc. no. 110) at 82:21-83:11. As a result, the expert and her colleagues abandoned the idea of using cord transection as a standard practice before intact D&E, and now use it only under uncommon

circumstances when they have no other options.[23]  Id. at
83:4-15.[24]

_____

   23.  The State argues that the law's health exception
would apply were a physician to attempt to transect the
umbilical cord and fail, because the patient would then
be in serious risk of irreversible impairment to major
bodily functions.  It is not apparent that the health
exception was designed to apply in this way. However, the
court need not resolve this issue at this time, because
it finds that the procedure would still be unavailable
to women in Alabama, even if the health exception were
to apply to every instance of a failed cord transection,
for the reasons set forth in this section.

   24.  The court makes these general findings regarding
two of the experts who testified at the hearing.  Dr.
Anne Davis, one of the plaintiffs' experts, was highly
credible and extremely knowledgeable about the
fetal-demise methods and the provision of abortion in the
outpatient clinic setting such as the Tuscaloosa and
Huntsville clinics.  In contrast, the court found that
Dr. Joseph Biggio, the State's expert, has expertise in
the provision of potassium-chloride injections in an
academic medical center, but that he had significantly
less expertise than the plaintiffs' experts on abortion
in general, because he does not in any sense specialize
in abortion.  In particular, he did not evince
significant knowledge of the provision of abortion in
outpatient clinic settings, and his testimony as to
digoxin injection and umbilical cord transection was
largely theoretical and not based on experience.
Accordingly, the court gave his testimony less weight in
those areas.

These concerns would be amplified in the Tuscaloosa and Huntsville clinics because of the outpatient setting in which they operate.[25]  Unlike physicians practicing in hospitals, the clinic physicians do not have access to blood services for patients at risk of serious blood loss, nor do they have access to subspecialists such as anesthesiologists; medical equipment at outpatient clinics is not as advanced as what is available in tertiary-care hospital settings.[26]  Tr. Vol. I (doc. no. 110) at 236:9-18.

---

25. The court rejects the defense expert's testimony that umbilical cord transection would be feasible in the Tuscaloosa and Huntsville clinics, in part because of the differences between the type of specialized hospital where he practices and the clinics. The expert, who practices at a major academic hospital, testified that with a certain type of advanced ultrasound machine, a physician should be able to locate the umbilical cord easily; however, the Tuscaloosa and Huntsville clinics do not have these advanced ultrasound machines suitable for academic hospitals, and these devices cost about $50,000 to $100,000.  Tr. Vol. I (doc. no. 110) at 43:10-13, 198:16-199:9.

26. Tertiary care is defined as "highly specialized medical care usually over an extended period of time that involves advanced and complex procedures and treatments performed by medical specialists in state-of-the-art

(iii)   Umbilical cord transection also is not a feasible method because it is essentially an experimental procedure that carries no medical benefits to the patient.   The State argues that umbilical cord transection is a viable, safe option before standard D&E based on a single study--indeed, the only existing study that has examined umbilical cord transection as a method for fetal demise before D&E.   But the study raises more questions than it answers.

The study suffers from several flaws that render it unreliable.   First, the article was a retrospective case series study, which means that the researchers were trying to answer a question by going through medical records after the data was collected for purposes other than research.   While not the least reliable type of study, it is one of the least reliable.   Because the study relies on medical records from a non-research

---

facilities."
http://www.merriam-webster.com/dictionary/tertiary%20care.

context, there is no way of knowing how the underlying data was collected, or what data was omitted from the records.  Tr. Vol. I (doc. no. 110) at 84:3 20.  The study states that close to 10% of the original study group was excluded for incomplete records.   Tocce, Kristina, et al., Umbilical Cord Transection to Induce Fetal Demise Prior to Second-Trimester D&E Abortion, 88 CONTRACEPTION 712, 713 (2013) (doc. no. 81-13).

Further, because of the study design, the article is missing details that would reliably establish risk levels.  It does not have a control group, meaning that there is no way to compare the outcomes of the group that received cord transection and the group that did not receive cord transection.  The study also does not report how much time or how many passes it took to successfully grasp and transect the cord in each case; as explained above, the more passes with instruments in the uterus, the greater the risk of injury to the uterus and infection.  Finally, the study does not report week-by-week distribution of gestational age of the

subjects, even though the success rate of cord transection procedures would be expected to vary across the gestational age due to the size of the umbilical cord. Tr. Vol. I (doc. no. 110) at 83:23-86:13; 125:14-22.

Moreover, it is not at all clear that the resources of where the transections in the study were performed are comparable to those of the Tuscaloosa and Huntsville clinics. The patients in the study underwent intracervical anesthetic blocks and IV sedation during the cord transection and D&E procedures, which are unavailable at the Tuscaloosa and Huntsville clinics. Tr. Vol. I (doc. no. 110) at 236:14-18; Tocce, Kristina, et al., Umbilical Cord Transection to Induce Fetal Demise Prior to Second-Trimester D&E Abortion, 88 Contraception 712, 713 (2013) (doc. no. 81-13). Comparing the study conditions to the Tuscaloosa and Huntsville clinics appears to be like comparing apples to oranges; the study provides paltry evidence as to the safety of performing the procedure in the Alabama clinics.

In sum, cord transection carries serious risks, but insufficient research has been conducted to quantify those risks.  Requiring cord transection before standard D&E would force physicians to perform a procedure without much, if any, information about the likelihood of harm to the patient.  Further, the law would force women to accept an uncertain, potentially grave risk of harm as the cost of undergoing standard D&E, which is well-documented for its low risks.  The court simply cannot countenance requiring thousands of women to undergo a risky procedure based on one questionable study.  Planned Parenthood of Central Missouri v. Danforth, 428 U.S. 52, 79 (1976) (striking down an abortion method ban where the alternatives proposed by the State were largely experimental and unavailable to women in the state).

(iv)  This risk of harm validates the plaintiff physicians' credible testimony that they would stop providing standard D&E if they were required to perform fetal demise procedures before standard D&E.  Tr. Vol. I

77

(doc. no. 110) at 212:4-14; Tr. Vol. II (doc. no. 111) at 48:24-49:6. Physicians have an ethical obligation not to subject patients to potentially harmful procedures without any medical benefit. The court finds that, due to these ethical concerns and the uncertain risk of harm, the plaintiff physicians are unlikely to continue to perform abortions at or after 15 weeks if required to use fetal-demise procedures.

(v) Cord transection is not a feasible fetal-demise method because training is unavailable. Given that cord transection is an experimental, technically difficult, and risky procedure, physicians would need training before performing it on patients. However, the physicians at the Tuscaloosa or Huntsville clinics have not been trained in the procedure, and it is unclear on the current record how they would get training. Because cord transection is not a common procedure before standard D&E, it would be difficult for physicians to even find cases to observe, especially in the early part

of the second trimester.  Tr. Vol. I (doc. no. 110) at 79:19-25.

The technical difficulties of performing umbilical cord transection, the potential for serious harm, the lack of sufficient research on risks associated with the procedure, and the unavailability of training all indicate that umbilical cord transection would impose substantial obstacles to women's right to terminate a pregnancy before viability if the fetal-demise law were to go into effect.  Because the procedure is too risky, it is simply not a feasible option for the Tuscaloosa and Huntsville clinics.

The court is troubled by the State's argument that women should be required to undergo this inadequately studied, potentially risky procedure.  Indeed, would we want ourselves or our families (our partners and children) to undergo a medical procedure for which the documented safety and effectiveness is comparably lacking and there is no potential medical benefit?  If not, why

should we ask otherwise of Alabama women seeking pre-viability abortions?

### b. Digoxin Injection

To inject digoxin, physicians begin by using an ultrasound machine to visualize the woman's uterus and the fetus. The physician then inserts a long surgical needle through the patient's skin, abdomen, and uterine muscle, in order to inject digoxin into the fetus. If the attempt to inject into the fetus fails, the physician may inject digoxin into the amniotic fluid, but evidence suggests this is generally less effective. Digoxin injection, when it works, takes up to 24 hours to stop the fetal heart. Physicians cannot accurately predict how long digoxin will take to work in a given patient. Tr. Vol. I (doc. no. 110) at 59:25-60:11, 68:6-9. Digoxin injections are painful and invasive because they are administered through a transabdominal needle without anesthesia. Tr. Vol. I (doc. no. 110) at 44:12-22, 75:25-76:6, 196:3-6.

The court concludes that digoxin injections are not a feasible method of causing fetal demise for the following reasons.

(i) Digoxin injections are not reliable for inducing fetal demise.  When injected into the fetus or amniotic fluid, digoxin has a failure rate ranging between 5 % and 15 %.  Tr. Vol. I (doc. no. 110) at 64:1-8; Tr. Vol. II (doc. no. 111) at 142:4-10.  Furthermore, a variety of factors, such as uterine positioning, fetal positioning, obesity, and the presence of uterine fibroids, can affect whether the physician is actually able to inject digoxin into the fetus or the amniotic fluid successfully. First, obesity can make it difficult for physicians to guide the needle through the abdomen into the uterus, for two reasons:  the additional tissue in the patient's abdomen reduces the quality of the ultrasound images, making it more difficult to find the fetus; and the needle must travel through more tissue in order to get to the uterus.  Tr. Vol. I (doc. no. 110) at 40:11-20, 61:1-6; Tr. Vol. II (doc. no. 111) at 139:3-16.  Many of the

Tuscaloosa and Huntsville clinics' patients are obese; the medical director for the Huntsville clinic testified that about 40 % of her patients are obese.  Tr. Vol. I (doc. no. 110) at 197:1-2; Tr. Vol. II (doc. no. 111) at 61:17-19.  Second, fetal and uterine positioning can affect whether the physician is able to get to the fetus or the amniotic fluid with a needle.  Tr. Vol. I (doc. no. 110) at 61:18-25.  Third, uterine fibroids, which are benign tumors on the uterine walls affecting over half of women, can get in the needle's way, because they can become calcified and impenetrable. Tr. Vol. I (doc. no. 110) at 40:21-41:4, 61:18-23, 197:3-4.  All four of these factors can make it difficult--or even impossible--for the needle to reach the fetus or the amniotic fluid.[27]

---

27. The State contends, based on the analysis in Gonzales, that women who are unable to obtain abortion due to their anatomy should bring an as-applied challenge.  In that case, the Court stated that an as-applied challenge would be appropriate if "in discrete and well-defined instances a particular condition has or is likely to occur in which the procedure prohibited by the Act must be used," where "the nature of the medical risk can be better quantified and balanced than in a facial attack."  Gonzales, 550 U.S. at 167. However, the

(ii) Digoxin injections are experimental for women before 18 weeks of pregnancy, and most second-trimester abortions in Alabama are performed before 18 weeks of pregnancy. Donald Decl. Exs. A-C, Induced Terminations of Pregnancy Occurring in Ala. (doc. no. 81-14) (showing that approximately two thirds of abortions at or after 15 weeks occur between 15 to 18 weeks). The majority of studies on digoxin injection focus on pregnancies at or after 18 weeks: only a few studies have included cases at 17 weeks, and no study has been done on the efficacy, dosage, or safety of injecting digoxin into women before 17 weeks of pregnancy. Tr. Vol. I (doc. no. 110) at 67:7-14; II-143:18-25. As with the unknown risks of umbilical cord transection, requiring digoxin injection before 18 weeks of pregnancy would force women to go

---

record here identifies a set of widespread conditions, any one or combination of which could make it impossible to complete a digoxin injection. This means that the feasibility of digoxin injection for a given patient likely cannot be determined until a physician attempts the injection. In other words, there is no "discrete and well-defined" class of women for whom digoxin injection would be impossible who could bring an as-applied challenge.

through an experimental, potentially harmful medical procedure without any counterbalancing benefits.

As mentioned above, a first dose of digoxin does not succeed in inducing fetal demise 5 to 15 % of the time. However, as with digoxin before 18 weeks, there is no study establishing appropriate dosage, potential risks, or time to fetal demise for the administration of a second injection of digoxin. Tr. Vol. II (doc. no. 111) at 142:12-25. The State argued that, in those 5 to 15 % of cases where an initial digoxin injection failed, the physician could try a different method of fetal demise. But, as discussed in this opinion, there are no other viable methods.[28]

_____

28. One of the plaintiffs' experts stated that between 2007 and 2011, in order to avoid the risk of violating the federal partial-birth abortion ban, his former employer required digoxin injections for abortions at or after 20 weeks. Tr. Vol. II (doc. no. 111) at 82:5-12. The expert explained that this practice is distinguishable from legally requiring digoxin use before all standard D&E, because in the case of elective digoxin use, when the first dose failed, he could stop attempting fetal demise and perform standard D&E without facing criminal liability. Therefore, he was not required to perform an experimental procedure of injecting digoxin

(iii) **Even when administered successfully with one dose at or after 18 weeks, digoxin injections carry significant health risks.** The parties' experts agreed, and the court so finds, that digoxin injections are associated with heightened risks of extramural delivery, infection, and hospitalization, compared to standard D&E alone: digoxin injection is six times more likely to result in hospitalization compared to injection of a placebo; it carries an increased risk of infection; and it is twice as likely than amniocentesis[29] to result in extramural delivery, the unexpected and spontaneous expulsion of the fetus from the uterus while the woman is outside of a clinic setting without any medical help. Tr. Vol. I (doc. no. 110) at 69:11-17; Tr. Vol. II (doc.

_____

before 18 weeks, or injecting a second dose. In any event, this issue likely needs to be clarified during further proceedings.

29. Amniocentesis is a testing procedure used in high-risk pregnancies, whereby a needle is used to extract amniotic fluid from the uterus. The State argued that the risks associated with digoxin injection are comparable to this procedure.

no. 111) at 150:2-8.   Spontaneous expulsion of the fetus

can cause bleeding and require medical attention, aside

from being very upsetting to the woman.[30]   Because of

these documented risks, the Society of Family Planning,

a professional organization for family planning, stated

that in order to justify "the harm of the documented

increase in spontaneous labor and extramural delivery,

along with an increase in vomiting seen in the one blinded

digoxin RCT [randomized control trial], in addition to

any more infrequent risks, a significant increase . . .

in D&E safety would seem warranted."   Tr. Vol. I (doc.

no. 110) at 26:20-24, 28:2-7.[31]

---

30.   This complication would have even worse
consequences for women surrounded by people who do not
support their decision to terminate a pregnancy, or if
they have abusive partners who find out about the
abortion due to a medical emergency caused by extramural
delivery.  Tr. Vol. I (doc. no. 110) at 72:1-13; see also
Casey, 505 U.S. at 887-98 (majority opinion) (striking
down the spousal notification requirement based on
concerns about abused women seeking abortion).

31.   The State argued that these fetal-demise
procedures do not introduce new categories of risks that
are not already present in standard D&E.  See, e.g., Tr.
Vol. II (doc. no. 111) at 13:15-22.   However, the

(iv) The use of digoxin injections as a fetal-demise method would impose serious logistical obstacles to abortion access.  Women undergoing digoxin injection would be required to make an additional trip to the clinic 24 hours prior to their D&E procedure appointment.  <u>See Whole Woman's Health</u>, 136 S. Ct. at 2313 (external factors that affect women's ability to access abortion care--such as increased driving distance--should be considered as an additional burden when conducting the undue burden analysis).  This would be in addition to the counseling session and 48-hour waiting period mandated by Alabama law.  Accordingly, if digoxin injection were used to induce fetal demise, a patient seeking an abortion would have to meet with the physician at least

---

significant risk of extramural delivery associated with digoxin does not apply to standard D&E. Tr. Vol. II (doc. no. 111) at 150:2-6. This means that digoxin injection introduces a new category of risk into second-trimester abortion procedures.   Furthermore, <u>Gonzales</u> and <u>Casey</u> simply ask whether the ban imposes "significant health risks" on women, rather than asking whether an alternative procedure introduces new types of risks. <u>Gonzales</u>, 550 U.S. at 161 (quoting <u>Casey</u>, 505 U.S. at 880)).

three times over four days all for a 10- to 15-minute procedure: first, to receive the required informed-consent warning; second, at least 48 hours later, to undergo the digoxin injection; and third, at least 24 hours later, to have the physician determine whether fetal demise was achieved and if so, to receive the standard D&E procedure. In addition, under certain circumstances, it would be necessary for the physician to administer digoxin before beginning cervical dilation; in that case, the patient would need to come for an additional visit between digoxin injection and the D&E procedure. Tr. Vol. I (doc. no. 110) at 90:24-91:6, 202:23-203:15. And, in the 5 to 15 % of cases where the first digoxin injection would fail, an additional visit could be required.

The burden of having to make multiple trips for the procedure is especially pronounced for low-income women. Most women who come to the Tuscaloosa and Huntsville clinics are low-income, and 60 % of patients at the

Huntsville clinic receive financial assistance.[32]   Tr.
Vol. I (doc. no. 110) at 206:18-23.  As this court found
in Planned Parenthood Southeast Inc. v. Strange, getting
to an abortion clinic is particularly expensive and
difficult for low-income women: they are less likely to
own cars and therefore more likely to depend on public
transportation, asking friends or relatives for rides,
or borrowing cars; they are unlikely to have regular
sources of childcare; they are more likely to work for a
job that pays hourly, without any paid time off, or to
receive public benefits that require regular attendance
of meetings or classes.[33]   Planned Parenthood Southeast,
Inc. v. Strange, 33 F. Supp. at 1357.  Having to make yet

_____

32.   The court notes that 17.6 % of Huntsville
residents live below the poverty line.  Katz Decl. (doc.
no. 54-11) ¶ 8.  25.2 % of Tuscaloosa's population lives
below the poverty line.  Id. ¶ 8.

33.   The medical director of the Huntsville clinic
also described the difficulties that her patients face
with arranging child care, traveling far distances to the
clinic, and affording shelter during the trip.  For
example, some women who are unable to afford staying at
a hotel sleep in the parking lot of the clinic.  Tr. Vol.
I (doc. no. 110) at 207:9-11.

another trip to the clinic in order to receive the digoxin injection would exacerbate the patients' difficulties, especially if they are traveling long distances to get to the clinic; for some of them, the procedure would become time- and cost-prohibitive.  Depending on how far away from the clinic the women lives--and some women travel from as far as 5 or 6 hours away--undergoing digoxin injection before D&E could require a woman to miss four or even five days of work.[34]  Tr. Vol. I (doc. no. 110) at 207:8-9. Faced with this great financial and logistical burden, some low-income women would have to delay obtaining an abortion or would not be able to have an abortion at all.

Based on the unreliability of the procedure, unknown risks for women before 18 weeks of pregnancy and for injecting a second dose of digoxin, increased risks of complications, the travel burden, and the pain and invasiveness of the procedure, the court finds that

_____

34. And, as mentioned earlier, given the unreliability of digoxin injection, this burden could stretch into an additional day.

digoxin injection is not a feasible method of inducing fetal demise before standard D&E in Alabama clinics.

### c. Potassium-Chloride injection

Physicians administer potassium-chloride injections by inserting a long surgical needle through the woman's skin, abdomen, and uterine muscle, and then into the fetal heart, using an ultrasound machine to guide the needle.  When administered directly to the fetal heart, potassium chloride stops it almost immediately.  As with digoxin injections, potassium-chloride injections are invasive and painful, because they are administered through a transabdominal surgical needle injection without anesthesia.  Tr. Vol. I (doc. no. 110) at 44:12-22; 75:25-76:6; 196:3-6.

The court finds that, based on the current record, potassium-chloride injections are not a feasible method of causing fetal demise before standard D&E procedures for the following reasons.

91

(i)   Injecting   potassium   chloride   takes   great
technical   skill   and   is   extremely   challenging.   The
physician's goal is to inject it directly into the fetal
heart,[35] which is smaller than the size of a dime at 15
weeks of pregnancy.  Tr. Vol. I (doc. no. 110) at 31:11.
An expert credibly testified that, despite being highly
trained in the field of abortion care, she was unable to
successfully inject potassium chloride into the fetal
heart, even at an advanced gestational age.  Id. at
52:11-53:14, 136:7-16.

(ii) Physicians must receive extensive training to
induce fetal demise through injection of potassium
chloride, and that training is unavailable to the
physicians at the Tuscaloosa and Huntsville clinics.
Potassium-chloride injection is not taught to OB/GYN
residents or to family-planning fellows, whose training

---

35.   If   the   physician   misses   the   fetal   heart,
potassium chloride may still be injected into the fetal
body   compartment.   However,   injecting   outside   of   the
heart may require a larger volume or a longer time to
achieve fetal demise.  Tr. Vol. II (doc. no. 111) at 120:
9-16; Biggio Decl. (doc. no. 81-1) ¶ 7.

involves abortion care, because it is generally only used for high-risk, multi-fetal pregnancy reductions (where one or more of the fetuses in the same pregnancy are terminated and the rest are carried to full-term).  Tr. Vol. I (doc. no. 110) at 39:9-23.  The only subspecialists who are trained to perform the injections are maternal-fetal-medicine fellows, who go through three years of highly supervised training to specialize in high-risk pregnancies. Tr. Vol. II (doc. no. 111) at 141:5-10.  Learning the procedure would require observing at least ten to twenty procedures, according to the more conservative estimate.[36]  Id. at 119:6-14.

Because the Tuscaloosa and Huntsville clinics' physicians are not trained in potassium-chloride injections, they would need to receive training in order for this procedure to be a meaningfully available method

---

36.  One of the plaintiffs' experts estimated, based on consultation with a leading expert in the field, that learning the procedure would require observing 100 to 200 cases.  Tr. Vol. II (doc. no. 111) at 60:7-61:2.

in the state of Alabama.[37]   However, it would be impossible for these physicians to receive this specialized training, because no hospital in the state of Alabama offers training on potassium-chloride injections to unaffiliated physicians not enrolled in their three-year fellowship program.  Tr. Vol. II (doc. no. 111) at 141:23-25.  Furthermore, because even a tertiary academic hospital like the University of Alabama at Birmingham hospital has a caseload of fewer than ten potassium-chloride injection procedures per year, even a hypothetical ad-hoc training program would take at least a year for a sufficient number of cases to arise.  Id. at 140:6-10.

(iii) Potassium-chloride injections carry serious risks to the patient.  Because potassium chloride has

---

37.  It is unlikely that Alabama will attract new providers who are already trained in these procedures, as Alabama has proven to be a hostile environment for abortion providers.  See Planned Parenthood Southeast, Inc. v. Strange, 33 F. Supp. 3d at 1333-34 (describing history of violence against abortion providers and decline in the number of clinics in Alabama in recent years).

harmful effects on the heart, inadvertently injecting it into the woman's circulation can endanger the patient. Tr. Vol. I (doc. no. 110) at 42:2-8; Biggio Decl. (doc. no. 81-1), ¶ 9.  In one instance reported in the medical literature, a woman suffered cardiac arrest because potassium chloride was accidently injected into one of her blood vessels instead of the fetus.  Tr. Vol. I (doc. no. 110) at 29:2-7.  Injections of potassium chloride may also increase the risk of uterine perforation and infection, due to the inherent risks associated with transabdominal injections.  Tr. Vol. I (doc. no. 110) at 29:3-5, 43:16-20, 80:6-8; II-121:5-9.  That said, the risk of potassium-chloride injection before standard D&E is not quantifiable because there has been no study on the efficacy or safety of the procedure before standard D&E.  Id. at 29:21-30:3, 44:4-11.[38]

_____

38.  Reports of adverse outcomes, while concerning, do not establish a risk level because researchers cannot know how often they occur without knowing how many potassium-chloride injections are being completed.  Tr. Vol. I (doc. no. 110) at 120:11-121:6.

(iv) Potassium-chloride injections are not a feasible method also because they cannot be completed on every woman seeking standard D&E. As with digoxin injections, obesity, fetal and uterine positioning, and presence of uterine fibroids may complicate or even prevent the administration of the injections in many women. Tr. Vol. I (doc. no. 110) at 40:4-42:1. And as mentioned earlier, obesity is common in the Tuscaloosa and Huntsville clinics' patient population.

As with umbilical cord transection and digoxin injection, potassium-chloride injection is an unnecessary and potentially harmful medical procedure with no counterbalancing medical benefit for the patient. Because it is a technically challenging procedure that carries serious health risks, and because there is no practical way for the plaintiffs to receive training to perform the procedure safely, the court finds potassium-chloride injection to be an unavailable method for fetal demise for women seeking abortion in the state of Alabama.

### 3. Balancing

As stated above, to determine whether a law regulating abortion constitutes an undue burden on the right to terminate a pregnancy before viability, the court must balance the State's interests underlying a law against the obstacles imposed by the law to women's access to abortion.

While the court assumes the State's interests are legitimate, it is clear that the State cannot pursue its interests in a way that completely denies women the constitutionally protected right to terminate a pregnancy before the fetus is viable. Here, the State contends that its interests are sufficiently strong to justify the burdens the fetal-demise law would impose on Alabama women because they would retain the ability to terminate pregnancy at or after 15 weeks. The State's argument is premised on the idea that it is feasible for the Tuscaloosa and Huntsville clinics to utilize the three fetal-demise methods examined above. However, for the reasons discussed above, the court concludes on the

current record that the proposed fetal-demise methods are not feasible for inducing fetal demise before standard D&E at the Alabama clinics.  Therefore, if the court were to allow the fetal-demise law to go into effect, Alabama women would likely lose their right to pre-viability abortion access at or after 15 weeks.  The State's interests, although legitimate, are not sufficient to justify such a substantial obstacle to the constitutionally protected right to terminate a pregnancy before viability.

Because, as the current judicial record reflects, the State's interests are insufficient to overcome the denial of Alabama women's right to terminate a pregnancy before viability, and because, as the current judicial record further reflects, the fetal-demise law would likely place substantial, and even insurmountable, obstacles before Alabama women seeking pre-viability abortions, the court preliminarily concludes that the law does not "confer[] benefits sufficient to justify the burdens upon access that [it] imposes."  <u>Whole Woman's</u>

Health, 136 S. Ct. at 2299.  The court thus preliminarily holds that the plaintiffs are likely to show that the fetal-demise law "constitutes an undue burden on abortion access" and is unconstitutional.  Id.


## B. Irreparable Harm

The second requirement for an order preliminarily enjoining enforcement of the fetal-demise law--irreparable harm--is satisfied.  In the absence of an injunction, Alabama women would immediately lose the right to obtain a pre-viability abortion anywhere in the State when they reached 15 weeks of pregnancy.[39] Moreover, as explained previously, these Alabama women would also suffer irreparable harm to their privacy rights.

---

39. See supra, note 9.

## C. Balancing of Harms

As explained, in the absence of an injunction, Alabama women would immediately lose the right to obtain a pre-viability abortion anywhere in the State when they reached 15 weeks of pregnancy, whereas all the State will face is that a likely unconstitutional law passed by legislators will not go into effect.  The threatened harm to the plaintiffs clearly outweighs whatever damage or harm a proposed injunction may cause the State.

## D. Public Interest

Finally, it is in the public interest to preserve the status quo and give the court an opportunity to evaluate fully the lawfulness of the fetal-demise law without subjecting the plaintiffs, their patients, or the public at large to any of its potential harms. Furthermore, the public has no interest in the enforcement of a law likely to be unconstitutional.

Odebrecht Const., Inc. v. Secretary, Fla. Dep't of Transp., 715 F.3d 1268, 1290 (11th Cir. 2013).

However, the court notes sua sponte that the Eleventh Amendment bars relief against an allegedly unconstitutional provision if the named state officials do not have the authority to enforce it. Summit Med. Assocs., P.C. v. Pryor, 180 F.3d 1326 (11th Cir. 1999) (concluding that the Ex Parte Young exception to the Eleventh Amendment does not apply to abortion providers' challenge to the private civil-enforcement provision of a statute regulating abortion, but does apply to the statute's criminal-liability provision). Therefore, the preliminary injunction does not extend to the private civil-enforcement provisions under the fetal-demise law.[40]

---

40. Since the Ex Parte Young issue has been raised sua sponte without briefing, the court will, upon request from any of the parties, reconsider it.

***

The court will, therefore, enter an order preliminarily enjoining enforcement of the school-proximity and fetal-demise laws.  The injunction does not extend to the private civil-enforcement provisions of the fetal-demise law.

DONE, this 27th day of October, 2016.

                    /s/ Myron H. Thompson
            UNITED STATES DISTRICT JUDGE