IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

WEST ALABAMA WOMEN'S          )
CENTER, et al., on behalf     )
of themselves and their       )
patients,                     )
                              )
        Plaintiffs,           )
                              )
                              )     CIVIL ACTION NO.
        v.                    )      2:15cv497-MHT
                              )          (WO)
DR. THOMAS M. MILLER, in      )
his official capacity as      )
State Health Officer,         )
et al.,                       )
                              )
        Defendants.           )


OPINION

In *West Alabama Women's Center v. Miller*, 217 F.
Supp. 3d 1313 (M.D. Ala. 2016) (Thompson, J.), this court
preliminarily enjoined enforcement of two Alabama
statutes, enacted on May 12, 2016, that regulate
abortions and abortion clinics.  The court must now
address whether the two laws should be permanently
enjoined.  Based on the following findings of fact and
conclusions of law, this court holds that they should be.

While the court parrots many of its earlier findings and conclusions, it substantially and importantly expands on some as well.

## I. INTRODUCTION

The first challenged statute, the "school-proximity law," provides that the Alabama Department of Public Health may not issue or renew licenses to abortion clinics located within 2,000 feet of a K-8 public school. *See* 1975 Ala. Code § 22-21-35. The second statute, the "fetal-demise law," effectively criminalizes the most common method of second-trimester abortion--the dilation and evacuation, or D&E, procedure--unless the physician induces fetal demise before performing the procedure. *See* 1975 Ala. Code § 26-23G-1 et seq.

The plaintiffs are West Alabama Women's Center (a reproductive-health clinic in Tuscaloosa, Alabama) and its medical director and Alabama Women's Center (a reproductive-health clinic in Huntsville, Alabama) and its medical director. The plaintiffs sue on behalf of

themselves and their patients.  The defendants are the State Health Officer, the State Attorney General, and the district attorneys for Tuscaloosa and Madison Counties, where the clinics are located.  All defendants are sued in their official capacities.

The plaintiffs claim that the school-proximity and fetal-demise laws unconstitutionally restrict abortion access in Alabama in violation of the Due Process Clause of the Fourteenth Amendment.  Jurisdiction is proper under 28 U.S.C. §§ 1331 (federal question) and 1343 (civil rights).

Based on the record (including evidence presented at a hearing), the court holds both laws unconstitutional. The evidence compellingly demonstrates that the school-proximity law would force the closure of two of Alabama's five abortion clinics, which together perform 72 % of all abortions in the State.  Meanwhile, the fetal-demise law would prohibit the most common method of second-trimester abortions in Alabama, effectively terminating the right to an abortion in Alabama at 15

weeks.   Because  these  laws  clearly  impose  an
impermissible undue burden on a woman's ability to choose
an abortion, they cannot stand.


## II. HISTORICAL BACKGROUND

Previously, this court described in some detail a
"climate of hostility," both non-violent and violent,
surrounding the provision of legal abortions in Alabama.
*Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d
1330, 1334 (M.D. Ala. 2014) (Thompson, J.).   Doctors
trained in and willing to provide abortion care in
Alabama are rare, and face retaliation and harassment on
a daily basis as a result of their work.   For example,
protesters have repeated gathered outside one of the
plaintiff physician's private medical practice and the
clinic carrying signs calling her "a murderer".   Robinson
White Decl. (doc. no. 54-4) ¶¶ 8-10.   A group also
launched a public campaign to convince a hospital to
revoke her admitting privileges; this effort included
protests in front of the hospital, televised press

conferences, and leafletting cars and stores near the
hospital. *Id.* at ¶ 9. Providers of abortion services
face difficulties recruiting, hiring, and retaining staff
willing to provide abortion care in the face of this
stigma and constant uncertainty as to the clinics'
continued existence. Women seeking abortion services in
Alabama suffer distinct threats to their privacy:
anti-abortion protesters regularly protest outside of
clinics and harass patients as they exit and enter; at
times, protesters have brought cameras and posted photos
of clinic patients and their license plates online.
Second Gray Decl. (doc. no. 54-1) ¶ 28. "As of 2001,
there were 12 clinics providing abortions in the State.
Today, that number has dwindled to five." *Planned
Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330,
1334 (M.D. Ala. 2014) (Thompson, J.).

In addition, against this historical backdrop and as
outlined in the court's preliminary-injunction opinion,
*W. Ala. Women's Ctr.*, 217 F. Supp. 3d at 1319, abortion
clinics and their physicians have been subject to a

5

number of regulations in Alabama.  In just the last six years, Alabama has passed a host of legislation to regulate how and where abortion care can be provided. The court, however, now mentions only some of those laws.

In 2011, the State prohibited abortions at 20 or more weeks after fertilization--that is, 22 weeks after the last menstrual period[1]--unless a woman's condition necessitates an abortion to avert her death or "serious risk of substantial and irreversible physical impairment of a major bodily function."  1975 Ala. Code § 26-23B-5.

In 2013, the State enacted a law requiring all abortion clinics to meet the same building safety codes applicable to ambulatory surgical centers.  1975 Ala. Code § 26-23E-9.  Under that requirement, abortion clinics must meet the standards of the "NFPA 101 Life Safety Code 2000 edition," *id*., which include

---

1.  Throughout the remainder of this opinion, the week of pregnancy refers to gestational age as measured from the last menstrual period (LMP), which is two weeks longer than the post-fertilization age.  The court has adjusted the numbers accordingly when citing statistics based on post-fertilization age.

requirements for egress, fire protection, sprinkler systems, alarms, emergency lighting, smoke barriers, and special hazard protection. To comply with that law, abortion clinics in Alabama conducted extensive renovations or had to purchase new spaces and relocate.

That same year, the State required all physicians who perform abortions in the State to hold staff privileges at a hospital within the same statistical metropolitan area as the clinic. *See* 1975 Ala. Code § 26-23E-4(c). This court held the staff-privileges requirement to be unconstitutional. *See Planned Parenthood Se., Inc. v. Strange*, 33 F. Supp. 3d 1330 (M.D. Ala. 2014) (Thompson, J.); *see also Planned Parenthood Se., Inc. v. Strange*, 172 F. Supp. 3d 1275, (M.D. Ala. 2016) (Thompson, J.) (determining appropriate relief).

In 2014, the State extended from 24 to 48 hours the time physicians must wait between providing informed consent explanations to patients and conducting the abortion procedure. *See* 1975 Ala. Code § 26-23A-4.

Also in 2014, Alabama enacted a law modifying the procedures for minors seeking to obtain an abortion.  At the time, minors who were unable or unwilling to obtain written consent from their parent or guardian could instead seek judicial approval from a juvenile judge or county court.  The new law authorized presiding judges to appoint a guardian ad litem to represent "the interests of the unborn child," and required that the county district attorney be notified and joined as a party.  1975 Ala. Code § 26-21-4(i)-(j).  These provisions were declared unconstitutional.  *See Reprod. Health Servs. v. Marshall*, --- F. Supp. 3d ---, No. 2:14-CV-1014-SRW, 2017 WL 3223916 (M.D. Ala. July 28, 2017) (Walker, M.J.).

In 2016, on the same day, Alabama enacted the two statutes now challenged in this litigation: the school-proximity law and the fetal-demise law.

This year, the Alabama legislature passed a proposed constitutional amendment that declares the State's public policy is "to recognize and support the sanctity of

**8**

unborn life and the rights of unborn children, including the right to life," and "to ensure the protection of the rights of the unborn child in all manners and measures lawful and appropriate." 2017 Ala. Laws Act 2017-188 (H.B. 98). Alabamians will vote on the amendment in November 2018.

The vast majority of abortions performed in Alabama occur in the remaining five outpatient clinics.[2] The plaintiffs operate two of the clinics: the Alabama Women's Center, located in Huntsville, and the West Alabama Women's Center, in Tuscaloosa.[3] Together, these two clinics provided 72 % of all abortions in Alabama in 2014. Second Johnson Decl. Ex. D (doc. no. 54-2) at 35.

---

[2]. In addition to abortion clinics, a very small number of abortions take place in Alabama hospitals and physician offices. In 2014, 8,080 abortions were performed in Alabama; of those, 23 abortions were performed in hospitals and six abortions were provided at physician offices. Second Johnson Decl. Ex. D (doc. no. 54-2) at 35.

[3]. The three other clinics operating in Alabama are Reproductive Health Services in Montgomery and Planned Parenthood clinics in Birmingham and Mobile.

The Alabama Women's Center, which opened in 2001, is the only abortion clinic in Huntsville, in the far northern part of the State. The Huntsville metropolitan area, with a population of 417,593, is Alabama's second largest urban area.[4] In addition to abortion services, the Huntsville clinic provides contraceptive counseling and care, testing and treatment for sexually transmitted infections, pap smears, pregnancy testing, and referrals for prenatal care and adoption. In 2014, approximately 14 % of the abortions in Alabama took place at the Huntsville clinic. Second Johnson Decl. Ex. D (doc. no. 54-2) at 35.

The West Alabama Women's Center began operations in 1993 and is the only abortion clinic in Tuscaloosa and all of west Alabama. The Tuscaloosa metropolitan area is Alabama's fifth largest urban area. The Tuscaloosa clinic provides reproductive health services to women,

---

4. Statistics are derived from 2010 census data. *See* U.S. Census Bureau, 2010 Census Population and Housing Tables, https://www.census.gov/population/www /cen2010/cph-t/CPH-T-5.pdf.

including abortions, birth control, treatment for sexually transmitted infections, pregnancy counseling, and referrals for prenatal care and adoption. In 2014, approximately 58 % of the abortions in Alabama took place at the Tuscaloosa clinic, far more than at any other clinic. Second Johnson Decl. Ex. D (doc. no. 54-2) at 35.

The Tuscaloosa and Huntsville clinics are the only clinics in Alabama that perform abortions at or after 15 weeks of pregnancy. Prior to 15 weeks, most abortions are performed either through the use of medication or the dilation and curettage method, the latter of which uses suction to empty the contents of the uterus. Because, starting at 15 weeks, it ordinarily is not possible to complete an abortion using suction alone, patients must go to clinics that offer D&E. The D&E procedure is a surgical abortion method where a physician uses instruments and suction to remove the fetus and other contents of the uterus. In 2014, the Huntsville and Tuscaloosa clinics provided about 496 abortions starting

at 15 weeks, all of which were D&E abortions. AWC Summary of Abortions Performed, Pls.' Ex. 17; WAWC Summary of Abortions Performed, Pls.' Ex. 16. That said, the vast majority of abortions performed by the Huntsville and Tuscaloosa clinics occur prior to 15 weeks and therefore do not involve D&E.

### III. LITIGATION BACKGROUND

The court will not go into the history of this litigation, which was outlined in the preliminary-injunction opinion, *see W. Ala. Women's Ctr.*, 217 F. Supp. 3d at 1320-21, other than to add that, after the preliminary injunction was issued, the parties asked the court to enter a final judgment based on the existing record without conducting any further discovery or evidentiary proceedings. The court granted the parties' joint motion to do so, and now makes its final findings of fact and enters its final conclusions of law.

## IV. LEGAL STANDARDS

In its most recent discussion of a woman's right to an abortion, the Supreme Court opened its opinion with this succinct statement: "[A] statute which, while furthering a valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends." *Whole Woman's Health*, 136 S. Ct. at 2309 (quoting *Casey*, 505 U.S. at 877 (plurality opinion)).

Women have a substantive due-process right to terminate a pregnancy before the fetus is viable. To determine whether that right has been violated, the governing standard is "undue burden." *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833, 876-79 (1992) (plurality opinion).[5] In *Casey*, a plurality

_____

5. The Court in *Whole Woman's Health* contrasted the undue-burden standard to the Court's less searching review of economic legislation under the rational-basis standard, and specifically rejected the notion "that legislatures, and not courts, must resolve questions of medical uncertainty." *Whole Woman's Health*, 136 S. Ct.

of the Court concluded that, if a government regulation has "the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus," the regulation is an undue burden on a woman's right to have an abortion and is unconstitutional. *Id.* at 877. *Casey* recognized that a woman's right of privacy extends to freedom "from unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child." *Id*. at 896 (majority opinion) (quoting *Eisenstadt v. Baird*, 405 U.S. 438, 453 (1972)).

"[T]he heart of this test is the relationship between the severity of the obstacle and the weight of the justification the State must offer to warrant that obstacle. ... [T]he more severe the obstacle a regulation

_____

at 2309-10 (citing *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483 (1955)). Unlike with rational-basis review, "the Court, when determining the constitutionality of laws regulating abortion procedures, has placed considerable weight upon evidence and argument presented in judicial proceedings." *Id*. at 2310 (emphasis added) (citing *Casey*, 505 U.S. at 888-94, and *Gonzales*, 550 U.S. at 165-66).

creates, the more robust the government's justification must be, both in terms of how much benefit the regulation provides towards achieving the State's interests and in terms of how realistic it is the regulation will actually achieve that benefit." *Planned Parenthood Se., Inc. v. Strange*, 9 F. Supp. 3d 1272, 1287 (M.D. Ala. 2014) (Thompson, *J.*); *see also Whole Woman's Health*, 136 S. Ct. at 2309 (the undue-burden analysis requires a court to "consider the burdens a law imposes on abortion access together with the benefits those laws confer"); *Planned Parenthood of Wis. v. Van Hollen*, 738 F.3d 786, 798 (7th Cir. 2013) (Posner, J.) ("The feebler the [state interest], the likelier the burden, even if slight, [is] to be 'undue' in the sense of disproportionate or gratuitous.").

The undue-burden test requires courts to examine "the [challenged] regulation in its real-world context." *Planned Parenthood Se., Inc. v. Strange*, 9 F. Supp. 3d 1272, 1287 (M.D. Ala. 2014) (Thompson, *J.*); *Casey*, 505 U.S. at 888-98 (majority opinion) (examining the effects

of the spousal notification provision on women in abusive relationships). In *Whole Woman's Health*, the Supreme Court endorsed the district court's consideration of the actual impact of the challenged laws on the Texas abortion clinics and their patients. *Whole Woman's Health*, 136 S. Ct. at 2312. In concluding that the law imposed an undue burden, the district court, and then the Supreme Court, considered several facts, including that half of Texas clinics closed after enforcement of the law commenced; that clinicians from the El Paso clinic would be unable to gain admitting privileges at hospitals, because not once did they transfer an abortion patient to a hospital; and that the closures resulted in an almost 30-fold increase in the number of women of reproductive age more than 200 miles from a clinic. *Id*. at 2312-13.

Courts must consider the burdens imposed by the new law or regulation against the backdrop of existing laws and regulations on abortion in the jurisdiction as well as others enacted at the same time. As Judge Posner explained, "[w]hen one abortion regulation compounds the

effects of another, the aggregate effects on abortion rights must be considered." *Planned Parenthood v. Van Hollen*, 738 F.3d 786, 796 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 2841 (2014); *accord Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 915 (9th Cir. 2014) (Fletcher, J.) (describing relevant factors to burdens analysis as including "the ways in which an abortion regulation interacts with women's lived experience, socioeconomic factors, and other abortion regulations"), *cert. denied*, 135 S. Ct. 870 (2014).

States may have myriad interests in regulating abortion. These interests may come in all shapes and forms, from protecting fetal life or maternal health to regulating the medical profession. Nevertheless, the State's interests--however legitimate--cannot "place[] a substantial obstacle in the path of a woman's choice [to have a pre-viability abortion]." *Whole Woman's Health*, 136 S. Ct. at 2309 (quoting *Casey*, 505 U.S. at 877 (plurality opinion)). And a State's interests surely cannot swallow the right. *See Casey*, 505 U.S. at 846

(reaffirming the essential holding of *Roe v. Wade*, 410 U.S. 113 (1973) that "[b]efore viability, the State's interests are not strong enough to support ... the imposition of a substantial obstacle to the woman's effective right to elect the procedure"). The court will now apply the undue-burden test to the facts of this case.

## V. THE SCHOOL-PROXIMITY LAW

The school-proximity law provides that the Alabama Department of Public Health "may not issue or renew a health center license to an abortion clinic or reproductive health center that performs abortions and is located within 2,000 feet of a K-8 public school." 1975 Ala. Code § 22-21-35(b). The parties agree that both the Tuscaloosa and Huntsville clinics are located within 2,000 feet of at least one K-8 public school. Order on Pretrial Hearing (doc. no. 93), Stip. 3(b) at 13. Each clinic is licensed by the Department; if the school-proximity law were to take effect, the parties

agree the Department could not renew either clinic's license to continue operations at its existing location.

Because no legislative findings accompany the school-proximity law, the court is without an explanation from the legislature of the purpose for the law. The plaintiffs have submitted newspaper articles, to which the State has not objected, that report that Reverend James Henderson, a leader of anti-abortion protesters outside the Huntsville clinic, drafted the bill that ultimately became the school-proximity law, with the purpose of shutting down the Huntsville clinic. Newspaper Article, Second Johnson Decl. Ex. H (doc. no. 54-2) at 56. Another article reported that Governor Robert Bentley's staff offered Henderson assistance in seeking sponsors for the bill. *Id*. Ex. I at 61.

The State has asserted that the purpose of the school-proximity law was to further two interests: minimizing disturbance in the educational environment and supporting a parent's right to control his or her children's exposure to the subject of abortion.

With regard to these interests, the State acknowledges two things. First, the State's interests are threatened by demonstrations outside the clinics, but not by the clinics themselves. Tr. of Final Pre-Trial Status Conf. (doc. no. 99) at 35:1-11. Thus, the school-proximity law attempts to serve the State's interests through an expressed *means* (the 2000-foot prohibition on clinics) to an unexpressed *end* (the relocation of the demonstrations away from public K-8 schools). Second, the State does not contend, and the court finds no evidence, that the demonstrators had any effect on the educational environment *inside* any school; the State concedes that its only concern is disruption *outside* of schools due to the presence of protesters near the clinics. *Id*. at 37:9-21.

In the absence of legislative findings, the court will now, as discussed below, make findings based on the "judicial record" as to the State's two asserted interests. *Whole Woman's Health*, 136 S. Ct. at 2310 ("[T]he relevant statute here does not set forth any

legislative findings.  Rather, one is left to infer that the legislature sought to further a constitutionally acceptable objective. ... For a district court to give significant weight to evidence in the judicial record in these circumstances is consistent with this Court's case law.").

The court is persuaded that the school-proximity law would impose a substantial obstacle on a woman's right to obtain a pre-viability abortion.  As discussed below, the evidence presented to the court reflects that the State's asserted interests are only minimally, if at all, furthered by the law, while the burden imposed on a woman's right to obtain an abortion is substantial.


### A. State's Interests

The State's interests are furthered by neither the law's means (the 2000-foot prohibition on clinics) nor its end (the relocation of the demonstrations).

In Tuscaloosa, a middle school sits just within 2,000 feet of the clinic, but a vast wooded area separates the

school and the clinic.  Map, Second Gray Decl. Ex. E
(doc. no. 54-1) at 77 (showing Tuscaloosa clinic at 1,986
feet away from middle school); Pl. Ex. 27 (satellite view
showing wooded area separating clinic and school); Tr.
Vol. II (doc. no. 111) at 106:4-9.  Up to five protesters
(but usually fewer than that) stand outside the clinic
on weekdays, but they are neither visible nor audible to
children entering, exiting, or inside the school.  Second
Gray Decl. (doc. no. 54-1) at ¶ 35; Tr. Vol. II (doc. no.
111) at 104:15-20, 108:24-25 - 109:1-5.  Indeed, this
court has been presented with no evidence that the
children (or parents) at the Tuscaloosa school are even
aware that an abortion clinic is located nearby.[6]  Because
the record does not reflect that any K-8 public school
children within 2,000 feet of the Tuscaloosa clinic are
even aware of the clinic or the demonstrations at the
clinic, the school-proximity law does not serve either

_____

     6. Counsel for the State agreed that nothing in the
record indicates the legislature intentionally included
the Tuscaloosa clinic within the scope of the
school-proximity law.  Tr. Vol. III (doc. no. 112) at
15:9-11.

of the State's asserted purposes of minimizing disruption or supporting a parent's right to control his or her children's exposure to the subject of abortion.



The Tuscaloosa clinic (A) and its protesters (B) are separated from the nearest school (C) by a large wooded area. Pl. Ex. 27 (excerpt).

The State does not dispute that, while the law impacts the Tuscaloosa clinic, it was targeted to the "perceived problem" at the Huntsville clinic. Tr. Vol. III (doc. no. 112) at 14:12-16.

In Huntsville, two to 15 protesters stand outside the clinic on weekdays. Tr. Vol. I (doc. no. 110) at 168:5-12 (medical director of Huntsville clinic estimates two to five protesters on a regular basis and up to 10 protesters on weekdays); Second Johnson Decl. (doc. no. 54-2) ¶ 31 (owner of Huntsville clinic estimates five to 15 protesters). Occasionally larger crowds of protesters congregate on weekends, when school is not in session. Tr. Vol. I (doc. no. 110) at 169:5-10; Johnson Dep., Def. Ex. 20 (doc. no. 81-20) at 3:13-18 (describing large rallies with up to 150 protesters). Demonstrators may yell at patients as they enter or exit the clinic. Tr. Vol. I (doc. no. 110) at 216:9-11.

Two public schools that include some or all of grades K-8--Highlands Elementary School and the Academy for Academics and Arts--are located within 2,000 feet of the Huntsville clinic.

The respective entrances to Highlands and the clinic are on different streets, and they are approximately three blocks apart. *Id*. at 176:18-19, 177:5-6. It is

not necessary to drive past the clinic to access the school. *Id.* at 176:20-23. The record contains absolutely no evidence of concerns expressed by the school's students or their parents about the Huntsville clinic or the demonstrations near it. Thus, as to Highlands, the court finds the State's two interests (minimizing disruption and supporting a parent's right to control their children's exposure to the subject of abortion) would not in any way be furthered by the closing or relocation of the Huntsville clinic.



The Huntsville clinic (A) and the two schools, the Academy for
Academics and Arts (B) and Highlands Elementary School (C).
Pl. Ex. 31 (excerpt).

The Academy for Academics and Arts sits diagonally
across a five-lane street from, and to the east of, the
Huntsville clinic. Published newspaper articles report
that some parents have complained about the presence of

protesters near the clinic.[7]  But the record reflects no
disturbance to the educational environment: no evidence
suggests that protests are visible or audible from inside
the school; no evidence suggests the classroom setting
has been in any way disturbed by the protests; and no
evidence suggests that children are hindered or disturbed
while entering or exiting the school.  In fact, although
demonstrators sometimes stand across the street from the
Huntsville clinic and close to an Academy driveway, that
driveway is not the school's primary driveway and is not
typically used by parents who are dropping off or picking
up children.  Instead, it is used by parents and others
to access an attached parking lot if they need to enter
the school for business or opt to walk their child into
the school, and even then no evidence suggests that

_____

7.  As evidence, the State relies on newspaper
articles which describe complaints from a few Academy
parents about anti-abortion protesters outside the
Huntsville clinic, including objections that the
protesters appeared to target the parents and concern
about traffic safety and delay.  Newspaper Articles, Def.
Ex. 16 (doc. no. 81-16), Def. Ex. 17 (doc. no. 81-17), &
Def. Ex. 18 (doc. no. 81-18).

children have been hindered or disturbed in those instances. Tr. Vol. II (doc. no. 111) at 26:21-25 – 27:1-3. The entrance used by parents during normal drop-off and pick-up is accessed from another street on the opposite side of the school, and the driveway used by buses bringing children to and from the school is on the same street as the clinic but further up the road. *Id*. at 27:21-25 – 28:1-8; Tr. Vol. I (doc. no. 110) at 174:16-23; Pl. Ex. 33 (depicting traffic flow at the Academy). Because there is no evidence of disruption to the school's educational environment, the court finds the State's interest in limiting disruption in the educational environment would not be measurably advanced by the closing or relocation of the Huntsville clinic.



**Traffic pattern at Huntsville's Academy for Academics and Arts.
Pl. Ex. 33.**

Also as to the Academy, the State's interest in
supporting a parent's right to control his or her
children's exposure to the subject of abortion would be
only weakly furthered by the closing or relocation of the
Huntsville clinic. The State failed to present evidence
of a significant problem: the record contains one report
of one mother who had to respond to questions from her
son, an Academy student, about the subject of abortion

after he witnessed a protest. Newspaper Article, Def. Ex. 16 (doc. no. 81-16).

In addition, the State's statutory means (the closing or relocation of the Huntsville clinic) will not lead to the State's intended end (the relocation of demonstrations away from the Academy). The evidence reflects, and the court so finds, that protests will continue at the Huntsville clinic's current location even if the school-proximity law were to take effect. Anti-abortion protesters have demonstrated not just outside the Huntsville clinic, but also outside the private practice of the clinic's medical director, Dr. Yashica Robinson White, as well as a hospital where she holds admitting privileges. Robinson White Decl. (doc. no. 54-4) ¶¶ 8-10; Tr. Vol. I (doc. no. 110) at 179:2-16; 180:14-20. Because Robinson White previously used the Huntsville clinic's current site for her private obstetrics and gynecology practice, and two and as many as 10 protesters routinely demonstrated outside the facility on weekdays, protests occurred at the site even

before it became an abortion clinic. Robinson White Decl. (doc. no. 54-4) ¶ 10; Tr. Vol. I (doc. no. 110) at 166:22-25 – 167:1-5. Robinson White credibly testified that, if the law were to go into effect and the clinic were to close, she would again use the facility for her private practice, which would likely engender protests again. Tr. Vol. I (doc. no. 110) at 181:22-25 - 182:1-12; Robinson White Decl. (doc. no. 54-4) ¶ 16. Moreover, Robinson White testified that, if the clinic closed, she would perform abortions at the facility[8] through her private practice, all but guaranteeing continued protests at the site, irrespective of the passage of the law. *Id*. As a result, the law will not stop protests at the site.

Based on the judicial record, the court therefore finds that the school-proximity law would provide little to no benefit to the State's asserted interests in

---

8. Robinson White would continue to perform up to 100 abortions per year at the location of the Huntsville clinic, the maximum number permitted under Alabama law without an abortion clinic license. Robinson White Decl. (doc. no. 54-4) ¶ 16.

minimizing disruption and supporting a parent's right to control his or her children's exposure to the subject of abortion.[9]

---

9.    Moreover, although the court does not reach this issue, the fact that the school-proximity law may do little or nothing for the stated purpose suggests that the law's actual purpose may have been "to place a substantial obstacle in the path of a woman seeking an abortion," and that the law would therefore fail the undue-burden test independent of its effects. *See Whole Woman's Health*, 136 S. Ct. at 2300 (quoting *Casey*, 505 U.S. at 878 (plurality)).    Legislative purpose may be inferred from the extent to which the statute actually furthers, or fails to further, the purported state interests.    Thus, "without evidence that the curtailment [of the right to an abortion] is justifiable by reference to the benefits conferred by the statute," it can be inferred that the legislature may hold an improper purpose, passing measures that "may do little or nothing for [the stated purpose], but rather strew impediments to abortion."    *Planned Parenthood of Wisconsin, Inc. v. Schimel*, 806 F.3d 908, 921 (7th Cir. 2015) (Posner, J.); *cf*. *Snyder v. Louisiana*, 552 U.S. 472, 484-85 (noting with regard to a *Batson* claim that a court's finding that a proffered reason was pretextual "naturally gives rise to an inference" of an impermissible purpose); *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 511 (1993) (holding, under Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. §§ 1981a and 2000e through 2000e-17), that the rejection of an employer's proffered reason for a given action permits the trier of fact to infer an improper discriminatory purpose).    The court's finding that the school-proximity law will provide little to no benefit to the State's purported interests therefore raises the question of whether the law in fact had the

## B. Burdens Imposed on Women

In addition to examining the State's asserted interests, the court must also "consider the burdens [the] law imposes on abortion access." *Whole Woman's Health*, 136 S. Ct. at 2309.

The parties do not dispute that, if the school-proximity law goes into effect, the State Health Department could not renew the licenses of the Huntsville and Tuscaloosa abortion clinics at their existing locations. After the expiration of their existing licenses, the clinics would need to relocate or shut down. The court finds, based on the judicial record, that the Tuscaloosa clinic and the Huntsville clinic would not be able to relocate and that, as a result, the two clinics would have to shut down if the law were to take effect. Tr. Vol. I (doc. no. 110) at

---

impermissible purpose of placing a substantial obstacle to women's access to abortion.

164:19-25 – 165:1-18; Second Gray Decl. (doc. no. 54-1)
¶ 34; Second Johnson Decl. (doc. no. 54-2) ¶ 3.

The evidence credibly shows that, because each clinic
incurred significant expenses as a result of the
surgical-center requirement imposed on abortion
providers by the State in 2013, neither clinic would be
financially able to relocate now.  Because the Huntsville
clinic was not able to bring its old building into
compliance with the surgical-center standards, it was
forced to relocate to a new facility (the place where
Robinson White had leased space for her private
practice), which cost  $ 530,000 to purchase and more
than $ 100,000 for building renovations.   Tr.  Vol. I
(doc. no. 110) at 160:23-24, 162:1-4.  To cover those
expenses, Dalton Johnson, the clinic owner, and Robinson
White, the medical director and sole physician, incurred
significant personal financial debt.   Second Johnson
Decl. (doc. no. 54-2) ¶ 16 ("In order to purchase the
facility, I cashed in all of my retirement savings;
borrowed from my life insurance policy; refinanced the

mortgage on the Madison Street building and pulled all the equity out of it; took out a $ 100,000 line of credit; and spent money I had inherited from my father, who had recently passed away. In addition, Dr. Robinson White and I each maxed out every one of our credit cards."); Tr. Vol. I (doc. no. 110) at 162:11-18 (Robinson White explaining that the clinic owner removed "all of the equity" from his mortgage on the prior clinic facility; and that she and the clinic owner "emptied" their savings accounts, "took all of the cash value" out of their insurance policies, obtained a line of credit through a bank, and "maxed out" all of their credit cards). Johnson remains hundreds of thousands of dollars in debt from these expenses. Second Johnson Decl. (doc. no. 54-2) ¶ 17 (describing outstanding debt on $ 100,000 line of credit; $ 90,000 owed to life insurance policy; and hundreds of thousands of dollars remaining on mortgages for both prior and current clinic facilities). The testimony of Robinson White, which the court found highly credible, establishes that she and Johnson have

sacrificed significant personal financial resources to continue operating the Huntsville clinic.

The Tuscaloosa clinic spent $ 130,000 to renovate its existing facility to comply with the surgical-center requirements. Second Gray Decl. (doc. no. 54-1) ¶ 32. Purchasing a new facility now would require the Tuscaloosa clinic's owner to use retirement funds or go into debt, which she would not be able to pay off at this stage of her career. *Id.* ¶ 34.

The Tuscaloosa and Huntsville clinics could not rely on leasing a new facility. Anti-abortion protesters in Alabama have targeted the landlords that lease space to organizations and individuals that provide abortions. After demonstrations targeted the former landlord of the Tuscaloosa clinic, the landlord did not renew the clinic's lease. *Id.* ¶ 31. Similarly, during an earlier search for a Huntsville facility, Johnson hired real estate agents and engaged in an extensive six-month search, but "each and every time [h]e would meet with the owner or real estate agent of a building [h]e wanted to

lease, the moment [h]e informed prospective lessors that [h]e intended to operate an abortion clinic in the space, they would not lease to [him]." Johnson Decl. (doc. no. 54-2) ¶¶ 12, 14. Robinson White explained that, during the Huntsville clinic's recent relocation, the stigma surrounding abortion made it difficult to find a banker and closing attorney to work with them. Tr. Vol. I. (doc. no. 110) at 165:2-11. These difficulties are consistent with the court's previous finding that abortion providers in Alabama face a "climate of extreme hostility to the practice of abortion." *Planned Parenthood Se.*, 33 F. Supp. 3d at 1334. Against this backdrop, the plaintiffs have credibly demonstrated that they would not be able to relocate; the clinics would finally be forced to close.

The State contends that the burdens analysis should not consider the probable closure of the Huntsville and Tuscaloosa clinics because whether the clinics close depends on "the idiosyncrasies of [the clinics'] specific financial position." Def. Br. (doc. no. 81) at 9. In

37

other words, the State seems to argue that the court should not consider the actual financial circumstances of the clinics in assessing whether the law would impose an undue burden Alabama women's right to choose an abortion.  This contention misapprehends the undue-burden case law.

As this court has previously explained, the undue-burden analysis requires an examination of the "real-world context" of the challenged statute and its actual effects--and not just those circumstances that are directly attributable to the statute.  *Planned Parenthood Se.*, 9 F. Supp. 3d at 1285-87.  In *Casey*, the Supreme Court's evaluation of the burdens imposed by a spousal-notification law took into consideration the reality that many women live in abusive relationships, and that requiring notification to an abusive spouse could impose a potentially insurmountable barrier to obtaining an abortion for those women.  *See Casey*, 505 U.S. at 888-898 (majority opinion).  Contrary to the State's reasoning, it was not relevant to the Court's

analysis that the spousal-notification law did not cause the women to live in abusive relationships, or that the idiosyncrasies of different relationships would result in varying impacts on different women. The Court carefully considered the real-world context in which the law would play out, and, based on that context, determined that the notification requirement would have imposed a substantial obstacle to access to abortion.

Moreover, "[w]hen one abortion regulation compounds the effects of another, the aggregate effects on abortion rights must be considered." *Van Hollen*, 738 F.3d at 796 (Posner, J.). Here, the financial peril of the remaining clinics is a direct result of earlier legislation regulating abortion in the State. The court cannot ignore, and in fact must take into consideration, the financial pressures on the plaintiff clinics resulting from those laws in assessing whether the school-proximity law imposes an undue burden.

Similarly, courts have repeatedly recognized that legislation that imposes substantial costs on abortion

providers places burdens on women's access to abortion because the costs discourage other clinics from opening or filling the gaps caused by closures. In *Whole Woman's Health*, the Supreme Court observed that the costs of $ 1 to $ 3 million required to achieve compliance with Texas's surgical-center requirement were "considerable." 136 S. Ct. at 2318. Evidence of those costs, the Court reasoned, "supports the conclusion that more surgical centers will not soon fill the gap when licensed facilities are forced to close." *Id.*; *see also Casey*, 505 U.S. at 901 (plurality opinion) (finding that recordkeeping requirements, which "[a]t most ... increase the cost of some abortions by a slight amount" do not impose an undue burden, but acknowledging that "at some point increased cost could become a substantial obstacle"); *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 542 (9th Cir. 2004) (concluding that application of new licensing and regulatory scheme to abortion facilities, which would have required abortion providers to expend

"[t]ens of thousands of dollars," contributed to undue-burden finding).

Because new abortion clinics are very unlikely to sprout up to fill the gaps, the closure of two of Alabama's five abortion clinics would leave only three abortion clinics operating in the State--one each in Birmingham, Montgomery and Mobile--while the rest of Alabama, including the highly populated metropolitan areas of Huntsville and Tuscaloosa, would have no licensed abortion providers at all. The resulting burdens on women would be substantial.[10]

First, women would lose the right to obtain an abortion in Alabama altogether when they reached 15 weeks of pregnancy, because the Tuscaloosa and Huntsville

---

10. The State has not disputed any of the plaintiffs' evidence about the resulting burdens on women should the Huntsville and Tuscaloosa clinics be forced to close.

clinics are the only providers of abortions beginning at

15 weeks of pregnancy.[11]

---

11. Admittedly, to obtain an abortion at that point,
women in Huntsville and Tuscaloosa could travel
approximately 400 miles round-trip out of state to the
nearest provider in Atlanta. Second Henshaw Decl. (doc.
no. 54-3) ¶¶ 18, 20. For women relying on public
transportation, that would require a round trip of at
least 12 hours in duration. Katz Decl. (doc. no. 54-11)
¶ 21. Citing a study from a similar scenario in Texas,
Dr. Stanley Henshaw concluded that the effect in Alabama
would be comparable to a 70 % reduction in the number of
Alabama women who obtained abortions starting at
approximately 15 weeks of pregnancy. Second Henshaw
Decl. (doc. no. 54-3) ¶ 20. In 2014, 560 abortion
procedures were performed beginning at 15 weeks. *See*
Donald Decl. Ex. F, Induced Terminations of Pregnancy
Occurring in Alabama, 2014 (doc. no. 81-14). Moreover,
although some women in Alabama could continue to access
abortions beginning at 15 weeks by traveling out of
state, courts have refused to allow out-of-jurisdiction
access to cure within-jurisdiction restrictions. See
*Planned Parenthood Se.*, 33 F. Supp. 3d at 1360-61; *see
also Planned Parenthood of Wis., Inc. v. Schimel*, 806
F.3d 908, 918 (7th Cir. 2015) (Posner, J.) (rejecting
argument that the availability of late second-trimester
abortions in Chicago could justify the closure of
Wisconsin's only abortion clinic that conducted such
abortions, because "the proposition that the harm to a
constitutional right can be measured by the extent to
which it can be exercised in another jurisdiction is a
profoundly mistaken assumption." (internal quotation
marks, citations, and alterations omitted)); *Jackson
Women's Health Org. v. Currier*, 760 F.3d 448, 457 (5th
Cir. 2014) (holding that the undue-burden analysis
"focuses solely on the effects within the regulating

Second, while abortions before 15 weeks would remain available in Alabama, women who would currently rely on the Huntsville or Tuscaloosa clinics would need to travel significantly greater distances. This burden would become particularly devastating for low-income women who represent the majority of women seeking abortions in Alabama. Katz Decl. (doc. no. 54-11) ¶ 15; *see also* Second Henshaw Decl. (doc. no. 54-3) ¶ 9 (half of all abortion recipients in the United States have incomes below the federal poverty level). In particular, 82 % of the Tuscaloosa clinic patients live at or below 110 % of the federal poverty level. Gray Decl. (doc. no. 54-1) ¶ 45. In Huntsville, over 60 % of the clinic's

---

state," and that a Mississippi abortion law therefore placed an undue burden); *cf*. *Missouri ex rel. Gaines v. Canada*, 305 U.S. 337, 350-51 (1938) (rejecting as "beside the point" the argument that black law students refused admission at the State University of Missouri could simply attend nearby law schools in other States, because the requirement of Equal Protection "is imposed by the Constitution upon the States severally" and "cannot be cast by one State upon another"). Nonetheless, the court does not need to resolve the legal issue of whether to consider out-of-state clinics because, even if this court were to consider those clinics, it would reach the same conclusion.

patients receive financial assistance from the government. Tr. Vol. I (doc. no. 110) at 206:18-23. If the Huntsville clinic closed, a woman in Huntsville would need to travel at least 200 miles round-trip to Birmingham for the next-closest abortion provider. Without a clinic in Tuscaloosa, a woman there would need to travel at least 110 miles round-trip to Birmingham. Multiple studies have concluded that longer travel distances to access an abortion provider correlate with fewer women obtaining abortions. Second Henshaw Decl. (doc. no. 54-3) ¶¶ 4-8, 19. The court has previously discussed the serious impact of the "first 50 miles" of travel on women seeking abortions, and that "when a clinic closes, the largest effects are actually felt by women who, prior to the closure, needed to travel only short distances, less than 50 miles." *Planned Parenthood Se.*, 33 F. Supp. 3d at 1358-60. The Supreme Court has also recognized that longer travel distances, when taken together with other burdens, increase the burdens on women seeking an abortion. *Whole Woman's Health*, 136 S.

Ct. at 2313 (citing evidence that, after regulation took effect, the number of women living more than 150 and 200 miles from an abortion provider skyrocketed). Here, without the school-proximity law, women in Huntsville and Tuscaloosa could obtain an abortion with a short trip within the city. If the law were to take effect, women in those cities would be required to arrange lengthy out-of-town trips, including obtaining access to transportation, time off from work, childcare, and lodging. Alabama law already requires women to make two trips to the clinic: one to satisfy the informed consent requirement, and one--at least 48 hours later--for the procedure.[12] But not all women have the means to do so,

_____

12. While Alabama law allows the informed consent counseling to be conducted either in person or by restricted delivery mail, restricted delivery is not a feasible option for low-income patients for a number of reasons. First, mail in low-income communities is "notoriously unreliable." Sheila Katz Tr. (doc. no. 90-2) at 30:17. Second, restricted mail requires the addressee sign for the mail upon delivery, and many low-income women work during the day and would therefore be unable to sign for it. Third, whereas middle- and upper-class women may be able to get mail delivered to their work, low-income women often do not work in

which would either prevent such women from obtaining an abortion altogether or delay their ability to obtain one. Second Henshaw Decl. (doc. no. 54-3) ¶¶ 14, 24 (noting that half of women who experience unwanted delay in obtaining abortions attributed the delay to arrangements such as raising funds, transportation, locating an abortion provider, and organizing childcare).

The increased difficulty of accessing an abortion clinic would be compounded by the three remaining abortion clinics' lack of sufficient capacity to meet the new demand. As a result, not all women who would choose to have an abortion could obtain one. The Huntsville and Tuscaloosa clinics have performed the majority of abortions in Alabama in recent years: combined, they performed 72 % of all abortions in Alabama in 2014, 60 % of all abortions in 2013, and 55 % of all abortions in 2012. Second Johnson Decl. Ex. D (doc. no. 54-2) at

occupations where this is an option, and even when possible, doing so would risk compromising the confidentiality of the correspondence, which is important for all women but is particularly important for women in abusive relationships.

35-37.  Together, the Huntsville and Tuscaloosa clinics performed 5,833 abortions in 2014, compared to 2,218 abortions provided by the three remaining clinics combined.  *Id*. at 35.  The three remaining clinics could not shoulder the plaintiff clinics' caseload.

As the directors of Alabama's three other clinics explained, if the Huntsville and Tuscaloosa clinics were to close, they project that they could at most reach a combined maximum capacity of 4,500 procedures per year (including the 2,218 they already provide), but this increase in capacity would depend on a significant expansion in staffing and services, which is unlikely in light of the climate surrounding abortion in Alabama. Ayers Decl. (doc. no. 54-7) ¶¶ 8-10; Fox Decl. (doc. no. 54-8) ¶¶ 4-5.  For example, the Montgomery clinic performed fewer than 900 abortions in 2014; stretched its resources to perform 1,200 abortions because of the temporary closure of the Tuscaloosa clinic in 2015; and estimates that it could perform a maximum of 1,800 abortions per year at the outermost limit--an estimate

dependent on recruiting additional physicians and support staff that it has previously struggled to hire because of the stigma surrounding abortion in Alabama. Ayers Decl. (doc. no. 54-7) ¶¶ 6-8. The Mobile and Birmingham clinics, which provided a combined total of 1,342 abortions in 2014, estimate that, with an expansion of capacity to provide abortions four days per month, they could perform 2,700 abortions per year--but they too are currently struggling to expand capacity because of staffing troubles. Fox Decl. (doc. no. 54-8) ¶ 5; Donald Decl. Ex. F, Induced Terminations of Pregnancy 2014 Report (doc. no. 81-14) at 19. Notably, none of the remaining clinics have plans to expand their services to provide abortions at or after 15 weeks, so women seeking abortions in that timeframe would simply be out of luck.

Also, capacity constraints, especially when combined with the increased travel times, would introduce delays in women obtaining abortions. Later-term abortions, if delayed past the 14th week of the pregnancy, carry greater medical risks and also increase the cost of the

procedure; if the delay extends to the 22nd week of pregnancy, it would become illegal for a woman to obtain an abortion in Alabama, with certain exceptions for the life and health the mother.  1975 Ala. Code § 26-23B-5.

For women in abusive relationships, delays could make the difference between obtaining or not obtaining an abortion at all: where a battered woman attempts to conceal her pregnancy from her abuser, she needs to be able to obtain an abortion before she starts to show; for a woman needing to pass her abortion off to an abusive partner as a miscarriage, she needs to receive a medication abortion (because it looks exactly like a miscarriage), which is only available until 10 weeks of pregnancy. In both scenarios, the longer the delay, the more likely the woman will not be able to get an abortion in time to conceal it from her abuser.  To impose additional delay by requiring women to travel further will result in some women taking an unwanted pregnancy to term.  Walker Decl. (doc. no. 54-9) ¶¶ 15-16.

Furthermore, the abortions that the remaining clinics could provide likely would not be equal in quality to the care provided prior to the law taking effect: in the crowded clinics that would surely result, women are "less likely to get the kind of individualized attention, serious conversation, and emotional support that doctors at less taxed facilities may have offered." *Whole Woman's Health*, 136 S. Ct. at 2318. To assume otherwise flies in the face of "common sense," which "suggests that, more often than not, a physical facility that satisfies a certain physical demand will not be able to meet five times that demand without expanding or otherwise incurring significant costs." *Id*. at 2317. These factors, too, would impose a burden on women seeking an abortion.

Each of these factors--the unavailability of abortions beginning at 15 weeks, the increased travel times, and the reduced capacity, increased wait times, and potentially reduced quality of care at Alabama's three remaining clinics--would result in women facing

significantly increased, and even insurmountable, barriers to obtaining an abortion.

Where these types of barriers exist, it is likely that some women will pursue risky alternatives. *Cf*. *Whole Woman's Health*, 136 S. Ct. at 2321 (Ginsburg, J., concurring) ("When a State severely limits access to safe and legal procedures, women in desperate circumstances may resort to unlicensed rogue practitioners, *faute de mieux*,[13] at great risk to their health and safety."); *Planned Parenthood Se.*, 33 F. Supp. 3d at 1362-63 (describing greater risk that women would attempt to obtain an abortion illegally where travel-related obstacles and capacity constraints are imposed). The Tuscaloosa clinic has had firsthand experience with attempts to self-abort, including when the clinic was temporarily closed in 2015. During that time, women would nonetheless come to the clinic seeking an abortion--including one woman who threatened to stab

---

13. This phrase, French in etymology, means "for lack of an alternative." *Faute de mieux*, Oxford English Dictionary (2d ed. 1989).

herself in the stomach.  Second Gray Decl. (doc. no. 54-1) ¶ 47.  During the same time period, the Huntsville clinic experienced an increased number of calls from women who lived far away seeking abortions, some of whom said "outright that they would try to self-induce an abortion because they could not reach a provider." Second Johnson Decl. (doc. no. 54-2) ¶ 49.  Recently, Tuscaloosa's medical director has treated multiple women who attempted to self-abort, such as a woman who consumed turpentine after consulting the Internet and learning about its use as a folk remedy.[14]  Tr. Vol. II (doc. no. 111) 69:1-9.  So too can Alabama expect an increased

_____

14.  Incidentally, women in the South have resorted to turpentine before.  One study from 1936 reported that rural black women in Georgia consumed turpentine for self-induced abortions.  Turpentine relies on ingredients similar to those reportedly used by southern slaves seeking to self-abort.  Jessie M. Rodrique, *The Black Community and the Birth Control Movement*, in *Women and Health in America* 293, 295 (Judith Walzer Leavitt ed., 1999).

level of self-abortions if the school-proximity law were to take effect.[15]

In summary, because the Tuscaloosa and Huntsville clinics provide more than 70 % of abortions in Alabama and are the only providers of abortions beginning at 15 weeks of pregnancy, and because the two clinics would have to cease operations if the school-proximity law were to go into effect, the availability of abortions in Alabama would be significantly reduced, and abortions beginning at 15 weeks would become almost wholly unavailable. Thus, Alabama women attempting to obtain a pre-viability abortion would experience substantial, and even insurmountable, burdens if the school-proximity law were to take effect.

***

As stated above, "the more severe the obstacle a regulation creates, the more robust the government's

_____

15. Even if the clinics did not permanently close, the temporary closure of both clinics would still impose the significant burdens described above on women seeking abortions in Alabama until each clinic could secure a new facility.

justification must be, both in terms of how much benefit the regulation provides towards achieving the State's interests and in terms of how realistic it is the regulation will actually achieve that benefit." *Planned Parenthood Se.*, 9 F. Supp. 3d at 1287.  Here, because, as the judicial record reflects, the State's interests are so attenuated and because, as the judicial record further reflects, the school-proximity law would place substantial, and even insurmountable, burdens on Alabama women seeking to exercise their right to a pre-viability abortion, the court concludes that the law does not "confer[] benefits sufficient to justify the burdens upon access that [it] imposes." *Whole Woman's Health*, 136 S. Ct. at 2300.[16]  The court thus holds that the

---

16.  While the court finds that the State's justifications for the school-proximity law are weak, the court must emphasize that its conclusion does not turn solely on that finding.  In the alternative, the court further finds that the justifications are by no means sufficiently strong to justify the obstacles that the requirement would impose on women seeking an abortion.

school-proximity law "constitutes an undue burden on abortion access" and is unconstitutional. *Id*.

## C.  State's Other Arguments

In its attempt to justify its regulatory approach, the State argues--relying principally on First Amendment challenges to zoning decisions--that governments routinely regulate the types of businesses that may operate near schools. *See, e.g.*, Def. Br. (doc. no. 81) at 44 ("'[T]here can be little doubt about the power of a state to regulate the environment in the vicinity of schools ... by exercise of reasonable zoning laws.'" (quoting *Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 121 (1982)).  That argument misapprehends the nature of the undue-burden analysis, which is the controlling standard here.  As the Supreme Court reaffirmed in *Whole Woman's Health*, the undue-burden analysis requires the court to consider, based on the judicial record, "the burdens a law imposes on abortion access together with the benefits those laws confer."  136 S. Ct. at 2309.  That analysis

must have bite: it would be erroneous to "equate the judicial review applicable to the regulation of a constitutionally protected liberty with the less strict review applicable where, for example, economic legislation is at issue." *Id.* In zoning cases, the government's authority is "undoubtedly broad," but "the standard of review is determined by the nature of the right assertedly threatened or violated rather than by the power being exercised or the specific limitation imposed." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 68 (1981). Thus, in government regulation of liquor establishments in the vicinity of schools, "judicial deference is the watchword." *Davidson v. City of Clinton, Miss.*, 826 F.2d 1430, 1433 (5th Cir. 1987) (upholding a restriction on sale of alcohol within 500 feet of a school, as applied to a nightclub, as neither irrational nor arbitrary). Where constitutionally protected interests that warrant more searching review are threatened, by contrast, the State's cited examples for government regulation of the areas around schools

have not withstood scrutiny and therefore do not support the State's position.  *See, e.g.*, *Larkin*, 459 U.S. at 117 (invalidating, on Establishment Clause ground, statute that delegated authority to schools and churches to veto liquor licenses within 500 feet of their premises).

Similarly, the State's reliance on the First Amendment 'secondary effects' doctrine of *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), is mistaken.  In that case, the Supreme Court upheld a city ordinance prohibiting adult movie theatres from operating within 1,000 feet of a school because the ordinance advanced the State's interests in eliminating the "undesirable secondary effects" of the theatres, such as crime, injury to retail trade, and depressed property values.  475 U.S. at 48-49.  The State here asserts that it too has an interest in regulating "the undesirable secondary effects" of abortion clinics, implying the demonstrations and the impact on children who witness them are the secondary effects the law sought to curtail. Def. Br. (doc.  no. 81) at 47.  But the secondary-effects

doctrine justifies only those State actions that would otherwise constitute an impermissible content-based infringement of First Amendment rights, which are not implicated here. Further, the Supreme Court has squarely rejected the doctrine's applicability to speech viewed as disturbing or offensive, specifically concluding that "[l]isteners' reactions to speech are not the type of 'secondary effects' we referred to in *Renton*." *Boos v. Barry*, 485 U.S. 312, 321 (1988); *accord Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 867-68 (1997) (rejecting application of *Renton*'s secondary-effects doctrine to statute intended to protect children from offensive speech). Thus, even under *Renton*, the State could not force abortion clinics to relocate based on parents' reactions to protester speech.

Moreover, if the State seeks to regulate the areas around schools, other approaches could more effectively advance its asserted interests. For example, the State could have enacted a reasonable "time, place, and manner" restriction on demonstrations outside facilities "where

abortions are offered or performed." *McCullen v. Coakley*, 134 S. Ct. 2518, 2530-32 (2014) (approving such a buffer zone because it advanced public safety objectives in light of evidence of crowding, obstruction, and violence). Of course, it is not the province of this court to prescribe the most appropriate regulatory approach; however, it is worth noting that the court's decision does not leave the State without recourse to limit students' exposure to demonstrators.

The court's holding that the school-proximity law is unconstitutional still obtains.

## VI. THE FETAL-DEMISE LAW

The court now turns to whether the fetal-demise law imposes an undue burden on women's access to pre-viability abortion in Alabama.

The Alabama Unborn Child Protection from Dismemberment Abortion Act, which the court calls the fetal-demise law, imposes a criminal penalty on physicians who purposely perform 'dismemberment

abortions,' defined as "dismember[ing] a living unborn child and extract[ing] him or her one piece at a time from the uterus through use of clamps, grasping forceps, tongs, scissors, or similar instruments." 1975 Ala. Code § 26-23G-2(3). A health exception applies if the physician in reasonable medical judgment decides "the child's mother has a condition that so complicates her medical condition that it necessitates the abortion of her pregnancy to avert her death or to avert serious risk of substantial and irreversible physical impairment of a major bodily function, not including psychological or emotional conditions." 1975 Ala. Code § 26-23G-2(6). A physician found to be in violation of this law may face a civil suit or a criminal penalty, consisting of either a fine of up to $ 10,000, imprisonment for up to two years, or both. While not mentioned explicitly in the language of the law, the parties agree that it would ban the most common method of abortion administered in

Alabama at or after 15 weeks--standard D&E--if used without first inducing fetal demise.[17]

The question before the court is whether the fetal-demise law has the purpose or effect of placing a substantial obstacle in the path of a woman's choice to obtain a pre-viability abortion. *Whole Woman's Health*, 136 S. Ct. at 2309 (quoting *Casey*, 505 U.S. at 878 (plurality opinion)) ("[U]nnecessary health regulations that have the purpose or effect of presenting a substantial obstacle to a woman seeking an abortion impose an undue burden on the right"). If it does, the law cannot stand.

This *Casey* undue-burden standard requires the court to "examin[e] the regulation in its real-world context" to determine whether the obstacles imposed by the law are

---

17. The law does not use or define the term 'fetal demise' or explain how fetal demise should be determined. The parties appear to agree that the fetus would no longer be considered "living" under the law when asystole, or the termination of a heartbeat, occurs, and they used the term 'fetal demise' to denote that occurrence. The court likewise uses the term to mean termination of the fetal heartbeat.

substantial.  *Planned Parenthood Southeast, Inc. v. Strange*, 33 F. Supp. 3d 1330, 1337 (M.D. Ala. 2014) (Thompson, *J*).  In so doing, the court must consider both the effect of an abortion statute on the availability of abortion and the health risks the statute imposes on women.  "[R]egulations which do no more than create a structural mechanism by which the State ... may express profound respect for the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of the right to choose."  *Gonzales v. Carhart*, 550 U.S. 124, 146 (2007) (internal citations and quotations omitted).  Further, "the fact that a law which serves a valid purpose ... has the incidental effect of making it more difficult or more expensive to procure an abortion cannot be enough to invalidate it."  *Id.* at 158. However, a statute designed to protect fetal life imposes a substantial obstacle, and therefore an undue burden, where it "forces a woman and her physician to terminate her pregnancy by methods more dangerous to her health than the method outlawed" or "subject[s] women to

significant health risks." *Planned Parenthood of Central Missouri v. Danforth*, 428 U.S. 52, 79 (1976). Further, a law requiring the substitution of certain abortion procedures over others will not be upheld if it has the effect of inhibiting the vast majority of pre-viability abortions after a certain week threshold, and the law must allow continued use of "a commonly used and generally accepted method." *Gonzales*, 550 U.S. at 165; *see Stenberg v. Carhart*, 530 U.S. 914, 945 (2000) (holding that a law prohibiting the most common second-trimester abortion method, standard D&E, would impose an undue burden). A ban on a particular method can "be upheld only if there [are] safe alternative methods" available. *Danforth*, 428 U.S. at 77.

For the reasons discussed below, the court finds the fetal-demise law effectively terminates the right to abortion for Alabama women at 15 weeks. Because it imposes an undue burden on the right of women in Alabama to obtain a pre-viability abortion, the court holds the fetal-demise law unconstitutional.

## A. State's Interests

Because no legislative findings accompany the fetal-demise law, the court does not have an explanation from the legislature of the purpose for the law. The State argues that the law advances these interests: advancing respect for human life; promoting integrity and ethics of the medical profession; and promoting respect for life, compassion, and humanity in society at large.[18] The court assumes the legitimacy of these interests. *See Whole Woman's Health*, 136 S. Ct. at 2310 (assuming that the State had legitimate state interests where the statute did not contain any legislative findings).

In any event, this court must now, based on the judicial record, make its own findings. *Whole Woman's Health*, 136 S. Ct. at 2310 ("[T]he relevant statute here

_____

18. It is worth noting that the State does not argue that the ban on dismemberment abortion is designed to avoid fetal pain. Fetal pain is not a biological possibility until 29 weeks, well beyond the range of standard D&E procedures and beyond the legal limit of abortion in Alabama; the State does not dispute this. Tr. Vol. I (doc. no. 110) at 138:1-6.

does not set forth any legislative findings.  Rather, one is left to infer that the legislature sought to further a constitutionally acceptable objective.  ... For a district court to give significant weight to evidence in the judicial record in these circumstances is consistent with this Court's case law.").


## B. Burdens Imposed on Women

The plaintiffs assert that the fetal-demise law makes the safest and most common method of second-trimester abortions, standard D&E, essentially unavailable, therefore imposing an undue burden on Alabama women's right to pre-viability abortions.  The State responds that fetal demise can be safely achieved before standard D&E with one of three procedures: umbilical-cord transection, potassium-chloride injection, and digoxin injection.

For the reasons discussed below, the court finds that the fetal-demise law imposes a substantial burden in at least two interacting ways: first, the law imposes

65

significant health risks on most women who choose to have an abortion by requiring them to undergo a fetal-demise procedure that is unsafe or experimental; second, and as a result, the law makes standard D&E--the only method of second-trimester abortion available in Alabama as a practical matter--largely unavailable because no safe, non-experimental methods are feasible in the vast majority of cases.

Based on the following factual findings, the court concludes that the proposed fetal-demise methods are not feasible in the plaintiff clinics and that requiring the use of those methods would pose a substantial obstacle to women seeking second-trimester abortions in the State.

### 1. Impact on Health of Women Seeking Abortions in Alabama

The court's determination whether the law imposes a substantial obstacle to abortion access turns on whether the statute would effectively ban the most common second-trimester abortion method by requiring a procedure that is either unavailable or unsafe. *See Stenberg*, 530

U.S. at 945 (finding that outlawing the most common second-trimester abortion method, standard D&E, would impose an undue burden upon a woman's right to terminate her pregnancy before viability). In *Gonzales*, the Court applied the *Casey* undue-burden standard to determine whether the federal Partial-Birth Abortion Ban Act of 2003 created a substantial obstacle to abortion access. *Gonzales v. Carhart*, 550 U.S. 124, 146 (2007). In so doing, the Court spent a substantial portion of the opinion examining whether the Act would proscribe standard D&E, which, as will be discussed in detail below, is the most common method of performing abortions at and after 15 weeks, and is the same method at issue here. The *Gonzales* Court found that the federal ban would not substantially decrease the availability of second-trimester abortions because it prohibited only intact D&E, which was rarely administered, and because the law still allowed "a commonly used and generally accepted method", namely, standard D&E. *Gonzales*, 550 U.S. at 165. The Court then addressed whether the ban

would impose serious health risks on women.  *Gonzales*,
550 U.S. at 161.

Here, the parties agree the fetal-demise law bans
standard D&E, the most commonly used method for
second-trimester abortions in Alabama, when performed
without first inducing fetal demise.  The parties also
agree that, if there are not safe methods available for
inducing fetal demise, the law is unconstitutional.
Thus, the court turns to an examination of the
availability of the fetal-demise methods proposed by the
State and the health risks they impose on women seeking
abortion in Alabama.  If the fetal-demise requirement
prevents women from obtaining pre-viability abortions or
exposes women to significant health risks, the
requirement would impose an undue burden on their
constitutional right to choose a pre-viability abortion.


a. Standard D&E

Before addressing the State's proposed methods for
inducing fetal demise, the court now provides background
on the current landscape of second-trimester abortions

in Alabama.  The vast majority of second-trimester abortions in Alabama are performed using "standard D&E."[19] Standard D&E is a surgical abortion method that consists of two parts: dilation of the cervix (the "D") and evacuation of the uterus (the "E").  Robinson White Decl. (doc. no. 54-4) ¶ 20.  First, a woman's cervix is dilated only enough to allow passage of surgical instruments. Then, the physician evacuates the uterus using forceps to grasp the fetus and remove it, and using suction to remove remaining contents of the uterus.  It is important to open the cervix gently, and then only a small amount, for safety reasons and to preserve it for future pregnancies.  Tr. Vol. I (doc. no. 110) at 16:5-12. Because the opening of the cervix is too small for the entire fetus to pass, separation of fetal tissues occurs

_____

19.  The court uses the term 'standard D&E' in order to distinguish it from 'intact D&E,' sometimes called 'D&X,' which involves dilating the cervix enough to remove the whole fetus intact.  'Intact D&E' is banned under the federal Partial-Birth Abortion Ban Act of 2003, unless fetal demise is induced before the procedure. *See Gonzales v. Carhart*, 550 U.S. 124 (2007) (upholding the federal partial-birth abortion ban).

during the process of removing the fetus. *Id*. at 17:6-14. Due to this separation of tissues, standard D&E falls under the fetal-demise law's definition of 'dismemberment abortions.' Physicians start using the standard D&E procedure around 15 weeks of pregnancy, before which they can remove the fetus using only suction.

Standard D&E is considered an extremely safe abortion method, with a less than 1 % chance of major complications. *Id*. at 17:17-18. Nationally, about 95 % of second-trimester abortions are performed through standard D&E. Davis Decl. (doc. no. 54-5) ¶ 7. Standard D&E is also the only abortion method that can be performed in an outpatient setting in Alabama at or after 15 weeks. Second Parker Decl. (doc. no. 54-6) ¶ 14; Tr. Vol. I (doc. no. 110) at 189:8-11. Typically, standard D&E is performed in one day.[20] Robinson White Decl. (doc. no.

_____

20. Occasionally, a physician may determine that a more gradual dilation is in the best interest of the patient and will begin dilation the day prior to the procedure. Second Parker Decl. (doc. no. 54-6) ¶ 13 ("I perform the vast majority of D&E's at WAWC as a one-day procedure. However, there are some women for whom I wish

54-4) ¶ 20.  After dilation, the procedure takes between
10 to 15 minutes.  *Id*. at 17:15-16.

    Due to its low risk of complications, relative
simplicity, and short duration, standard D&E is the most
common method of second-trimester abortion in Alabama.
Second Parker Decl. (doc. no. 54-6) ¶ 14; Robinson White
Decl. (doc. no. 54-4) ¶ 23.  The ability to perform
standard D&E in one day and in outpatient settings is
particularly important because the vast majority of women
seeking abortions in Alabama rely on outpatient clinics.
Alabama hospitals provide very few abortions: in 2014,
hospitals provided 23 abortions in 2014, which amounted
to less than 0.3 % of all abortions in the state.  Donald
Decl. Exs. C & F, Induced Terminations of Pregnancy
Occurring in Ala. (doc. no. 81-14).[21]   Of those 23

_____

to achieve a more gradual and/or wider dilation of the
cervix, in which case I will administer osmotic dilators
to begin cervical ripening the day before the
procedure.").

    21.  Exhibits C and F provide the number of abortions
in Alabama as reported to the Alabama Department of
Public Health.  After these exhibits were submitted, the
plaintiffs brought to the court's attention that there

abortions performed in hospitals, seven were performed after 15 weeks of pregnancy: six of these were induction abortions, and the seventh was by standard D&E. *Id.* Induction is the only alternative to standard D&E in Alabama after 15 weeks of pregnancy and is not available in outpatient clinics.[22] Robinson White Decl. (doc. no. 54-4) ¶ 24. In other words, outpatient clinics performed

---

had been a clerical error in the reporting of standard D&E procedures. To rectify this error, the plaintiffs submitted supplemental declarations and exhibits correcting the number of such procedures performed from 2012-2015. *See* Second Robinson White Decl. (doc. no. 89-1); Third Gray Decl. (doc. no. 89-2); WAWC Summary of Abortions Performed, Pls.' Ex. 16; AWC Summary of Abortions Performed, Pls.' Ex. 17. The defendants did not object to these corrected figures.

22. The induction method involves using medication to induce labor and deliver a non-viable fetus over the course of hours or even days. Tr. Vol. I (doc. no. 110) at 12:20-13:30. Induction procedures are more expensive, difficult, and stressful for the patient. State regulations do not allow outpatient clinics to initiate an abortion procedure that may entail more than 12 hours of clinical involvement, which means that induction abortion must be performed in a hospital. Tr. Vol. II (doc. no. 111) at 43:8-24. The State does not dispute that induction procedures are unavailable to women seeking second-trimester abortions in outpatient clinics in Alabama. *See supra* note 1.

standard D&E for 99 % of women undergoing abortions at or after 15 weeks of pregnancy in Alabama in 2014. Donald Decl. (doc. no. 81-14). The Tuscaloosa and Huntsville clinics are the only outpatient clinics in Alabama providing standard D&E procedures. Accordingly, these two clinics performed 99 % of abortions at or after 15 weeks in Alabama in 2014.

### b. Umbilical-Cord Transection

One of the methods the State proposes the Alabama clinics use to induce fetal-demise is umbilical-cord transection. To perform umbilical-cord transection incident to standard D&E, the physician must first dilate the woman's cervix enough to allow the passage of instruments to transect the cord. Once the cervix is dilated, the physician uses an ultrasound machine to visualize the umbilical cord. The physician then punctures the amniotic membrane, inserts an instrument into the uterus, and tries to find the cord with a surgical instrument and cut it. The physician must then wait for the fetus to achieve asystole, or cessation of

heart activity. Tr. Vol. II (doc. no. 111) at 123:8-124:18; *see* Tr. Vol. I (doc. no. 110) at 77:13-78:7. Once asystole has occurred, the physician can perform standard D&E, removing fetal tissues and other contents of the uterus.

The court finds that, for the following reasons, inducing fetal demise with umbilical-cord transection prior to conducting standard D&E is not feasible or safe in the plaintiff clinics, and therefore is not a method that allows the plaintiffs to comply with the fetal-demise law.

(i) Multiple factors make cord transection technically difficult, and sometimes impossible, before a standard D&E procedure: lack of visualization; continuous shrinking of the uterus during the procedure; and the size of the umbilical cord. First, a physician performing umbilical-cord transection must be able to do so without much visual aid. Before the amniotic membrane is punctured, the physician is readily able to visualize the fetus and the umbilical cord due to the contrast on

74

the ultrasound between the amniotic fluid and the uterine and fetal tissue.  However, when the amniotic membrane is punctured at the beginning of the procedure, the amniotic fluid drains from the uterus.  Once the fluid has drained, it is much more difficult to visualize the location of the umbilical cord because the contrast dissipates along with the amniotic fluid.  Tr. Vol. I (doc. no. 110) at 77:16-78:17.  Second, as the fluid drains, the uterus contracts, pushing the contents of the uterus against each other.  *Id*.  Depending on the gestational age, the cord may be very thin; at 15 weeks, it is the width of a piece of yarn.[23]  Finally, as the fluid drains out of the uterus, the cord may become flaccid, making it harder to find.  *Id*.  As a result, the umbilical-cord transection method requires a physician

---

23.  Because the vast majority of patients in Alabama who receive standard D&E have the procedure between 15 and 18 weeks of pregnancy, the cord is quite narrow in the majority of such procedures.  *See* Donald Decl.  Ex. C, Induced Terminations of Pregnancy Occurring in Ala. (doc. no. 81-14) (providing that 80 % of women who received standard D&E in 2014 did so between 15 and 18 weeks LMP or 13 to 16 post-fertilization age).

to identify, reach, and transect a flimsy, roughly yarn-sized cord without any visualization aid or space between different types of tissues; should the physician fail and grasp the fetal tissues, she could be subject to prosecution for conducting a "dismemberment abortion" under the fetal-demise law. *Id*.

(ii) Cord transection carries significant health risks to the patient, including blood loss, infection, and injury to the uterus. *See Gonzales*, 550 U.S. at 161 (reiterating the Court's jurisprudence that abortion regulations that pose "significant health risks" are unconstitutional). Performing cord transection before standard D&E to achieve fetal demise involves a heightened risk of serious blood loss compared to performing standard D&E alone. Cord transection is a risky procedure: one of the experts in this case had first-hand experience of attempting to perform cord transection to comply with the federal ban on intact D&E in a hospital setting. She credibly testified that she and her colleagues stopped attempting the procedure

because of concerns about patient safety. In their experience, it took as long as 13 minutes after cutting the cord for the heartbeat to stop; and, while waiting for the fetal heart to stop, the patients were having contractions, undergoing placental separation, and losing blood, which caused the physicians great concern for the safety of their patients. Tr. Vol. I (doc. no. 110) at 82:21 - 83:11. As a result, the expert and her colleagues abandoned the idea of using cord transection as a standard practice before intact D&E.[24] *Id*. at 83:4-15.

Moreover, cord transection increases the risk of infection and uterine perforation compared to standard D&E. Every time a physician introduces an instrument into the uterus, there is a risk of infection or uterine

_____

24. The State argues that the law's health exception would apply were a physician to attempt to transect the umbilical cord and fail, because the patient would then be in serious risk of irreversible impairment to major bodily functions. This argument, along with the general discussion of the health exception, is addressed later in this section.

perforation; this risk increases with every pass of the instrument. Tr. Vol. I (doc. no. 110) at 80:1-16. As performing cord transection involves searching blindly for the umbilical cord--which can take several passes prior to the passes needed to perform standard D&E--the risk of complications is greater than when performing standard D&E alone.

These risks would be amplified in the outpatient setting of the Tuscaloosa and Huntsville clinics, where all abortions in Alabama at or after 15 weeks take place. Unlike physicians practicing in hospitals, the clinic physicians do not have access to blood services for patients at risk of serious blood loss, nor do they have access to subspecialists such as anesthesiologists. Moreover, the medical equipment at the plaintiffs' clinics, such as the ultrasound machines crucial to cord transection, is not as advanced as what is available in tertiary-care hospital settings. Tr. Vol. I (doc. no. 110) at 236:9-18. The lack of these services and

technologies would undoubtedly increase the risks of the procedure.

(iii) Umbilical-cord transection is also not a feasible method because it is, for all intents and purposes, an experimental procedure.[25]  The State argues that umbilical-cord transection is a viable, safe option before standard D&E based on a single study--that is, the only existing study that has examined umbilical-cord transection as a method for fetal demise before D&E.  But the study raises more questions than it answers.

The study suffers from several flaws that render it unreliable.  First, the article was a retrospective case series study, which means that the researchers were trying to answer a question by going through medical records after the data was collected for purposes other

_____

25. Of course, some people *choose* to undergo risky, or even experimental, procedures when they foresee some possibility of medical benefit; no one goes to the doctor and elects to have an experimental procedure that only increases the risk of complications and pain and confers no medical benefit even in the best-case scenario.  The question at hand is whether a State can *mandate* a woman to undergo an experimental procedure that is more likely to harm her compared to the standard abortion procedure.

than research.  While not the least reliable type of study, it is one of the least reliable.  Because the study relies on medical records from a non-research context, there is no way of knowing how the underlying data was collected, or what data was omitted from the records.  Tr. Vol. I (doc. no. 110) at 84:3-20.  The study states that close to 10 % of the original study group was excluded for incomplete records.  Kristina Tocce et al., *Umbilical Cord Transection to Induce Fetal Demise Prior to Second-Trimester D&E Abortion*, 88 Contraception 712, 713 (2013) (doc. no. 81-13).

Further, because of the study design, the article is missing details that would reliably establish risk levels.  It did not utilize a control group, so there is no way to compare the outcomes of the group that received cord transection and a group that did not receive cord transection.  The study also does not report how much time or how many passes it took to successfully grasp and transect the cord in each case; as explained above, the more passes with instruments in the uterus, the greater

the risk of injury to the uterus and infection.  Finally,
the study does not report week-by-week distribution of
gestational age of the subjects, even though the success
rate of cord transection procedures would be expected to
vary across the gestational age due to the changing size
of the umbilical cord.  Tr. Vol. I (doc. no. 110) at
83:23 - 86:13; 125:14-22.

Moreover, the resources of the facility where the
transections in the study were performed are not
comparable to those of the Tuscaloosa and Huntsville
clinics.  The patients in the study underwent
intracervical anesthetic blocks and IV sedation during
the cord transection and D&E procedures, Tocce et al.,
*supra*, at 713 (doc. no. 81-13), neither of which are
available at the Tuscaloosa and Huntsville clinics, Tr.
Vol. II (doc. no. 111) at 11:2-20; Tr. Vol. I (doc. no.
110) at 137:9-24.  Comparing the study conditions to the
Tuscaloosa and Huntsville clinics appears to be like
comparing apples to oranges; the study provides paltry

evidence as to the safety of performing the procedure in the Alabama clinics.

Cord transection carries serious risks, and insufficient research has been conducted to quantify those risks. Requiring cord transection before standard D&E would force physicians to perform a medically unnecessary procedure without much, if any, information about the likelihood of harm to the patient. Further, the law would force women to accept an experimental procedure and exposure to a potentially grave risk of harm as the cost of undergoing standard D&E, which is well-documented for its low risks.

(iv) Not surprisingly given the potential health risks and the experimental nature of cord transection prior to D&E, no training is available for doctors within Alabama to learn to perform this procedure. The physicians at the Tuscaloosa and Huntsville clinics have not been trained in this technically challenging procedure, and they are unlikely to be able to get any training: because cord transection is not common, it

would be difficult for physicians to find cases to observe, especially in the early part of the second trimester. Further, given the climate of hostility and the difficulty of hiring doctors willing and able to perform abortions in Alabama, attracting doctors already trained in the procedure to work in the Huntsville and Tuscaloosa clinics is unlikely. The lack of training opportunities and the inability to recruit trained physicians renders the procedure unavailable in Alabama as a practical matter.

(v) The risk of harm associated with cord transection supports the plaintiff physicians' credible and valid concerns about being forced to perform this procedure under the fetal-demise law. Tr. Vol. I (doc. no. 110) at 212:4-14; Tr. Vol. II (doc. no. 111) at 48:24-49:6. Physicians have an ethical obligation not to subject patients to potentially harmful, experimental procedures without any medical benefit and the patient's consent. The fetal-demise law forces women to either undergo a risky procedure with no any medical benefit or give up

their right to pre-viability abortion; placing women in such a predicament negates any opportunity for meaningful consent.

***

In sum, the court finds that the technical difficulties of performing umbilical-cord transection, combined with the potential for serious harm, the experimental, virtually unstudied nature of the procedure, and the unavailability of training, render umbilical-cord transection unavailable as an option for the plaintiffs to comply with the fetal-demise requirement. Thousands of women cannot be required to undergo a risky procedure based on one questionable study. *See Danforth*, 428 U.S. at 79 (striking down an abortion method ban where the alternatives proposed by the State were largely experimental and unavailable to women in that State).


c. Potassium-Chloride Injection

Another method the State proposes the Alabama clinics use to induce fetal-demise is potassium-chloride

injection. Physicians administer potassium-chloride injections by inserting a long surgical needle through the woman's skin, abdomen, and uterine muscle, and then into the fetal heart, using an ultrasound machine to guide the needle. When administered directly to the fetal heart, potassium chloride stops it almost immediately. Potassium-chloride injections are invasive and painful, because they are administered through a transabdominal surgical needle without anesthesia. Tr. Vol. I (doc. no. 110) at 44:12-22; 75:25 - 76:6; 196:3-6. The procedure is generally performed as a means of selective fetal reduction--where one or more of fetuses in the same pregnancy are terminated and the rest are carried to full-term--or during labor-induction abortions, which may not be provided in outpatient settings and very rarely performed in Alabama. Tr. Vol. I (doc. no. 110) at 37:10-20; Donald Decl. Ex. F, Induced Terminations of Pregnancy 2014 Report (doc. no. 81-14) at 19 (showing that outpatient clinics performed no induction abortions in 2014).

The court finds that potassium-chloride injections are not an available method for causing fetal demise before standard D&E procedures in plaintiffs' outpatient clinics for the following reasons.

(i) Physicians must receive extensive training to induce fetal demise through injection of potassium chloride, and that training is unavailable to abortion providers at outpatient clinics in Alabama. Injecting potassium chloride takes great technical skill and is extremely challenging. The physician's goal is to inject it directly into the fetal heart, which is smaller than the size of a dime at 15 weeks of pregnancy.[26] Tr. Vol. I (doc. no. 110) at 31:11. Accidentally injecting potassium chloride into the woman's body can cause significant harm, such as cardiac arrest. Potassium-chloride injection is not taught to OB/GYN

---

26. If the physician misses the fetal heart, potassium chloride may still be injected into the fetal body compartment. However, injecting outside of the heart may require a larger volume or a longer time to achieve fetal demise. Tr. Vol. II (doc. no. 111) at 120: 9-16; Biggio Decl. (doc. no. 81-1) ¶ 7.

residents or to family-planning fellows, whose training involves abortion care, because it is generally used only for high-risk, multi-fetal pregnancy reductions.[27]  Tr. Vol. I (doc. no. 110) at 39:9-25.  The only subspecialists who are trained to perform the injections are maternal-fetal medicine fellows, who complete three years of highly supervised training to specialize in high-risk pregnancies.  Tr. Vol. II (doc. no. 111) at 141:5-10. Learning to perform these injections safely would require observing approximately 100 to 200 procedures.  *Id.* at 60:7 - 61:9.[28]

Because the plaintiff physicians have not been trained in potassium-chloride injections, they would need

---

27. As explained above, fetal reduction refers to a procedure where one or more of the fetuses in the same pregnancy are terminated and the rest are carried to full-term, due to health risks of multiple gestations.

28. For the reasons discussed in the subsection below about the parties' experts, the court rejected the State's expert's far lower estimate of the number of procedures the clinic doctors would need to view in order to be able to perform the procedure safely.  In any case, even if he were correct, there would be no practical way for them to observe those procedures.

to receive training in order for this procedure to be a meaningfully available method.[29]   However, it would be impossible for these physicians to receive this specialized training, because no hospital in Alabama offers training on potassium-chloride injections to unaffiliated physicians not enrolled in their three-year maternal-fetal medicine fellowship program.   Tr. Vol. II (doc. no. 111) at 141:23-25.   Furthermore, because even a major academic hospital such as the University of Alabama at Birmingham has a caseload of fewer than 10 potassium-chloride injection procedures per year, even a hypothetical ad-hoc training program would take more than 10 years for a sufficient number of cases to arise.   *Id*. at 140:6-10.

---

29.   It is unlikely that Alabama will attract new providers who are already trained in these procedures, as Alabama has proven to be a hostile environment for abortion providers.   *See Planned Parenthood Southeast, Inc. v. Strange*, 33 F. Supp. 3d at 1333-34 (describing history of violence against abortion providers and decline in the number of clinics in Alabama in recent years).

(ii) Potassium-chloride injections carry serious risks to the patient. Because potassium chloride has harmful effects on the heart, inadvertently injecting it into the woman's circulation can endanger the patient. Tr. Vol. I (doc. no. 110) at 29:2-7; Biggio Decl. (doc. no. 81-1) ¶ 9. In one instance reported in the medical literature, a woman suffered cardiac arrest because potassium chloride was accidently injected into one of her blood vessels instead of the fetus. Tr. Vol. I (doc. no. 110) at 42:2-8. Injections of potassium chloride may also increase the risk of uterine perforation and infection, due to the inherent risks associated with transabdominal injections. *Id.* at 29:3-5, 43:16-22, 80:6-8; Tr. Vol. II (doc. no. 111) at 21:5-9. No systemic study on the efficacy or safety of the procedure before standard D&E is available, rendering the procedure experimental. Tr. Vol. I (doc. no. 110) at 29:21-30:3, 44:4-11.

(iii) Physical conditions common to many women can make potassium-chloride injection extremely difficult or

impossible.  Obesity, fetal and uterine positioning, and presence of uterine fibroids may complicate or even prevent the administration of the injections in many women.  Tr. Vol. I (doc. no. 110) at 40:4-42:1.

First, obesity can make it difficult for physicians to guide the needle through the abdomen into the uterus, for two reasons: the additional tissue in the patient's abdomen reduces the quality of the ultrasound images, making it more difficult to find the fetus; and the needle must travel through more tissue in order to get to the uterus.  Tr. Vol. I (doc. no. 110) at 40:11-20, 61:1-6; Tr. Vol. II (doc. no. 111) at 139:3-15.  Obesity is common in the Tuscaloosa and Huntsville clinics' patient population; indeed, about 40 % of the patients at the Huntsville clinic are obese.  Tr. Vol. I (doc. no. 110) at 197:1-2; Tr. Vol. II (doc. no. 111) at 61:17-19. Second, fetal and uterine positioning can affect whether the physician is able to get to the fetus with a needle. Tr. Vol. I (doc. no. 110) at 61:18-25.  Because fetal positioning changes throughout pregnancy, a doctor is

unable to know whether fetal and uterine positioning pose a problem for the injection until the woman receives an ultrasound immediately prior to the procedure. Third, uterine fibroids, which are benign tumors on the uterine walls affecting over half of women, can get in the needle's way, because they can become calcified and impenetrable. Tr. Vol. I (doc. no. 110) at 40:21-41:4, 61:18-25, 197:3-4. All four of these factors can make it difficult--or even impossible--for the needle to reach the fetus or even the amniotic fluid. Thus, many women seeking abortions in Alabama would not be good candidates for potassium-chloride injections.

***

Because it is a technically challenging procedure that carries serious health risks, because there is no practical way for the plaintiffs or any other outpatient abortion providers in Alabama to receive training to perform the procedure safely, and because common conditions would render the administration of potassium-chloride difficult or impossible for many women

who seek second-trimester abortions in Alabama, the court finds potassium-chloride injection unavailable as a method for achieving fetal demise.

### d. Digoxin Injection

The final method that the State argues the Alabama clinics could use to induce fetal-demise prior to standard D&E is digoxin injection. To inject digoxin, physicians begin by using an ultrasound machine to visualize the woman's uterus and the fetus. The physician then inserts a long surgical needle through the patient's skin, abdomen, and uterine muscle, in order to inject digoxin into the fetus. If the attempt to inject into the fetus fails, the physician may inject digoxin into the amniotic fluid, but evidence suggests this is generally less effective. Digoxin injection, when it works, takes up to 24 hours to stop the fetal heart. Physicians cannot accurately predict how long digoxin will take to work in a given patient. Tr. Vol. I (doc. no. 110) at 59:25-60:11, 68:6-9. As with

potassium-chloride injections, digoxin injections are painful and invasive because they are administered through a transabdominal needle without anesthesia. Tr. Vol. I (doc. no. 110) at 44:12-22, 75:25-76:6, 196:3-6.

The court concludes that digoxin injections are not a feasible method of causing fetal demise in the Alabama clinics for the following reasons.

(i) First, digoxin injections are not reliable for inducing fetal demise. When injected into the fetus or amniotic fluid, digoxin has a failure rate ranging between 5 % and 15 %. Tr. Vol. I (doc. no. 110) at 64:1-8; Tr. Vol. II (doc. no. 111) at 142:4-10. The State suggested that when fetal demise is not successful after the first injection, a second injection of digoxin could be attempted. However, no study has established the appropriate dosage, potential risks, or time to fetal demise for administering a second injection of digoxin. Tr. Vol. II (doc. no. 111) at 142:12-25. Further, performing a second injection is not acceptable medical practice because its safety remains untested. Davis

Decl. (doc. no. 54-5) ¶ 28.  The State further argued
that, in those 5 to 15 % of cases where an initial digoxin
injection failed, the physician could try a different
method of fetal demise.  But, as discussed earlier, there
are no other viable methods in the plaintiff clinics.
Requiring digoxin injection would force women to undergo
an unreliable method of fetal demise, and, in cases where
fetal demise is not achieved by the first injection,
would mandate physicians to experiment with the right
dosage for the second injection.

(ii) The lack of reliability is compounded by the
fact that, as with potassium-chloride injections, a
variety of factors, such as uterine positioning, fetal
positioning, obesity, and the presence of uterine
fibroids, can affect whether the physician is able to
inject digoxin into the fetus or the amniotic fluid
successfully.  As noted above, a high percentage of the
patients at the plaintiff clinics are obese, and over
half of all women suffer from fibroids.  Further, uterine
and fetal positioning can make the injection impossible,

and cannot be predicted ahead of the procedure. As a result, digoxin injections will not be possible for many patients seeking to have an abortion at the plaintiff clinics.

(iii) Digoxin injections are experimental during the time period when most Alabama women receive abortions using the D&E procedure. The majority of studies on digoxin injection focus on pregnancies at or after 18 weeks: only a few studies have included cases at 17 weeks, and no study has been done on the efficacy, dosage, or safety of injecting digoxin into women before 17 weeks of pregnancy. Tr. Vol. I (doc. no. 110) at 67:7-14; Tr. Vol. II (doc. no. 111) at 143:18-25. Because there are no studies for this gestational period, digoxin injections remain experimental for women before 18 weeks of pregnancy--the period during which most second-trimester abortions in Alabama are performed. Donald Decl. Ex. C, Induced Terminations of Pregnancy Occurring in Ala. (doc. no. 81-14) (showing that 80 % of abortions performed in 2014 at or after 15 weeks occurred

between 15 to 18 weeks). As with the experimental nature of umbilical-cord transection, requiring digoxin injection before 18 weeks of pregnancy would force women to go through an experimental, potentially harmful medical procedure.

(iv) Even when effective at inducing fetal demise with one dose at or after 18 weeks, digoxin injections carry significant health risks. The parties' experts agreed, and the court so finds, that digoxin injections are associated with heightened risks of infection, hospitalization, and spontaneous labor and extramural delivery--that is, the unexpected and spontaneous expulsion of the fetus from the uterus while the woman is outside of a clinic setting without any medical help--compared to standard D&E alone. There is no dispute among experts that digoxin injection is six times more likely to result in hospitalization compared to injection of a placebo; that it carries an increased risk of infection over standard D&E; and that it is twice as

likely as amniocentesis[30] to result in extramural delivery.  Tr. Vol. I (doc. no. 110) at 170:22-171:2, 153:15-154:6; Tr. Vol. II (doc. no. 111) at 153:2-8. Spontaneous expulsion of the fetus can cause bleeding and require medical attention, aside from being very upsetting to the woman.[31]  Because of these documented

_____

30. Amniocentesis is a testing procedure used in high-risk pregnancies, whereby a needle is used to extract amniotic fluid from the uterus.  The State argued that the risks associated with digoxin injection are comparable to this procedure.  In addition to the undisputed fact that digoxin injection is riskier than amniocentesis, the analogy fails: amniocentesis is a procedure that only a small subset of women--those with high-risk pregnancies--*elect* to undergo in order to obtain vital information about the health of the fetus. In contrast, the digoxin injection (or other fetal-demise method) would be State-mandated for *all* women, would provide no benefit to the patient, and would not be in any sense medically necessary.

31. This complication would have even worse consequences for women surrounded by people who do not support their decision to terminate a pregnancy, or if they have abusive partners who find out about the abortion due to a medical emergency caused by extramural delivery.  Tr. Vol. I (doc. no. 110) at 72:1-13; *see also Casey*, 505 U.S. at 887-98 (majority opinion) (striking down the spousal-notification requirement based on concerns about abused women seeking abortion).

risks, the Society of Family Planning, a professional organization for family planning, stated that in order to justify "the harm of the documented increase in spontaneous labor and extramural delivery, along with an increase in vomiting seen in the one blinded digoxin RCT [randomized control trial], in addition to any more infrequent risks, a significant increase ... in D&E safety would seem warranted." Tr. Vol. I (doc. no. 110) at 26:20-24, 28:2-7.[32]

One of the plaintiffs' experts testified that between 2007 and 2011, in order to avoid the risk of violating the federal partial-birth abortion ban, his former

_____

32. The State argued that these fetal-demise procedures do not introduce new categories of risks that are not already present in standard D&E. *See*, *e.g.*, Tr. Vol. II (doc. no. 111) at 13:15-22. However, the significant risk of spontaneous labor and extramural delivery associated with digoxin does not apply to standard D&E. Tr. Vol. II (doc. no. 111) at 150:2-6. This means that digoxin injection introduces a new category of significant risk into second-trimester abortion procedures. More to the point, *Casey* simply asks whether the law imposes "significant health risks" on women, rather than asking whether an alternative procedure introduces new types of risks. *Casey*, 505 U.S. at 880.

employer required digoxin injections for abortions at or after 20 weeks.  Tr. Vol. II (doc. no. 111) at 82:5-12. This was before more research on digoxin injections showed that the procedure carries significant risks of extramural delivery, infection, and hospitalization.  Tr. Vol. I (doc. no. 110) at 70:6-71:16.  The expert explained that his former employer's past practice is distinguishable from legally requiring digoxin use before all standard D&E for two reasons.  First, in the case of the employer's elective digoxin use, when the first dose failed, the physician could stop attempting fetal demise and perform standard D&E without facing criminal liability; therefore, the physician was not required to administer an experimental second dose of digoxin. Second, the policy was never applicable to pregnancies before 18 weeks, because it would have been experimental for those women.  In other words, even before research showed that digoxin injections carry significantly greater risks of extramural delivery and hospitalization, digoxin injections were never used for pregnancies before

18 weeks--the time during which the majority of second-trimester abortions in Alabama are sought. Were the fetal-demise law to go into effect here, in contrast, the physicians would have to use digoxin before 18 weeks, and would have no other, non-experimental option were the first injection unsuccessful; the patient would simply be unable to have an abortion.

(iv) The use of digoxin injections as a fetal-demise method would impose serious logistical obstacles to abortion access. For the vast majority of women in Alabama, standard D&E is a one-day procedure. Second Parker Decl. (doc. no. 54-6) ¶ 13; Robinson White Decl. (doc. no. 54-4) ¶ 20. Requiring a digoxin injection increases the procedure from one day to two: women undergoing digoxin injection would be required to make an additional trip to the clinic 24 hours prior to their D&E procedure appointment for the injection. *See Whole Woman's Health*, 136 S. Ct. at 2313 (external factors that affect women's ability to access abortion care--such as increased driving distance--should be considered as an

additional burden when conducting the undue burden analysis).  This would be in addition to the counseling session and 48-hour waiting period mandated by Alabama law.  Accordingly, if digoxin injection were used to induce fetal demise, a patient seeking an abortion would have to meet with the physician at least three times over four days all for a 10- to 15-minute procedure: first, to receive the required informed-consent warning; second, at least 48 hours later, to undergo the digoxin injection; and third, at least 24 hours later, to have the physician determine whether fetal demise was achieved and if so, to receive the standard D&E procedure.  Tr. Vol. I (doc. no. 110) at 202:23 - 204:11.  And, in the 5 to 15 % of cases where the first digoxin injection would fail, an additional visit would be required.

The burden of having to make multiple trips for the procedure is especially pronounced for the population of women who seek second-trimester abortions in Alabama. Most women who come to the Tuscaloosa and Huntsville clinics are low-income: 82 % of patients at the

Tuscaloosa clinic live at or below 110 % of the federal poverty level, and 60 % of patients at the Huntsville clinic receive financial assistance.[33]  Second Gray Decl. (doc. no. 54-1) ¶ 45; Tr. Vol. I (doc. no. 110) at 206:18-23.  Travel is not free, and the burdens of additional trips is compounded by the fact that low-income patients often do not have access to a car.  Second Katz Decl. (doc. no. 54-11) ¶ 22 (estimating more than one in four patients does not have access to a car).  As this court found in *Planned Parenthood Southeast, Inc. v. Strange*, getting to an abortion clinic is expensive and difficult for low-income women: they are more likely to depend on public transportation, ask friends or relatives for rides, or borrow cars; they are unlikely to have regular sources of childcare; they are more likely to work for a job that pays hourly, without any paid time off, or to receive public benefits that require

---

33.  The court notes that 25.2 % of Tuscaloosa's population lives below the poverty line, as do 17.6 % of Huntsville residents.  Katz Decl. (doc. no. 54-11) ¶ 8.

regular attendance of meetings or classes.[34]  *Planned*

*Parenthood Se.*, 33 F. Supp. at 1357; Second Katz Decl.

(doc. no. 54-11) ¶ 16-34.  Having to make yet another

trip to the clinic in order to receive the digoxin

injection would exacerbate the patients' difficulties,

especially if they are traveling long distances to get

to the clinic; for some of them, the procedure would

become time- and cost-prohibitive.  Depending on how far

away from the clinic the woman lives--and some women live

as far as five hours away by car, presumably far more by

bus--undergoing digoxin injection before D&E could

require a woman to miss four or even five days of work.[35]

_____

34.  The medical director of the Huntsville clinic
also described the difficulties that her patients face
with arranging child care, traveling far distances to the
clinic, and affording shelter during the trip. For
example, some women who are unable to afford staying at
a hotel sleep in the parking lot of the clinic.  Tr. Vol.
I (doc. no. 110) at 207:9-11.

35.  Dr. Robinson White credibly testified that
because at least 88 % of women live in a county with no
abortion provider, women travel from as far as
Mobile--which is about five hours away by car--to the
Huntsville clinic.  Tr. Vol. I (doc. no. 110) at 207:8-
9; *see also* Tr. Vol. I (doc. no. 110) at 203:8-13

Faced with what will be, for many, an insurmountable
financial and logistical burden, some low-income women
would not be able to have an abortion at all.

***

Because the court has found that umbilical-cord
transections and potassium-chloride injections are not
feasible and unsafe in the Alabama clinics, and therefore
unavailable, digoxin injection is the only remaining
alternative for inducing fetal demise. Based on the
unreliability of the procedure, the experimental nature
of the procedure for women before 18 weeks of pregnancy
and for injecting a second dose of digoxin, the increased
risks of complications beyond standard D&E alone, the

_____

(describing how the fetal-demise requirement would
increase the number of trips a woman seeking an abortion
would have to make from two to three or four); Tr. Vol.
II (doc. no. 111) at 37: 21 - 38:5 (explaining that women
travel to the Huntsville clinic from west Alabama and
southern Alabama). Patients traveling these great
distances would either have to make at least three
lengthy round trips to the clinic over a four-day period,
or travel and stay in the area over the four days. Either
option would require the patient to take a number of days
off work, including an additional day in the event that
she would need to leave the day before to make it to the
appointment.

travel burden, and the pain and invasiveness of the procedure, the court finds that digoxin injection is not a feasible method of inducing fetal demise before standard D&E in Alabama clinics.

## e. Findings on Experts

Before analyzing the impact of the proposed use of these three methods on the availability of second-trimester abortion in Alabama, the court pauses here to explain certain findings with regard to the testimony of the parties' experts, both as a general matter and on particular topics.

The court makes these general findings regarding two of the experts who testified at the hearing. Dr. Anne Davis, one of the plaintiffs' experts, was highly credible and knowledgeable about the fetal-demise methods, the strengths and weaknesses of various types of studies, the provision of abortion, and, in particular, the practical realities of provision of abortion in outpatient clinics such as the Tuscaloosa and

Huntsville clinics.  In contrast, the court found that Dr. Joseph Biggio, the State's expert, has expertise in the provision of potassium-chloride injections in an academic medical center, but that he has significantly less expertise than the plaintiffs' experts on abortion in general, because he does not in any sense specialize in abortion and has performed far fewer such procedures. In particular, he did not evince significant knowledge of the provision of abortion in outpatient-clinic settings or the conditions that exist in those clinics, and his testimony as to digoxin injection and umbilical-cord transection was largely theoretical and not based on experience.  Accordingly, the court gave his testimony less weight based on those concerns.

While the State's expert opined that umbilical-cord transection would be feasible in the Tuscaloosa and Huntsville clinics, the court found this suggestion unconvincing in part because he did not recognize the differences between the type of specialized hospital where he practices and the clinics.  Dr. Biggio practices

at a major academic hospital, and testified that with a certain type of advanced ultrasound machine, a physician should be able to locate the umbilical cord easily. However, the Tuscaloosa and Huntsville clinics do not have these advanced ultrasound machines, and these devices cost $ 50,000 to $ 100,000. Tr. Vol. I (doc. no. 110) at 43:10 13, 198:16 199:9. Likewise, in the case that a patient experienced significant blood loss during the umbilical-cord transection procedure, Dr. Biggio would have the resources of a major hospital--including access to blood services--to address the problem, which the plaintiff clinics lack. Furthermore, the State's expert has never attempted umbilical-cord transection, which rendered his testimony far less probative than that of the plaintiff's expert, Dr. Davis, who had.

While agreeing that plaintiff physicians would need to observe a number of procedures in order to learn how to perform a potassium-chloride injection safely, Dr. Biggio estimated that it would take only 10-20 procedures for the plaintiffs to learn to inject potassium chloride

for purposes of performing abortions in the outpatient clinics. Tr. Vol. II (doc. no. 111) at 119:6 14. The court viewed this estimate as unreasonably low given the technical difficulty of the procedure, the severity of the potential health risk to the woman, and the difference in technological and emergency resources between the academic hospital where the State's expert works and the plaintiffs' outpatient clinics. Based on these issues, as well the fact that the plaintiffs' expert's opinion was based on consultation with a leading expert in the use of potassium chloride, the court credited the plaintiffs' expert's testimony on this issue, and rejected that of the State's expert.

### 2. Impact on Availability of Second-Trimester Abortions

Having discussed the mechanisms and risks of the three proposed fetal-demise methods, the court turns to the aggregate impact of the law mandating fetal demise before standard D&E on women's access to second-trimester abortions in Alabama. As mentioned above, the

undue-burden analysis requires the court to consider the "real-world" impact of the proposed regulation. Accordingly, the court considers the impact of the fetal-demise law on the availability of abortions for Alabama women at 15 or more weeks of pregnancy who would otherwise receive a standard D&E abortion at either the Huntsville or Tuscaloosa clinic.

The State argues that it has no obligation to come up with one fetal-demise method that works for all women; standard D&E itself does not work for every woman, and the State is not requiring that any specific method be used for all women because, in theory, women have three options from which to choose.  However, if none of the proposed fetal-demise methods works for women who would otherwise have been able to receive standard D&E, the fetal-demise requirement would impose a substantial burden on those women.  Furthermore, if available options expose women to significant health risks, the fetal-demise requirement would impose a substantial burden on women seeking to terminate their pregnancy.

Based on the factual findings discussed above, it is clear that the fetal-demise requirement would significantly reduce access to pre-viability second-trimester abortions in Alabama. The court finds it apparent that these burdens go beyond having "the incidental effect of making it more difficult or more expensive to procure an abortion," *Gonzales*, 550 U.S. at 158; should the fetal-demise law stand, Alabama women will be altogether unable to access a safe abortion at or after 15 weeks of pregnancy.

There are a number of burdens that the vast majority of woman seeking a second-trimester abortion would face under the fetal-demise law. All women seeking a second-trimester abortion in Alabama would have to endure a medically unnecessary, invasive procedure that increases the duration of the procedure as well as the risk of complications. Davis Decl. (doc. no. 54-6) ¶ 19 ("The American Congress of Obstetricians and Gynecologists ('ACOG') has stated that there is no sound medical basis for requiring abortion providers to induce

fetal demise prior to performing a D&E. According to the ACOG, 'No evidence currently supports the use of induced fetal demise to increase the safety of second-trimester medical or surgical abortion.'"). These women will be unique: there is no other medical context that requires a doctor--in contravention of her medical judgment and the best interests of the patient--to administer a procedure that delivers no benefit to the patient. *Id.* at ¶ 18. For many women, the fetal-demise law would increase the length of the procedure from one day to two--not including the mandatory visit 48 hours before attempting fetal demise--increasing all accompanying costs of travel and/or lodging. This delay and extra cost would be particularly burdensome for low-income women, many of whom end up seeking a second-trimester abortion (rather than a first-trimester abortion) precisely because of the time it took them to gather money to cover these costs.

Other burdens of the fetal-demise law depend on the gestational period of the woman seeking the abortion, who

can be put into two groups: those whose pregnancies are between 15 and 18 weeks, and those whose pregnancies are between 18 and 22 weeks.[36] The first group is significantly larger than the second group: approximately 80 % of women who obtain abortions at or after 15 weeks in Alabama do so between 15 and 18 weeks of pregnancy. Donald Decl. Ex. C, Induced Terminations of Pregnancy 2014 Report (doc. no. 81-14) at 13. This group, under the fetal-demise law, would have no avenue for obtaining an abortion in Alabama. First, as discussed above, umbilical-cord transection and potassium-chloride injections would be unsafe and are not at the plaintiff clinics; even if they were attempted, the size of the fetus at this stage of pregnancy would make the procedures extremely technically difficult. Second, digoxin injections are virtually unstudied for this group of women--no data on dosage, safety, or side effects

---

36. Twenty-two weeks after the last menstrual cycle is the latest point at which Alabama allows abortions, unless a health exception can be invoked. 1975 Ala. Code § 26-23B-5.

exist; in other words, women would have to undergo an experimental procedure with significant health risks in order to have an abortion.  In sum, for women between 15 and 18 weeks of pregnancy--the majority of the population affected by the law--none of the three procedures are available in any practical sense in Alabama; in other words, the fetal-demise law would operate as an absolute barrier to these women's access to pre-viability abortions.

For those whose pregnancies are at 18 weeks or later, their access to pre-viability abortion would be substantially burdened by significant health risks that would be absent if not for the fetal-demise requirement. First, potassium-chloride injection is not available on an outpatient basis in Alabama.  Second, while not as difficult as in pre-18 week pregnancies, cord transection is technically difficult, unreliable, and unsafe, due to the significant risk of blood loss.  Third, digoxin injections increase the risk of extramural delivery, infection, and hospitalization and fail 5 to 15 % of the

time, and no appropriate dosage, timing, or side effects of a second dose are known.  This means that in addition to being subject to heightened risks of complications, for up to one out of every six women undergoing the procedure, digoxin would fail, and the patient would be caught between a rock and a hard place: either elect an experimental second dose of digoxin, undergo another unsafe procedure with its attendant risks at the hands of a physician with no training, or give up the right to have an abortion.

The interplay among the three proposed fetal-demise methods illustrates that each method suffers from significant flaws, thereby significantly reducing the availability of second-trimester abortions and making obtaining an abortion substantially more burdensome.  The State's claim that women have three options does not negate the fact that for most women who would have been previously able to get standard D&E--a safe and commonly used procedure for women after 15 weeks of

pregnancy--none of the three 'alternatives' would be safe or feasible.

Indeed, one of plaintiff's experts credibly testified about how the flaws in these fetal demise methods could be expected to interact in the real world. Dr. Davis testified that, because she was hoping to perform an intact D&E, which she believed to be safer at a later gestational age, she attempted fetal demise to comply with the federal ban on intact D&E. She first tried digoxin, which failed to work; then she attempted the potassium-chloride injection. Despite being highly trained in the field of abortion care, she was unable to successfully inject potassium chloride into the fetal heart, even at or after 20 weeks of pregnancy. Tr. Vol. I (doc. no. 110) at 52:11 - 53:14, 136:7 16. She did not find it safe to perform cord transection. At that point, she still had the option of performing standard D&E without fetal demise, which is what she did. However, had the fetal demise requirement been in effect for

standard D&E, she would not have been able to provide the abortion.

When a woman is forced to undergo an unwanted, risky, invasive, and experimental procedure in exchange for exercising her right to choose an abortion, her right is substantially burdened. A regulation that "as a practical matter, [] forces a woman and her physician to terminate her pregnancy by methods more dangerous to her health than the method outlawed" cannot withstand constitutional challenge. *Danforth*, 428 U.S. at 79. Indeed, would we want ourselves, our spouses, or our children to undergo an unnecessary medical procedure for which the documented safety and effectiveness is comparably lacking? The court finds that the State should not ask otherwise of Alabama women seeking pre-viability abortions.

The State suggests that mandating fetal demise does not burden women's access to pre-viability second-trimester abortion because some doctors have chosen to perform fetal-demise procedures before standard

or intact D&E. This argument fails to appreciate the distinction between elective and government-mandated surgical procedures. In the absence of a legal requirement that fetal demise must be achieved, a physician and a patient can discuss the risks and determine the best course of action for that woman's particular medical needs and based on that woman's particular desires. In that context, a physician and her patient may elect a fetal-demise procedure because the patient wants it.

On the other hand, when the State requires that every woman getting a second-trimester abortion must go through an extraneous procedure, what was an acceptable health risk in the context of a physician recommending the procedure and a patient giving informed consent turns into a much higher risk, for two reasons: first, the State is turning a rare procedure that was done only in the context of pregnancy of multiples (potassium-chloride injections) or late-stage pregnancies (digoxin injections) into a requirement for practically all women

getting an abortion at or after 15 weeks, greatly increasing the number of women who are subject to the heightened health risks; second, the State is mandating the procedure on women, even for whom the procedure is especially risky, without their consent. *See Casey*, 505 U.S. at 857 (stating that *Roe v. Wade*, 410 U.S. 113 (1973) and its progeny may be seen as a rule of "bodily integrity, with doctrinal affinity to cases recognizing limits on governmental power to mandate medical treatment or to bar its rejection.").

Further, the court cannot find that the health-exception functions as a fail-safe; it does not nullify the burden the fetal-demise requirement creates on women's access to second-trimester abortion. As noted earlier, the statute provides that, if the physician in reasonable medical judgment decides that "the child's mother has a condition that so complicates her medical condition that it necessitates the abortion of her pregnancy to avert her death or to avert serious risk of substantial and irreversible physical impairment of a

major bodily function, not including psychological or emotional conditions." 1975 Ala. Code § 26-23G-2(6). The State argues that the health exception would kick in in the situation in which a fetal-demise procedure fails and poses a significant health risk to the patient. In particular, the State argues that whenever cord transection fails, then the health exception would apply, and that in some of the cases where digoxin or potassium-chloride injections fail, the health exception might apply.

The State's arguments are not convincing. First, the existence of a health exception does not address the fact that no training is available for technically difficult procedures like potassium-chloride injections and cord transection, or that no data are available on the appropriate dosage, timing, and risks of digoxin for women between 15 and 18 weeks of pregnancy, or for a second dose of digoxin should the first dose fail. Second, because the fetal-demise procedures themselves impose significant health risks (and therefore the State

cannot constitutionally require them under *Gonzales*), a health exception to address those health risks cannot alter the fact that such procedures are not constitutional: a medical exception cannot save an otherwise unconstitutional ban. *See Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 340 (6th Cir. 2007) (holding that a general ban on standard D&E imposed an undue burden and that "it is unnecessary ... to address exceptions to an unconstitutional and unenforceable general rule").

Third, counsel's assertion as to how the health exception would be construed are not determinative of how the exception would actually be enforced. *See Stenberg*, 530 U.S. at 941 (rejecting the Attorney General's interpretation of the statute and warning against accepting as authoritative an Attorney General's litigation position when it does not bind state courts or local law enforcement authorities); 1975 Ala. Code § 12-17-184 (showing that district attorneys have independent authority to prosecute "all indictable

offenses"). In fact, evidence suggests that the health exception, as written, will not operate in the way that the State's counsel described, given the history and usage of such exceptions in other abortion regulation contexts in Alabama. *See*, *e.g.*, Report of Induced Termination of Pregnancy, ADPH-HS-10 (doc. no. 89-2) at 7. Alabama prohibits abortion at or after 22 weeks unless a health exception can be invoked; this health exception's language is identical to the one included in the fetal-demise law. According to hearing testimony and the State administrative form for reporting abortions, the Alabama Department of Public Health has interpreted this language to require actual serious and life-threatening conditions such as "severe preeclampsia" or "life threatening sepsis," rather than the *risks* of developing such conditions. Tr. Vol. II (doc. no. 111) at 148:1-16. In other words, the plaintiffs would have to wait until their patients are in extremely serious danger before they could safely

invoke the health exception and proceed to performing a D&E with first inducing fetal demise.

Even the plain language of the exception makes it evident that it sets an extremely high threshold: the exception would not apply unless there is a "*serious* risk of *substantial* and *irreversible* physical impairment of a *major* bodily function." 1975 Ala. Code § 26-23G-2(6) (emphasis added). The words "serious risk" and "substantial" set the bar high; the word "irreversible" raises the bar to another level entirely. The applicability of the health exception, by its terms, turns on whether there is a serious risk of substantial, permanent disability. The physician could not invoke the health exception where the patient, while at serious risk of grave illness, would likely recover from the illness eventually, no matter how long that recovery would take. Take, for example, a patient undergoing serious blood loss during an unsuccessful attempt at umbilical-cord transection: if the physician assessed that patient as being in a serious risk of being bedridden for six months

as a result of that blood loss, but thought that she would probably recover without permanent disability, the health exception would not apply. Due to its extremely limited application, the health exception provides vanishingly little protection for patients or doctors.

Most significantly, the exception would not protect against the grave health risks arising from cord transection because the procedure does not 'fail' at a discrete point that would trigger the health exception. The blood loss accompanying the cord transection procedure happens on a continuum: the longer the transection procedure takes, the greater the risk of serious blood loss becomes. Therefore, in order to trigger the health exception, the physician would have to make a difficult snap judgment on the murky issue of whether the blood loss has reached a level at which the health exception can be safely triggered and the physician can stop blindly attempting to transect the cord and proceed to standard D&E. To be sure, the statute's health exception is governed by a

reasonableness standard; however, here that reasonableness would be determined post-hoc in a proceeding in which the physician would face criminal prosecution, in a State in which these physicians are already working in a hostile climate.

The fetal-demise law also burdens Alabama women by reducing the number of doctors in Alabama able and willing to perform abortions. First, not all residency programs train doctors in standard D&E, so finding doctors trained in abortion care and willing to practice in Alabama proves difficult for abortion providers. *Practice Bulletin: Second Trimester Abortion*, 121 Obstetrics & Gynecology 1394, 1395 (2013) ("Dilation and evacuation training is not available in all residency programs, and many residents trained in D&E have not performed a sufficient number of procedures to achieve competency in the technique.") The fetal-demise requirement tacks on an additional training requirement--training that is not readily available to Alabama doctors--on the already few doctors trained in

standard D&E in Alabama.  Second, the fetal-demise law would increase the difficulty of finding doctors to work in Alabama because it imposes a requirement that doctors could view as compromising their ethical obligations to patients.  The medical directors of both clinics testified as to having difficulty finding doctors trained and willing to provide abortion services; they further testified that, if forced to induce fetal-demise before every D&E, they would stop performing second-trimester abortions in order to comply with their ethical obligation of beneficence--doing what is in the best interest of patients.  Second Parker Decl. (doc. no. 54-6) ¶ 16; Robinson White Decl. (doc. no. 54-4) ¶ 25. While the State argues it cannot be held responsible if doctors elect not to perform abortions under the new regulations, the court disagrees.  The law imposes an affirmative obligation on doctors to perform an unsafe procedure--with no medical benefit to the patient--for

which they are not trained.[37]  Doctors are subject to
liability for violations of ethical duties,[38] and these
doctors believe--in part based on guidance from the
American College of Obstetricians and Gynecologists, as
well as the Society of Family Planning--that
administering a risky, experimental procedure for which
they are not trained that delivers no benefit to the
patients violates that code of ethics.  *See* Davis Decl.
(doc. no. 54-5) ¶ 18-19.  The court cannot find these
doctors to be unreasonable for refusing to expose
themselves to liability, in addition to the harassment

_____

    37.  This is not a matter of giving doctors
"unfettered choice" in abortion procedures.  *Gonzales*,
550 U.S. at 163.  As the evidence demonstrated, the
fetal-demise law offers doctors no "reasonable
alternative procedures." *Id.*  Here, doctors are required
to take an affirmative adverse action against patients
by performing one of the three risky fetal-demise
methods, or not performing the abortion at all.

    38.  Douglas NeJaime & Reva Siegel, *Conscience Wars:
Complicity-Based Conscience Claims in Religion and
Politics*, 124 Yale L.J. 2516, 2534 ("Licensing boards
enforce professional standards against healthcare
institutions, doctors, nurses and pharmacists. Tort law,
and specifically medical malpractice, provides redress
to patients injured by breaches of professional
duties.").

126

and abuse they already face as doctors practicing abortions in Alabama. Further, given the ethical concerns and the climate of hostility doctors face, combined with the testimony of both clinic directors demonstrating the difficulty of finding doctors trained and willing to perform abortions in Alabama, this ethical hurdle will likely further dissuade other doctors from coming to the State to take the place of the current doctors. While these considerations alone may not constitute an undue burden, together with the other findings by the court, they further contribute to the court's conclusion that the fetal-demise law would impose a significant obstacle to abortion access at and after 15 weeks of pregnancy.

***

As stated above, to determine whether a law regulating abortion constitutes an undue burden on the right to terminate a pregnancy before viability, the court must consider the State's interests underlying a law in conjunction with the obstacles imposed by the law

to women's access to abortion under the *Casey* undue-burden test.

While the court assumes the State's interests are legitimate, it is clear that the State cannot pursue its interests in a way that completely denies women the constitutionally protected right to terminate a pregnancy before the fetus is viable: as important as the State's professed interests in the dignity of the fetal life and the regulation of the medical profession, those interests cannot be considered in isolation; they must be considered in the context of women's right to elect a pre-viability abortion, and that right must remain free of undue state interference and substantial obstacles regardless of the legitimacy of state interests. *Casey*, 505 U.S. at 846. Indeed, the State does not contend that the fetal-demise law can stand in the absence of alternative procedures.

Here, the State contends that its interests are sufficiently strong to justify the burdens the fetal-demise law would impose on Alabama women because

they would retain the ability to terminate pregnancy at or after 15 weeks.  The State's argument is premised on the idea that it is feasible for the only clinics that provide elective abortions starting at 15 weeks of pregnancy to utilize the three fetal-demise methods before performing the most common second-trimester abortion method.  However, for the reasons discussed above, the court concludes that the proposed fetal-demise methods are not feasible for inducing fetal demise before standard D&E at the Alabama clinics.  Therefore, if the court were to allow the fetal-demise law to go into effect, Alabama women would likely lose their right to pre-viability abortion access at or after 15 weeks.  The State's interests, although legitimate, are not sufficient to justify such a substantial obstacle to the constitutionally protected right to terminate a pregnancy before viability.

Because the State's interests are insufficient to overcome the denial of Alabama women's right to terminate a pre-viability pregnancy at or after 15 weeks, and

because the fetal-demise law would place substantial, and even insurmountable, obstacles before Alabama women seeking pre-viability abortions, the court concludes that the law constitutes an undue burden on abortion access and is unconstitutional.


## VII. GONZALES

In briefs filed before the hearing as well as in the briefs filed after the preliminary injunction was entered, the State argued extensively that this case is controlled by *Gonzales v. Carhart*, 550 U.S. 124 (2007), which upheld a federal law banning the use of the intact D&E abortion procedure against a broad facial challenge; and that under *Gonzales*, the plaintiffs are not entitled to relief. On the contrary, the court's holding today is fully in keeping with *Gonzales*. In upholding the ban on intact D&E, the *Gonzales* Court first concluded that the ban did not prohibit the most common procedure for second-trimester abortions, standard D&E, and then analyzed whether the procedure that would remain legal

would in some circumstances pose more risk to the health of the woman than the prohibited procedure of intact D&E. Because the most common procedure--standard D&E--would remain an available and viable option for all women, and expert testimony conflicted as to whether the rarely used procedure, intact D&E, was ever safer, the Court found that the ban did not create a substantial obstacle to obtaining an abortion. In other words, because "there is uncertainty over whether the barred procedure is ever necessary to preserve a woman's health, given the availability of other abortion procedures that are considered to be safe alternatives," the Court upheld that ban on intact D&E. *Id*. at 166-67. While *Gonzales* thus found that legislative factual findings were due some deference amidst circumstances of "medical uncertainty," the Court also noted that courts "retain[] an independent constitutional duty to review factual findings where constitutional rights are stake." *Id.* at 165. Consequently, the Court's deference to the legislature was not "uncritical," and legislative

findings were not given "dispositive weight."  *Id.* at 165-66.

With regard to the fetal-demise law, the State argues that under *Gonzales*, any time there is medical uncertainty about whether a procedure is safe or even when there are unknown risks of an experimental procedure, the legislature can further the State's interest in promoting respect for fetal life by requiring physicians to use that medical procedure to perform an abortion.  The court disagrees, for several reasons.

First, the Court in *Whole Woman's Health* squarely rejected a reading of *Gonzales*--and of the Court's abortion jurisprudence more broadly--as suggesting that "that legislatures, and not courts, must resolve questions of medical uncertainty." *Whole Woman's Health*, 136 S. Ct. at 2310.  The Court further contrasted the undue-burden standard with the Court's less searching review of economic legislation under *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483 (1955).  *Id.* at 2309-10.  "Instead, the Court, when determining the

constitutionality of laws regulating abortion procedures, has placed considerable weight upon evidence and argument presented in judicial proceedings." *Id*. at 2310 (discussing *Casey*, 505 U.S. at 888-94, and *Gonzales*, 550 U.S. at 165-66). Accordingly, district courts reviewing challenged abortion regulations must "consider[] the evidence in the record——including expert evidence, presented in stipulations, depositions, and testimony[,] [and] then weigh[] the asserted benefits against the burdens." *Id.*; *see also id*. at 2324 (Thomas, J., dissenting) ("[T]oday's opinion tells the courts that, when the law's justifications are medically uncertain, they need not defer to the legislature, and must instead assess medical justifications for abortion restrictions by scrutinizing the record themselves.").

In *Whole Woman's Health*, the Court noted, "Unlike in *Gonzales*, the relevant statute here does not set forth any legislative findings." 136 S. Ct. at 2310. In the absence of such findings, the district court there was "left to infer that the legislature sought to further a

constitutionally acceptable objective" and to "give significant weight to evidence in the judicial record." *Id*. Similarly, here, neither the school-proximity law nor the fetal-demise law contained legislative findings. Specifically, the fetal-demise law contained no findings as to the safety of alternative abortion methods, including the three alternatives--umbilical-cord transection, potassium-chloride injection, and digoxin injection--proposed by the State in this litigation, and there is no other evidence that these alternatives have been subject to scrutiny through the legislative fact-finding process. Moreover, there is no indication that the Alabama legislature relied on the safety of these alternatives in drafting the fetal-demise law. Without such findings, the court accordingly "consider[s] the evidence in the record--including expert evidence," and "give[s] significant weight" to that evidence. *Id.* at 2310. The court concludes on that basis that both the school-proximity law and the fetal-demise law, "while furthering a valid state interest, ha[ve] the effect of

placing a substantial obstacle in the path of a woman's choice [to have an abortion of a nonviable fetus," and are therefore unconstitutional. *Id.* at 2309 (quoting *Casey*, 505 U.S. at 877 (plurality opinion)).

In addition, the Court in *Gonzales* addressed a statute that banned a rarely used abortion method, intact D&E. 550 U.S. at 155 (noting that intact D&E constitutes "a small fraction of the overall number of D&E abortions"). In finding that the ban did not create a substantial obstacle, the Court relied heavily on the fact that the most common procedure--standard D&E--would remain available to all women under the statute. *Id.* at 150-54, 166-67 (noting "the availability of other abortion procedures that are considered to be safe alternatives"); *cf. Stenberg*, 530 U.S. at 945-46 (holding Nebraska ban on intact D&E unconstitutional because it was broad enough to allow prosecution of "physicians who use [standard] D&E procedures, the most commonly used method for performing pre-viability second trimester abortions"). By contrast, the Alabama fetal-demise law

has the effect of rendering the most common second-trimester abortion method, standard D&E, unavailable to women in Alabama. Indeed, this is precisely the method that *Gonzales* took care to note remained available. Because *Gonzales* dealt with a ban on one exceedingly rare form of abortion, it cannot be read to suggest that statutes that effectively ban common abortion methods--such as the fetal-demise law--should be upheld.

To the extent the State contends, relying on *Gonzales*, that a court should wait until the laws are in effect before determining whether they have imposed an undue burden warranting facial relief, this court disagrees. This 'wait-and-see' approach would require the court to wait--until the clinics close, until the doctors are prosecuted, until women in Alabama cannot access abortion--before holding an abortion regulation to be facially invalid. By this time, however, the damage will have been done. In addition to the interim harm to particular women's constitutional rights to access a

pre-viability abortion--a harm that cannot be undone once denied--the long-term viability of that right in the State may have been irreversibly compromised: doctors may not return to their practices; as the court's findings demonstrate, the plaintiff clinics--already in financial peril--are not likely to reopen. The court finds nothing in the Supreme Court's jurisprudence that requires courts to witness the deterioration of a constitutional right before acting to protect it.

Moreover, it is notable that the law at issue in *Gonzales* was a federal statute that imposed a nationwide ban, in contrast to the two Alabama statutes challenged here. *Gonzales* rejected the plaintiffs' "broad, facial attack" against that statute, and found that an as-applied challenge based on particular factual circumstances would have been more appropriate under the circumstances. 550 U.S. at 133, 167-68. As this court has observed, *Casey*'s undue-burden standard requires a "real-world analysis" of an abortion regulation's effects, *Planned Parenthood Se.*, 172 F. Supp. 3d at 1289,

including such relevant factors as "the nature and circumstances of the women affected by the regulation, the availability of abortion services, both prior to and under the challenged regulation, ... and the social, cultural, and political context." *Planned Parenthood Se.*, 33 F. Supp. 3d at 1342; *cf. Planned Parenthood Arizona, Inc. v. Humble*, 753 F.3d 905, 915 (9th Cir. 2014) (Fletcher, J.) (describing relevant factors to burdens analysis as including "the ways in which an abortion regulation interacts with women's lived experience, socioeconomic factors, and other abortion regulations"); *Planned Parenthood v. Van Hollen*, 738 F.3d 786, 796 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 2841 (2014) ("When one abortion regulation compounds the effects of another, the aggregate effects on abortion rights must be considered."). In other words, the undue-burden analysis focuses on factors that can vary greatly between jurisdictions; a regulation that places a substantial obstacle to women in one jurisdiction, based on a number of these factors, may not pose such an

obstacle in another jurisdiction where those factors do not exist.[39] *Gonzales*'s reluctance to entertain a broad challenge to a statute of nationwide application, in light of the jurisdiction-specific factors that may inform the undue-burden analysis, does not dissuade this court from holding that the Alabama laws challenged here create a substantial obstacle to women seeking pre-viability abortions in Alabama.

## VIII. SCOPE OF RELIEF

Finally, the court concludes that the school-proximity law is unconstitutional both as applied to the plaintiffs and facially and that the fetal-demise law is unconstitutional as applied to the plaintiffs.[40]

---

39. Indeed, the court does not reach whether Alabama's fetal-demise law might be constitutional in another jurisdiction where different conditions exist, such as where abortions are routinely available in specialized hospitals.

40. This court has previously discussed the law on facial versus as-applied relief in another abortion context. *See Planned Parenthood Se., Inc. v. Strange*, 172 F. Supp. 3d 1275, 1284 (M.D. Ala. 2016) (Thompson, J.).

A law restricting abortion is facially unconstitutional if, "in a large fraction of the cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895; *accord Whole Woman's Health*, 136 S. Ct. at 2320; *see also Reproductive Health Servs. v. Strange*, --- F. Supp. 3d ----, 2016 WL 4607253, at *21-22 (M.D. Ala. Sept. 2, 2016) (Walker, M.J.) (concluding that *Whole Woman's Health* confirmed that *Casey*'s large-fraction test applies to facial challenges to a statute regulating abortion). In the large-fraction test, one must use as the denominator those cases "in which the provision at issue is relevant," which is a narrower class than "pregnant women" or "the class of women seeking abortions." *Whole Woman's Health*, 136 S. Ct. at 2320 (citing *Casey*, 505 U.S. at 894-95) (internal quotations and alterations omitted).

The plaintiffs have amply demonstrated that the school-proximity law is unconstitutional as applied to them because the law imposes a substantial obstacle to

women seeking access to abortions at the plaintiff clinics. Whereas abortion in Tuscaloosa, Huntsville, and the surrounding areas is currently relatively accessible, the law would result in the closure the clinics and therefore eliminate the availability of abortion in Alabama at or after 15 weeks. Women at an earlier stage of their pregnancies would be required to travel long distances to obtain abortion care. Nor would these women be assured of the opportunity to obtain a timely abortion elsewhere, and some women would not be able to receive an abortion at all due to the delay or added travel time and costs. In contrast, the State has presented minimal evidence that requiring the existing clinics to relocate would further its asserted interests. As such, the plaintiff clinics have demonstrated that their substantive due process claim should prevail.

In addition, the school-proximity law is facially unconstitutional. As explained above, a law restricting abortion is facially unconstitutional if, "in a large fraction of the cases in which [the law] is relevant, it

will operate as a substantial obstacle to a woman's
choice to undergo an abortion." *Casey*, 505 U.S. at
888-95. During argument on the motion for preliminary
injunction, the plaintiffs contended that the fraction's
denominator--the class of women for whom the
school-proximity law would be relevant--should be all
women who would have sought abortion care at the
Huntsville and Tuscaloosa clinics. In contrast, the
State argued that the denominator should be all women who
receive abortion care at clinics throughout the State.
Under the plaintiffs' reading, practically all women who
would have sought abortions in Huntsville and Tuscaloosa
would be burdened by those clinics' closure. But even
under the State's approach, a large fraction of women in
Alabama would experience a substantial obstacle because
so many have relied on the Huntsville and Tuscaloosa
clinics. Indeed, the majority of women who receive
abortions in Alabama do so at the plaintiff clinics--and
for the most recent year for which complete statistics
are available, 70 % of women who obtained abortions in

Alabama received them at one of those locations. And of course, all Alabama women seeking abortion at or after 15 weeks would experience a substantial obstacle, as the only clinics they could have used would be closed. Thus, using either denominator, the court concludes that the school-proximity law will operate as a substantial obstacle, if not an absolute barrier, to a large fraction of the women for whom the law is relevant.

Beyond the closure of the plaintiff clinics as a result of the school-proximity law, all abortion clinics in Alabama would suddenly find themselves under threat of closure, dependent on the mercy of local zoning boards and school districts making school construction decisions. The law prohibits the Health Department from renewing the license of any abortion clinic located within 2,000 feet of a K-8 school; it makes no exception if a school is later built near a pre-existing clinic. For example, if a K-8 public school were built within 2,000 feet of the Mobile abortion clinic on December 1, 2017, then that clinic too would be required to move or

close at the year-end expiration of its license; given the difficulty of siting new clinics in Alabama's climate of hostility to abortion, the exclusion of areas within 2,000 feet of public K-8 schools, the extensive surgical-center requirements for buildings where Alabama abortion clinics operate, and the financial circumstances of any particular clinic, closure would be a significant risk.[41] This ever-present possibility would threaten the right of all women in Alabama to access an abortion.

Accordingly, the court holds that school-proximity law unconstitutional both facially and as applied to the plaintiffs.

---

[41]. The school-proximity law operates in conjunction with the surgical-center requirements law to limit the locations where abortion clinics can be located and to increase the expense of operating such clinics; the combined impact of these laws contribute to the undue burden on the right of women in Alabama to access a pre-viability abortion. *See Planned Parenthood v. Van Hollen*, 738 F.3d 786, 798-99 (7th Cir. 2013), *cert. denied*, 134 S. Ct. 2841 (2014) (Posner, J.) ("When one abortion regulation compounds the effects of another, the aggregate effects on abortion rights must be considered.").

Turning to the fetal-demise law, the parties agree that the plaintiffs brought a facial challenge to that statute. However, as the Supreme Court observed that in *Whole Woman's Health*, a "final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." 136 S. Ct. at 2307 (quoting Fed. R. Civ. P. 54(c)). Accordingly, although the plaintiffs there had brought an as-applied challenge as to the Texas statute's admitting-privileges requirement, because "the arguments and evidence show[ed] that [the] statutory provision [was] unconstitutional on its face," the Court upheld the district court's grant of facial relief on that claim.[42] *Id.*

---

[42] The Court further noted that the petitioners had, "in addition to asking for as-applied relief, ... asked for 'such other and further relief as the Court may deem just, proper, and equitable.' *Whole Woman's Health*, 136 S. Ct. at 2307. Here likewise, the plaintiffs requested that the court grant "such other, further, and different relief as the Court may deem just and proper." First Supplemental Compl. (doc. no. 50) at 31.

The question of as-applied and facial relief is admittedly complex with regard to the fetal-demise law. The parties disagree as to the appropriate test for when facial relief may be granted. While the court finds unconvincing the State's argument that *Gonzales* sets a new test for facial relief that replaces *Casey*'s significant-fraction test, it need not decide the issue. As discussed above, the parties' arguments and evidence clearly demonstrate that the fetal-demise law places an undue burden on women seeking a pre-viability abortion at the Huntsville and Tuscaloosa clinics. Because there is no question that the fetal-demise law is unconstitutional as applied to the plaintiffs, and because the court can provide sufficient relief with an as-applied finding at this time, the court in its discretion grants only as-applied relief on the fetal-demise law.

Finally, the court, as it did with the preliminary injunction order, does not extend the final injunction

to the private civil-enforcement provisions under the fetal-demise law.[43]

***

In summary, "a statute which, while furthering a valid state interest, has the effect of placing a substantial obstacle in the path of a woman's choice cannot be considered a permissible means of serving its legitimate ends."  *Whole Woman's Health*, 136 S. Ct. at 2309 (quoting *Casey*, 505 U.S. at 877 (plurality opinion)).  At issue here is whether Alabama can pass a school-proximity law whose effect is to shut down the Huntsville and Tuscaloosa clinics.  Similarly, the question for the fetal-demise law is whether the court can let stand a statute whose effect will unquestionably

---

43. The parties did not object when the court did so in the preliminary-injunction order.  There, the court noted *sua sponte* that the Eleventh Amendment bars relief against an allegedly unconstitutional provision if the named State officials do not have the authority to enforce it.  *Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326 (11th Cir. 1999).

be to prevent women in Alabama from obtaining an abortion
after 15 weeks.  The answer to both questions is no.

The court will, therefore, enter an order enjoining
enforcement of the school-proximity and fetal-demise
laws.

DONE, this 26th day of October, 2017.

/s/ Myron H. Thompson
UNITED STATES DISTRICT JUDGE